Jennifer Yeh

2309 Noriega St. # 90

San Francisco, CA 94122

(415) 800-3250

j02082024@gmail.com

Pro Se *Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

*Oakland*

|  |  |
|---|---|
| | ) |
| | ) Case Number: <u>24-CV-00797 KAW</u> |
| | ) |
| JENNIFER YEH | ) FIRST AMENDED COMPLAINT |
| | ) (DISCRIMINATION CASE, |
| Plaintiff(s), | ) ADMINISTRATIVE PROCEDURE ACT |
| | ) CASE, FOIA/PRIVACY ACT CASE, AND |
| vs. | ) OTHER VIOLATIONS OF LAW) |
| | ) _____ |
| ALEJANDRO MAYORKAS, in his official | ) |
| capacity as the secretary of the | ) |
| DEPARTMENT OF HOMELAND | ) DEMAND FOR JURY TRIAL |
| SECURITY, DEPARTMENT OF | ) |
| HOMELAND SECURITY, FEDERAL | ) |
| EMERGENCY MANAGEMENT AGENCY, | ) |
| DEANNE CRISWELL, in her official | ) |
| capacity as Administrator of the FEDERAL | ) |

AMENDED COMPLAINT    24-CV-00797 KAW    Page **1** of **190**

EMERGENCY MANAGEMENT AGENCY, )

ROBERT SCOTT, VIKRAM KAPOOR,      )

ERIKA JORDAN, KIRSTEN GUNSOLUS,  )

ADRIAN SEVIER, CYNTHIA MAZUR,     )

JOEL DOOLIN

Defendant(s).

_____

## I.   INTRODUCTION

1.      The current complaint is an amended version of the initial complaint that was first filed in the United States District Court for the Northern District of California on February 9, 2024.  Plaintiff considers this unsealed version of the complaint to satisfy the order by Judge Westmore on April 22, 2024, but if another version is required, Plaintiff will submit that version instead.

2.      Plaintiff Jane Doe, a disabled Asian American woman of Chinese/Taiwanese descent, a California-barred attorney, and a graduate of one of the top universities in the world was recruited from California and hired as an attorney for the Federal Emergency Management Agency (FEMA) to practice alternative dispute resolution (ADR) and management within FEMA's ADR Division within the Office of Chief Counsel (OCC).  However, within a month of starting her position at FEMA in July 2014, she began facing multiple forms of discrimination and harassment based on her protected classes.  When Plaintiff opposed discrimination, tried to preserve evidence of or document the discrimination, and engaged in other forms of protected activity, she faced retaliation and retaliatory harassment, especially after leaving witnesses of her protected activity.

3.     Over about 2 years, Plaintiff faced over 100 instances of discrimination, including but not limited to retaliation and harassment, on a nearly daily basis multiple times a day 24/7 (including after hours and while on medical leave), especially after Plaintiff started reporting up and out about the discrimination. This discrimination and retaliation increased in frequency and severity particularly after Plaintiff began to report up and out over her then first-time supervisor Robert Scott starting in March 2015, which forced Plaintiff into unpaid leave for four months and ultimately out of the division. Even during medical leave, Plaintiff was ordered to work and respond to FEMA even while Plaintiff was in a medical provider's office under the threat of termination. These instances have been divided into 31 claims.

4.     Examples of the abuse, pervasive, and offensive workplace environment Plaintiff faced sexist and racist jokes and comments (e.g., a coworker's statement that Chinese people are barbarians because they eat dogs and other coworkers retelling jokes about how a woman's place was in the kitchen), assault/physical intimidation and false imprisonment by a supervisor, battery and stalking by a coworker, orders by management to stop engaging in protected activity and using equal employment opportunity (EEO) words (e.g., discrimination, harassment), several retroactive extensions of employment and benefits, and work assignments based on discriminatory stereotypes (e.g., orders to women to bake without pay regularly, orders for women assigned to office housekeeping and secretarial duties).

5.     Plaintiff's managers had a consistent practice of censoring Plaintiff's speech and restricting Plaintiff's ability to document, report, and preserve evidence of discrimination, which they incorporated into office policy, performance goals, and retaliatory assignments. Plaintiff was forced to see a therapist and complete assignments to recant her allegations of discrimination, reveal personal medical information, and apologize to her harassers.

6.     When FEMA demoted Plaintiff to Ms. Jordan as Plaintiff's supervisor, Plaintiff moved lower on the chain of command, had work responsibilities of promotion potential removed from her, added assignments based on stereotypes, and her overall workload increased significantly, all while her harasser and former supervisor Mr. Scott still had access to Plaintiff daily and control over Plaintiff's work assignments and performance appraisals.

Ms. Jordan even started tracking and limiting Plaintiff's bathroom usage. Plaintiff's work assignment rate increased at least 56%, not including the hours of emails (270 pages sent after hours alone), unpaid office housework, EEO time, and detailed daily and monthly work plans that required Plaintiff to predict future assignments (by Ms. Jordan and other managers) and account for every minute of every work day (including bathroom usage).

7. The DHS Inspector General and a FEMA-commissioned study by the RAND corporation found that FEMA between fiscal years 2012-2018 had a systemic problem with harassment, including senior FEMA leadership, personnel lawyers within OCC, the Office of Equal Rights (OER), Office of the Chief Security Officer (OCSO), and a widespread failure to investigate in an unbiased and adequate manner, prevent, and stop harassment at the agency.

8. Not only did Plaintiff's chain of command and those who were supposed to stop harassment, such as human resources, lawyers assigned to advise those divisions, and the EEO office, fail to stop the harassment but also they began to participate in retaliation and reward discriminatory behavior. These offices also contributed to a culture of discrimination through a systemic failure of the EEO process with those named as named harassers drafting or advising on the EEO complaints against themselves or their supervisors. Furthermore, the litigation and EEO process was used to further silence Plaintiff to keep her from speaking out against discrimination. FEMA openly admitted to destroying evidence related to this discrimination case as well, even after the EEO case was initiated, an agency-wide litigation hold for harassment issues, and filed FOIA/Privacy Act requests asking for the evidence.

## II.  JURISDICTION

9. This court has subject-matter jurisdiction over this case because the United States government is a Defendant (28 USC § 1346), the claims arise under federal US law (e.g., 28 USC § 1331) and involve a challenge to the deprivation of federal constitutional rights (42 USC §§ 1981, 1983, 1985-6, and the First and Fifth Amendments of the Constitution). The court has supplemental jurisdiction over state law claims (28 USC § 1367).

10. Jurisdiction is conferred on this Court by 42 USC § 2000e-5.

11.     Equitable and other relief is sought under 42 USC § 2000e-5(g), 42 USC §§ 1981a and 1986, 29 CFR § 1614.501.  The Court may grant declaratory relief and other necessary or proper relief pursuant to 28 USC §§ 2201 and 2202, and may grant equitable relief, monetary damages, and a civil penalty pursuant to 42 USC § 12188(b)(2), 42 USC § 2000e-16b(b), 29 USC § 2617, 29 USC § 216-217.

12.     This Court has personal jurisdiction over the Defendants DHS, FEMA, Alejandro Mayorkas, and Diane Criswell because they represent the United States government with offices and employees in California and the District of Northern California.  This Court has personal jurisdiction over Vikram Kapoor because he had an active California law license during Plaintiff's employment within the FEMA ADR Division between 2014 to 2016 and has since 2020 an inactive California bar license.  This Court has personal jurisdiction over Robert Scott, Erika Jordan, and Kirsten Gunsolus because they all made active outreach to residents of California, some of whom were FEMA employees.  In addition, Mr. Scott and Ms. Jordan actively recruited Plaintiff and Mr. Kapoor from California to become FEMA employees.  There is diversity jurisdiction for the nongovernmental defendants.

### III.    VENUE

13.     The venue is appropriate for this court because the Defendant is the US government; the Plaintiff resides in this district per 28 USC § 1391(e)(1); the claims involved in this case also involve a matter of public policy specific to California and the Ninth Circuit; witnesses reside in California; the Plaintiff would have a hardship litigating the case elsewhere; and the counsel for Defendant FEMA previously represented to the Equal Employment Opportunity Commission (EEOC) that discovery was impossible.

14.     The claims involved in this case also involve a matter of public policy specific to California and the Ninth Circuit involving California attorney professional responsibility requirements not to participate in discrimination in the course of one's duties.  Plaintiff as a California attorney was retaliated against when she refused to submit to attempts by Defendant to coerce her to violate the professional responsibility rule.  Attorneys barred in California or

the Ninth Circuit and representing Defendant FEMA participated in or facilitated discrimination against Plaintiff in the course of their duties.

15.     It would be a hardship for Plaintiff to travel to litigate this case because she is requesting in forma pauperis. Since Plaintiff is a San Francisco resident, she will be able to access free research services and limited pro bono assistance through the local San Francisco law libraries but will not be able to easily access free research services and likely pro bono assistance if this case is litigated elsewhere. Plaintiff's health also makes it difficult for her to travel often to litigate the case elsewhere. Because of FEMA's hostile work environment, Plaintiff has been diagnosed with a number of medical conditions, which not only make her at high risk for becoming seriously ill but also make it more difficult for her to treat those conditions if she were needed to travel often to litigate this case.

16.     On February 2, 2022, Defendant FEMA notified Plaintiff that it had destroyed evidence in response to her FOIA request and repeated that claim in a NARA investigation. Similarly, on February 6, 2023, FEMA counsel Linda Aragon argued in a brief sent to the EEOC that "discovery is impossible" further supporting the likelihood of the destruction of evidence. The EEOC sanctioned the Defendant DHS with a default judgment for failing to investigate Plaintiff's claims, and the DHS Inspector General found that FEMA, the primary component of DHS for this case, had a practice of not properly investigating, collecting, and retaining evidence related to EEO cases. Therefore, keeping the case in this district in California should not make a difference in terms of evidence.

## IV.     INTRADISTRICT ASSIGNMENT

17.     This lawsuit should be assigned to San Francisco because the Plaintiff is a resident of San Francisco per Civil L.R. 3-2(c) and (d).

## V.     PARTIES

18.     Plaintiff Jane Doe is and was, a resident of the County of San Francisco, California throughout the applicable period. Plaintiff was a dual resident of Arlington, Virginia between 2014 and 2019. Plaintiff is licensed to practice law in California.

19.    Defendant is the Department of Homeland Security (DHS), which is a department of the United States of America. DHS has offices in California, has residents of California as employees, and serves residents of California.

20.    Defendant Alejandro Mayorkas is being sued in his capacity as representing the US government as the Secretary of the US Department of Homeland Security (DHS).

21.    Defendant, the Federal Emergency Management Agency (FEMA), is a component of DHS where Plaintiff worked. FEMA has offices in California, residents of California as employees, and serves residents of California.

22.    Defendant Deanne Criswell is being sued in her capacity as representing the US government as the Administrator of the FEMA.

23.    Defendant Robert Scott, an attorney (VA bar # 19800), is being sued in his official and individual capacity. Mr. Scott was Plaintiff's initial first-line supervisor at FEMA. He recruited and interacted with FEMA employees from California.

24.    Defendant Vikram Kapoor is being sued in his official and individual capacity. Mr. Kapoor was a co-worker of Plaintiff at FEMA and is a California attorney who had an active law license during Plaintiff's employment within the FEMA ADR Division between 2014 to 2016 and has since 2020 an inactive California bar license.

25.    Defendant Erika Jordan, an attorney, is being sued in her official and individual capacity. Ms. Jordan Plaintiff's second first-line supervisor at FEMA starting in April 2016. She recruited and interacted with FEMA employees from California.

26.    Kirsten Gunsolus is being sued in her official and individual capacity. Ms. Gunsolus was an employee of the FEMA Office of the Chief Component Human Capital Officer (OCCHCO). She interacted with FEMA employees from California.

27.    Defendant Cynthia Mazur, former Director of the FEMA Alternative Dispute Resolution Division of the FEMA OCC, is an attorney (former Maryland Bar with member # 9405250001, current DC bar member number, and current Virginia bar member # 26717) and was Plaintiff's manager and manager to Erika Jordan, and first-line supervisors to both Vikram

Kapoor and Robert Scott. Ms. Mazur is being sued in her official and individual capacity. She recruited and interacted with FEMA employees from California.

28.    Defendant Adrian Sevier (an attorney) is being sued in her official and individual capacity. Mr. Sevier was the FEMA Chief Counsel who oversaw the entire OCC, including the Alternative Dispute Resolution Division, Mission Support Legal Division (MSLD), and the Legal Counsel and Ethics Legal Division, which advised the Office of Equal Rights (the office responsible for processing Plaintiff's discrimination complaint, assigning an investigator that FEMA never did, and making decisions regarding Plaintiff's reasonable accommodation requests. MSLD included the Personnel Law Branch (PLB) attorneys who represented the agency in Plaintiff's discrimination complaints before the EEOC, the PLB attorneys who advised on and personally participated in harassing and carrying out adverse actions against Plaintiff, the legal branch (PLB) that the DHS Inspector General named in its report to have facilitated or contributed to widespread discriminatory harassment at FEMA, the attorneys who oversaw FEMA's refusal to release information related to Plaintiff's FOIA/Privacy Act requests that would provide evidence of discrimination at FEMA. He interacted with FEMA employees from California.

29.    Defendant Joel Doolin (an attorney) is being sued in her official and individual capacity. Mr. Doolin was the Deputy Chief Counsel to Adrian Sevier to whom Plaintiff reported about discrimination. Mr. Doolin followed and preceded Michael Cameron (an attorney) as Deputy Chief Counsel. He interacted with FEMA employees from California.

## VI.    BASES OF DISCRIMINATION CLAIMS

30.    Defendant discriminated against Plaintiff based on Plaintiff's

1.    Sex/gender: Female

2.    National origin: Chinese/Taiwanese

3.    Race: (East) Asian, not Caucasian

4.    Color: not white, color of East Asians

5.    Disability: actual Post-Traumatic Stress Disorder, adjustment disorder, and cancer; regarded as though not actually having multiple unspecified mental disorders associated with being a woman (being hysterical, emotional) and unspecified others

6.    Protected activities:

(i.)    participation (filing and participating in complaints to the FEMA Office of Equal Rights, Equal Employment Opportunity Commission, Inspector General, Office of Special Counsel, and National Archives and Records Administration complaint processes, and filing complaints through internal reporting channels to the Administrative Investigation Division),

(ii.)    opposition (reporting to Plaintiff's chain of command and through internal reporting channels such as human resources, refusal to carry out illegal orders, telling others to stop discriminating, complaining about discrimination against Plaintiff and others and a hostile work environment, raising concerns about illegal or discriminatory policies, practices, or procedures, participating in activities to prevent, stop, and discuss discrimination, speaking about and writing discrimination Plaintiff faced and witnesses),

(iii.)    requesting an accommodation,

(iv.)    exercise of Family and Medical Leave Act (FMLA) rights, and

(v.)    whistleblowing

VII.    **PROCEDURAL HISTORY AND EXHAUSTION OF ADMINISTRATIVE REMEDIES**

31.    Plaintiff has exhausted her administrative remedies and has a right to file in district court.

32.    On January 11, 2016, Plaintiff made first contact with Douglas Goudy of FEMA's Equal Employment Opportunity (EEO) Office, the Office of Equal Rights (OER) to report discrimination she had faced since July 2014 and inquire about the EEO process.

33.    On or around January 11, 2016, Plaintiff contacted Jill McDonnell of FEMA human resources to report her allegations of discrimination and workplace violence within the ADR Division.

34. On or about March 21, 2016, Plaintiff initiated the informal complaint process with her employer Federal Emergency Management Agency (FEMA) regarding Defendant's discriminatory conduct and requested to undergo Alternative Dispute Resolution (ADR) instead of EEO counseling.

35. On or around March 22, 2016, Plaintiff reported to building security Officer Devine her experience with harassment, including Mr. Scott assaulting/physically intimidating Plaintiff on March 22, 2016. Officer L. Devine of building security told Plaintiff she would talk to ADR (management) about Plaintiff's claim.

36. On June 22, 2016, Plaintiff filed a formal EEO complaint.

37. On June 29, 2016, Plaintiff complained to Kirsten Gunsolus of Human Resources about Erika Jordan's interference with Plaintiff's FMLA leave. Ms. Gunsolus represented that she was the point of contact for FMLA complaints, and the Department of Labor said that FMLA complaints should be filed internally.

38. Plaintiff provided updates to OER regarding the framing and addition of more claims on or around April 13-14, 21, and 25, May 12-13, and 16-19, June 3, July 13 and 19, August 10, September 5 and 8, October 11, and 13, November 14 and 21, 2016.

39. On December 8, 2016, Plaintiff sent an email to Dalita Piper of human resources (OCCHCO) to file a complaint with the FEMA Administrative Investigations Division (AID) team regarding her allegations of discrimination, torts, FMLA, and other issues alleged in this complaint. The AID team is comprised of representatives from OER (EEO), OCCHCO (human resources), Office of the Chief Security Officer (OCSO), and OCC (legal, personnel law). Plaintiff offered to provide information, but AID asked Plaintiff nothing. On April 14, 2017, Plaintiff received notice from a Privacy Act disclosure that AID closed the complaint. Although OER had been assigned to handle the matter, none of Plaintiff's EEO issues (including the assault by Robert Scott) was investigated as documents reveal.

40. Plaintiff emailed OER's Director Willisa Donald (along with Regina McPhie, Tiffany Wallace, and Erik Skinner) on December 29, 2016, with her opposition to OER's characterization of the charge (comprising of 4 claims and 17 subclaims on 4 pages) dated

December 22, 2016, which omitted many of the claims within the 100-pages of claims Plaintiff had provided OER and all of the claims made against OER's participation in the discrimination against Plaintiff. OER refused to amend the charge nor respond to Plaintiff regarding her opposition to the framing of the complaint. FEMA did not send Plaintiff's case to another office or component due to the conflicts of interest with FEMA OER processing the complaint where individuals accused of discrimination or advising those accused of discrimination would be drafting or supervising those drafting the complaint against themselves.

41.    Plaintiff requested a hearing with the EEOC per 29 CFR § 1614.106(e)(2) on April 8, 2017, after FEMA had not assigned an investigator, started investigating the Plaintiff's complaint, nor completed any investigation within 290 days from the date she filed a formal complaint. Plaintiff's request included detailed allegations including a timeline (including amendments) and an example of how Plaintiff's claims met the prima facie elements for different types of discrimination (e.g., harassment, disparate treatment). At the time of requesting a hearing, Plaintiff had not received a final version of the charge from FEMA's OER although Plaintiff had sent several updates to OER regarding additional claims.

42.    On May 20, 2017, EEOC Supervisory Administrative Judge Gladys Collazo ordered Defendant FEMA/DHS (with notice of potential sanctions) to produce the complaint file, report of investigation, and charge, or submit in writing a show of good cause why Defendant will not do so, within 15 days of the order date. Defendant FEMA/DHS did not reply nor show cause for its delay. According to the EEOC Decision on Liability and Relief for EEOC case # 570-2017-00832X dated September 30, 2022, Defendant FEMA/DHS did not even download the Order to Produce until July 24, 2017.

43.    Plaintiff made a report to building security twice (once soon after March 22, 2016, and again on July 22, 2016), FEMA security (OCSO/FIID), and DHS Federal Protective Services (FPS). Plaintiff reported the incident to the FPS on July 20, 2018, and the FEMA building security around March 22, 2018, and again on July 20, 2018. In 2018, building security Captain Matthews urged Plaintiff to make a report to FPS. In 2018, FPS urged Plaintiff to continue to make reports to keep a record but declined to investigate by stating that FEMA's

OCSO Fraud and Internal Investigations Division (FIID) would be able to address the matter. FPS made Plaintiff aware that he had been told by his superiors that he could not intervene unless a perpetrator directly battered (through bodily contact) a victim. Physical intimidation (assault to frighten) was not enough as in the case of Mr. Scott. FPS notified Plaintiff that emergency panic buttons could take two hours to work in the building. FIID declined to investigate because Plaintiff had filed an EEOC complaint. In retaliation, Mr. Arnone of FIID instead started to investigate Plaintiff for making a delayed report, and he wrongfully accused an uninvolved Black woman from an office outside of the ADR Division and OCC of issues Plaintiff raised about OCC. OCSO refused to investigate any allegations that Plaintiff had alleged in an EEO complaint (including the incident on March 22, 2016), refused to act against Mr. Scott, and instead tried to investigate Plaintiff for her allegations.

44.    On July 26, 2017, EEOC Administrative Judge (AJ) Maricia Woodham (EEOC case # 570-2017-00832X) issued a default judgment pursuant to 29 CFR § 1614.109(f)(3)(iv); EEO MD-110, Chap. 6(XII)(4) and Chap. 7(III)(D)(10)(d) for Defendant FEMA/DHS's failure to comply with the EEOC's order dated May 20, 2017. Defendant FEMA/DHS did not respond to the EEOC's order and did not assign an investigator nor submit any report of investigation (ROI) had an investigator completed an investigation. On July 26, 2017, the AJ ruled in her Order Entering Default Judgment that "the Agency's failure to respond to the Commission's May 18, 2017, Order to Produce effectively stalled the proceedings and rendered it impossible to commence the hearings process."

45.    As ordered by AJ Woodham, Plaintiff submitted her statement of relief for EEOC case no. 570-2017-00832X on August 23, 2017. On September 28, 2017, FEMA counsel Melissa Williams submitted FEMA's Response to Plaintiff's statement of relief. FEMA's submission included not only a response to the Plaintiff's request for relief but also evidence regarding the merits, four affidavits in support of the Defendant, and the Defendant's version of the charge.

46.    On July 25, 2018 (with an update on August 8, 2018), Plaintiff filed a complaint involving her AID and EEO allegations to the DHS IG.

47.    On August 21, 2018, DHS IG declined to investigate Plaintiff's claim for whistleblower retaliation (IG complaint #C1837173) and said Plaintiff could file a complaint with the Office of Special Counsel instead.

48.    On October 29, 2019, EEOC AJ Woodham for EEOC case # 570-2017-00832X ordered a hearing on the merits despite no material change in circumstances from the EEOC's July 2017 Order Entering Default Judgment that stated that it would be "impossible to commence the hearing process" without FEMA's production of a Report of Investigation and the rest of the complete complaint file as ordered in May 2017.  As of October 29, 2019, and continuing to date, FEMA still has not produced any Report of Investigation, nor did it produce the complete complaint file on the date of the order for a hearing.  The order allowed Defendant to present evidence although Defendant had been sanctioned with a default judgment because it had not timely collected or presented any evidence to defend itself.  AJ Woodham did not allow Plaintiff to have any additional witnesses to support her position while AJ Woodham allowed Defendant to have three witnesses (Cynthia Mazur, Robert Scott, and Erika Jordan).

49.    On November 8, 2019, Plaintiff filed a motion to update the EEOC Portal, seek clarification of the Commission's order to a targeted hearing, and request permission to submit a motion to amend.

50.    On January 14-16, 2020, AJ Woodham held a hearing on the merits at the EEOC Washington, DC office.  The sanctioned party (the Defendant) was allowed to present evidence. Contrary to the requirement outlined in 29 CFR § 1614.109(d), AJ Woodham never permitted discovery to be opened nor ordered any investigation before the hearing began.

51.    On October 8, 2020, Plaintiff sent FEMA counsel Melissa Williams and her manager (co-counsel) Ashley Darbo a list of 12 points of fabricated and other evidence by its own witnesses to allow counsel to correct FEMA's false and fabricated testimony and other evidence.  Ms. Darbo refused to correct the knowingly false and fabricated testimony, and Ms. Williams did not answer.

52.    On October 10, 2020, Plaintiff submitted a request to submit a motion for sanctions and estoppel for at least 10 instances of when Defendant DHS/FEMA submitted false

information. This request for a motion included evidence that Defendant DHS/FEMA's counsel of record Melissa Williams and Ashley Darbo failed to correct testimony and submission to the Commission it knew were false, as well as the direct false testimony. AJ Woodham did not respond to Plaintiff's October 2020 request nor answer Plaintiff's follow-up the following year on September 5, 2021.

53. Commissioned in 2019, the RAND Corporation in 2020 found widespread evidence of discriminatory harassment and retaliation at FEMA based on race and gender and stated that FEMA internal investigations found "sexual harassment, misconduct, and workplace misbehavior" by senior agency leadership. RAND Corporation study found that approximately one-third of FEMA employees reported having faced discrimination based on their sex and/or race.

54. In a report dated September 29, 2021, the DHS Inspector General (IG) found that FEMA had a widespread problem with discriminatory harassment, retaliation, an ineffective complaints system to adequately prevent and stop harassment, and biased investigators who led incomplete and insufficient investigations between fiscal years 2012 to 2018. The IG found FEMA's failure to keep necessary EEO-related records. The IG found that FEMA OCC personnel lawyers, the Office of the Chief Security Officer (OCSO), OCCHCO (which is the FEMA human resources office), and OER (which is FEMA EEO office), contributed to such widespread harassment. The same offices named in the DHS IG report also were involved in Plaintiff's discrimination complaints.

55. On December 1, 2021, Plaintiff submitted a complaint to the DHS IG with reference #HLCN1638407039593. This complaint involved allegations about FEMA's knowing misrepresentation to the EEOC and on EEO statistics, destruction of evidence related to EEO cases, USCO misconduct, censorship of speech for those engaging in protected activity, FEMA refusal to correct harassment, a lack of a system to correct harassment, and OER's mishandling of discrimination and harassment reports.

56. On February 2, 2022, FEMA's FOIA office notified the Plaintiff of FEMA's destruction of evidence in response to the Privacy Act/FOIA request on June 8, 2020. In the

2020 FOIA request, Plaintiff requested video footage related to her EEOC cases from March 22, 2016, and July 20, 2018.

57.     On February 3, 2022, Plaintiff filed a claim with the US National Archives and Records Administration (NARA) for FEMA's destruction of video footage, which was video evidence for discrimination complaints, after the Plaintiff requested said footage. NARA closed the case (UD-2022-0023) on October 27, 2023, citing that FEMA represented that Plaintiff had not filed an EEO case within 45 days of the footage, so the agency destroyed the footage on both days. The dates of video footage that Plaintiff requested were March 22, 2016 (one day after Plaintiff initiated the informal process of her first EEO complaint for this current case), and July 20, 2018 (40 days before Plaintiff initiated the second EEO complaint and 32 days before the FEMA Chief of Staff Eric Heighberger sent out a litigation hold to all employees to preserve all evidence related to harassment).

58.     On March 14, 2022, Plaintiff filed a complaint with the DHS IG with reference #HLCN1647289451773.

59.     On March 22, 2022, FEMA's Office of Professional Responsibility (OPR) declined to investigate Plaintiff's claims (especially regarding Mr. Scott's assault of Plaintiff) to the DHS IG after the IG referred the matter (#C2213839) to OPR. OPR declined to investigate because it claimed that the EEO process *could* handle the matter. In addition, OPR claimed that it would not investigate because Mr. Scott was no longer an employee.

60.     On April 28, 2022, AJ Danielle Hoyt ordered FEMA to reinstate Plaintiff for related and subsequent EEOC case no. 270-2019-01375X, which was the EEOC case against FEMA subsequent to the current case. To date, FEMA has not reinstated Plaintiff.

61.     Plaintiff filed a claim with the Office of Special Counsel (OSC) on March 26, 2022. On August 31, 2022, OSC closed the case because OSC declined to investigate a claim where the claim had been filed with the EEOC even if some of the claims before the OSC were not EEOC claims.

62.     On September 30, 2022, Supervisor Administrative Judge Maricia Woodham issued a decision on liability and relief for EEOC case # 570-2017-00832X, claiming that an

employer does not discriminate against an employee by hiring a man and a woman for the same position description as an ADR attorney advisor if the employer intended to classify one of the positions (the one that the woman did) to do administrative or secretarial work (a gender-stereotype for women) while one on the positions (the one the filled by a man) be doing ADR practice work). AJ Woodham made adverse inferences against Plaintiff (the non-sanctioned party), allowed the sanctioned party to present evidence, and made inferences favorable to Defendant all caused by the misconduct of the sanctioned party (Defendant). The Plaintiff was not asked, allowed to present, nor allowed to obtain through discovery the evidence that the AJ claimed was missing.

63. On November 8, 2022, Defendant DHS issued a final agency decision (FAD), which adopted AJ Woodham's decision for EEOC case # 570-2017-00832X.

64. On December 7, 2022, Plaintiff submitted a formal complaint form to appeal the FAD for EEOC case # 570-2017-00832X before the EEOC.

65. On February 6, 2023, FEMA counsel Linda Aragon notified the EEOC in a brief that "discovery is impossible" for the administrative discrimination case that underlies the current complaint, which would only be the case if FEMA destroyed evidence as with the video footage in the FOIA request Plaintiff made in 2020.

66. On May 4, 2023, the EEOC issued a decision on the Plaintiff's appeal (Appeal No. 2023001109, EEOC case # 570-2017-00832X).

67. On November 13, 2023, EEOC issued a decision for request for reconsideration upholding its appeal decision (Appeal No. 2023001109, EEOC case # # 570-2017-00832X) and gave Plaintiff a right to sue within 90 days of the receipt of said notice. *See* Exhibit 1.

68. Plaintiff filed a claim with workers' compensation on August 11, 2016, which was denied on September 23, 2016, after the Post Office lost/did not deliver Plaintiff's mail with the notification to provide additional information.

69. No statute of limitations is listed for federal employees under Title II of the Family and Medical Leave Act (FMLA) nor its implementing regulations for federal employees under 5 CFR Part 630.

70. FMLA suits are permissible not only against an employee's employer but also against employees at the employer organization in their individual capacity.

## VIII.   FACTS

71. Plaintiff was interviewed by Robert Scott and Erika Jordan (Mr. Scott's subordinate) and later hired as an Alternative Dispute Resolution (ADR) Attorney Advisor within the ADR Division of the Office of Chief Counsel of the Federal Emergency Management Agency (FEMA) of the Department of Homeland Security (DHS) to practice ADR and engage in management activities at a pay rate of GS-13, Step 1.

72. During the interview process, Robert Scott and Erika Jordan of the ADR Division represented to Plaintiff that her primary job would involve ADR practice and management responsibilities.

73. Plaintiff started working at FEMA at the ADR Division on July 14, 2014 (during the pay period on July 13, 2014) as an Attorney Advisor (job classification 0905) at a GS-13, Step 1 level.

74. Before Plaintiff started at FEMA, Plaintiff graduated from a top university with two Bachelor of Science degrees and a minor. Plaintiff worked in peace, prevention of terrorism and extremist violence, civil rights, and anti-discrimination efforts.

75. When Plaintiff started work at FEMA, her initial first-line supervisor was Robert Scott (ADR Division Deputy Director and licensed to practice law in Virginia), and her second-line supervisor was Cynthia Mazur (ADR Division Director and licensed to practice law in New York, Maryland, District of Columbia, and Virginia). Cynthia Mazur reported to the Deputy Chief Counsel (who was initially Michael Cameron and then became Joel Doolin) who in turn reported to the Chief Counsel Adrian Sevier. The Deputy Chief Counsel and Chief Counsel had dual reporting structures to the FEMA Administrator and a political appointee within the DHS Office of General Counsel. Erika Jordan was Mr. Scott's right hand who managed the ADR Division cadre with Mr. Scott. None of Plaintiff's supervisors and/or managers were investigators per DHS/FEMA policy.

76. While working at FEMA, Plaintiff's regular work hours were from 8:30 AM to 5 PM, Monday through Friday with approved regular telework locations at her residences in Arlington, Virginia and San Francisco, California.

77. The 0905 Attorney Advisor position at FEMA is a non-competitive, excepted service position paid out of the disaster relief fund.

78. The Vacancy Announcement for the position that Plaintiff applied for at FEMA in 2013 stated that the thirteen "Major Duties" of the position included working with the ADR Division Director on issues related to the Administrative Dispute Resolution Act of 1996, programs, and solutions; assuming management responsibilities; conducting workplace coaching; conducting mediations, facilitating discussions, providing teambuilding, conducting climate assessments, and other forms of ADR practice. Similarly, the official position description for the position included ten major duties that included ADR practice. Plaintiff's official position description did not include providing legal advice as a major duty.

79. Neither the official job description nor the job vacancy announcement for Plaintiff's position included working on the FEMA Qualification System (FQS) and secretarial duties, nor did they specifically mention drafting and maintaining manuals, as major duties.

80. However, the major duties of the Cadre Coordinator Position (GS-14), which FEMA refused to reassign Plaintiff to, included dealing with FQS for cadre members (i.e., deployable field employees within the OCC cadre), technical oversight of cadre members, and provision of legal advice for FEMA's Statutory Authorities and disaster-related topics.

81. Plaintiff performed her job satisfactorily throughout her employment within the FEMA ADR Division and received satisfactory performance reviews from 2014-2015 until she received a negative performance review in January 2016. When Plaintiff was given satisfactory performance reviews, FEMA awarded her a bonus in mid-2015.

82. Plaintiff and Vikram Kapoor (California bar # 289340) started at the FEMA ADR Division on the same date with the same title at the same GS-13 pay grade, and they were initially seated together in a shared cubicle.

83. FEMA supervisory personnel lawyer Leigh Hoburg is licensed to practice law in California (California bar # 101796). FEMA personnel lawyer Linda Aragon (Hawaii bar # 008069) is licensed to practice law in Hawaii, a state in the 9th Circuit. FEMA personnel lawyers Ashley Darbo and Melissa Williams are licensed to practice law in Washington, DC. Supervisory lawyers Joshua Stanton (licensed in DC) and Daniel Hall (likely licensed in Maryland) are also licensed to practice law.

84. Plaintiff's managers FEMA Chief Counsel Adrian Sevier (Massachusetts Bar # 630352) and FEMA Deputy Chief Counsels Joel Doolin (Virginia Bar # 36215) and Michael Cameron (North Carolina bar # 9729) are licensed to practice law.

85. Plaintiff worked in the ADR Division from July 13, 2014, until October 15, 2016.

86. Plaintiff was a qualified individual who, with or without reasonable accommodation, could perform the essential functions of the position.

87. Plaintiff has been diagnosed with the following disabilities related to this case: adjustment disorder, PTSD, and cancer. The adjustment disorder and PTSD were caused by the abusive work environment at FEMA. Dr. Harvey Oaklander, a clinical psychologist, diagnosed Plaintiff with adjustment disorder and PTSD, which were caused by the abusive work environment at FEMA, and affected several major life activities. Since 1974, Dr. Oaklander has been a licensed clinical psychologist for 50 years.

88. The major life activities affected by Plaintiff's impairments leading to mental health diagnoses included but were not limited to sleeping, eating, talking, concentrating, and other bodily functions.

89. FEMA counsel and Plaintiff's supervisors made contradictory statements at various times (either under oath or submitted to a tribunal) as to when they found out Plaintiff had a disability from never knowing Plaintiff had a disability while under their supervision to knowing on the first day Plaintiff that started working at FEMA in July 2014. In a declaration under penalty of perjury dated September 27, 2017, and submitted to the EEOC by FEMA counsel Melissa Williams, Mr. Scott swore, "During my supervision on Complainant, she did not reveal to me that she had a medical condition." On January 16, 2020, at the EEOC hearing

associated with the current complaint (EEOC No. 570-2017-00832X), Mr. Scott testified under oath that he believed Plaintiff had a disability in January 2016. However, after Plaintiff reported to FEMA OCSO, FEMA building security, and Federal Protective Services in July 2018 about the harassment she alleges in the current case, Mr. Scott wrote in a sworn statement to OCSO that Plaintiff "has had a number of mental health issues" that Mr. Scott knew about on since Plaintiff's first day at work in July 2014. In a sworn declaration under penalty of perjury dated September 28, 2017, and submitted to the EEOC by FEMA counsel Melissa Williams, Erika Jordan claimed, "At no time, prior to May 20, 2016, did Complainant disclose to me that she had a medical condition." On September 28, 2017, FEMA counsel Melissa Williams for the associated EEOC complaint for the current complaint represented to the EEOC in the Agency Response to Complainant's Requested Relief, "At no time prior to May 20, 2016, did Complainant disclose to Mr. Scott or any other supervisor that she had a medical condition. See Counselor's Report at 30/58; Scott Aff. ¶ 23; Jordan Aff. ¶ 11."

90.    As part of Plaintiff's FMLA requests in 2016, FEMA claimed that Plaintiff's essential job functions were to be able to work in an office setting with the ability to telework at home and conduct work by phone or a computer.

91.    As part of Plaintiff's reasonable accommodation request in 2016, FEMA claimed that the essential functions of Plaintiff's position were the major duties listed in a job description Erika Jordan attached to her request for Plaintiff's medical provider to certify Plaintiff's need for an accommodation. These major duties described in this job description included but were not limited to being an ADR process expert, teaching conflict management, selecting cases for ADR processes, and assisting with ADR program management. The major duties described in the position vacancy announcement consisted of 13 duties, including but not limited to assessing dispute resolution needs, assuming leadership responsibilities, resolving conflict, facilitating discussions, and delivering training. FEMA claimed all major duties were essential, but when Plaintiff worked in the ADR Division, Plaintiff's ADR management claimed that these major duties were not her main duties and admonished Plaintiff for engaging in such duties, such as

ADR practice. They instead claimed that Plaintiff's major duties were technical administrative or secretarial work.

92. Plaintiff satisfied the skills, experience, education, and other job-related requirements of the position because Plaintiff's application was vetted before her hiring to ensure she met those job-related requirements. Plaintiff's management Robert Scott and Cynthia Mazur performed satisfactorily after she started reporting her allegations of discrimination up the chain of command and opposing discrimination in 2015. External clients outside of the ADR Division also commented on Plaintiff's skill in the performance of ADR services, which showed more effective results than other ADR attorney providers who were placed in the same position.

93. On or about August 24, 2014, Mr. Kapoor asked Plaintiff to present together a one-hour presentation on August 28, 2014, where they initially agreed to divide the presentation time 50-50. However, later, Mr. Kapoor tried to take over 100% of the presentation time and said he would not have asked Plaintiff to work with him on the project beforehand had he known Plaintiff was not going to be his assistant for the project. Plaintiff originally thought they would be working as equals in the project until Mr. Kapoor said and indicated otherwise.

94. Approximately August-September 2014, Mr. Kapoor started yelling at Plaintiff (unprovoked) in the hallway in response to her question if he wanted to or had time to discuss or work on a project (e.g., the presentation).

95. In September 2014, Plaintiff, Mr. Kapoor, and Loretta Vardy (project lead) worked on a joint facilitation project for an office retreat for another DHS component September 23-24, 2014. During this project, Mr. Kapoor made it known several times that it was Plaintiff's job, not his, to do administrative work for the project while he believed Plaintiff should not do substantive ADR work. Immediately before one such statement, Mr. Kapoor bragged that he had a female secretary in his previous workplace and that she did his administrative work there. At one time during this project before the first day of the facilitation, Mr. Kapoor yelled at Plaintiff after she had called him out on again the unequal distribution of gender-stereotyped work when he tried to complete the ADR practice work himself although project lead Ms. Vardy had assigned both of them the work.

AMENDED COMPLAINT    24-CV-00797 KAW    Page **21** of **190**

96.    On Friday, September 18, 2014, Vikram Kapoor said it was Plaintiff's job to make the copies and gather supplies for the facilitation. He was unhappy Plaintiff had the nerve to ask him a question to help the team by completing administrative work for the facilitation.

97.    On September 22, 2014, Mr. Kapoor reacted negatively, gave Plaintiff a sour look, kept asking in a negative tone what Plaintiff was doing and looking over, and scrutinized her work assignments when she asked Mr. Kapoor to share in doing the administrative work (tent cards) as she had done. At the time, Plaintiff was doing other work for the same facilitation, which had an immediate deadline, and had asked Mr. Kapoor to share his portion of the administrative work as Plaintiff had done a good deal of the administrative work.

98.    On September 24, 2014, Plaintiff debriefed Loretta Vardy, the head of the facilitation project, about the project and Mr. Kapoor's behavior during it. Ms. Vardy told Plaintiff that she notified Ms. Mazur and Mr. Scott of Ms. Vardy's offer and actual facilitation of a conversation between Mr. Kapoor and Plaintiff. Ms. Vardy tried to convince Plaintiff that the problem with Plaintiff's gender discrimination claims against Mr. Kapoor was that Plaintiff needed to look at the situation in a different way because she and Mr. Kapoor were both Asian (though of different national origins) and that Taiwan and China were an analogous situation.

99.    Within a month or two of Mr. Kapoor's presentation comments, Mr. Kapoor's behavior escalated to tripping Plaintiff in their small, crowded, and shared cubicle filled with glass and sharp-edged furniture soon after Plaintiff raised the issue of equally sharing responsibilities to complete administrative tasks to which he responded by calling her nasty.

100.    In connection to the December 2014 ADR Division retreat (which Mr. Scott and/or Cynthia Mazur assigned on or around October 10, 2014), Mr. Kapoor and Plaintiff Mr. Kapoor called Plaintiff "nasty" implying that she was a nasty woman. Mr. Kapoor characterized the following question Plaintiff wrote by email as assigning Mr. Kapoor work, "I hope all is well. How do you wish to deal with surveying the rest of the people not surveyed yet for the retreat?" Mr. Kapoor again reacted negatively toward the perception of a violation of gender norms, especially when he thought he was performing administrative work or being in a position of less authority than a woman. She acknowledged his opposition to doing administrative work,

clarified that she did not "assign" anything, and explained that she had asked whether he could do an equal number of surveys as well, as it was a team effort. On a site visit to George Mason University to scout locations for the 2014 ADR Division Retreat, Vikram Kapoor said something along the lines of minorities should just try harder and that he did not see the point of diversity while he was talking about Asian inclusion efforts.

101.    On October 17, 2014, Mr. Kapoor asked Plaintiff to be his plus one at an event, which she declined.

102.    Mr. Kapoor asked Plaintiff at least seven times to go to her home. On December 11, 2014, Mr. Kapoor asked Plaintiff multiple times to send her home. Plaintiff continuously declined yet he continued to ask her. He on other occasions (e.g., December 12, 2014) offered to pick Plaintiff up the day of the retreat and that he could come into her apartment, but Plaintiff declined multiple times. His offers were not that of a merely friendly coworker. Previously, Mr. Kapoor told Plaintiff that he was profiling her. He asked her many inappropriately intrusive and personal questions about where she lived and other personal details to build an actual profile of Plaintiff. He had also rhetorically commented that she was not a shark.

103.    On December 17, 2014, Plaintiff told Mr. Kapoor that she felt uncomfortable that he was using patronizing (gender-stereotyped) language like "baby" to refer to Plaintiff's work.

104.    On February 4, 2015, Mr. Kapoor won an Office of General Counsel "OGC Excellence" Award. People typically may not receive awards if they have had misconduct issues, such as proposed disciplinary or adverse actions, presumably including EEO issues.

105. Sometime before Ms. Watkins left with Mr. Kapoor to deploy to a detail in 2015, Ms. Watkins told Plaintiff that Chinese people are barbarians because they eat dogs. After Plaintiff had a long chat with Ms. Watkins about how Ms. Watkin's slur and stereotype of Chinese people could be considered offensive and how the statement was a stereotype, Plaintiff thought Ms. Watkins had learned why the sentence should not be repeated and could offend others. However, afterward, Ms. Watkins behaved negatively around Plaintiff.

106. On or around March 13, 2015, Mr. Kapoor (while he was on detail to a regional office or disaster zone) tried to sabotage the evaluation of Plaintiff's coaching performance by

inserting himself as her client despite her already having a client for the evaluation. At this event, Plaintiff's coaching performance would be evaluated by Ms. Mazur and viewed by others in the ADR Division. Without asking her in a show of machismo, Mr. Kapoor switched himself to be Plaintiff's client for the evaluation of her coaching skills without first asking Plaintiff for her permission. He knew the match could interfere with Plaintiff's performance because International Coaching Federation (ICF) ethics, which the coaching group adhered to, prohibited the match due to the effect of Mr. Kapoor's discrimination against Plaintiff would interfere with her ability to coach. Therefore, as another coworker had, Plaintiff could be required to leave the coaching group based on this coaching demonstration.

107.    On or around March 13, 2015, Plaintiff notified Mr. Scott that she would be unable to coach Mr. Kapoor and another co-worker Inga Watkins for their discriminatory attitude toward Plaintiff as it violated coaching ethics to coach someone who acts in a discriminatory manner against the coach. Mr. Scott said that Plaintiff should pretend that those individuals did not believe that Plaintiff was an inferior race/gender.

108.    In an email dated April 23, 2015, Mr. Scott called Plaintiff "argumentative" after she clarified by email that she was not questioning whether Mr. Scott could determine who would be capable in the field but rather concerned about her legal/ethical duties in assembling documentation that qualifications for deployment that Mr. Scott and/or Ms. Jordan ordered to be falsified.

109.    On Wednesday, July 1, 2015, Plaintiff told Robert Scott about when Mr. Kapoor tried to trip Plaintiff. Mr. Scott acknowledged to Plaintiff Mr. Kapoor's intent to harm Plaintiff in tripping her after she told Mr. Kapoor her opposition to his discriminatory actions and characterized Mr. Kapoor's action as "bullying."

110.    On or around Wednesday, July 29, 2015, in front of the ADR division facilitation designed to resolve disagreements amongst ADR Division staff members at headquarters, offsite host Ms. Carole Powell stated she too faced gender issues with offsite co-host Mr. Lester Schoene, indicating known/widespread gender problems within the division. Everyone was asked to speak separately to either Mr. Schoene or Mr. Powell about disagreements in the office.

However, later, Mr. Scott told Plaintiff that she should not have spoken to Ms. Powell and Mr. Schoene about Mr. Kapoor (i.e., raise allegations of discrimination). Mr. Scott also said Plaintiff should not have raised the issue of discrimination by Mr. Kapoor to Ms. Vardy, the project team lead of a project involving Mr. Kapoor, Ms. Vardy, and Plaintiff.

111. On or around September 9, 2015, Plaintiff reported to supervisor Mr. Scott several instances of discriminatory behaviors and comments by Mr. Kapoor: tripping Plaintiff, believing that it was appropriate for male supervisors to call female subordinates "babe," asking Plaintiff to be Mr. Kapoor's plus one, and raising his voice. Plaintiff discussed with Mr. Scott again that Plaintiff did not think that Mr. Kapoor should be rewarded for bad behavior. Mr. Scott refused to stop the behavior and told Plaintiff not to let Mr. Kapoor's behavior bother her.

112. Around Tuesday, October 13, 2015, Plaintiff submitted a comment in a review of a FEMA manual involving medical and disability issues. Mr. Scott asked Plaintiff for citations to support her position.

113. On October 14, 2015, Plaintiff sent Mr. Scott pin cites and examples to support her opinion, which was contrary to Mr. Scott's opinion. Plaintiff refused to use her services to help Mr. Scott discriminate against others by writing a legal opinion that made false statements.

114. On October 30, 2015, During Plaintiff's third-quarter performance evaluation, Robert Scott told Plaintiff not to forward any inflammatory emails from coworker Vikram Kapoor because he did not want a record. Mr. Scott told Plaintiff not to talk to other people if Mr. Kapoor said something wrong or bad about her or spread false information or misinformation about her. Mr. Scott said he would not act against Mr. Kapoor (a man) if there could be *any* alternate interpretation for the behavior.

115. On November 5, 2015, in a meeting discussing Plaintiff's comment about the FEMA manual where she raised a grammar issue with legal implications, Plaintiff opposed Mr. Scott's attempt to make Plaintiff write down a statement or opinion that would be discriminatory and false. In response, Mr. Scott asked Plaintiff to write the following notes, including "Don't argue with your supervisor." Mr. Scott added that if Plaintiff wanted to do research to draft an

opinion/memorandum contrary to his, Plaintiff the research would need to be on her own time (unpaid time).

116. In an email dated November 18, 2015, Plaintiff shared Mr. Scott's comments about the ADR isms group, a group that discussed how to eliminate racism and other isms in ADR practice, with the group that he said there was "too much meeting for too little result" and that he did not see purpose in the group. A member of the group forwarded the email and Mr. Scott in turn admonished Plaintiff for sharing his comments to the group and threatened Plaintiff that they were going to discuss her "role" in the office. While what he said about the group might have been true, he claimed that Plaintiff should have only told what was "necessary" and "acceptable to the listener." He told Plaintiff that the work was not valuable and that she should not tell the rest of the members of the group that he said the group's work was not valuable.

117. On December 4, 2015, Mr. Scott sent Plaintiff an email admitting that OCC standards for awards should align with the Administrators' awards in which those who raised had EEO issues against them would not be eligible to receive an award.

118. On or around December 10 or 14, 2015, in a meeting of the committee responsible for drafting the 2016 performance goals, Plaintiff expressed her concern about the potentially discriminatory proposal Mr. Scott was making regarding the performance goals; she did so by posing a question about what would happen if she told Mr. Kapoor to stop harassing her. Mr. Scott told Plaintiff that discussing topics, such as discrimination, workplace violence, and hate crimes, or making discrimination allegations against Mr. Kapoor would result in adverse performance appraisals per Mr. Scott's interpretation of the 2016 performance goals. Mr. Scott expressed his intention after he muted co-worker Rea Wynder (a fellow committee member) and closed the door so that Lester Schoene and Ms. Wynder could not witness what he said. Mr. Scott again said Plaintiff's issues with Mr. Kapoor were minor. Mr. Scott then tried to make Plaintiff memorize every word he said and recite it back to him verbatim.

119. On December 11, 2015, after the ADR division retreat back at 400 Virginia Avenue, the Plaintiff directly reported to FEMA ADR Division Director Cynthia Mazur (Plaintiff's second-line supervisor) that co-worker Vikram Kapoor (Ms. Mazur's direct report)

that Mr. Kapoor was harassing the Plaintiff multiple times, including Plaintiff's fear of Mr. Kapoor would try to come to Plaintiff's apartment, gender-based comments, and the workplace violence issues. Plaintiff also reported that Mr. Scott had not done anything about her reports to Mr. Scott of Mr. Kapoor's behavior. Ms. Mazur said she would watch Mr. Kapoor.

120. On Friday, January 8, 2016, around 8:30 AM, the first day that Plaintiff returned to the office after Christmas leave, Plaintiff discovered on her desk Vikram Kapoor's present to her of jewelry (diamond or diamond-like earrings).

121. On January 8, 2016, between 1-3 PM, the ADR Division met to discuss the new seating arrangements after the move to the new office to an open office arrangement. ADR management determined that Ms. Mazur, Mr. Scott, and Linda Davis (Director of Professional Development) would have fixed, assigned seats but that the rest of the division would decide the seating arrangement for the remainder of the seats, which could be assigned seats, flexible seating that would change every day (hoteling), or a hybrid option between the two, as well as decide how the seating arrangement would be determined (e.g., by seniority, lottery). Plaintiff's managers Ms. Mazur and Mr. Scott did not determine and tell the rest of the division that Mr. Kapoor would need to sit away from Plaintiff in any of the proposed seating arrangements. All of the proposed options (fixed seating, hoteling, and hybrid) left the possibility that Plaintiff's harasser Mr. Kapoor would sit next to Plaintiff. At the meeting, Plaintiff was asked if/what her concerns were about the new open space. Plaintiff said that she had safety concerns/workplace violence concerns. When Plaintiff was asked to explain, Plaintiff said that she was barred from speaking and her speech was being censored. Plaintiff used the words safety without mentioning Mr. Kapoor's name to answer the questions posed to her and communicate her rationale for her seating arrangement vote because Mr. Scott had barred Plaintiff in December 2015 from using HR-related words (such as discrimination), prohibited Plaintiff from making allegations against Mr. Kapoor for discrimination in front of others, and threatened to lower Plaintiff's performance appraisal if she did so. Plaintiff said she could live with the hybrid seating system for the most part, but it depended on safety considerations. Plaintiff said she could not agree to vote for a seating arrangement that would subject her to workplace violence. Mr. Scott said that there was

AMENDED COMPLAINT        24-CV-00797 KAW        Page **27** of **190**

no option of it depends. She asked to speak offline to managers Mr. Scott and Ms. Mazur, but Mr. Scott declined and refused to delay the vote after a discussion about separating Mr. Kapoor from Plaintiff. Plaintiff suggested a temporary hybrid seating arrangement that could be revised later. Upon prompting by another member of the decision, Plaintiff said she wanted Mr. Scott and Ms. Mazur to decide the seating arrangements. No one in the division (including management) gave Plaintiff a guarantee that there would be no more continued violations against her in the future.

122. After the ADR Division meeting on January 8, 2016, Plaintiff met with her manager Cynthia Mazur. Ms. Mazur said that Plaintiff showed discretion in the meeting since Plaintiff did not mention any names when expressing her concerns about her safety.

123. On January 8, 2016, at 4:31 PM, Mr. Scott prohibited Plaintiff from the move decision-making process, excluded her from all meetings, ordered her to go to therapy, and gave a retaliatory emotional intelligence assignment to work full time until its completion to his satisfaction. This emotional intelligence assignment included drafting an apology to the ADR Division (including her harassers) for her so-called derailment of the meeting earlier in the day in which she refused to agree to sit next to her harasser, writing 4 pages on her emotional intelligence, and writing 1 page of questioning her assumptions and identifying her "thinking errors" about her "current work situations and the staff working there." Mr. Scott said that the seating arrangement (and thus Plaintiff's vote regarding seating arrangement in the new office) "did not depend on anything in the past, present, or future," which would include having to sit next to an individual Plaintiff made harassment allegations against (Mr. Kapoor). Robert Scott sent her an email saying that she did not have emotional intelligence and that emotional intelligence was part of her job description because she mentioned safety and workplace violence concerns in determining a seating arrangement, which she was concerned about because of Mr. Kapoor's discriminatory behavior made her fear for her safety.

124. On January 8, 2016, at 5:32 PM, Plaintiff forwarded Mr. Scott's emotional intelligence assignment to her manager Ms. Mazur, which put Ms. Mazur on notice of Mr.

Scott's retaliatory assignment. Ms. Mazur knew that Plaintiff had been referring to feeling discriminated against in mentioning concerns about her safety.

125.    On January 11, 2016, Mr. Scott emailed Plaintiff at 8:55 AM confirming that he told her "not to speak with others in the office" about her allegations regarding discrimination and not to use words related to discrimination. At 10:57 AM, Plaintiff asked Mr. Scott to clarify his position. She documented the admonishment Mr. Scott gave Plaintiff on December 14, 2015, about her protected activity over Mr. Scott's censorship of speech. Plaintiff also documented what happened at the January 8, 2016, ADR meeting discussing the office move and how she expressed her concerns around safety yet stayed within Mr. Scott's censorship guidelines by not mentioning names or using words like "discrimination" and how she was being treated differently because others' speech was not being censored. At 3:43 PM, Mr. Scott responded by calling Plaintiff "argumentative."

126.    On January 11, 2016, at 7:13 PM, Plaintiff submitted a draft of emotional intelligence assignment. She refused to recant her discrimination allegations or admit a lack of emotional intelligence because she faced discrimination. Plaintiff again engaged in protected opposition by claiming that others were not taking her discrimination allegations seriously and that she had mentioned her safety concerns because management had not intervened in counseling or created a policy to prevent a coworker from making discriminatory statements and related workplace violence.

127.    On or around January 11, 2016, Plaintiff reported to OCCHCO's Jill McDonnell and Douglas Goudy (of the Office of Equal Rights)—though she did not file an official OER complaint—about the hostile work environment Plaintiff faced at the ADR Division. Plaintiff met with Douglas Goudy of the Office of Equal Rights to ask about how to file a discrimination complaint.

128.    On January 12, 2016, Mr. Scott reordered Plaintiff to rewrite the assignment. He said by email that he ordered Plaintiff to see a therapist in response to and after her harassment allegations against co-worker Mr. Kapoor, including characterizing when Mr. Kapoor tripped her as workplace violence. Mr. Scott characterized Plaintiff's discrimination allegations as "attacks"

AMENDED COMPLAINT        24-CV-00797 KAW            Page **29** of **190**

on Mr. Scott, Ms. Mazur, and her coworkers. Mr. Scott indicated that he regarded Plaintiff as having a mental disability due to her allegations against Mr. Kapoor, which Mr. Scott characterized as having a "misplaced" perspective that was causing her to "behave badly" and creating "people who do not exist." He called her allegations defamation and told her to stop. Mr. Scott said Plaintiff should not have said that her vote on seating arrangements would depend on anything (i.e., that her harasser would not be seated near her). In his January 2020 testimony before the EEOC, Mr. Scott claimed that Plaintiff should have offered to transfer to another office. Plaintiff emailed to clarify how her allegations of workplace violence were related to her allegations of discrimination and documented Mr. Scott's attempt to stop Plaintiff from discriminating.

129.    On January 12, 2016, around 5-6 PM that day in a meeting with Plaintiff and Mr. Scott, Mr. Scott said it was solely Plaintiff's fault for not cultivating her relationship with him. Mr. Scott said Plaintiff was completely wrong that she believed Mr. Kapoor tripping her (based on her gender and beliefs about Asians) was a crime. Mr. Scott told Plaintiff that she was talking to too many people (including but not limited to Jill McDonnell of human resources and manager Cynthia Mazur). Mr. Scott started to threaten Plaintiff's job but then tried to take back the threat. Plaintiff suggested that Mr. Kapoor undergo training as a solution to the harassment, but Mr. Scott said Plaintiff was not solution oriented. Mr. Scott said that a divisional training could not be on the topic of hate crimes, workplace violence, and so forth. Plaintiff relayed how Cynthia Mazur's response to Plaintiff's discrimination allegations was to tell Plaintiff to join the ADR Etiquette committee. Thereafter, Robert Scott followed Plaintiff and trapped her in her cubicle by blocking the doorway, slammed down his hand to gesture to her to put down her writing utensil, told Plaintiff not to speak about her allegations, and started to make a threat about Plaintiff's employment. Mr. Scott was an exceptionally large and physically imposing man (previously he stated he wore an XXXL size).

130.    On January 12, 2016, Cynthia Mazur was put on notice that Mr. Scott excluded Plaintiff from other work, including meetings and work assignments (e.g., facilitation) until Plaintiff finished the remedial assignment to Mr. Scott's satisfaction, which was retaliation for

engaging in protected speech by bringing up EEO issues. Plaintiff also notified Cynthia Mazur that Robert Scott had told Plaintiff to coach someone despite discriminatory remarks that person made and again that Vikram Kapoor had engaged in discriminatory behavior against Plaintiff.

131. In Plaintiff's January 11 and/or 12, 2016, drafts of the emotional intelligence assignment, Plaintiff described how she had been "subject to workplace violence, abuse and/or comments about her gender and minorities in general (as well as comments about others in regards to their age," described her concern of being subjected to trauma again, and how that related to the events that happened on January 8, 2016, at the ADR Division meeting. She repeated what management had told her and how they did not intervene, agreeing to disagree with their approach to handling discrimination allegations. She described how she could have waived her legal rights or not given an opinion (as Mr. Scott tried to coerce Plaintiff into doing or pursuing more protected activity) as options.

132. On January 13, 2016, supervisor Robert Scott required Plaintiff to go to therapy and complete an "emotional intelligence" assignment in response to her protected activity/speech. In the emotional intelligence assignment, Mr. Scott said that the Plaintiff could not work on anything else, nor attend any other meetings until she recanted harassment/discrimination allegations against Mr. Vikram Kapoor and apologized to Mr. Kapoor and the rest of the office for bringing up her concerns around safety in the move to a new office such that she would need to sit next to Vikram Kapoor and refusing to vote for a seating arrangement that would require her to sit next to Mr. Kapoor. At 8:29 AM, in response to her draft emotional intelligence assignment, Mr. Scott emailed Plaintiff that should be "more flexible and collaborative with everyone," which he defined as "engaging in give and take with others and not insisting that everything be done exactly as you think it should." At 10:34 AM, Plaintiff acknowledged that he was entitled to his opinion and agreed to disagree with Mr. Scott about whether Mr. Kapoor intended to commit workplace violence and whether Mr. Kapoor's behaviors were appropriate. Plaintiff said she would be open to learning more and hearing more from others. In response, at 11:49 AM, Mr. Scott called Plaintiff's 10:34 AM email an example

of how she was "becoming increasingly argumentative and disrespectful" with Mr. Scott and "everyone in the office" and ordered her to stop.

133.   On January 14, 2016, during a 10-11:30 AM meeting with Ms. Mazur, Ms. Mazur told Plaintiff that she had heard a rumor that Plaintiff was going to file an EEO complaint and asked Plaintiff whether she was going to file an EEO complaint. Ms. Mazur acknowledged that she knew about the remedial assignments and told Plaintiff that she would have to ask whether Robert Scott would agree to reset relations.

134.   On or around January 15, 2016, Mr. Scott asked Plaintiff to send him her Strengths Finder results, to which he commented by email that the results were also a "Weakness Finder."

135.   On January 20, 2016, Plaintiff overheard conversations a bit before 2 PM and again around 4:30 PM in the office (including by Erika Jordan) that a position in the cadre (of which Plaintiff was a member) was going to be eliminated and that there was a lack of respect, word Mr. Scott used to describe Plaintiff's opposition to discriminatory practices, in the office. Plaintiff believes the chatter was referring to Plaintiff and her protected activity.

136.   On January 21, 2016, Robert Scott tried to hide the location and access to the ADR database from Plaintiff. After 9 back and forth emails, Mr. Scott finally revealed the location at 1:26 PM the next day.

137.   On Sunday, January 24, 2016, to Monday, January 25, 2016, Nathelia (Nicky) Davenport—with an urgent request from a Federal Coordinating Officer at a disaster—requested for Plaintiff to teach her to and to run reports on the ADR statistics database. Plaintiff said she had also reached out to Robert Scott, but he did not respond. Mr. Scott later said that Plaintiff should not have responded to Ms. Davenport but at the same time that Plaintiff should have been able to decide on her own which tasks to work on without asking Mr. Scott.

138.   On January 28, 2016, Robert Scott (the Plaintiff's supervisor) retaliated by giving Plaintiff a docking her performance review when he claimed she did not perform in an assignment because she refused to condone or make false claims contrary to law that would use her services as an attorney to discriminate against others and help others do so. He made

comments during the annual performance review discussion explaining such, using language that mirrored his language surrounding her opposition to writing a discriminatory memorandum. In this performance appraisal score, Mr. Scott reduced Plaintiff's performance score by one in three categories (communication, customer service, and teamwork and cooperation) compared to the prior performance year.

139. On January 29, 2016, Mr. Scott gave Plaintiff a 2-minute deadline to sign her performance review. Two minutes is not enough time to review and decide whether to write an opposition to a performance appraisal. After he made her sign the appraisal form, Mr. Scott at 4:26 PM changed Plaintiff's performance appraisal score from the day before without explanation. Plaintiff was not given an opportunity to oppose the score changes, and Mr. Scott did not tell Plaintiff what the changes were until after the deadline to submit an opposition to the scores. Without discussing the rationale, Mr. Scott changed Plaintiff's performance appraisal score from the day before at her performance appraisal discussion. Mr. Scott arbitrarily swapped her scores for customer service and technical proficiency. Mr. Scott reduced Plaintiff's performance score by one in three categories (communication, teamwork and cooperation, and technical proficiency) of her core competencies for the 2015 performance review from the previous annual performance cycle ending in December 2014.

140. On February 4, 2016, Plaintiff emailed her supervisor Mr. Scott to ask whether she could take sick leave since he had not approved it yet in the leave system.

141. On February 5, 2016, in response to Plaintiff's February 4, 2016, sick leave request email, Mr. Scott admonished Plaintiff for confirming the approval of her sick leave by emailing back the following, "Please explain why you are doing this to Erika" and that "You're not handling these correctly. Please check with Erika on how you should manage this." Plaintiff was not given any forewarning that coworker Erika Jordan was approving Plaintiff's sick leave.

142. On February 12, 2016, Plaintiff asked supervisor Robert Scott if he did not want a teach back instead of counseling harasser Mr. Kapoor on discrimination, hate crimes, or workplace violence, and what topic he would like for the teach back. Mr. Scott responded that Plaintiff should not write those words (e.g., discrimination, hate crimes, workplace violence) by

email. In an email at 5:16 PM, Plaintiff sent Mr. Scott a document of what she had accomplished for the week in response to his request for more communication.

143. In a meeting on February 16, 2016, Mr. Scott told Plaintiff not to document her accomplishments in writing.

144. On or around February 19, 2016, the ADR Division moved offices about 1-2 blocks from 400 Virginia Avenue to 500 C Street in the same building with the rest of the FEMA Office of Chief Counsel.

145. On Monday, February 22, 2016, in an email chain, Plaintiff expressed her interest in one of the groups an OCC-wide project (TRSG) dealing with promotion, performance reviews, and awards, but Mr. Scott suggested that Plaintiff join the work-life balance TRSG workgroup that instead dealt with topics such as childcare responsibilities.

146. On February 23, 2016, in reply to her email the day before, Mr. Scott tried to keep Plaintiff from participating in a subgroup on promotions, performance reviews, and awards of the OCC-wide committee called TRSG on the issues related to her discrimination allegations. Mr. Scott told Plaintiff she was taking on too much when she expressed her interest in joining that TRSG subgroup but did not have the same concerns when he suggested that she join another subgroup unrelated to her discrimination allegations.

147. In a 2 PM meeting with Mr. Scott on February 24, 2016, Mr. Scott said Plaintiff should not email him what he had said to her orally. Mr. Scott again said that he did not want to invite a guest lecturer regarding discrimination, hate crimes, or workplace violence. Plaintiff said as a compromise that if leadership did not want to directly counsel Vikram Kapoor for discriminatory language, actions, and violence, then Plaintiff said that there could be group training for the entire Division on those issues. Mr. Scott rejected the training and counseling ideas as acceptable proposals to keep Mr. Kapoor from continuing to engage in discrimination.

148. Although Plaintiff wrote Mr. Scott on February 24, 2016, that she would be willing to decrease her participation in other projects or not facilitate the work-life balance group (such that she would stay on the TRSG performance review subgroup), Mr. Scott still decided

that he considered her participation in TRSG performance review subgroup as too much in his April 15, 2016, performance appraisal of Plaintiff.

149.    On February 25, 2016, at 10:09 AM, Mr. Scott (in response to Plaintiff's January 23, 2016, email on her interest in joining the TRSG group that would prevent workplace discrimination) again said that Plaintiff was "taking on too much extra-curricular activity" to dissuade her from engaging in protected activity.

150.    On Monday, February 29, 2016, Plaintiff tried calling Mr. Scott several times for about 1.5 hours on multiple phone numbers (e.g., his cell phone, work phone) to call in sick to telework so she would not need to come into the office while under the weather. He responded to Plaintiff's calls 15 minutes before her scheduled work start time, too late for Plaintiff to get dressed and travel to the office from her apartment. He later claimed that he was not at his desk. However, another coworker Elisabeth Bissell saw him at his desk, and he only responded after Ms. Bissell talked to him after Plaintiff called Ms. Bissell to relay the message to Mr. Scott.

151.    On March 10, 2016, at 4:13 PM, Plaintiff emailed Robert Scott and Cynthia Mazur expressing her concern that Mr. Scott based his latest performance evaluation of Plaintiff on improper bases (e.g., discrimination and refusing to violate ethics regulations) and said she hoped not to continue to face retaliation. Plaintiff asked Mr. Scott and Ms. Mazur to clarify what the ADR policy was on restricting employee speech, e-mails, and notes on EEO, safety, HR, or labor/employee relations/personnel terms and to write them down in writing to apply to everyone (not just Plaintiff's speech restricted). Plaintiff expressed that she felt Mr. Scott retaliated against her due to the restriction on her speech for using EEO-related words and interfering with her ability to make progress on work-related matters (e.g., finding a speaker on the topic).

152.    On March 15, 2016, Cynthia Mazur had a meeting with Plaintiff about EEO matters and office policy. Ms. Mazur asked Plaintiff to repeat what Plaintiff had emailed. To Ms. Mazur, Plaintiff summarized her reporting of discrimination, her refusal to engage in illegal, unethical, and discriminatory behavior, her question about office policy, and told how Mr. Scott wanted Plaintiff to do legal research on her own time. Ms. Mazur did not answer the question

about office censorship policy and expressed the idea of transferring Plaintiff's supervision to Erika Jordan or Linda Baron, both subordinates of Robert Scott.

153.    On March 16, 2016, Mr. Scott emailed the ADR Division that members should not use email to document "any discussions that are potentially critical, conflictual, judgmental [sic], or emotional." He also mentioned in a separate point that cc'ing higher up in emails would be an example of using email to "threaten people," which he said not to do. Given the timing and content of the email, Plaintiff believes this email was yet another attempt to try to prevent individuals from documenting and reporting EEO activity. Before the March 16 speech policy came out, Plaintiff had asked management to clarify the office policy on the censorship of Plaintiff's speech and its application to the rest of the division regarding EEO matters on March 10 and March 15. At 2:05 PM, in response to Mr. Scott's email that day, Plaintiff emailed Ms. Mazur to ask whether Ms. Mazur was endorsing the entirety of Mr. Scott's emails. Plaintiff asked Ms. Mazur specifically whether she and/or the ADR Division would specifically prohibit employees from documenting EEO, HR, or integrity matters in email or writing.

154.    In a meeting on or around March 17, 2016, at around 8:40-9 AM, Plaintiff again reported discrimination to Ms. Mazur. Ms. Mazur told Plaintiff to speak to Mr. Scott directly without her involvement and told Plaintiff to suggest a transfer to Erika Jordan as Plaintiff's supervisor. Plaintiff suggested that a neutral third party mediate or facilitate the meeting on March 18, 2016. Ms. Mazur claimed that the OER would not be neutral. Ms. Mazur confirmed that there were not to be any emails on EEO/HR matters, citing Chief Counsel Adrian Sevier once winding up on the front page of the Washington Post as the reason. Ms. Mazur said the office strived not to make records documenting that he said that and that. Later that day around 5 PM, Ms. Mazur told Plaintiff in a call that Mr. Scott did not want to meet with Plaintiff in the presence of a third party. Plaintiff said that she did not feel safe meeting alone with Mr. Scott.

155.    On or around March 18, 2016, Cynthia Mazur told Plaintiff not to create records, including for EEO/HR terms.

156.    On March 18, 2016, at 1 PM the Plaintiff reported to then Deputy Chief Counsel Joel Doolin the harassment she was facing. Mr. Doolin told Plaintiff to document the issues that

she was facing, send it to Ms. Mazur, and then forward the email to him. Mr. Doolin said that he would give Ms. Mazur a few days to respond before he would intervene. Joel Doolin suggested the possibility of switching to another division.

157. On March 21, 2016, at around 8:45 AM, Mr. Scott initiated a conversation with Plaintiff asking her across the open space whether she was willing to talk to him about work. Plaintiff asked him what he would like to talk about and asked whether he was willing to clarify his policy restricting what Plaintiff could and could not say and his prohibition on her use of specific terms. Mr. Scott denied receiving an email from Plaintiff asking for the clarification of such a policy, so Plaintiff restated her request. Mr. Scott said Plaintiff could not talk negatively about others.

158. Mr. Doolin showed the Plaintiff on March 21, 2016, during their 10:45 AM meeting, that he forwarded her allegations to Chief Counsel Adrien Sevier.

159. On March 21, 2016, at 2:46 PM, Plaintiff emailed Cynthia Mazur and Robert Scott to ask them "Please clarify and document in writing with underlying rationale on the prohibition on the use of EEO, HR-related, ethics violations terms, and other protected speech. Please communicate such a policy to the entire office if such a policy is in fact a Division policy." Plaintiff also asked them regarding their response to a proposal by human resources Jill McDonnell regarding a training about "hostile work environments, rude comments, professional treatment, implied threats and bullying." Mr. Scott emailed at 5:26 PM Plaintiff and called her allegations against Mr. Kapoor false and that Plaintiff had an "active imagination." He again tried to dissuade Plaintiff from documenting EEO issues by saying that she should "discuss and clarify such issues in person, calmly, and rationally." He also told Plaintiff to talk to a therapist as he did not feel like her EEO claims were "positive and productive ways of looking at your issues. I'm sure a fresh approach will help you succeed at your job." Mr. Scott cited an email that Plaintiff wrote documenting EEO issues and opposing a discriminatory policy, which he considered to be an "emotional" email.

160. On March 22, 2016, Mr. Scott assaulted the Plaintiff while telling her that her email documenting her allegations of discrimination amounted to "hate mail" and told her to stop

making those allegations. Plaintiff's supervisor Robert Scott approached (unsolicited) Plaintiff twice, once around 9:50 AM and then again at around 10:05 AM. First, he approached her (unsolicited) around 9:50 AM asking Plaintiff whether she was less emotional and calmer today in reference to an email she sent the day before documenting her allegations of discrimination. Sensing the dangerousness of Mr. Scott's agitated state, Plaintiff excused herself to speak to the Avaya phone technicians who were setting up the phone lines from the move to the new office. At around 10:05 AM, Mr. Scott (without cooling down) again approached Plaintiff on his own accord and cornered her at her desk while telling her that she should not have documented (i.e., written down in an email) her allegations of discrimination. Mr. Scott told Plaintiff that he considered an email she wrote to document her allegations of discrimination to be "hate mail." In an email at 5:27 PM, Plaintiff made manager Cynthia Mazur aware of what had happened that day (as well as other EEO allegations), including Mr. Scott's multiple instances of trying to physically intimidate Plaintiff. He was so enraged that Plaintiff could see the blood vessels of his neck pumping. While cornering Plaintiff, Mr. Scott invaded her personal space and held his hands in a choking gesture inches from her throat. Mr. Scott told Plaintiff that he considered an email she wrote to document her allegations of discrimination to be "hate mail."

161.    On March 28, 2016, Mr. Scott gave Plaintiff a negative quarterly performance appraisal. Mr. Scott gave Plaintiff a negative quarterly performance review as not meeting achieved expectations along with an informal document labeled "Rob's Guidance for Successfully Performing Your Job" in which he claimed Plaintiff was not performing her job because of the "Technical Proficiency" portion of her core competency performance goals, which in turn he said affected her teamwork and customer service scores. As part of technical proficiency, Mr. Scott claimed that technical administrative work (e.g., website design) was one of her key objectives for her position, which changed the major duties of her job from those on her official job description and the vacancy announcement for her position. Mr. Scott also told Plaintiff not to write emails for so-called complicated issues. Plaintiff asked Ms. Mazur to transfer Mr. Scott as her supervisor. Ms. Mazur rejected becoming Plaintiff's supervisor.

162. On March 29, 2016, manager Cynthia Mazur revoked her previous agreement to stop prohibiting Plaintiff's protected activity not only for opposing and reporting discrimination but also for retaliating against Plaintiff (for a negative performance review) for opposing and refusing to allow fraudulent recording of FQS requirements using Plaintiff's services.

163. On March 30, 2016, at 7:42 AM, Mr. Scott gave the rest of the ADR Division to submit their accomplishments for their quarterly performance review but did not allow Plaintiff to do so before he gave her performance review. Mr. Scott intentionally made the announcement and deadline such that Plaintiff would not be able to really work on the assignment because he knew Plaintiff was on leave. At 12:55 PM, Plaintiff e-mailed Cynthia Mazur making explicit that Plaintiff did not choose to have Erika Jordan as her supervisor as Robert Scott had effective control of the work and over Erika Jordan, subjecting Plaintiff to continued retaliation. Plaintiff specified that her first choice was to do a detail and her second choice would be to transfer to a supervisor outside of Robert Scott's chain of command. At 1:26 PM, Ms. Mazur said Plaintiff's request to transfer Mr. Scott or detail Plaintiff was rejected. Cynthia Mazur said Erika Jordan would be Plaintiff's supervisor starting Monday, April 4, 2016.

164. In March 2016, Mr. Scott and potentially Ms. Jordan attempted to access the pedi (storage locker) of Plaintiff that day, potentially tampering with her personal belongings.

165. Around April 2, 2016, Elisabeth Bissell started to call Plaintiff difficult and not a team player (a gender stereotype) when told Ms. Bissell that the office did not need to bake for Plaintiff for her birthday or could do whatever was easy if she insisted. Plaintiff gave some examples, such as ice cream, Jello, or something ready-made. Ms. Bissell had no problem making ice cream for others with her ice cream maker but only called Plaintiff difficult after Plaintiff filed her EEO complaint on March 21, 2016, where she made accusations of gender discrimination. Ms. Bissell and others had no problem bringing fruit for coworker Mr. Schoene but had a problem when Plaintiff suggested that a sugary dessert was not required at all. Plaintiff had also stopped baking for the office due to harassment she was facing from her supervisors. Ms. Bissell acted this way to enforce the office cultural norms of a hostile work environment to ostracize Plaintiff for opposing discrimination.

166.    Erika Jordan became Plaintiff's first-line supervisor on April 4, 2016. For the first few days, Ms. Jordan did not meet Plaintiff at all until April 8, 2016.

167.    Plaintiff was on leave on April 4, 5, and part of April 7, 2016.

168.    On Thursday, April 7, 2016, Erika Jordan and Mr. Scott assigned Plaintiff to complete the quarterly database report assignment by completing 25 worksheets, hand counting 2910 data points (which Mr. Scott did not require of himself), and creating 37 graphs by the close of business the next day (Friday). Mr. Scott hid from Plaintiff the file location and keycode to access the data to count and analyze until 1:47 PM that Friday afternoon (right before the deadline), and Mr. Scott and Ms. Jordan did not give Plaintiff specifics about the assignment. In addition, Mr. Scott hid from Plaintiff the file location and keycode to access the data to count and analyze until 1:47 PM that Friday afternoon (right before the deadline), and Mr. Scott and Ms. Jordan did not give Plaintiff the specifics about the assignment. Ms. Jordan knew Plaintiff would need to work the weekend without additional pay to complete the project as she allowed Plaintiff to email the project by Monday morning. When Plaintiff checked Mr. Scott's prior work, she found that Mr. Scott's work had made errors than hers.

169.    On April 11, 2016, Ms. Jordan ordered Plaintiff to write a detailed 30-day plan of her proposed activities for her proposed activities for the month, including a by-minute account of the time it would take for each activity and deliverables. At the time, no one else who reported to Ms. Jordan had to make such plans, nor did they have to when they first joined her team. No one else in the ADR Division besides Plaintiff had their bathroom usage or breaks monitored. At 3:57 PM, Ms. Jordan indicated that Plaintiff should find a course related to her duties and should not use her training funds for a coach training course, which implied ADR practice (coaching) was not part of Plaintiff's job as an ADR Attorney Advisor.

170.    On April 12, 2016, at 12:34 PM, Plaintiff sent supervisor Ms. Jordan a draft of the 30-day plan for Ms. Jordan's review, including color-coordinated rows breaking down the category of work (e.g., training, meetings, etc.), the tasks or deliverables within that category (e.g., creating a work plan, interviewing Reservists and DFAs), hours per week, how often the task was given the hours column the hours per day spent on that row task, the hours per week

spent on a given task, the hours per month on a given task, and the subtotal hours spent per category, as well as any other notes. Plaintiff noted in the 30-day plan about the so-called doozy of an assignment from Robert Scott that was supposedly coming down the pipeline.

171.    On April 14, 2016, Ms. Jordan asked Plaintiff (while on leave) to obtain Plaintiff's input for an assignment related to her co-worker Karen Asaro's area of expertise. After Plaintiff consulted and concurred with Ms. Asaro, Plaintiff relayed to Ms. Jordan the consensus (with Ms. Asaro's comments) and offered to hold a joint meeting, which Ms. Jordan declined. However, on April 26, 2016, Ms. Jordan told Plaintiff she was not performing and tried to pigeonhole Plaintiff into a yes and no answer.

172.    On April 15, 2016, Robert Scott recorded Plaintiff's negative quarterly performance review in the online FHR navigator system.

173.    On April 18, 2016, Plaintiff started using FMLA leave with mixed intermittent and continuous FMLA leave. On April 18-24, 2016, Plaintiff took full-time FMLA leave with further sick leave in the following work week (April 25-29, 2019) for a condition that started Plaintiff had taken leave for the same condition starting April 13, 2016.

174.    On Sunday, April 17, 2016, Erika Jordan stated that she did not think that Plaintiff needed FMLA leave after Plaintiff requested it and before requesting any supporting documentation.

175.    On Monday, April 18, 2016, Erika Jordan also did not automatically designate Plaintiff's leave as FMLA by trying to ask her to choose something else besides FMLA leave.

176.    FMLA paperwork dated April 24, 2016, which was filled out by Plaintiff's doctor Dr. Zahid Hameed, confirmed that Plaintiff needed to be off work between April 13-24, 2016, and qualified for FMLA leave. Ms. Jordan refused to designate all the leave requested as FMLA and therefore interfered with Plaintiff's right to use FMLA although the leave was taken for the same underlying condition certified by Dr. Hameed previously.

177.    In an email to Erika Jordan on April 25, 2016, Plaintiff alleged retaliation by Ms. Jordan, including Plaintiff's performance goals (but not others in the Division) being changed, excluding Plaintiff alone from meeting, a change in job description, and pressuring Plaintiff to

withdraw from groups needed for the full performance of her performance goals and where Plaintiff engaged in protected activity in trying to report and eliminate discrimination in OCC.

178.   On April 26, 2016, Plaintiff's supervisor Erika Jordan limited Plaintiff's EEO time. The same day, Ms. Jordan based her evaluation of Plaintiff's performance, taking into account the time Plaintiff was on FMLA leave for 10 days, as well as two days when Plaintiff was on sick or annual leave. Ms. Jordan only had seven business days (of which two days we had not yet initially met) as Plaintiff's supervisor that she was not on leave, and already Ms. Jordan said Plaintiff was not performing. In an email, Erika denied designating a couple of days of Plaintiff's leave as FMLA after she received documentation from Plaintiff's doctor that it was all the same underlying condition for the days that Plaintiff was on leave.

179.   On April 26, 2016, at 8:58 AM, Ms. Jordan sent Plaintiff an email saying that Plaintiff should at her pay grade of an IC-13 be able to finish drafting a revised 30-day plan within the day. Again, this was one day after Plaintiff had been on leave for 1.5 weeks. Ms. Jordan had not answered her previous request. As a comparison, this was similar to a combination of a workload analysis that the ADR division required to do plus a POAM that the knowledge management working group drafted. Both of those individually had at least a couple of weeks to complete such a task, and it took several deliberation meetings to develop deliverables. However, those analyses did not require employees to predict the future. Later, when Plaintiff held listening sessions with others or deliberated with group members, individuals said that it was too premature (or impossible) to know what types of deliverables and thus timelines that Ms. Jordan was asking for without further deliberation. No one else was asked to draft such detailed plans within such short time frames and without adequate information as a regular part of their work (for all of their work) rather than for specific group projects.

180.   On April 26, 2016, at 9:17 AM: Plaintiff sent an email requesting to meet with Ms. Mazur about Ms. Jordan's unrealistic work expectations regarding Ms. Jordan's request that Plaintiff finish the 30-day plan by the end of the day and reported how Ms. Jordan had expected that Plaintiff complete over 100 hours of work a week. Plaintiff stated she believed the 30-day plan and Ms. Jordan's reactions were an example of continued harassment and interference with

participation in EEO activity. Mr. Scott was continuing to contribute to the harassment either directly (by directing Ms. Jordan to do so) or indirectly (since Ms. Jordan was basing her plans on the quarterly performance review he gave Plaintiff, which was discriminatory.

181. On April 26, 2016, at 7:23 PM (after hours), Ms. Jordan sent Plaintiff an 8-paragraph email. Ms. Jordan said that ADR work was "ancillary" to Plaintiff's "key areas within cadre management" as an ADR Attorney. Ms. Jordan restricted Plaintiff's EEO time. Ms. Jordan mischaracterized that Plaintiff was not working on database work (as if she had) when Mr. Scott had told Plaintiff not to work on that area, so Plaintiff was receiving mixed directives. At 7:41 PM, Ms. Jordan told Plaintiff that she needed to attend every 8:30 AM Reservist meeting unless canceled or she was on approved leave. In contrast, Ms. Jordan had said previously that Plaintiff should skip meetings and events to do the other things Ms. Jordan thought were Plaintiff's "actual" job when Plaintiff mentioned that meetings took 30+ hours a week. It was a meeting-heavy office.

182. On April 28, 2016, at 10:56 AM, Plaintiff wrote an email seeking support/input from Ms. Jordan about the next steps for cadre documentation and implementation of their previous discussions to do a needs assessment among cadre members. Ms. Jordan accused Plaintiff of not consulting Ms. Jordan and Mr. Scott about an initiative when the email was a consultation email where Plaintiff outlined her plans. In the email, Plaintiff shared her plan of meetings that she would hold with various cadre members, which she had discussed previously, and at a cadre meeting.

183. On April 28, 2016, at 11:13 AM, Plaintiff informed the cadre management team about the FQS credentialing sheet that she updated, which showed initiative and responsibility in the areas that Ms. Jordan described as key. However, Ms. Jordan said that Plaintiff should not have taken such a responsibility upon herself or shown such initiative. As a result, Ms. Jordan would create contradictory expectations that admonished Plaintiff for both showing initiative and not showing initiative. At 5:36 PM, Plaintiff wrote an email to Ms. Jordan that documented the continued harassment/retaliation. At 6:43 PM (again after hours), Ms. Jordan said she told

Plaintiff not to reply by email to prevent Plaintiff from engaging in EEO activity to provide evidence to the Office of Equal Rights.

184. On Friday, April 29, 2016, at 10:09 AM, Ms. Jordan denied that she was retaliating against Plaintiff. Ms. Jordan said that her vision would dictate Plaintiff's workload and assignments. In contrast, Ms. Jordan also admonished Plaintiff for not creating a shared vision with Ms. Jordan and taking the initiative to dictate her own workload. Ms. Jordan's comment on April 29, 2016, contradicted her statement in her email dated May 3, 2016, at 5:38 PM email that it was Plaintiff's responsibility to re-prioritize work. Ms. Jordan restricted Plaintiff to two hours for meetings only for EEO issues. She said that federal law does not require breaks and that she did not think 30 minutes for breaks (the same time for two fifteen-minute breaks) was reasonable in a day. Others were not surveilled in the time they could/should take for breaks.

185. On April 29, 2016, at 2:31 PM, Ms. Jordan assigned Plaintiff (through manager Robert Scott) a very extensive legal memo that she wanted Plaintiff to complete the research and analysis for (though not written product) by Wednesday, May 4, 2016, or Thursday, May 5, 2016, morning. She also assigned Plaintiff other tasks with a 24-hour turnaround (e.g., the submission of Core Competencies to the ADR newsletter on Wednesday, May 4, 2016) and meetings Erika said were mandatory (e.g., Monday and Wednesday Reservist meetings at 8:30 AM). Others who have researched the topic of the legal said that it took them months, not hours to do the research, in less than 1-2 business days. They researched the topic for the good of the agency, and the Chief Counsel asked an entire legal division specializing in that area of law to research the topic over months. However, Ms. Jordan and Mr. Scott tried to circumvent the Chief Counsel's final decision on the topic and scope of agency policy by having Plaintiff create an attorney-client relationship with individuals (in violation of government ethics) and weigh in on what another agency had the authority to do. Moreover, the aspects of that issue that were within the scope of a government attorney, the Chief Counsel Adrian Sevier had already made a final decision on and had worked with a different legal division that had spent months drafting a position. Mr. Scott and Ms. Jordan put Plaintiff in a precarious position of using Plaintiff to

engage in insubordination against Mr. Sevier's order if she completed the assignment or unjustly negatively marking down her performance if she did not. That day, even when she seemed surprised at the short deadline, manager Ms. Mazur refused to stop an excess workload when Plaintiff notified her. Ms. Mazur simply said that she thought it was doable to research and write a 20-page legal memo on an unfamiliar area of law (one where Plaintiff never took a course in) within 12 hours. Ms. Mazur said that she did not think Robert Scott was retaliating,

186.    Ms. Jordan tried to stop Plaintiff from documenting discrimination (April 29, 2016, May 6, 2016, and May 11, 2016).

187.    On April 29, 2016, at 12:22 PM, Ms. Jordan wrote Plaintiff an email stating that the time allocated of 6-10 hours per week on EEO issues was not reasonable, although manager Ms. Mazur had said that that amount of time had been reasonable. Ms. Jordan limited the time spent to two hours a week and said that Plaintiff needed to provide prior permission to use more time and only for meetings. However, given the 100+ hour expectation of work (the load of work). EEO Counselor refused to meet to draft the allegations and had asked Plaintiff time to work on the allegations outside of meetings. The allegations Plaintiff drafted turned into over 50-60 pages of allegations.

188.    On April 29, 2016, at 4:58 PM, Ms. Jordan again tried to keep Plaintiff from documenting continued harassment and told Plaintiff not to email. Ms. Jordan said, "I don't want you to spend time preparing a written response...I believe you have been repeatedly told that email is not conducive to addressing these complex issues."

189.    On May 1, 2016, Plaintiff sent out ideas to stop retaliation to the OCC TRSG project, a group in which manager Robert Scott was a member and who did not like Plaintiff's participation in the said group for her protected activity.

190.    On May 2, 2016, in reprisal for sending out ideas to the OCC TRSG Project to stop retaliation on May 1, 2016, Plaintiff's supervisor told Plaintiff to give the supervisor a daily plan of work (in addition to writing a 30-day plan), which documented actual and projected minutes spent on every matter of the day similar to billable hours.

191.    On May 4, 2016, at 6:28 PM, Plaintiff again brought up to Cynthia Mazur that Plaintiff wished that her performance evaluations (annual and quarterly) be changed because they were based on illegal and unethical activity, which had Plaintiff done would have violated discrimination laws or which were discriminatory/retaliatory against Plaintiff.

192.    On May 5, 2016, in an email to Plaintiff at 8:22 PM, Ms. Mazur said that she did not believe Plaintiff's allegations of retaliation and that she was not going to change Plaintiff's performance review.

193.    On May 6, 2016, supervisor Ms. Jordan said that reporting discrimination and opposing retaliation was disrespectful. Ms. Jordan said Plaintiff needed to obtain Ms. Jordan's permission to report Ms. Jordan for discrimination. During a work plan meeting (which was documented by an 8 PM email), Ms. Jordan told Plaintiff to stop writing emails that were disrespectful. Plaintiff asked Ms. Jordan what she meant by disrespectful. Ms. Jordan said Plaintiff was disrespectful because 1) Plaintiff said that she hoped her ability to perform the mission would not be interfered with due to retaliation and 2) Plaintiff was claiming retaliation. During that same meeting, Erika Jordan said that Plaintiff must ask for Ms. Jordan's permission to report up issues (including retaliation).

194.    On Wednesday, May 11, 2016, at 8:05 AM, Ms. Jordan unjustly blamed Plaintiff for tasking a coworker Don Greenstein with work when Robert Scott had tasked Mr. Greenstein to contact Plaintiff to assist him. At 10 AM, work plan meeting with Erika Jordan (see meeting notes for greater detail), Plaintiff asked Ms. Jordan what her objective standards for evaluation were. Ms. Jordan said that her standards were subjective, not objective. She again tried to dissuade Plaintiff from documenting EEO issues by stating that Plaintiff should not send emails. Ms. Jordan said conflicting things from what she had said in previous meetings. She said that Plaintiff should move forward without checking in with her. However, at other meetings, even when Plaintiff checked in with her, Ms. Jordan said that Plaintiff should have checked in with her. Here, Ms. Jordan said that Plaintiff should have tasked another employee Lydia Crafton without hearing back an answer. However, earlier that morning, Erika Jordan blamed Plaintiff that Plaintiff had tasked another employee (although Plaintiff had not, and Robert Scott had)

without checking in with her. Erika Jordan criticized Plaintiff for her answer/position about the prior Concur assignment. However, when Plaintiff shared that co-worker Ms. Asaro (a white woman) had agreed with Plaintiff's position, Ms. Jordan did not criticize or call for Ms. Asaro's performance to be downgraded.

195.   An email chain dated May 17-18, 2016, and titled "RE: Termination notice for J. Yeh," Robert Scott, Erika Jordan, and Kirsten Gunsolus shows that intended to wrongfully terminate Plaintiff's employment.

196.   On May 19, 2016, Erika Jordan directed Plaintiff to come into the office while still sick on Tuesday, May 24, 2016. Plaintiff shared with Ms. Jordan that Plaintiff was on antibiotics and requested FMLA leave. Erika Jordan delayed granting leave to Plaintiff by asking her what the leave was for although Ms. Jordan knew that Plaintiff had noted a qualifying reason for the leave in the online payroll system WebTA.

197.   On Friday, May 20, 2016, at 2:41 PM, Erika Jordan denied Plaintiff's request for FMLA leave for the following week. Ms. Jordan also noted in an unsecured email the reason for Plaintiff's leave, thus releasing SPII in an unsecured method. For the first time, Ms. Jordan required Plaintiff to obtain a certification for FMLA leave before approving the leave first rather as the Department of Labor had said is normal practice. Plaintiff confirmed with the Department of Labor that Erika Jordan should have designated Plaintiff's leave as FMLA when she learned that Plaintiff was taking leave for a qualifying condition and that Plaintiff did not need to provide certification instantaneously, only as soon as practicable, for Erika Jordan to designate her leave as FMLA.

198.   In a letter dated May 20, 2016, clinical psychologist Dr. Oaklander wrote a letter supporting Plaintiff's need to take leave from work through June 3, 2016, because her work environment exacerbated her psychological condition and needed to take in a less stressful work environment. In FMLA certification documentation dated May 20, 2016, Dr. Oaklander certified that Plaintiff's medical condition began approximately January 12, 2016, with regular weekly 45-minute appointments. Dr. Oaklander also stated that Plaintiff would be able to fully complete her duties if she were in a different work environment. From this documentation, Erika Jordan

had sufficient information to certify the need for a reasonable accommodation. However, Ms. Jordan continued to maintain that the information provided for FMLA documentation was different than that provided for reasonable accommodations.

199. On May 21, 2016, Plaintiff submitted the requested FMLA certification from Dr. Oaklander for continuous (full-time) leave between May 23, 2016, and June 3, 2016.

200. On May 23, 2016, Ms. Jordan refused to designate leave as FMLA leave (only sick leave) although Plaintiff already submitted FMLA certification documentation, including a doctor's note. Contrary to the terms of Section 825.207 of the FMLA, employees are allowed to have sick leave run concurrently with FMLA leave and by denying Plaintiff's right to use both paid sick leave and FMLA leave, Ms. Jordan interfered with Plaintiff's FMLA rights.

201. On Tuesday, May 24, 2016, Erika Jordan asked Plaintiff to respond to three tasks regarding reasonable accommodations. Ms. Jordan notified Plaintiff asking whether Plaintiff's doctor's FMLA certification meant that Plaintiff was asking for a reasonable accommodation for a disability.

202. Plaintiff started continuous FMLA leave from May 25, 2016, until she exhausted her FMLA leave at the end of June 2016 for a condition that started around January 12, 2016.

203. On or around May 31, 2016, Plaintiff returned a signed copy of the official reasonable accommodation request form for her adjustment disorder/PTSD, which was caused by the stress from the hostile and abusive work environment that Plaintiff faced. However, Plaintiff expected that the reasonable accommodation that she requested would not interfere with her ability to seek medical treatment for all of her disabilities.

204. On June 1, 2016, Ms. Jordan and Ms. Gunsolus exchanged several emails about Plaintiff and a questionnaire to her (likely the accommodation questionnaire).

205. On Thursday, June 2, 2016, Ms. Jordan required that Plaintiff's doctor resubmit a certification of her disability and need for accommodation. Ms. Jordan gave Plaintiff a packet for more information for Plaintiff's doctor to fill out, which inquired about inappropriate medical information about whether Plaintiff was taking any medication. Ms. Jordan refused to accommodate Plaintiff unless she resubmitted medical information on an accommodation-

specific form although the information her doctor already submitted in an FMLA certification provided enough information about Plaintiff's functional limitations to warrant accommodations.

206.    On Monday, June 6, 2016, Erika Jordan said that Plaintiff could not bill for the time taken to respond and to address reasonable accommodations requests, time to engage in the interactive process, and FMLA. Others were not required to use leave to respond to such HR requests. Whereas Plaintiff was allowed to bill for the time before, Ms. Jordan said that Plaintiff was no longer able to bill for such hours after June 7, 2016, so that Plaintiff would exhaust her paid leave. Ms. Jordan claimed that Plaintiff would not be able to bill because her medical documentation said Plaintiff could not telework (in the hostile work environment). However, Ms. Jordan still required Plaintiff to respond to FMLA/ADA requests (i.e., work), yet Plaintiff could not bill for it. Plaintiff's medical documentation specifically stated that Plaintiff would be able to work on issues that would resolve the condition, such as EEO issues. Ms. Jordan made Plaintiff work (without pay) by ordering her to respond to FMLA and accommodation requests but said Plaintiff could not work to respond to EEO requests.

207.    Between June 10-17, 2016, Ms. Jordan ordered Plaintiff to make several hours of changes to her timesheet while on protected medical leave when Ms. Jordan or another ADR staff member could have approved Plaintiff's timesheet on her behalf.

208.    On Friday, June 10, 2016, Erika Jordan said that Plaintiff would not be able to concurrently use leave without pay FMLA hours and paid leave (time off award) although WebTA allowed this, and Plaintiff was able to validate her time as such. WebTA will not let an individual validate a timesheet when an impermissible use of leave is put into the system. Plaintiff requested leave as an accommodation to run concurrently with her FMLA and then continuously after her paid leave was exhausted at the end of June 2016. Because of this denial of concurrent leave, Plaintiff would not be able to take protected FMLA leave and apply for the Voluntary Leave Transfer Program (VLTP) since the coordinator Juan Porter said on Tuesday, June 14, 2016, around 11 AM that all paid leave (including credit hours and a time off award and not just sick and annual leave) must be exhausted before participating in the program. This is interference or retaliation for engaging in EEO activity and using the FMLA.

209.    On Tuesday, June 14, 2016, Juan Porter of the leave donation program VLTP (Voluntary Leave Transfer Program) of the FEMA Office of the Chief Component Human Capital Officer stated in an email that Plaintiff would not be able to access if she claims any working hours while on leave. Despite previously qualifying Plaintiff as eligible for the program, Mr. Porter said Plaintiff no longer had a qualifying medical condition after Plaintiff and her doctor did not recant their position that Plaintiff could work on EEO issues (i.e., participating in the EEO process, which included drafting her formal EEO complaint).

210.    On Wednesday, June 15, 2016, at 9:26 AM and Thursday, June 17, 2016, at 9:44 AM, Erika Jordan continued to edit Plaintiff's timesheet, even reverting leave that she already approved for the last pay period. She continued to task Plaintiff with work for which she was not paying Plaintiff while Plaintiff was on FMLA leave, and she had the ability to edit the timesheet herself. The email she sent Plaintiff on Thursday, June 17, 2016, was 7 paragraphs with 5 tasks. Plaintiff could have easily just not have validated excess time so that Plaintiff would need to use a sick leave advance, yet instead, Erika Jordan decided to task Plaintiff with multi-subparts to ask for leave.

211. On June 11, 18, and 23, 2016, Mr. Kapoor continued to stalk Plaintiff on social media and friend to friend her on social media sent multiple times to her personal email address and FEMA work address. At the time, Plaintiff was on leave due to the hostile work environment created in part by Mr. Kapoor's continued unwanted advances.

212. On Tuesday, June 21, 2016, at 10:02 AM, Ms. Jordan threatened to retroactively deny Plaintiff's approved FMLA leave. Ms. Jordan said that Plaintiff had to correct her timesheet for a leave request from the last pay period. Ms. Jordan said that if she did not do so by close of business, Plaintiff would be audited as having not had enough approved leave to cover the last pay period. This leave had already been approved, and she was reversing it after the fact. Ms. Jordan knew that Plaintiff had a medical appointment during that time because of Plaintiff's leave request, so she was not leaving Plaintiff enough time to edit her time sheet. Ms. Jordan could make those edits but did not. At 3:27 PM, Ms. Jordan ordered Plaintiff to complete her timesheet by 8 AM the next day, the same day Plaintiff filed her formal EEO complaint.

213. On documentation dated June 23, 2016, Dr. Oaklander certified that Plaintiff's then work environment would exacerbate her psychological condition, which FEMA could mitigate if Plaintiff were exposed to another work environment. Another work environment could be attained if DHS/FEMA implemented its own anti-harassment policies by transferring all of her harassers, such as the harassing management staff. In the alternative, reassigning Plaintiff to another work environment with a completely new management team should have in theory also put Plaintiff in another work environment.

214. On June 30, 2016, Ms. Jordan ordered Plaintiff to be reassigned to a vacant position or a position that would become vacant in the next 60 days. Ms. Jordan said that human resources (OCCHCO) would conduct the search for reassignment, limited only to CORE positions within FEMA but not within the wider DHS.

215. On June 30, 2016, Plaintiff exhausted her paid FMLA leave and on June 29, 2016, Plaintiff started using leave without pay (LWOP). After exhausting her paid sick or FMLA leave on June 30, 2016, FEMA put Plaintiff on continuous LWOP for about 4 months from July 1, 2016, until FEMA reassigned her on October 13, to start on October 18, 2016.

216. On July 5, 2016, Dr. Oaklander wrote another note that FEMA was not to contact Plaintiff between July 20 and July 31, 2016, for a provider-recommended treatment because it would harm her mental health. However, FEMA still contacted Plaintiff during that time.

217. In an email on or around July 6, 2016, Erika Jordan said the reassignment search should only take one day to complete.

218. On July 7, 2016, HR's Juan Porter of the leave donation program VLTP (Voluntary Leave Transfer Program) denied Plaintiff's request for the VLTP program. Mr. Porter said Plaintiff no longer had a qualifying medical condition after Plaintiff and her doctor did not recant their position that Plaintiff could work on EEO issues.

219. On July 12, 2016, Plaintiff's first-line supervisor Erika Jordan gave Plaintiff a negative second-quarter performance appraisal. Contrary to agency policy, Ms. Jordan completed a performance appraisal without adequate time for time for appraisal given the majority of the quarter Plaintiff was on protected medical leave. In addition, Ms. Jordan did not

discuss the performance appraisal with Plaintiff, nor notify Plaintiff that Ms. Jordan had written a performance appraisal. The same day, internal correspondence between Plaintiff's supervisors Joel Doolin, Cynthia Mazur, and Ashley Darbo shows that Joel Doolin, Ashley Darbo, and Melissa Williams were participating in (if not in charge of) Plaintiff's reassignment.

220. On July 13, 2016, FEMA made its first offer of reassignment for a Deployable Field Counsel (DFC), as well as an offer for two other positions. One job was in the field working 12-hour days without ready access to medical care as is typical in disaster deployment situations, especially given Plaintiff's pre-existing conditions requiring specialists and medical scans that are best taken with consistent machinery. Plaintiff would still be reporting to the same managers Joel Doolin and Adrian Sevier.

221. On July 13, 2016, Catherine Clark of human resources (Juan Porter's supervisor) emailed that Plaintiff's VLTP case was referred to Employee Relations (Kirsten Gunsolus, the individual about whom Plaintiff had complained of retaliation). The agency refused to respond to or investigate Plaintiff's appeal of its decision.

222. On July 13, 2016, FEMA offered Plaintiff three positions for reassignment: a Deployable Field Counsel in OCC with hardship disaster locations, an Emergency Management Specialist (Recovery) position at an unknown location, and a Human Resources Specialist (Policy) for OCCHCO, which one of the offices which was engaged in retaliation against Plaintiff.

223. On July 17, 2016, Robyne Jackson of human resources (supervisor to Kirsten Gunsolus) sent an email to Plaintiff and personnel lawyer Ashley Darbo (Melissa Williams' supervisor), refusing to answer why the agency would not allow abide by FMLA regulations to return Plaintiff to an "equivalent" position if Plaintiff requested a reasonable accommodation.

224. On July 19, 2016, supervisor Ms. Jordan denied leave as an accommodation and would not entertain such a request until the exhaustion of FMLA leave. Ms. Jordan's decision was based on Plaintiff's exercise of protected activity (request for FMLA leave) rather than on medical facts. Ms. Jordan refused to adhere to agency policy to respond to reasonable accommodation requests within 10-11 days of receipt and refused to make decisions based on

AMENDED COMPLAINT          24-CV-00797 KAW          Page **52** of **190**

medical facts. Ms. Jordan did not demonstrate that she conducted an undue hardship analysis in making the denial of Plaintiff's reasonable accommodation request.

225. Employee Relations' Kirsten Gunsolus (on August 2, 2016, August 4, 2016, and August 9, 2016) and Robyne Jackson (August 4, 2016, and August 9, 2016) refused to stop or even address Ms. Jordan's prohibition on Plaintiff to report up EEO issues.

226. On July 20, 2016, Kurt Nance from Equal Rights tried contacting Plaintiff while she was on leave for prescribed medical treatment, although her doctor had said that contacting Plaintiff during this time would be detrimental to her health.

227. On August 2, 2016, after Plaintiff clarified that her first choice to accommodate her disability was to transfer her management chain, Ms. Jordan denied (without explanation) Plaintiff's request to transfer her management. Ms. Jordan did and could not provide Plaintiff with evidence that FEMA had conducted an undue hardship calculation for this request. Emails show correspondence regarding Plaintiff amongst Erika Jordan, Melissa Williams, Ashley Darbo, Nance Kurt of OER, and Kirsten Gunsolus of OCCHCO.

228. On August 8, 2016, at 11:58 AM, Kirsten Gunsolus of human resources (with Kurt Nance of OER cc'd) emailed Plaintiff to say that FEMA would not compensate Plaintiff for being on call. In addition, Ms. Gunsolus said that Plaintiff would receive 24 hours' notice before reporting to work. Ms. Gunsolus confirmed that, "your management chain will not be moved as an accommodation, and this decision will not change." FEMA also declined to provide Plaintiff with EEO time until she was reassigned.

229. On August 11, 2016, per an SF-50 Notification of Personnel Action, FEMA retroactively extended her appointment by one month to August 12, 2016, with an effective date of July 13, 2016. HR Office Angela A McGuirl signed the SF-50. HR Officer Angela A McGuirl signed the SF-50.

230. FEMA has denied vacation time from August 14, 2016, to August 20, 2016, although Plaintiff's supervisor Ms. Jordan herself was on vacation until August 15, 2016, and FEMA had no notice sign of reassigning Plaintiff anytime soon.

231.   On September 1, 2016, Joel Doolin, Cynthia Mazur, Jeff Neurauter, Leigh Hoburg, Kim Farley, Joshua Stanton, and Gregory Dowling exchanged several emails with each other regarding Plaintiff's reassignment.

232.   On September 6, 2016, OER Director Ms. Willisa Donald wrote Plaintiff at the end of the business day and gave Plaintiff less than one business day, requiring Plaintiff to work at night while on protected leave to respond, to respond by midnight (and no later than in the morning) regarding reassignment as an accommodation. Plaintiff notified Robert Scott and Joel Doolin of the harassment/retaliation by the agency as an opportunity to have them intervene to stop the behavior as an alternative to reassignment in response to Ms. Willisa Donald that day. Plaintiff reported to both Joel Doolin (also acknowledging Adrian Sevier's knowledge regarding the matter) and Robert Scott regarding the EEO matters and other matters of retaliation.

233.   On September 7, 2016, Mr. Scott refused to act (intervene or even investigate) and instead encouraged Plaintiff to respond to the reassignment deadline (which had already passed). Joel Doolin said that he did not see the email until after the time when Plaintiff responded to Ms. Donald.

234.   On September 8, 2016, although Plaintiff accepted the Deployable Field Counsel position on July 18, 2016, September 1, 2016, and September 6, 2016, FEMA Office of Equal Rights Director Willisa Donald said she asked Human Resources (of her own volition) to conduct second reassignment search and presented Plaintiff with three non-legal positions and unrelated to alternative dispute resolution. Ms. Donald refused to answer what happened to the position Plaintiff already accepted. Ms. Donald would email Plaintiff at the end of the business day expecting a response before the next morning (i.e., primarily outside of work hours). After Ms. Jordan finally lifted the ban on Plaintiff from reporting up discrimination on September 6, 2016, Plaintiff notified Mr. Scott and Mr. Doolin of the harassing behavior, showing a lack of good faith in the interactive process, but they refused to intervene. After Plaintiff reported up to Mr. Scott and Mr. Doolin, FEMA notified Plaintiff (on September 16, 2016) that it had rescinded the offer of the DFC attorney position.

235. On September 9, 2016, per an SF-50 Notification of Personnel Action, FEMA retroactively extended her appointment by one month to September 17, 2016, with an effective date of August 12, 2016. HR Office Angela A McGuirl signed the SF-50. HR Officer Angela A McGuirl signed the SF-50.

236. On September 16, 2016, Plaintiff accepted another position twice (on or around 2:58 PM and another time on or around 4:51 PM) from the second reassignment search after multiple back-and-forth correspondence between Kirsten Gunsolus and Plaintiff on that date. At 2:34 PM, Kirsten Gunsolus told the DFC position from FEMA rescinded the first reassignment search, and she gave Plaintiff a less than 30-minute deadline (by 3 PM) with which to accept the second set of reassignment offers or forfeit the reasonable accommodation request of reassignment. Ms. Gunsolus sent these positions to Plaintiff's FEMA email address accessible only by her government phone, which Plaintiff did not have on her, and Ms. Gunsolus refused to send Plaintiff a copy of the job descriptions of the offered positions. FEMA (including Ms. Gunsolus specifically) knew that at that point, Plaintiff was at a medical appointment (Plaintiff was already physically in the provider's office and the provider was in the room), but Ms. Gunsolus refused to extend the deadline. Ms. Gunsolus made Plaintiff respond without enough information to make an informed decision. Ms. Gunsolus never responded to Plaintiff's questions about the positions before Ms. Gunsolus set the short deadline. Within minutes of Plaintiff's acceptance, FEMA rescinded its offer of reassignment. Contrary to the agency's assertions, Plaintiff is eligible for Schedule A hiring, so Plaintiff was eligible to be appointed to a permanent position. See Schedule A hiring documentation. The same day, Kirsten Gunsolus of Employee Relations and supervisor Erika Jordan refused to respond to Plaintiff's inquiry about the status of her employment and whether she would be reassigned as her contract was to end on September 17, 2016. In addition, Ms. Gunsolus (cc'ing Willisa Donald, the Director of the FEMA EEO Office) said that if Plaintiff continued to engage in protected speech, the agency would not reassign her, and the protected speech would be considered to be a declination. Kirsten Gunsolus said she would consider Plaintiff to be declining reassignment if she continued to engage in protected activity (protesting discrimination).

AMENDED COMPLAINT   24-CV-00797 KAW   Page **55** of **190**

237. On Monday, September 19, 2016, at 4:04 PM, Kirsten Gunsolus offered Plaintiff only one position (Intergovernmental Affairs position, also a non-attorney and non-dispute resolution position) in the third reassignment set of offers. Plaintiff accepted the position on September 21, 2016, by email, and Plaintiff requested that FEMA accommodate her so that she could continue to attend medical appointments in the same email.

238. On September 22, 2016, Plaintiff again requested to be accommodated at the new reassignment position that she accepted and submitted additional documentation. OER Director said that if Plaintiff wanted to be accommodated at her reassignment position, Plaintiff would ask her new supervisor. FEMA would not make sure that the new position would accommodate her disabilities before assigning her to the position.

239. On September 27, 2016, at 10:40 AM, Willisa Donald (with cc'd Kirsten Gunsolus) admitted by email that the agency had refused to accept Plaintiff's reassignment for the DFC position because of Plaintiff's engagement in protected speech. Plaintiff was continuously asked whether she was located in California in the interim on September 26, 2016.

240. On September 27, 2016, at 12:09 PM, FEMA human resources told Plaintiff to report to work for the Intergovernmental Affairs Specialist position by the next morning at 9 AM (less than 24 hours) by email from Lisa Lewis with Miranda Christiano, Ashley Darbo (personnel attorney, supervisor to attorney Melissa Williams), Robert Nadeau, Vallee Bunting, and Angela McGuirl cc'd. A location was not given for where Plaintiff should report. Unfortunately, this was in contravention of the previous assurances from the agency that Plaintiff would receive at least 24 hours' notice to return to work. Afterward, Plaintiff asked about the exact location to where she should report to work, and she tried to work out being able to attend mediation and medical appointments after the start of the position. The request to go to medical appointments was related to the condition caused by the agency due to its continued harassment. In approximately 2 hours, the agency rescinded the offer for the Intergovernmental Affairs Specialist position. FEMA told Plaintiff to report to work after the last flight from California could have left, given less than 24 hours' notice. Later that day, the reassignment to Intergovernmental Affairs position was rescinded. Kirsten Gunsolus stated, "As a result of your

new management being out of the office on travel, there will be no one in the office to get you situated tomorrow. Therefore, we will be sending you a new reassignment letter with a new start date." In Kirsten Gunsolus's sworn declaration, she claimed that the Intergovernmental Affairs position was rescinded because the position was offered to someone else.

241. On September 27, 2016, at 3:30 PM, FEMA EEO Intake Coordinator Mr. Goudy asked Plaintiff whether she was going to withdraw her EEO complaint if she was reassigned.

242. On October 5, 2016, per an SF-50 Notification of Personnel Action, FEMA retroactively extended her appointment by one week to September 24, 2016, with an effective date of September 17, 2016. HR Office Angela A McGuirl signed the SF-50. HR Officer Angela A McGuirl signed the SF-50.

243. On October 13, 2016, Lisa Lewis of HR sent Plaintiff a fourth reassignment notice, including a reassignment letter for Plaintiff's decision of acceptance to be reassigned to the OCC Response and Recovery Division as Attorney Advisor IC-13. Plaintiff accepted on October 14, 2016.

244. On November 16, 2016, per an SF-50 Notification of Personnel Action, FEMA retroactively extended her appointment two years to October 17, 2018, with an effective date of September 25, 2016. HR Officer Angela A McGuirl signed the SF-50.

245. On November 22, 2016, per an SF-50 Notification of Personnel Action, FEMA retroactively reassigned Plaintiff on October 17, 2018, with an effective date of October 16, 2016. HR Officer Corey C. Coleman (Director of HR) signed the SF-50.

246. On January 14, 2020, Defendant refused to settle the present case during settlement discussions convened by Administrative Judge Maricia Woodham at the beginning of the EEOC hearing unless Plaintiff agreed not to speak about the underlying and continued allegations of the discrimination case in any circumstance. A reason negotiations broke down was because of FEMA's requirement that the Plaintiff not speak about the underlying and continued allegations of the discrimination case, even if needed to do so for an investigation (e.g., state bar investigation), and would need to lie to said investigation or tribunal officials.

247. On January 15, 2020, Cynthia Mazur testified at the EEOC hearing that transferring any managers (even temporarily) was not acceptable to her nor part of the culture. There is no exception in the FEMA or DHS policy to transferring harassers (including before a finding of an investigation) away from a victim if a harasser is a manager.

248. At the EEOC hearing in January 2020, Ms. Mazur testified that she did not become Plaintiff's supervisor because Mr. Doolin "thought that was totally inappropriate" because doing so would make the Agency look bad.

249. On May 20, 2022, in response to Defendant's question about opening up settlement negotiations, Plaintiff asked whether Defendant would continue to require a nondisclosure or gag imposition for any settlement agreement. Defendant never responded.

## IX.    CLAIMS

250. Even if not specifically referenced, Plaintiff realleges and incorporates by reference all the other paragraphs of this complaint in each claim.

### 1.    FIRST CLAIM OF RELIEF

**Changing and unequal terms and conditions of the job and nature and assignment of work based on protected activity and stereotypes of race, national origin, gender/sex, color, and disability; disparate impact**

*CA Labor Code § 98.6(b)(1), Title VII of the Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Part 1604 and Part 1606). FMLA (29 USC §§ 2601 et seq., as amended; 5 USC §§ 6381-6387, 5 CFR Part 630; 29 CFR Part 825), Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203), 42 USC § 1981, 1983, and 1985-6*

251. Facts specifically incorporated for this claim include procedural history section #62 (September 2022 EEOC finding rationale) and facts section #71-81 (job description and performance), 85-92, 220 (performance appraisal dated July 12, 2016), 168 (analysis assignment of April 7, 2016), 146-148 (TRSG in February 2016), and 189-90 (TRSG May 2016).

252. Plaintiff performed her job satisfactorily throughout her employment within the FEMA ADR Division and received satisfactory performance reviews from 2014-2015 until she

received a negative performance review in January 2016. When Plaintiff was given satisfactory performance reviews, FEMA awarded her a bonus for her performance.

253. When Plaintiff started working at FEMA, ADR management (primarily Mr. Scott) assigned Plaintiff work according to gender stereotypes and to some extent the intersection of gender and racial/ethnic stereotypes. She was primarily technical administrative work, such as working on drafting manuals, assisting with data analysis, database upkeep, and recordkeeping work, rather than ADR practice as per the job description. ADR management suppressed Plaintiff's attempts to engage in leadership activity, which is associated with male gender stereotypes and violated stereotypes of East Asians as nondominant or submissive.

254. FEMA only hired white individuals (100%) in one of the six supervisory job titles within the ADR Division during Plaintiff's tenure working at the ADR Division. As far as Plaintiff knew, ever since the founding of the ADR Division, FEMA only hired white individuals into supervisory positions. Although the ADR Division at headquarters had a female super majority (80%), two-thirds of the men at the ADR Division headquarters office held a supervisory position, and not long after Plaintiff was reassigned, 100% of men at the ADR Division headquarters office held supervisory positions when Mr. Kapoor was promoted to a supervisory position over a more experienced woman of color. Mr. Scott considered 75% of women of color at headquarters under his supervision to have positions of primarily administrative duties.

255. As far as Plaintiff knew, FEMA had only hired women (especially young women of color) but not men into Plaintiff's position in the ADR Division organization chart prior to October 2016.

256. Karen Roos, a young Latina woman, occupied the Plaintiff's position with Robert Scott as her first-line supervisor and then Erika Jordan as her first-line supervisor before she was forced out of the position. Mr. Scott also assigned Ms. Roos administrative work. Therefore, ADR management with the blessing of OCC management (who were Senior Executive Service members) segregated or classified Plaintiff's position –thus Plaintiff and limited her employment opportunities—based on her sex/gender, race, and color.

257. Between 2014-2016, FEMA did not classify positions held by men in the ADR Division as administrative only with no leadership opportunities.

258. Ms. Mazur and others with the blessing of ADR management asked Plaintiff and other women (but none of the men) to bake for and contribute to ADR social events (e.g., birthdays) that occurred as often as twice weekly.

259. Costs for baking supplies and time were not always reimbursed.

260. If a woman (especially if she were a woman of color) declined, tried to make a less time-consuming dessert, or made a dessert she wanted to make instead of the ordered dessert, she was considered not to be a team player.

261. If a woman (particularly women of color) declined or tried to make a less time-consuming dessert, she was considered not to be a team player and not invited to participate in ADR practice projects, and her professional references would be in jeopardy. This labeling and limiting a woman's career-enhancing opportunities is retaliation against a woman for refusing to adhere to gender stereotypes.

262. The time commitment to bake, source ingredients, and buy specialty equipment was significant. Baking assignments were determined by baker skill, which meant Plaintiff was assigned complicated multiple-day or multi-hour creations. Once Plaintiff went to New York City (at least 4-6 hours away from DC) to source a difficult-to-find spice for a cake order.

263. At headquarters, ADR management exempted men from administrative work or placed them in supervisory positions to "supervise" the administrative work of the females in the office. When men did administrative work, Ms. Mazur and Mr. Scott gave them kid gloves with step-by-step instructions, less work, no deadlines or longer timelines, and/or an assistant (i.e., making Plaintiff assist Mr. Kapoor) to complete the tasks but did not treat women as such. The portion of administrative work or other feminine-stereotyped work men did compared to the women (especially younger women) in the office was less.

264. On Thursday, April 7, 2016, through former supervisor Robert Scott, supervisor Erika Jordan assigned Plaintiff to complete the quarterly database report assignment to be completed by the close of business Friday of 12.5 times the number of worksheets and an

AMENDED COMPLAINT    24-CV-00797 KAW    Page **60** of **190**

additional 37 graphs and thousands of data points to manually count in less than 3% of the time Mr. Scott gave himself to do the work.

265.    Comparatively, when Mr. Kapoor was assigned database work, Ms. Mazur and Mr. Scott gave Mr. Kapoor an assistant (making Mr. Kapoor the lead over Plaintiff), and Mr. Scott gave Mr. Kapoor detailed instructions for a much easier assignment than given to Plaintiff.

266.    Ms. Mazur, Mr. Scott, and Ms. Jordan assigned Plaintiff (a woman) and asked to participate in fewer career-enhancing assignments that were part of her major duties, such as ADR practice, and instead told to participate in housework and baking duties, such as an ADR Division etiquette committee.

267.    The workload analysis ADR Division members filled out, the daily and monthly work plans and job task lists Plaintiff created, and the ADR Division database logging ADR practice hours per provider, would show the different proportion of administrative versus ADR practice Plaintiff received compared to others of a difference gender paid at the same grade and job classification (e.g., Vikram Kapoor) and difference of the assignment of administrative work or other work by stereotype by race, national origin, color, gender, and the intersectionality thereof. The decreasing portion of Plaintiff's ADR practice over time and the increasing assignment of administrative work and other work outside of her job description by ADR management, particularly after she increased protected activity, would also show evidence of retaliation and interference with protected activity.

268.    The ADR Division database of ADR service hours between 2014 and 2016 would clearly show that ADR management assigned Mr. Kapoor more ADR practice hours than they gave Plaintiff during her time within the ADR Division.

269.    Mr. Scott's reaction to the subgroup Plaintiff wanted to join compared to the one he suggested and the one-day difference between his change in reaction demonstrates that Plaintiff's protected activity (raising allegations of discrimination and trying to prevent or stop discrimination in the office) caused Mr. Scott to dissuade Plaintiff from joining the TRSG subgroup on promotions, performance reviews, and awards. Mr. Scott did not want Plaintiff to report up or others to know his own discriminatory behavior, as a way to prevent Plaintiff from

engaging in EEO activity when it was okay to join the group on work-life balance but not the one related to potential EEO issues. Because Mr. Scott had a specific issue with Plaintiff joining that one particular TRSG subgroup (particularly for what she would say or do in the subgroup) contradicts his outwardly stated reason that Plaintiff was joining too many groups.

270. Mr. Scott's actions also demonstrate his actions related to the TRSG performance review subgroup in 2016 had a connection to Plaintiff's sex/gender because he did not have an issue with Plaintiff joining a committee discussing issues conforming to her gender, such as childcare, but did have an issue with her joining a committee related to masculine-stereotyped activities, such as career ambition or advancement. Mr. Scott (a man) had no issue when he joined the same TRSG performance review subgroup that Mr. Scott tried to dissuade Plaintiff from joining, nor did he consider himself to be joining too many groups when he himself joined the same group.

271. Plaintiff's performance goals included office-wide (OCC) and division-wide goals (ADR Division) goals set to distinct levels of performance, which would be used to determine the receipt of bonuses. Participating in office-wide committees and task groups was part of the requirement to complete and receive high scores for her performance goals. However, when Plaintiff participated in such groups, especially if they involved Plaintiff's protected activity, Plaintiff's supervisor Mr. Scott gave her a negative performance appraisal on April 15, 2016.

272. Plaintiff's participation in an OCC-wide workgroup, such as the TRSG workgroup, was necessary for Plaintiff to obtain full marks on her performance goals. As a result, Mr. Scott's attempts to dissuade Plaintiff from joining the specific TRSG subcommittee affected whether and how much she obtained in bonuses and her eligibility for promotion.

273. Mr. Scott had no problem when Mr. Scott or Cynthia Mazur assigned Plaintiff to or Plaintiff participated in committees or work groups when such work did not involve her engaging in protected activity or when they conformed to gender stereotypes, such as a committee on etiquette that discussed housekeeping for the office.

274. Plaintiff was passed over for career-enhancing assignments despite greater expertise and experience in particular areas by others in different protected classes. While men

in the office were assumed to automatically have experience, women had to prove it and were given less career-enhancing work first.

275. Contrary to FEMA's claim that those working under Robert Scott had a primary responsibility to conduct administrative work, Robert Scott made none of those claims about the five white employees or one of the other non-Asian ADR advisors under his supervision in the ADR Division at headquarters nor prevented such employees from engaging in ADR practice. Mr. Scott was also the manager of all of the deployable field ADR advisors in the ADR cadre whose job was to deploy to disasters to provide ADR services.

276. Karen Asaro, a white coworker with the same supervisor as Plaintiff (Robert Scott) in the same section of the ADR Division at headquarters, was not told by management that her job was to do administrative work alone and was given ADR practice assignments. ADR management called her to deploy, and she continued to be able to work on ADR practice projects without restraint.

277. Mr. Scott increased his calls that Plaintiff's job was to perform administrative work alone and not ADR practice after she made discrimination allegations against Mr. Kapoor for his sexist comments about Plaintiff and women's job to do administrative, secretarial, or domestic work.

278. After Plaintiff was demoted on April 4, 2016, to Ms. Jordan as her first-line supervisor, Ms. Jordan eliminated all ADR practice work (a major duty of Plaintiff's position) from Plaintiff's workload, assigned no ADR practice work, increased her administrative workload, and admonished Plaintiff for participating in activities required for Plaintiff to score well and complete the OCC set goals for performance, citing these activities as not part of Plaintiff's position. Ms. Jordan also told Plaintiff her primary duties were none of the duties listed in her official job description or the vacancy announcement (e.g., tracking coworker certification status of FQS through administrative or secretarial work) and violated not only the Chief Counsel's office-wide order but also potentially government ethics (e.g., using government time to research and rule on tax law to advise individual employees on their tax liability).

279. Although Plaintiff was experienced in mediating discrimination complaints and to her knowledge others in the ADR Division had no experience mediating this type of complaint, Robert Scott offered the assignment to coworkers who were not experienced in mediating employment discrimination cases, even those who openly stated they did not know how to mediate those cases (e.g., Rea Wynder).

280. In the ADR and coaching worlds, experience is often measured by hours and number of cases. The number of coaching hours and clients are used to determine eligibility for coaching credentialing. Because of FEMA/DHS's discriminatory assignments, Plaintiff was held back from being eligible to apply for some International Coaching Federation coaching certification levels and being hired elsewhere for another position or a promotion. For example, although Plaintiff was hired to the State Department in 2016 in an effort to escape the hostile work environment at FEMA, the hiring manager stated that Plaintiff would need to perform some remedial mediations once onboarded to that office, remedial mediations Plaintiff would not have needed had she been given the ADR practice assignment as she had been promised when she was hired and as was stated in the vacancy announcement and official position descriptions.

281. For government vacancies, applicants are required to demonstrate specific experience in an area as measured in the number of hours and types of assignments to obtain the points to be hired. FEMA's refusal to assign promotion-potential work to Plaintiff according to her job description interfered with her ability to obtain a position elsewhere.

282. Before Plaintiff's time at FEMA's ADR Division, co-worker Vikram Kapoor (same 0905 Attorney Advisor position) said he did not have real-world work experience in ADR. Not only did Plaintiff have real-world work experience in ADR and had experience in ADR far longer than Mr. Kapoor.

283. Throughout the ADR Division, employees volunteered for assignments, were recruited by coworkers, assigned by management, or assigned by direct supervisors. Ms. Mazur (as ADR Division Director and Plaintiff's manager) directly or indirectly assigned or requested Plaintiff complete projects or assignments, such as the division retreat, etiquette committee, baking assignments, drafting reward proposals, and assisting Mr. Kapoor on a database project.

## 2. SECOND CLAIM OF RELIEF

**Assault/physical intimidation by a supervisor (retaliation/interference, discrimination based on sex/gender, color, race, disability, and national origin)**

*Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203), Title VII of the Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Parts 1604 and 1606), CA Labor Code Section § 98.6(b)(1), 42 USC §§ 1981, 1983, and 1985-1986, Federal Tort Claims Act (FTCA) (28 USC §§ 1346 and 2671-2680).*

284. Facts specifically incorporated for this claim include procedural history section #35 (report to Officer Devine of assault), 39 (FEMA/DHS's refusal to investigate internally), and 56 (FEMA's admission of destruction of video evidence), as well as facts section #87 (PTSD diagnosis cause), 129 (supervisor Mr. Scott previous attempt to block Plaintiff in her cubicle to prevent her from documenting evidence of discrimination), 144 (2016 move to 500 C Street office), 128, 158 (Mr. Scott ordered to see a therapist after her protected activity), and 160 (assault by Plaintiff).

285. On March 22, 2016, one day after Plaintiff initiated the EEO process, Plaintiff's supervisor Robert Scott assaulted/physically intimidated Plaintiff while telling her that she should not have documented (i.e., written down in an email) her allegations of discrimination. Mr. Scott's actions were related to Plaintiff's protected activity both due to the proximity in time of the events and Mr. Scott's reference to Plaintiff's protected activity in assaulting Plaintiff.

286. Mr. Scott committed the assault/physical intimidation against Plaintiff to stop her from further making allegations of discrimination.

287. Mr. Scott's behavior on March 22, 2016, which occurred at 500 C Street, SW, Washinton, DC, could constitute an intent-to-frighten assault. In Washington, DC, there is a form of assault, which is a crime, labeled as an "intent to frighten" or "tort" type of assault that does not require actual or attempted battery or bodily but can include conduct by a perpetrator intended to frighten or injury the victim. *See Robinson v. United States*, 506 A.2d 572 (DC 1986).

AMENDED COMPLAINT  24-CV-00797 KAW  Page 65 of 190

288. Mr. Scott's behavior of angrily invading her intimate personal space while cornering and making a choking gesture with his hands served to frighten Plaintiff.

289. Because Mr. Scott was only inches away from Plaintiff and tried to come closer such that she had to lean backward, he had the ability to injure her on March 22, 2016. On that date, Mr. Scott was taller and bigger than Plaintiff with Mr. Scott previously reporting that he wore XXXL-sized clothing.

290. Plaintiff thought Mr. Scott could have killed her on March 22, 2016, and that incident made her believe he might try to kill her in the future, all of which contributed to her PTSD diagnosis.

291. Plaintiff had worked with angry people in the conflict resolution field and even worked on peace issues while living in the Middle East but never had she felt so close to being murdered as on March 22, 2016.

292. Mr. Scott had no legitimate business reason to approach Plaintiff and get up into her face while he was enraged, nor approach her twice on March 22, 2016, while he was in such a state. On that date, Mr. Scott spoke to Plaintiff within an intimate partner distance (a few inches), rather than what is appropriate for business relationships (a few feet).

293. Ms. Mazur, Joel Doolin, Adrian Sevier, Kirsten Gunsolus, Kurt Nance, and Erika Jordan refused to intervene and transfer Plaintiff's supervisors/managers.

294. Mr. Scott referred to an email Plaintiff wrote to document and report EEO allegations as not calm or rational. The text of the email shows Mr. Scott's assessment of said email as unreasonable and based on Plaintiff's sex/gender.

295. On January 12, 2016, Mr. Scott ordered her to see a therapist in response to and after her harassment allegations against co-worker Mr. Kapoor, including Mr. Kapoor tripping Plaintiff in retaliation for opposing gender discrimination, emailing her: "You've actually created, in your mind, people who don't exist and then you're projecting your views onto them… that is why I am asking you to call EAP to discuss and I also suggest you consult with your mentors if you are unable to see that your perspective is misplaced and causing you to behave badly."

296.    Mr. Scott again emailed Plaintiff on March 21, 2016, at 5:26 PM stating that she had an "active imagination" and further stated "honestly, none of what you say in your email below has really happened, right? I continue to encourage you, especially as an attorney, to avoid making false and unsubstantiated allegations..."

297.    Mr. Scott's physical intimidation/assault of Plaintiff and his accompanying words to her amounted to physical and verbal abuse that was likely to deter protected activity.

298.    Mr. Scott's assault/physical intimidation of Plaintiff on March 22, 2016, occurred because of her documentation of her allegations of discrimination, because of her gender (female presenting), sex (female), race (Asian), national origin (Taiwanese/Chinese), and color (not white, a person of color), and because Mr. Scott regarded Plaintiff as disabled due to her gender/sex.

299.    Mr. Scott had not so treated as such men or any white individuals yet had physically intimidated at least two women of color who worked for the ADR Division after they had engaged in protected activity.

300.    Mr. Scott treated Plaintiff as having an unspecified disability in association with his behavior when he physically intimidated/assaulted Plaintiff.

301.    Mr. Scott regarded Plaintiff to be disabled due to her sex/gender as a hysterical, irrational, or emotional woman as seen by Mr. Scott's emails to Plaintiff on January 12, 2016, and March 21, 2016, in response to her gender/sex discrimination allegations.

302.    Mr. Scott's conduct was unwelcome and sufficiently serious enough or happened often enough to change the conditions of Plaintiff's employment and create a hostile working environment.

303.    At the January 2020 EEOC hearing, Ms. Mazur (whose office desk was near Robert Scott's) could not corroborate Mr. Scott's testimony of what happened on March 22, 2016.

304.    FEMA counsel for the case during the EEOC hearing Ashley Darbo and Melissa Williams did not stop any of FEMA's witnesses from testifying falsely during the January 2020 hearing. Even after Plaintiff reached out to Ms. Darbo and Ms. Williams on October 8, 2020, to

have them stop allowing their witnesses to false testimony and to correct the record, Ms. Darbo refused, and Ms. Williams (Ms. Darbo's subordinate) did not respond.

305. Video footage, badging data, timesheets on March 22, 2016, as well as ADR Division seating plans and floor plans, are material because they could show that Mr. Scott's testimony at the January 2020 EEOC hearing was false: the time, date, location of the event, time Plaintiff entered the office, whether Mr. Scott could have seen Plaintiff from his desk, the words Mr. Scott said to Plaintiff (talking about Plaintiff's protected activity), what Mr. Scott and Plaintiff were doing and where at the date and times in question.

306. Plaintiff exhausted her administrative remedies in reporting the tort and discriminatory aspects of Mr. Scott's behavior on March 22, 2016.

307. OSC, DHS IG, DHS FPS, and FEMA OSCO, AID, OER, and OPR all refused to investigate Plaintiff's allegations.

308. While Plaintiff's management may not have been qualified to investigate discrimination allegations per the DHS policy, FEMA/DHS's representation (true or not) to the EEOC that Plaintiff's management so-called investigated Plaintiff's allegations of discrimination indicates the government's waiver of immunity from prosecution under the Federal Tort Claims Act (FTCA) because of its representation indicates that the government is admitting that members of Plaintiff's management (including Mr. Scott) were designated as investigative or law enforcement officers within the meaning of FTCA during Plaintiff's employment at FEMA.

### 3.    THIRD CLAIM OF RELIEF

**Hostile work environment (lack of functioning EEO system, conflicts of interest, destruction of evidence), retaliation**

*Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Parts 1604 and 1606), Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203), 5th Amendment of the US Constitution, 29 CFR § 1614.105(c), 29 CFR § 1602.14 (Preservation of records), FOIA (5 USC § 552), Privacy Act (5 USC § 552a), NARA (18 USC § 641 and 2071), 36 CFR Part 1230, 42 USC § 1981, 1983, 1985-6*

309. Plaintiff specifically realleges and incorporates facts # 235 (EEO official linked receiving accommodations on dropping EEO case on September 27, 2016).

310. FEMA subjected Plaintiff to a hostile work environment because there has been a systemic failure to have an impartial and effective internal complaints process and investigations procedure at FEMA. Plaintiff effectively has had no departmental or agency recourse to have her discrimination complaint investigated and heard, as well as to correct past, stop prevent, or prevent future harassment. Even after spending eight years exhausting her administrative remedies and about 10 years since she first started working for FEMA and first faced discrimination, Plaintiff's complaint has yet to be thoroughly investigated with an opportunity for discovery besides Plaintiff's own efforts to uncover the truth.

311. Despite DHS IG, RAND Corporation, and internal FEMA findings of a widespread culture of discriminatory harassment, DHS/FEMA refused to correct and prevent specific harassment against Plaintiff. Even in the IG report, DHS never ordered or recommended that FEMA correct deficiencies for past complaints.

312. The same offices named in the DHS IG report on widespread discriminatory harassment at FEMA also were involved in Plaintiff's discrimination complaints.

313. The DHS IG refused to investigate Plaintiff's individual complaint, and even at least once referred Plaintiff's claims to named individuals or offices to investigate themselves (conflicts of interest).

314. FEMA/DHS's systemic failure to have an impartial and effective complaints process and investigations procedure affected Plaintiff because of her protected activity and protected classes that form the basis of this complaint because perpetrators of discrimination feel entitled to discriminate when they know their employer will not enforce any consequences.

315. Especially since Plaintiff was an OCC employee and named employees were OCC, OCCHCO, and OER employees, FEMA's administrative processes involved having named individuals or their subordinates process or decide complaints against themselves or their superiors.

316. This conduct has been unwelcomed and was sufficiently serious and happened often enough to change the conditions of Plaintiff's employment and create an abusive or hostile work environment, and a reasonable person in these circumstances would consider the environment to be abusive or hostile.

317. Defendants DHS and FEMA or a member of Defendant's management knew or should have known of the hostile work environment because FEMA has encountered many complaints, and they should have known the terms of their own policies. Plaintiff's senior managers supervised or advised on the supervision of the processing of the Equal Employment Opportunity (EEO) complaints process.

318. Defendants DHS and FEMA did not take prompt action that was likely to end this hostile work environment because the responsible members reached up to senior FEMA officials and FEMA did not face severe consequences for failing to take action. FEMA instead blamed the issue on scapegoats and deflected responsibility.

319. During all relevant periods, the offices and individuals in FEMA/DHS who were responsible for investigating and processing discrimination complaints (e.g., lawyers, EEO officials) also had dual functions of making or advising on personnel decisions and processing or advising on EEO complaints. These individuals also participated in discriminating against Plaintiff. Individuals who had these dual functions conveniently left out allegations against themselves or their offices in drafting Plaintiff's discrimination charge, refused to add claims implicating themselves to the charge, and watered down the claims.

320. On September 27, 2016, when Mr. Goudy of OER asked Plaintiff whether she was going to withdraw her EEO complaint if she were reassigned, his question implied that receipt of Plaintiff's reasonable accommodation was conditioned on Plaintiff dropping her discrimination complaint against FEMA/DHS and interfered with Plaintiff's exercise of her rights to request a reasonable accommodation.

321. OER was involved in processing Plaintiff's discrimination complaint and her reasonable accommodation request.

322. FEMA refused to adequately investigate, maintain evidence (even with litigation holds), and issue a litigation hold despite knowledge of an EEO complaint.

323. Plaintiff's experience with the FEMA EEO process was rife with conflicts of interest and none of the guarantees of a timely and thorough EEO process.

324. Because so many divisions and components of DHS were involved in the systemic failure to investigate and process discrimination complaints at FEMA, this failure amounts to a conspiracy to violate Plaintiff's civil rights.

325. AJ Woodham of the EEOC issued a default judgment for the administrative portion of this complaint because she determined that FEMA completely lacked a functioning EEO process and investigations procedure.

326. FEMA provided no evidence that Plaintiff's supervisors or managers reported the harassment to the IG, nor that OER or the IG investigated Plaintiff's allegations.

327. The Agency specifically defined the terms investigation and investigator to mean more than any supervisor simply asking questions; an investigator per FEMA's own policies must have specific training, employ forensic techniques, and be part of specific offices, none of which FEMA did.

328. FEMA declined to investigate through the official EEO process and the internal Administrative Investigations Division (AID) process, especially regarding Plaintiff's allegations of workplace violence.

329. Plaintiff's management also did not hire someone qualified as a "factfinder" with DHS Civil Rights and Civil Liberties approved training in investigative techniques per the requirements of FEMA Instruction 256-01-001 to investigate her claims. DHS declined to investigate Plaintiff's specific claims, specifying that it did not have the resources to investigate unless mandated by Congress.

330. DHS/FEMA enabled individuals named to as harassers to investigate, advise investigations, or supervise the investigations against themselves.

AMENDED COMPLAINT       24-CV-00797 KAW       Page **71** of **190**

331. A lack of any evenhanded, impartial, and thorough investigations in the EEO process, especially without any discovery allowed, put Plaintiff at a disadvantage in the EEO process for due process and equal protection violations.

332. The EEOC made a determination on the merits without Plaintiff ever being able to access internal evidence from her harassers and those who aided her harassers.

333. The EEOC also held against Plaintiff failure to present evidence that she had no opportunity to present or seek in the EEOC process from witnesses and DHS/FEMA to present.

334. FEMA has tried to restrict Plaintiff's ability to access relevant evidence in processes outside of the official EEO process (e.g., FOIA/Privacy Act requests) and has destroyed evidence in its possession. The attempts to hide and destroy evidence makes salient the due process and equal protection violations FEMA has committed.

335. Plaintiff filed her discrimination complaint (on March 21, 2016) with the FEMA Office of Equal Rights within 45 days of the recording of material video footage dated March 22. The video that FEMA destroyed is material because it would show the falsity of Mr. Scott's testimony at the January 2020 EEOC hearing regarding his assault/physical intimidation of Plaintiff: the time, date, location of the event, time Plaintiff entered the office, the words Mr. Scott said to Plaintiff, what Plaintiff and Mr. Scott were doing at the date and time in question.

336. Leigh Hoburg and Daniel Hall (supervisory attorneys in charge of discrimination complaints) knew Plaintiff filed a discrimination complaint and knew they should have issued a litigation hold but did not. Their division belongs to the same division in charge of advising on FOIA and Privacy Act issues. Neither their supervisors nor subordinates issue a litigation hold specific to evidence related to Plaintiff's discrimination cases against FEMA/DHS.

337. FEMA notified Plaintiff that it destroyed video evidence related to the present EEO case after Plaintiff had requested the evidence via a FOIA request. FEMA also alleged that discovery was not possible, which indicates that other evidence had been destroyed. There was a litigation hold on all evidence related to harassment at FEMA at the time Plaintiff requested that the material video footage.

338. There is no evidence FEMA has tried to retain evidence instead of allowing employee accounts to be deactivated as is typical when an employee leaves the agency. When Plaintiff left FEMA, FEMA OCC XO Kim Farley notified Plaintiff that her electronics had been wiped, even after Plaintiff notified OCC to preserve evidence and not destroy evidence given pending EEO matters. FEMA OCC specifically asked Plaintiff to wipe her electronics, which Plaintiff refused to do.

339. Plaintiff's FOIA request related to Ms. Jordan's assignment of the same work plans to another woman of color Karen Roos has been open since July 5, 2020. The DHS website to check the status of Privacy Act and FOIA requests says that the average days to answer simple requests is 21.24 days and 111.59 days for complex cases. Although Plaintiff has checked in with DHS/FEMA several times regarding the matter directly with DHS/FEMA and through her Senate representative, FEMA has yet to disclose the information.

340. OER officials were directly involved in personnel decisions and the EEO process, including conditioning participation in the EEO process on Plaintiff's protected activity. OER officials were directly involved in facilitating discrimination.

341. FEMA did not outsource any investigation to another component investigator for the allegations of this case as outlined in DHS policy Department of Homeland Security, Anti-Harassment Program, Instruction #256-01-001 (June 6, 2019). If there is a conflict of interest (as the DHS Anti-Harassment Program policy defined there was), FEMA should have outsourced the investigation to another component.

342. FEMA also refused to provide Plaintiff her full alternative dispute resolution (ADR) rights in the EEO process. FEMA Equal Rights (OER) refused to assign to Plaintiff's case an impartial mediator who did not know and work with her managers, as well as ensure that the Agency requires those with settlement authority to attend the mediation. FEMA OER Equal Employment Opportunity (EEO) Counselor Andrea Pearson said FEMA did not need to provide a neutral/impartial mediator.

343. Throughout Plaintiff's employment at FEMA, the head of OER did not report to the head of FEMA or DHS.

344. FEMA OER's EEO Counselor Andrea Pearson did not complete and send Plaintiff a copy of the EEO Counselor's report in a timely manner.

345. FEMA counsel allowed its witnesses to defame Plaintiff and knowingly submit blatantly false information under oath or in its responses without correction to the relevant governing bodies or tribunals.

346. OER officials directly involved in personnel decisions and the EEO process, including conditioning participation in the EEO process on Plaintiff's protected activity, OER officials directly involved in facilitating discrimination (e.g., Mr. Goudy trying to find out Plaintiff's location as a means to ensure FEMA would not accommodate Plaintiff).

347. Per FEMA's Anti-Harassment Policy, OER employees must physically remove the harasser from the complainant and the workplace, and OER must be the one to promptly investigate allegations of harassment that do not involve physical touching or GS-15 or higher. OER never did so in Plaintiff's case.

### 4. **FOURTH CLAIM OF RELIEF**

**Harassment (discriminatory/hostile work environment and quid pro quo) by coworkers based on sex/gender, race, national origin, disability, color, and protected activity**

*Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Parts 1604 and 1606), 42 USC § 1981, 1983, and 1985-6, Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203)*

348. In addition to the examples as follow, refer to the fact section (lines 93-111, 164-165, 211, 218-245) as examples of coworker harassment include but are not limited to Ms. Watkins' comment about Chinese people being barbarians, women only were made to bake, Mr. Kapoor's action regarding the August 2014 presentation, September 2014 facilitation, Mr. Kapoor tripping Plaintiff, Mr. Kapoor's invitation to be Plaintiff's plus one on October 17, 2014, Mr. Kapoor asking to go to Plaintiff's home several times on December 12, 2014, Plaintiff expressing her discomfort to Mr. Kapoor that he used gender-stereotyped language, Mr. Kapoor's remarks against minorities (particularly in referring to Asians), Mr. Kapoor's sabotage of Plaintiff's coaching career on March 13, 2015, Mr. Kapoor's gift of earrings to Plaintiff in

January 2016, Ms. Bissell's harassment of Plaintiff relating to baking, Mr. Kapoor's stalking Plaintiff on social media in June 2016, and actions taken by human resources and EEO officials.

349.   Co-workers harassed or created a hostile work environment because of Plaintiff race (Asian, a minority), color (the color of East Asians of Taiwanese/Chinese descent, not white), national origin (individual of Chinese/Taiwanese descent), sex/gender (female), and protected activity.

350.   Along with the other hostile work environment claims and other claims of discrimination alleged elsewhere, this conduct in its totality, has been unwelcome, severe, and pervasive to change the conditions of Plaintiff's employment and create a hostile or abusive work environment.

351.   A reasonable person in these circumstances would consider the environment to be hostile or abusive, such as found by the RAND Corporation, the DHS Inspector General, and FEMA's own internal investigation. *See* procedural history lines #52-53.  Others commented on how they would feel uncomfortable or how inappropriate the conduct Plaintiff experienced was. For example, Jill McDonnell of HR commented about the inappropriateness of the type of jewelry Mr. Kapoor gave to Plaintiff and the consequences a woman might face if were married and a male coworker gave this type of jewelry to her.

352.   The conduct was unwelcome and sufficiently serious or happened enough to change the conditions of Plaintiff's employment and create an abusive or hostile work environment.

353.   Plaintiff and coworker Mr. Kapoor who shared a cubicle with Plaintiff both worked on at least five of the same projects together: a multi-day retreat of another office, the office retreat, a presentation for the ADR division on coaching competencies, a database project, and a peer coaching.  In addition, the two (the Plaintiff and Mr. Kapoor) regularly interacted with each other or attended the same whole-office meetings, retreats, a divisional video production, and other similar projects.

354. Plaintiff's supervisors—the Deputy ADR Division Director and the ADR Division Director—assigned the majority of multi-month projects to the Plaintiff and Mr. Kapoor to work together.

355. Between the end of August and December 2014, Mr. Kapoor engaged in at least 16-17 instances of escalating discriminatory behavior against Plaintiff based on her protected categories and activity during their shared projects. During every project together in the same period, Mr. Kapoor's behavior started from several comments about women or minorities, actions asserting or enforcing gender norms, sexual advances, inappropriate personal questions, and unprovoked yelling to progressed to backlash against Plaintiff (yelling, gender slurs, and tripping) when she told Mr. Kapoor to stop the unwanted behavior. Mr. Kapoor's actions made it difficult for Plaintiff even to assess the progress of joint projects and coordinate with him on such projects.

356. Around the beginning of Plaintiff's employment in 2014, the office made it known that Plaintiff was a token hire because of and different because of her race and national origin. Lester Schoene (a white man) told her to see (point to both Asians in the ADR Division) how the office had changed since their hire. Plaintiff was also told that Mr. Scott (a white man) had hired Plaintiff and another Asian person in the ADR Division headquarters because of their last name (both Asian last names, and in Plaintiff's case, a Taiwanese/Chinese last name). At some point, Mr. Schoene also pointed out how back in the day, he (and others like him, implying other white individuals living in or grew up in Virginia or the mid-Atlantic) did not talk to "those people" as he referred to another woman of color (who was Black). In earlier days, Chinese individuals were classified as people of color in Virginia. Several others in the office grew up in Virginia (such as Mr. Scott) and other states within the mid-Atlantic region. The nexus between these comments and gestures to race, color, and national origin were clear by body language and implication.

357. One time, Erika Jordan stated that someone else at FEMA had asked her whether Plaintiff actually worked for the US government (FEMA) or whether Plaintiff's email was spam with the implication that Plaintiff's email could not be trusted because of her Chinese/Taiwanese

last name, which was part of her email address. FEMA had an internal email system to check who worked at FEMA. Plaintiff's managers did not try to protect Plaintiff, nor correct or prevent the discriminatory event from happening again.

358. Inga Watkins and/or Loretta Vardy tried to repeat (with Plaintiff's supervisor Robert Scott in the room) a sexist joke that Mr. Kapoor told during their interview of Mr. Kapoor. They relayed that Mr. Kapoor made a joke about how a woman's place was in the kitchen. This joke that created a hostile work environment was related to the female sex/gender because it mentioned women or feminine stereotypes or gender roles of women in the kitchen.

359. Mr. Scott nor Ms. Mazur (Mr. Kapoor, Ms. Watkins, and Ms. Vardy's supervisor) is known to have disciplined nor counseled Mr. Kapoor nor Ms. Watkins or Ms. Vardy for the retelling of Mr. Kapoor's sexist joke.

360. Mr. Kapoor's unwanted behavior toward Plaintiff continued even while he was deployed to another office in another region in 2015.

361. After Plaintiff reported harassment by her coworkers to management, Mr. Kapoor continued to give Plaintiff inappropriate gifts (jewelry) in January 2016 and stalk Plaintiff on social media even while Plaintiff was on medical leave due to the level of harassment she faced.

362. Ms. Watkin's comment that Chinese people are barbarians because they eat dogs was related to Plaintiff's national origin because it was a statement directly linking a national origin to a discriminatory stereotype or remark. Ms. Watkins openly disclosed her discriminatory beliefs about Chinese people based on the stereotype and her belief that all Chinese people eat dogs. Ms. Watkins started to retaliate against Plaintiff after they had a talk in which Plaintiff explained that Ms. Watkin's statement could be considered offensive and based on an overgeneralization.

363. Making women only bake in the office was discrimination based on gender because coworkers and Ms. Mazur asked Plaintiff (a woman) but none of the men to bake for office social events and birthdays, which happened regularly.

364. Plaintiff was asked to bake for her harassers Mr. Scott and Mr. Kapoor. Plaintiff was supposed to act in a subservient or cooperative manner to individuals harassing her in line with gender and racial stereotypes for East Asian women.

365. When Plaintiff pushed back or refused to back, she was labeled as not a team player or not cooperative by coworkers and management, which was backlash for Plaintiff refusing to conform to norms (based on gender, race, and national origin) and retaliation based on oppositional activity.

366. Plaintiff knew that the harassment by Mr. Kapoor was based on Plaintiff's sex/gender because of the totality of Mr. Kapoor's comments or jokes about sex/gender, his stated beliefs that Plaintiff should act according to gender roles or stereotypes, how he spoke about other women especially compared to men, how he reacted in response to Plaintiff opposing his discriminatory comments, and how others repeated his discriminatory comments. A number of times, Mr. Kapoor mistreated Plaintiff (including raising his voice multiple times, name-calling using words like "nasty," etc.) when she talked to Mr. Kapoor about jointly sharing administrative duties or when Plaintiff did not act like his assistant (e.g., acting like an equal or displaying leadership qualities).

367. Plaintiff knew that the gender/sex-based harassment by Mr. Kapoor toward Plaintiff could be classified to be of a sexual nature because of the number of bizarre comments and actions by Mr. Kapoor that could be interpreted as sexual advances or displays of male gender dominance: giving her jewelry of an inappropriate nature, asking her to be his plus one, continuing to ask to know where her home was and to come into her home, and stalking her on social media. Mr. Kapoor told Plaintiff that he was profiling her, asked her many questions about where she lived and personal details beyond normal conversational curiosity, and asked her, "You're not a shark are you?" to verify her level of submissiveness. He mentioned that he had trouble working with a female coworker at his previous workplace and spoke about the coworker dismissively.

368. Mr. Kapoor's harassing comments about the division of work were related to Plaintiff's gender/sex because his comments were based on his prescriptive gender stereotype

that women are supposed to complete administrative or secretarial work and assist men. Mr. Kapoor's comments revealed his belief a young, minority woman should not be able to make requests or ask a man anything because he labeled one such request a demand along with showing his displeasure through his face, yelling, or later tripping Plaintiff. Mr. Kapoor's comments were also based on racial/national origin stereotypes and the intersectionality of racial, ethnic, and gender stereotypes because Asians (especially East Asian females) are stereotyped to be submissive (not dominant) and communal even more so than women of other races or ethnicities.

369. Mr. Kapoor intended to trip Plaintiff because of the close quarters of the event, the strange setup of the drawer (which Mr. Kapoor had never done and had no reason to do), and Mr. Kapoor's unusual reaction to Plaintiff tripping. In their cubicle, Mr. Kapoor's desk drawers separated the left side (Plaintiff's) and right side (Mr. Kapoor's) side of the desk. On the date, Mr. Kapoor's drawer fully extended all the way out about two to three feet, which he had never done nor had any reason to do. He was not using his drawer at all, organizing files, or looking for documents when she tripped on his drawer toward nearby furniture. He sat at his desk for hours saying nothing even after she tripped right near him in his line of sight, and quietly closed his drawer hours later without saying anything. Social convention dictates that when someone trips next to you, you should express surprise or sorrow, ask the victim how she is, or apologize, especially if the victim almost hits her head on a glass bookshelf due to your actions.

370. The proximity (within a month or two) of Plaintiff's protected activity (opposing the enforcement of prescriptive stereotypes and Mr. Kapoor's sexual advances) and Mr. Kapoor tripping Plaintiff shows the nexus between the two events.

371. Mr. Kapoor tripped Plaintiff to assert dominance against Plaintiff due to gender and racial/ethnic norms and retaliated against Plaintiff for her protected activity telling him to stop engaging in the discriminatory behavior.

372. Mr. Kapoor's actions to sabotage Plaintiff's coaching evaluation were related to Plaintiff's sex and gender stereotypes, as well as the intersectionality of her sex/gender with her race and national origin because it demonstrated Mr. Kapoor's belief of Plaintiff's lack of agency

(a stereotype of gender roles) and expectation of Plaintiff's agreement or submission (a stereotype of East Asian women). At the same time, Mr. Kapoor deciding for Plaintiff without asking her demonstrated his belief in the adherence to gender norms of males for agentic, paternalistic behavior even at the cost of female self-determination. Plaintiff did not see Mr. Kapoor treat any men in such a paternalistic way, denying them of their autonomy or agency.

373. Mr. Kapoor's language of using patronizing and gender-stereotyped language in relation to Plaintiff's work (e.g., "baby"), when taken in context with his other language and stereotypes of women, was related to Plaintiff's sex because the context of his language implied that Plaintiff's work was less important compared to Mr. Kapoor's work (a man) and associated Plaintiff with child-care or mothering activities, which is stereotyped as women's work according to gender norms or stereotypes and classified as less valuable.

374. Mr. Kapoor's actions were related to Plaintiff's sex/gender, national origin, race, and color because his actions aligned with the scientific literature on the profile of predicted perpetrators of harassment of female and minority victims. Scientific literature also predicts backlash by Mr. Kapoor (as well as Plaintiff's managers) against Plaintiff, an individual of a targeted group as a result of her protected activity.

375. FEMA's Anti-Harassment and Retaliation Directive FD 256-5 states the following requirements: "the alleged harasser is removed from the supervisory responsibility over the alleged victim (if applicable), and to the extent possible, physically separated from the Plaintiff while working in the workplace" and that "If physical separation is possible, only the alleged harasser shall be moved from the workplace, not the complainant."

376. Having Mr. Kapoor (the harasser) move was in line with the anti-harassment policies of FEMA and DHS but having Plaintiff (the victim) move was against the same policies.

377. Per DHS policy, harassment of a sexual and non-sexual nature were both classified as sexual harassment.

378. Per the FEMA CORE Manual, Plaintiff should have been referred to the Office of Equal Rights (OER) after she told her supervisors Mr. Scott, Ms. Mazur, Ms. Jordan, and Mr. Doolin about discrimination. None of them referred her to OER to file an EEO complaint. None

of them, nor the internal FEMA investigations division (AID) referred the named harassers who were GS-15 and above to the DHS Inspector General as required either.

379. Supervisors Robert Scott and Cynthia Mazur had heard in 2014 that Plaintiff had issues. Mr. Kapoor regarding this project but did not directly speak or talk to the two about the matter that year.

380. Plaintiff reported the harassment by her coworkers (including other supervisors and members of other offices) to many of her managers, to human resources (OCCHCO), OER, and security, as described in the Facts section #107-111, 114, and 119.

381. After Plaintiff's report to her supervisors, managers, and other responsible officials, they began to harass Plaintiff. ADR management did nothing to effectively stop, correct, or prevent any of the other harassment by others as well. Instead, they joined in on the harassment and recruited others to do so as well.

382. FEMA/DHS management did not tell Plaintiff that they would keep her named harassers away from her and not to contact her while she worked in the ADR Division and perhaps even from 2016 to the present. Plaintiff's named harassers were allowed to return to harass Plaintiff.

383. FEMA/DHS did not discipline, transfer to another office or work location, or change the work schedule of any of Plaintiff's named harassers. FEMA has never revealed any record of progressive discipline.

384. Mr. Kapoor and Mr. Scott who both had violent tendencies were not ordered to undergo medical examinations and evaluated for being direct threats.

385. ADR management could have ordered Mr. Kapoor to a number of empty seats in the ADR Division, had him transferred altogether to another division, had him work a different schedule, had him transferred outside of headquarters, or had him sit at OCC headquarters like Mr. Scott said Plaintiff should have offered to do herself. Instead, FEMA (including Plaintiff's supervisors) allowed Mr. Kapoor to take other women's seats, blame Plaintiff for Mr. Kapoor displacing them, and imply she was the harasser would not fix the issue of harassment but rather spread it for further retaliation against Plaintiff.

AMENDED COMPLAINT     24-CV-00797 KAW          Page **81** of **190**

386. FEMA/DHS, including but not limited to Plaintiff's supervisors and others in her management chain, human resources, and OER were ineffective in stopping, preventing, and correcting discrimination (including harassment and retaliation) against Plaintiff.

387. Mr. Kapoor continued to harass Plaintiff when he worked in an entirely different office in another region while he was on detail.

388. FEMA (through various managers) told Plaintiff it would be unreasonable for the agency to restrict any of her harassers (including Mr. Kapoor who displayed violent tendencies) from approaching or contacting her.

389. As Plaintiff reported out about the discrimination she faced, FEMA OCC, including Plaintiff's supervisor Mr. Scott, started to blame Plaintiff, call her jealous of Mr. Kapoor and accuse her of having a mental illness, hysterical, and other false attributes. Mr. Scott characterized Mr. Kapoor's language as "dismissive" but refused to intervene.

390. In response to Plaintiff's refusal to coach clients due to discrimination and a potential violation of coaching ethics, Mr. Scott said that Plaintiff should pretend that those individuals did not believe that Plaintiff was an inferior race/gender. Though Mr. Scott scrutinized the comment of Ms. Watkins (a minority woman) more severely than those of Mr. Kapoor (man), Mr. Scott refused to stop Ms. Watkins and blamed Plaintiff for Ms. Watkins's behavior. FEMA/DHS gave Ms. Watkins an award in response. When Ms. Watkins later retaliated, Mr. Scott told Plaintiff to give up her chair to Ms. Watkins and move even when Ms. Watkins took Plaintiff's spot at a meeting, and Mr. Scott did not stop Ms. Watkins or Mr. Kapoor from disparaging Plaintiff.

391. In 2015, in front of the ADR division offsite designed to resolve disagreements amongst ADR Division staff members at headquarters, offsite host Ms. Powell stated she too faced gender issues with offsite co-host Mr. Schoene, indicating known/widespread gender problems within the division. Mr. Scott responded that Plaintiff was talking to too many people (i.e., that she should not have talked to the offsite leads to resolve the harassment issue).

392. After December 2015 Plaintiff told manager Cynthia Mazur about Vikram Kapoor's harassment and asked Ms. Mazur to keep Mr. Kapoor away from Plaintiff, Ms. Mazur

retaliated by ordering Plaintiff to join the ADR Division etiquette committee, which only further heightened gender stereotypes by making Plaintiff join a committee with other women to discuss housekeeping in response to a gender harassment complaint. At the committee, Plaintiff further faced stereotyped comments from coworkers in which Plaintiff was forced to listen to white coworkers comment how food from Asia and Africa were too "smelly" and should be prohibited from the office but food of European descent that was equally fragrant should be allowed and was not characterized as smelly.

393. Had Mr. Scott accepted Plaintiff's discrimination allegations as true and taking disciplinary action, he would not have told Plaintiff in 2016 that she was defaming Mr. Kapoor with her allegations and then retaliated against her.

394. When Plaintiff complained about discrimination, she was told to assist others and assigned to stereotyped work. For example, Ms. Mazur and Mr. Scott assigned Mr. Kapoor to lead a data project with Plaintiff as his assistant, which only reinforced gender stereotypes.

395. FEMA management, including OCC's Chief Counsel and Deputy Chief Counsel, gave awards and promotions to individuals who Plaintiff accused of discrimination after she made the allegations, awards they should not have been able to receive if they had been disciplined in any way. FEMA/DHS did not discipline or stop individuals named as harassers in the ADR Division between July 2014 and October 2016.

396. Other women of color also received punishment when they complained. However, when white individuals complained (not related to discrimination), they were assigned to leadership positions.

397. Defendant DHS/FEMA, Plaintiff's managers, and various offices responsible for stopping and preventing harassment failed to take prompt action that was likely to end the harassment for a variety of reasons. There was a culture permissive of discrimination. Management would not have allowed harassment to continue if they did not agree with what was happening. Responsible parties in FEMA did not take responsibility that harassment or discrimination occurred or could occur within their office. They blamed, disparaged, and tried to discredit Plaintiff, such as falsely attributing to her mental illnesses that she did not have or

falsely accusing her of doing something they themselves did. Ms. Mazur testified that FEMA thought it would look bad if they took corrective action. She also told Plaintiff that Chief Counsel Adrian Sevier feared that the Washington Post would find out, so the agency suppressed whistleblowers. Multiple times, various people in a position to do something to prevent harassment told Plaintiff that they could not, would not, or were told not to act unless there were extreme circumstances with no plausible deniability, such as in the case of battery that results in hospitalization or arrest with witnesses willing to testify, media coverage, and videotape by outside of FEMA's control.

### 5.    **FIFTH CLAIM OF RELIEF**

**Free speech**

*First Amendment to the US Constitution, 5 USC § 2302(b) (whistleblowing)*

398.    Facts specifically incorporated for this claim include Facts #99-100 (Mr. Kapoor tripping Plaintiff and calling her nasty in response to her opposition of being required to conform to gender norms), 110 (Mr. Scott told Plaintiff not to report discrimination to internal ADR sources), 115 (no pay for protected speech on November 5, 2015), 116 (restriction of speaking about racism and other -isms), 118 (December 2015 performance goals incorporated protected activity), 123-133 (January 2016, Mr. Scott prohibition on speaking about discrimination, order to see a therapist, and order for an assignment to recant discrimination allegations and a restriction on work until completion of assignment), 135 (January 20, 2016 discussions to terminate Plaintiff), 145-149 (TRSG group), 151-159 (office policy on censorship), 160-162, 178, 188 (permission required to report discrimination), 190 (daily work plans), 208-209 (VLTP), 236 (Kirsten Gunsolus with knowledge of the OER Director threatened not to accommodate on September 16, 2016), 239, and 246 (January 14, 2020, use of the legal process to restrict speech), 249 (May 20, 2022, use of the legal process to restrict speech).

399.    Plaintiff's supervisors and managers interfered with and discouraged Plaintiff's ability to engage in protected activity by censoring her speech and developing policies designed to prevent the report of, opposition to, end of, prevention of, and documentation of discrimination. These policies were a discriminatory application of work rules that ADR

managers claimed were neutral because they were applied specifically related to protected activity to document, report, prevent, stop, or allege discrimination.  If disparate treatment were contested, a disparate impact analysis would also show discrimination.

400.    The limitations FEMA/DHS imposed on Plaintiff fell into the following categories:

(i.)    Plaintiff making allegations, reporting, and talking about her own experience with discrimination perpetrated by others at FEMA

(ii.)    Refusal by Plaintiff to help, participate, or condone actual or the appearance of discrimination and/or fraud

(iii.)    Plaintiff saying no to discrimination (communicating the alleged behavior was unwanted)

(iv.)    Plaintiff advocating for or participating in training and other initiatives to stop, prevent, or discuss discrimination, racism, workplace violence, and other illegal activity.

401.    Plaintiff's OCC managers were not effective in stopping their subordinates from censoring speech about discrimination and in stopping the enforcement of this censorship policy.

402.    FEMA/DHS with enforcement by Plaintiff's supervisors (e.g., Robert Scott, Erika Jordan, and Cynthia Mazur) and its personnel lawyers engaged in viewpoint discrimination in particularly singling out speech that opposed or discussed allegations of discrimination, workplace violence, harassment, fraud, and other such violations of law and matters of public importance.  FEMA/DHS through its employees and the legal process created policies that prohibited Plaintiff from engaging in protected speech and other communicative conduct and destroyed evidence of such conduct.

403.    Plaintiff's supervisors (e.g., Robert Scott, Erika Jordan, and Cynthia Mazur) and FEMA's personnel lawyers did not stop others (including Plaintiff's supervisors and coworkers) from speaking publicly when they complained about issues not related to whistleblowing (e.g., taking out the trash, spilt water, those who brought so called ethnic food to work), spoke negatively about Plaintiff publicly, gave false testimony, or falsified documents.  FEMA ADR

Division managers did not discipline employees who wrote long emails, participated in groups, or made speeches about non-protected conduct or speech.

404. FEMA/DHS attempted to stop or prevent Plaintiff from speaking and other protected activity by directly telling Plaintiff not to engage in the speech, giving her assignments to prevent her from speaking, withholding benefits or accommodations, or punishing Plaintiff when she did speak. FEMA/DHS has continued to use a policy of censorship of allegations of discrimination through the litigation process through nondisclosure agreements and nondisparagement clauses so that harm continues to the present day and is a subject of public concern as Plaintiff is no longer a federal employee and FEMA's policies impacted its dealings with the public, especially if a division tasked with dealing with harassment, workplace violence, and conflict, as well as sometimes mediated discrimination cases, prohibited its employees from using words related to their jobs.

405. Multiple times (October 30, 2015, January 12, 2016, February 24, 2016), Mr. Scott told Plaintiff not to document EEO issues or leave evidence (writing down notes, forwarding damaging emails, etc.) regarding her EEO allegations. Mr. Scott said he did not want to have a record that he was notified of such emails showing discriminatory activity.

406. Plaintiff had several interactions with Ms. Mazur and Mr. Scott about their censorship of her speech (e.g., March 17-18, 26, 29), which included Ms. Mazur ordering Plaintiff not to create records regarding EEO/HR matters.

407. Because Mr. Scott had previously prohibited Plaintiff from using those words after she had made allegations against Mr. Kapoor, Plaintiff at the division meeting on January 8, 2016, responded to her coworkers' questions by using the word safety but not the words harassment, workplace violence, or discrimination. However afterward (e.g., January 11-13 and March 21, 2016), Mr. Scott still alleged that Plaintiff was "defaming" Mr. Kapoor for making allegations of discrimination against him and wanted Plaintiff to recant her allegations that Mr. Kapoor was engaging in discriminatory behavior and admit she was lacking in emotional intelligence because she reported discrimination. Mr. Scott also referred to Plaintiff as arguing

or argumentative when she also opposed Mr. Scott's attempt to make her use attorney services to perpetuate discrimination.

408. On February 23, 2016, Mr. Scott tried to keep Plaintiff from participating in OCC subgroups for the TRSG workgroup that could help stop workplace retaliation but might reveal discrimination within ADR. However, he did not say the same for other subgroups of TRSG not related to EEO activity. Participation in the TRSG subgroup was necessary for Plaintiff to receive full performance goals and reach her officewide performance review goals.

409. On April 26, 2016, Plaintiff's supervisor Erika Jordan limited Plaintiff's EEO time, which included responding to the EEO Counselor Andrea Pearson. Ms. Jordan claimed that 2 hours was too much time to draft and provide what would become 81 pages of submission (including evidence and over 100 bullet points or events with dates, names, times, bases of discrimination, prima facie elements, and examples) that Ms. Pearson in her report.

410. Multiple times, after Erika Jordan became Plaintiff's supervisor, Ms. Jordan tried to stop Plaintiff from documenting discrimination (April 29, 2016, May 6, 2016, and May 11, 2016). Erika Jordan allowed or required written documentation and emails requiring clarification, and complex or nuanced discussions for non-EEO matters. While Ms. Jordan said the reason was that Plaintiff should not write down complex issues, some of the assignments Ms. Jordan wanted written down were complex (e.g., legal memorandum), except that it was not on an EEO matter.

411. The actions of FEMA to restrict Plaintiff's speech (particularly EEO and whistleblowing) were apparent because others were not subject to the same barriers to speech (e.g., obtaining permission to report discrimination to upper-level managers). After Plaintiff engaged in speech that FEMA managers disapproved of, she was made to complete assignments others were not subjected to (e.g., daily or monthly work plans, increase in workload). Plaintiff's supervisors likewise significantly increased work before she would engage in EEO activity (e.g., submitting a formal discrimination complaint).

412. On September 16, 2016, Ms. Gunsolus (cc'ing Willisa Donald, the Director of the FEMA EEO Office) said that if Plaintiff continued to engage in protected speech, the agency

would not reassign her, and the protected speech would be considered to be a declination of a transfer. This position was direct evidence of retaliation and suppression of speech based on Plaintiff's protected opposition to discrimination and suppression of speech.

413. Employee Relations' Kirsten Gunsolus (on August 2, 2016, August 4, 2016, and August 9, 2016) and Robyne Jackson (August 4, 2016, and August 9, 2016) refused to stop or even address Ms. Jordan's prohibition on Plaintiff to report up EEO issues. This prohibition continued for months, and Ms. Jordan negatively marked down Plaintiff's performance appraisal because of such a prohibition for being able to report up the chain of command discrimination.

414. FEMA has taken continued action to keep Plaintiff from asserting allegations of discrimination and harassment by Defendant, even when state and federal law prohibits such on public policy, as well as professional rules of responsibility to report wrongdoing.

415. Individuals and attorneys have a right to express and document their refusal to participate in illegal activity (such as discrimination) to defend themselves against potential (wrongful) accusations of participating in or helping such illegal activity. Employers and the government do not have the right to suppress individuals and attorneys from engaging in such speech and protected activity.

416. It is a matter of public concern (especially to California residents) if a government policy, practice, or procedure to censor speech will inhibit the regulation of the practice of law and interfere with lawyers reporting up and out (including to the state bar of California that prohibits discrimination in the practice of law) violations of law and rules of professional responsibility by other lawyers.

417. FEMA/DHS, as well as the ruling by the EEOC during the administrative adjudication of the current complaint, adversely affected Plaintiff and others targeted by discrimination or retaliation by refusing to allow those targeted by discrimination to receive attorneys' fees and the full time spent on EEO matters that other individuals not so targeted by discrimination or retaliation. This policy has a discriminatory effect on those protected groups targeted by discrimination and blocks full and equal access to the justice system.

418. Perpetrators of discrimination would receive 100% of their pay and likely premium pay to participate in the EEO process or support the employer's defense. However, Plaintiff and others targeted by discrimination would not receive any premium pay and the full amount of time spent engaging in the EEO process.

419. Attorneys who represent a plaintiff and attorneys for defendants would receive full payment for all of their time spent on EEO cases, but plaintiffs who are attorneys, targeted for discrimination, and represent themselves would not receive any pay for the same work.

420. When Plaintiff complained about discrimination, she was ordered to assist others in projects and management promoted others or gave them leadership opportunities shortly thereafter. Promotions and awards often were tied to increased pay and bonuses.

### 6. SIXTH CLAIM OF RELIEF

**Discriminatory policies and discriminatory application of work rules to silence protected activity: disparate impact, retaliation, disparate treatment**

*SB 331 (CA Silence No More Act), "Speak Out Act" (H.R 8827), 42 USC § 1981, 1983, and 1985-6, Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Parts 1604 and 1606), Rehabilitation Act of 1973 (29 USC 791, 29 CFR 1614.203)*

421. Plaintiff realleges and incorporates by reference all the other paragraphs of this complaint, including paragraphs # 118-119, 151-159.

422. Ostensibly, management instituted policies/rules not to document "potentially critical, conflictual, judgmental [sic], or emotional" issues, talk to too many people, or use words related to discrimination or workplace violence but these rules were only applied to differently based on one's protected activity, race, gender, color, disability, and national origin.

423. Censorship was only applied to Plaintiff (as an Asian woman of Taiwanese/Chinese descent who had engaged in protected activity) and characterized as "emotional" (a stereotype of women) but not to men who had not made allegations of discrimination, including if the men had lashed out in anger.

424. FEMA/DHS's censorship of Plaintiff gives rise to a pattern of discriminatory and retaliatory conduct given the multiple instances of censorship, their relationship to Plaintiff's

protected activities (especially enforced censorship after Plaintiff's protected activity and increasing as Plaintiff reported up and out and participated in the EEO process), and the comparative lack of censorship for other types of speech or conduct.

425.    When Mr. Scott (Plaintiff's supervisor) told Plaintiff she was talking to too many people after she reported discrimination to Jill McDonnell of human resources, manager Cynthia Mazur, and others, Mr. Scott's actions were retaliatory because he prohibited protected activity. Mr. Scott's prohibition was related to Plaintiff's protected activity because his comments happened close in time (a day after, or about a month after) to her protected activity and were specifically referencing Plaintiff's protected activity. Plaintiff's report to Ms. McDonnell could not have been interpreted to involve anything but Plaintiff's protected activity because Plaintiff only interacted with Ms. McDonnell in relation to Plaintiff's protected activity.

426.    When Ms. Jordan (Plaintiff's supervisor) admonished Plaintiff for reporting discrimination and required Plaintiff to receive permission to report discrimination up the chain of command (including about Ms. Jordan), Ms. Jordan engaged in per se retaliation (direct evidence of retaliation) because she prohibited protected activity.

427.    Actions taken by Robert Scott, Cynthia Mazur, Erika Jordan, FEMA, and DHS interfered with Plaintiff's access to justice by prohibiting her from documenting evidence of protected activity and other evidence necessary to litigate a discrimination complaint were also pro se retaliatory as such rules prohibited protected activity. These policies and practices are particularly troublesome when FEMA had a history of and pattern of destroying evidence (e.g., videotape) related to Plaintiff's discrimination allegations, refusing to issue, or ignoring litigation holds, and not maintaining nor asking for evidence in discrimination investigations as found by the DHS Inspector General.

428.    Management did not prohibit others (e.g., Ms. Jordan) from taking notes about other issues.

429.    When Plaintiff complained to manager Ms. Mazur that the negative or decreased performance reviews (adverse actions) that she received in 2016, Ms. Mazur refused to change Plaintiff's performance scores due to Plaintiff's protected activity because Plaintiff refused to

complete that would require Plaintiff to engage in or aid discrimination or fraud and opposed assignments that were discriminatory (including retaliatory). Ms. Mazur said that it was the "blowback" and "outright refusal" to complete such illegal activities that were the basis of her refusing to correct an adverse action. ADR management did not give or allow others to give negative performance reviews when others (especially white individuals) complained about assignments unrelated to their protected activity. ADR management sometimes gave others leadership positions when they complained.

430. FEMA/DHS personnel lawyers would not settle her allegations unless Plaintiff agreed to sign a nondisclosure agreement (NDA) to prevent Plaintiff from speaking about her discrimination allegations, even when NDAs were not allowed by law. FEMA/DHS maintained the position that if Plaintiff were to sign the NDA, she would be required to lie or prohibited from speaking about the allegations when requested in a legal process, by future employers, or by the state bar in an investigation against her harassers.

431. Making Plaintiff sign an NDA was retaliatory because it was designed to prohibit employees who engaged in protected activity, such as Plaintiff, from continuing to engage in protected activity. It also had a disproportionate impact on those who engaged in protected activity because Plaintiff was requested to sign such an NDA only through the EEO process. FEMA did not require all employees (including employees who did not file discrimination complaints) to sign such NDAs.

432. Employees who did not make allegations against the agency were not withheld their deserved pay and benefits unless they signed an NDA.

433. California's SB 331 was passed on October 7, 2021, and went into effect on January 1, 2022. Defendant never responded, and Defendant knew that Plaintiff was a California resident at the time of Defendant's question. Even after Congress passed the "Speak Out Act" (H.R 8827), the Defendant refused to engage in settlement discussions.

434. As a result of DHS/FEMA's censorship of Plaintiff's protected activities, Plaintiff faced a variety of adverse actions, including but not limited to ADR management threatening to fire the Plaintiff (not renew her contract) after Plaintiff complained about discrimination,

withholding pay and access to benefits, attempted termination, interference with medical leave, to assign promotion-worthy assignments and experience, restricting Plaintiff's access to bathroom breaks and sick leave, interfering with Plaintiff's employment prospects, overwork without commensurate pay, reassignment, changing terms and conditions of employment, and other actions described elsewhere.

435.    Plaintiff made it clear that the censorship attempts and policies were unwanted because she documented her opposition and had several meetings with individuals in her chain of command about the censorship and asked management to clarify and share widely their censorship policies if it were not solely targeted against Plaintiff.

### 7.    SEVENTH CLAIM OF RELIEF

**Retaliatory harassment & silencing protected activity**

*SB 331 (CA Silence No More Act), "Speak Out Act" (H.R 8827), 42 USC § 1981, 1983, and 1985-6, Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Parts 1604 and 1606), Rehabilitation Act of 1973 (29 USC 791, 29 CFR 1614.203)*

436.    Specifically incorporated are the cited events in the 5th Claim of Relief (free speech), 311st-33rd Claims (retaliation by EEO officials, HR, and attorneys), and Facts section # 118, 140, and 146.

437.    FEMA employees (both supervisory and coworkers) tried to prevent Plaintiff from and retaliate against Plaintiff for participatory and oppositional activity (speaking out, reporting, trying to stop, and opposing discrimination), which are all adverse actions.

438.    Plaintiff was subjected to harassment (hostile work environment, quid quo pro harassment) by those with supervisory control over her, including but not limited to individuals in her chain of command, human resources employees, personnel lawyers, and EEO officials who had the authority to advise on or take personnel actions against Plaintiff.

439.    Mr. Scott's admonishment of Plaintiff, threat to her performance appraisals, and restriction of her speech in response to her protected activity changed the terms and conditions of her employment.

440. Those with supervisory control did not stop, prevent, or correct harassment by coworkers who harassed Plaintiff and aided or subjected Plaintiff to harassment themselves.

441. The harassing conduct was unwelcome.

442. It is per se reprisal when an individual (e.g., agency attorney, human resources official) involved in a plaintiff's prior discrimination complaint advised on or directed a subsequent adverse action.

443. In December 2015, Plaintiff spoke about her concerns regarding discrimination in front of coworkers (including those on the committee to adjudicate the discriminatory application of a performance goal), reporting allegations of discrimination she faced, and using words that could be interpreted to be related to discrimination were all instances of protected opposition.

444. Mr. Scott's admonishment occurred within about the same day if not within a week of Plaintiff's protected opposition to raising her concerns about the discriminatory performance goals, which gives rise to an inference of pretext.

445. Mr. Scott prohibited Plaintiff from using specific terminology related to discrimination (e.g., discrimination, harassment, workplace violence, safety) in the workplace without restriction, which could apply to servicing the public given the nature and mission of the work in the ADR Division.

446. Threatening a subordinate with negative performance scores if she tells a harasser to stop harassment or other forms of discrimination is direct evidence of retaliation and per se discrimination. It highlights a division codification of management's refusal to protect victims of harassment and to punish the victim instead of correcting the hostile work environment.

447. Mr. Scott carried out this threat to negatively impact Plaintiff's performance review for her 2015 annual performance appraisal (provided in January 2016) and her 2016 first-quarter review if she engaged in protected activity shows the nexus between Mr. Scott's subsequent adverse action (negative quarterly and annual performance reviews) and Plaintiff's protected activity.

448. On January 11-13, 2016, and March 21, 2016, Mr. Scott characterized Plaintiff's attempts to report and document discriminatory behavior and policies as being "argumentative

statements in opposition," "increasingly argumentative and disrespectful," "emotional," and "publicly defaming a coworker." Mr. Scott wanted Plaintiff to recant her allegations that Mr. Kapoor was engaging in discriminatory behavior. Plaintiff refused to say that she was lacking in emotional intelligence because she reported discrimination. Mr. Scott also referred to Plaintiff as arguing or argumentative when she also opposed Mr. Scott's attempt to make her use attorney services to perpetuate discrimination.

449. Plaintiff believes the chatter on January 20, 2016, to eliminate someone's position by a subordinate of her supervisor was referring to Plaintiff and her protected activity. The proximate timing between Plaintiff's protected activity and the expression of management's intent to eliminate Plaintiff demonstrates the nexus between the two.

450. Although Plaintiff wrote Mr. Scott on February 24, 2016, that she would be willing to decrease her participation in other projects or not facilitate the work-life balance group (such that she would stay on the TRSG performance review subgroup), Mr. Scott still decided that he considered her participation in TRSG performance review subgroup as too much in his April 15, 2016, performance appraisal of Plaintiff. That shows Mr. Scott had a specific issue with Plaintiff joining that one particular subgroup (particularly for what she would say or do in the subgroup) and not his outwardly stated reason that Plaintiff was joining too many groups.

451. Mr. Scott's attempt to prevent Plaintiff from joining an OCC-wide subgroup committee called TRSG (related to protected activity) was retaliatory because he did not have those same concerns when he suggested the day before that she join another subgroup of the same committee related to work-life balance and childcare issues that would not raise issues related to Plaintiff's protected activity.

452. Mr. Scott's reaction to the subgroup Plaintiff wanted to join compared to the one he suggested and the one-day difference between his change in reaction demonstrates that Plaintiff's protected activity (raising allegations of discrimination and trying to prevent or stop discrimination in the office) caused Mr. Scott to dissuade Plaintiff from joining the TRSG subgroup on promotions, performance reviews, and awards. Mr. Scott did not want Plaintiff to report up or others to know his own discriminatory behavior, as a way to prevent Plaintiff from

engaging in EEO activity when it was okay to join the group on work-life balance but not the one related to potential EEO issues.

453.    Mr. Scott then used the same language he used on February 23, 2016, as on her subsequent first-quarter performance appraisal less than two months later on April 15, 2016, that Plaintiff had joined too many workgroups indicates that the performance review was further retaliation for Plaintiff's protected activity. Mr. Scott on February 25, 2016, in a 10:09 AM email, referred to Plaintiff's preferred TRSG committee selection as "taking on too much extra-curricular activity." In her first-quarter performance review dated April 15, 2016, Mr. Scott then wrote that he had counseled Plaintiff against joining committees and task groups. That admission of counseling Plaintiff is an explicit declaration of his intention to dissuade Plaintiff from and punish her (progressive discipline) for participating in the protected activity she intended to do in the TRSG performance review subgroup.

454.    Mr. Scott's actions also demonstrate his actions related to the TRSG performance review subgroup in 2016 had a connection to Plaintiff's sex/gender because he did not have an issue with Plaintiff joining a committee discussing issues conforming to her gender, such as childcare, but did have an issue with her joining a committee related to masculine-stereotyped activities, such as career ambition or advancement. Mr. Scott (a man) had no issue when he joined the same TRSG performance review subgroup that Mr. Scott tried to dissuade Plaintiff from joining, nor did he consider himself to be joining too many groups when he himself joined the same group.

455.    Plaintiff's performance goals included office-wide (OCC) and division-wide goals (ADR Division) goals set to distinct levels of performance, which would be used to determine the receipt of bonuses. Participating in office-wide committees and task groups was part of the requirement to complete and receive high scores for her performance goals. However, when Plaintiff participated in such groups, especially if they involved Plaintiff's protected activity, Plaintiff's supervisor Mr. Scott gave her a negative performance appraisal on April 15, 2016.

456.    Plaintiff's participation in an OCC-wide workgroup, such as the TRSG workgroup, was necessary for Plaintiff to obtain full marks on her performance goals. As a

result, Mr. Scott's attempts to dissuade Plaintiff from joining the specific TRSG subcommittee affected whether and how much she obtained in bonuses and her eligibility for promotion.

457. Mr. Scott had no problem when Mr. Scott or Cynthia Mazur assigned Plaintiff to or Plaintiff participated in committees or work groups when such work did not involve her engaging in protected activity or when they conformed to gender stereotypes, such as a committee on etiquette that discussed housekeeping for the office.

458. This conduct occurred because of and after Plaintiff's protected activity, both participatory and oppositional.

459. Mr. Scott's behavior has a nexus to race, gender, and retaliation because Mr. Scott did not have an issue with Plaintiff participating in events or communicating about issues that did not involve protected activity or issues conforming to gender and racial norms (e.g., cleaning, not being a leader) but did have an issue when Plaintiff engaged in speech or activities that involved protected activity (e.g., talking about discrimination or racism) and violated gender and racial norms (e.g., leadership positions, ADR practice). Mr. Scott had an issue with Plaintiff facilitating discussions on how to eliminate racism in ADR practice but he did not have an issue Plaintiff participating in a much more time-intensive ADR division group involving housekeeping issues that had nothing to do with Plaintiff's job description.

460. Censorship was only applied to Plaintiff (as an Asian woman of Taiwanese/Chinese descent who had engaged in protected activity) and characterized as "emotional" (a stereotype of women) but not to men who had not made allegations of discrimination, including if the men had lashed out in anger.

461. Plaintiff's supervisors and FEMA's personnel lawyers did not stop others from speaking publicly when they complained about issues not related to whistleblowing (e.g., taking out the trash, spilt water, those who brought so called ethnic food to work), spoke negatively about Plaintiff publicly, gave false testimony, or falsified documents.

462. FEMA ADR Division managers did not discipline other employees who wrote long emails, participated in groups, or made speeches about non-protected conduct or speech.

463. Mr. Scott's retaliation against Plaintiff was related to her gender because of how Mr. Scott treated men and women differently.

464. Mr. Scott referred to speech reporting discrimination (especially by a woman against a man) as "emotional," which is a stereotype of women being emotional. Mr. Scott did not characterize men (including himself) as "emotional" or use similar terms implying that they were hysterical or disabled (especially mentally disabled) toward men who lashed out in anger or yelled at others.

465. When Plaintiff made allegations of discrimination, her speech (although true) was censored, but Mr. Kapoor's speech (speech by a man) was not censored when spreading false information about Plaintiff and not related to protected activity.

466. Mr. Scott (nor any of Plaintiff's other managers) took swift action against Plaintiff (a woman) for engaging in protected activity but did not take effective corrective action against Mr. Kapoor (a man) for engaging in harassment/discrimination. Neither did FEMA/DHS take any swift and effective corrective actions against others that Plaintiff accused of discrimination (perpetrators of discrimination) and gave awards to these perpetrators. It also showed Plaintiff that FEMA would not protect those targeted for discrimination to create a hostile work environment as the DHS Inspector General and the RAND corporation later found.

467. Plaintiff's supervisors Mr. Scott and Erika Jordan did not call her argumentative or disrespectful in other situations but only referred to Plaintiff as such in situations where she engaged in protected activity.

468. Robert Scott, Cynthia Mazur, Erika Jordan, FEMA, and DHS interfered with Plaintiff's access to justice by prohibiting Plaintiff from documenting evidence of protected activity and other evidence necessary to litigate a discrimination complaint. These policies and practices are particularly troublesome when FEMA had a history of and pattern of destroying evidence (e.g., videotape) related to Plaintiff's discrimination allegations, refusing to issue, or ignoring litigation holds, and not maintaining nor asking for evidence in discrimination investigations as found by the DHS Inspector General.

469. As mentioned previously, Plaintiff made it known to her management this censorship of her speech and restriction on Plaintiff's ability to report the discrimination to her management (Mr. Scott, Cynthia Mazur, Joel Doolin, and indirectly to Mr. Sevier), human resources, and FEMA's EEO office. She had several email conversations and in-person meetings about the ADR Division's policy to restrict speech related to discrimination.

470. Although not required for retaliatory harassment, this conduct was both severe and pervasive to change the conditions of Plaintiff's employment and create an abusive or hostile work environment.

471. A reasonable person in these circumstances would consider the working environment to be abusive or hostile.

472. Plaintiff was harmed by this abusive or hostile working environment.

### 8. EIGHTH CLAIM OF RELIEF

**Equal pay (gender/sex, race, national origin, color, disability, retaliation/interference, and intersectionality thereof)**

*Equal Pay Act of 1963 (29 USC § 206, 29 CFR § 1614.202, Part 1620 and 1621), Title VII of the Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Part 1604 and Part 1606), Lilly Ledbetter Fair Pay Act of 2009, Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203), 13th and 15th Amendments of the US Constitution, 22 USC § 7102(8)*

473. Plaintiff realleges and incorporates by reference all the other paragraphs of this complaint. Refer to facts section #78-80 (job classification and tenure) and 144 (location).

474. This claim includes every pay period from the date Plaintiff started working at FEMA in July 2014 and ongoing (at least until the date of payment of damages for the current complaint). This claim includes pay periods after Plaintiff was transferred to the Response and Recovery Legal Division because FEMA transferred Plaintiff to another Division while intentionally refusing to fix the equal pay issues. In a subsequent discrimination case again against OCC, including retaliation, the EEOC found discrimination by Defendants FEMA/DHS and ordered them on April 28, 2022, to reinstate Plaintiff. FEMA has yet to abide by that order.

475.    At FEMA headquarters in Washington, DC, attorneys who were Asian and/or women were paid a lower salary than attorneys of other races or who were men with the same years of service and the same 0905 job classification.

476.    ADR Division management told Mr. Kapoor (male) that he should petition OCC management to start at a higher starting pay than step 1 but did not do so tell Plaintiff (female).

477.    The effective salary of Plaintiff and others of her like protected classes was lower than the stated OPM stated grade and step levels, which sometimes could be an over $19,000 difference in annual salary.

478.    Plaintiff and those of similar protected classes, therefore, were expected to give the amount of time equaling the pay gap for free to the US government. This uncompensated time and therefore loss in salary meant that Plaintiff incurred opportunity costs and that the US government (Plaintiff's employer) deprived Plaintiff of pension, retirement returns with tax-free growth, and other investment returns without compensation.

479.    Within the ADR Division during 2014-2016, all other non-Asian Attorney Advisors (including pay adjusted for years of service) were paid more than Asians in the same position. Even then, Plaintiff was paid at a lower rate than the other Asian attorney who was a man because Plaintiff worked more hours for the same base pay while the male Asian attorney received more premium pay than Plaintiff (an Asian woman). While Plaintiff worked in the ADR Division, FEMA paid Asian attorneys employed at the ADR Division at a GS-13 level but paid non-Asians at a GS-14 level or higher.

480.    Plaintiff was told that Mr. Scott intentionally hired the ADR Division Asian attorneys based on their last names, which were the only Asian last names in the ADR Division in Washington, DC. Therefore, the ADR Division intentionally hired Asian attorneys for the lower-paying GS-13 Attorney Advisor positions based on their race.

481.    The FEMA OCC Women's forum revealed that OCC had a pattern of hiring women into lower-paying positions and promoting them less than men for the same work.

482.    At the EEOC hearing in January 2020, Mr. Scott testified that he hired Plaintiff to do his work, which he was paid for at a GS-15 level. Plaintiff was only paid at a GS-13 level for

what Robert Scott (white, male) claimed to do for a level of work at his level (GS-15). Plaintiff performed better (increased accuracy of work) under less favorable work conditions (greater workload in less time and fewer resources) than Mr. Scott did.

483. FEMA has had GS-14 and GS-15 non-supervisory employees.

484. ADR management claimed that one of Erika Jordan's main work duties and areas of expertise included time sheets. However, Ms. Jordan testified at the January 2020 EEOC hearing that she could not complete Plaintiff's timesheets while Plaintiff was on leave and instead delegated the role to Plaintiff while Plaintiff was on protected medical leave. Once when Ms. Jordan was on leave, Robert Scott and Satta Nallo (ADR administrative assistant woman of color) were able to perform those timesheet functions Ms. Jordan claimed she could not do.

485. Ms. Jordan (white) delegated her GS-14 (later GS-15) time sheets and cadre coordination duties to Plaintiff, but Plaintiff was not so compensated at the same higher rate. The other woman of color (Satta Nallo) also was not known to be compensated at least at the rate of Ms. Jordan's salary for performing part of Ms. Jordan's duties.

486. At times, ADR division or cadre meetings comprised over 30 hours a week in which all members of the division, cadre, ADR headquarters, or ADR headquarters cadre attended the same meetings.

487. Baking was not a major duty or any listed duty in the vacancy announcement Plaintiff applied for or in FEMA's official ADR attorney advisor job description.

488. White employees Erika Jordan and Robert Scott were paid overtime for hours worked beyond a 40-hour work week while Plaintiff was not.

489. Plaintiff (as well as other women) was not fully compensated for the time (often after-hours time) she spent baking and preparing to make those baked goods. If they baked during the workday, that meant less time working on career-promoting activities as part of their major duties.

490. Plaintiff was not always reimbursed for materials and equipment for social events and baked goods, which was expected for Plaintiff to donate for social events (public use), such as office birthdays, without compensation. The cost of supplies could have instead been used to

contribute more fully to Plaintiff's retirement account, made for other investments, or other private uses.

491. Even if they knew how to bake, men were not asked to bake or contribute their time or money for the baking or other ADR Division social events.

492. Baking assignments given to women were not truly voluntary. Plaintiff faced adverse actions on her performance review and socially for in any way opposing (such as through modifications) a baking order.

493. Other women of color who used to work at FEMA's ADR Division also were threatened with negative references or actually had managers interfere with their ability to receive another position.

494. FEMA caused Plaintiff harm by trying to keep Plaintiff from obtaining another job and potential for job prospects. Erika Jordan spoke ill of Plaintiff on a security clearance investigation to disparage Plaintiff, which delayed Plaintiff's ability to start a position at

495. Baking assignments were intentionally made based on gender. Vikram Kapoor (man) joked that a women's place was in the kitchen, and Inga Watkins and Loretta Vardy tried to repeat the sexist joke that he told in his hiring interview. Mr. Scott knew about the joke but did nothing. ADR Division Director Cynthia Mazur directly asked Plaintiff to bake.

496. Defendant Mr. Scott, as Plaintiff's supervisor, refused to pay Plaintiff for legal work. Mr. Scott stated that Plaintiff would need to volunteer her time (work unpaid) if she wanted to complete a legal memorandum that ran contrary to Mr. Scott's order of how he wanted Plaintiff to draft the memorandum. Plaintiff refused to draft a memorandum that made false statements and would use attorney time to discriminate against others or allow the agency or Mr. Scott to discriminate against others.

497. Those within her management chain limited Plaintiff's EEO time to have adequate time to file and talk to an EEO officer to document her complaint and bill for such time. Erika Jordan limited Plaintiff to less than 2 hours of EEO time to work on a complaint consisting of over a hundred instances plus additional pages of supporting documents. FEMA's EEO counselor Andrea Pearson from the FEMA Office of Equal Rights (OER) refused to hold

AMENDED COMPLAINT        24-CV-00797 KAW            Page **101** of **190**

meetings with Plaintiff to go one-by-one through each event to document the complaint knowing that Plaintiff's supervisor would not allow EEO time otherwise and required Plaintiff to compile and go through thousands of pages of documentary evidence to extract the date, exact time, and description of each instance of discrimination (all in less than 2 hours). OER also waited until Plaintiff had notified the office that she was going on Christmas break in California for OER to order Plaintiff to respond to her complaint while she was on leave such that she would not take work time to do so.

498. While Plaintiff was on protected medical leave from May through October 2016, Erika Jordan, OER officials, and Kirsten Gunsolus of human resources (OCCHCO) required Plaintiff to be on call 24/7 or perform unnecessary administrative duties, including when Plaintiff was on leave without pay. FEMA did not pay Plaintiff overtime or for her time on-call. They even threatened to deny Plaintiff accommodations (which would lead to her termination) and told her that she would be considered AWOL if she did not respond right away even while Plaintiff was in the process of seeking medical treatment (i.e., in a provider's office or in a place with no cell phones allowed). They also made Plaintiff wait until after the start of travel (including out of state) for medical treatment to approve the leave because they refused to accept advanced notification and approval of leave for medical treatment (as is typical agency practice). FEMA did not pay Plaintiff overtime or for her time on-call.

499. In addition to her own duties in the position vacancy announcement, Plaintiff took on the duties of a GS-15 (Robert Scott), a GS-14 (Erika Jordan, cadre coordinator), additional work based on discriminatory stereotypes (e.g., baking, administrative work), EEO counselor, employment attorney, and on-call or overtime work without the equal base or premium pay given to those outside Plaintiff's protected class or those who did not engage in protected activity.

500. The EEOC erred in refusing to analyze Plaintiff's equal pay claims on all applicable laws instead of only analyzing whether Defendants FEMA/DHS paid Plaintiff unequally based on only one law (the Equal Pay Act) when failing to pay Plaintiff equally or at all, especially based on gender stereotypes of woman performing office housework without pay,

violated the Civil Rights Act of 1964. The Equal Pay Act also does not account for unequal pay based on Plaintiff's disability and race, which the Civil Rights Act of 1964 and the Rehabilitation Act of 1973 would consider.

### 9.    NINTH CLAIM OF RELIEF

#### Non-payment for work

*Fair Labor Standards Act (29 USC §§ 201, et seq.), Equal Pay Act of 1963 (29 USC § 206, 29 CFR § 1614.202, Part 1620 and 1621), Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Part 1604 and Part 1606), Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203), FMLA (29 USC 2601 et seq., as amended; 5 USC §§ 6381-6387, 5 CFR Part 630; 29 CFR Part 825), 22 USC § 7102(8), 13th and 15th Amendments of the US Constitution, 22 USC § 7102(8)*

501.    Plaintiff was hired as an exempt ADR Attorney Advisor.  However, after she was onboarded, Plaintiff's managers said her primary duties were not to perform the specialized work for which she was hired (e.g., ADR practice, coaching, mediation).  She was assigned highly repetitive administrative work, such as making daily and monthly work plans starting April 11, 2016, for monthly work plans and May 2, 2016, for daily work plans.

502.    Plaintiff worked at the ADR Division between July 13, 2014-October 18, 2016, which equaled 118 weeks or 4,720 hours if calculated at an average of 40 hours a week. However, Plaintiff's workload was more than 40 hours per week.

503.    In 2016, Plaintiff earned $55,448.22 in compensation from DHS/FEMA.

504.    Plaintiff spent at least 550 hours on this discrimination complaint in 2019 alone. This time does not include time spent on EEO activities between 2014-2019, meetings with her supervisors to report and discuss EEO matters, and time Plaintiff spent working on a subsequent EEO case that resulted from further retaliation and FEMA/DHS's failure to correct the hostile work environment.

505.    Plaintiff was also required to perform manual labor (baking and shopping for said baking) for the office between 2014-2016.

506. Other women in the office but not men were not asked to bake. Plaintiff was not fully compensated for all of the time and money she spent on baking, office housework, and other social events Plaintiff was asked to do while in the ADR Division.

507. Women bore disproportionate social, money, time, and cost of cooking. In the OCC, especially in the ADR Division, women more than men bore the costs of social events and other office housework and often disproportionately spent their own time and money on such social events. The ADR Division asked women (but not men) to bake and cook on a regular basis (e.g., about two times a week) and pay for the cost to do so. If a woman declined or tried to make a less time-consuming dessert, she was considered not to be a team player.

508. Plaintiff and those of similar protected classes, therefore, were expected to give work time free to the US government. This uncompensated time and therefore loss in salary meant that Plaintiff incurred opportunity costs and that the US government (Plaintiff's employer) deprived Plaintiff of pension, retirement returns with tax-free growth, and other investment returns without compensation.

509. Plaintiff was asked to work (e.g., revising time sheets, responding to emails, drafting discrimination complaints) and be on call 24/7 while on medical leave in 2016, which included unpaid time under the threat that her employment or request for accommodations denied if she did not while on leave as ordered. When Plaintiff was required to be on-call, she was required to work outside of scheduled work hours. Plaintiff was required to stay within a radius where she could be recalled to DC in less than 24 hours.

510. Plaintiff was required to work and provide extensive responses unpaid while on protected medical leave. At various points in the spring/summer of 2016 while Plaintiff was on medical leave, supervisor Erika Jordan required Plaintiff to fix her time sheet for hours (until midnight at times) uncompensated. Before taking protected medical leave, edits on timesheets took less than 15 minutes. On September 29, 2016, Robert Scott filled out and certified Plaintiff's timesheet, such as on the WebTA Certification for 2016 Pay Period 19, without her involvement needed while she was on medical leave.

511.    On September 16, 2016, Kirsten Gunsolus required Plaintiff to respond while on medical leave when Plaintiff was in a provider's office.

512.    In addition to the position that she was hired to do (ADR Attorney Advisor), Plaintiff was required to take on parts of the job of Robert Scott (ADR Deputy Director), Erika Jordan (ADR Division cadre coordinator), a baker, Equal Employment Opportunity (EEO) counselor (Andrea Pearson), and Plaintiff's employment attorney. However, Plaintiff was only paid for the hours for one position up to 40 hours a week as ADR Attorney Advisor.

513.    Robert Scott and Erika Jordan (both white) were paid overtime in 2016.

514.    Plaintiff was not paid overtime pay between 2014 and 2016.

515.    FEMA refused to pay Plaintiff for her time required by law and allowed to others:

(i.)    for work assignments (time to complete an assigned legal memorandum if Plaintiff was only going to write one that did not violate EEO laws);

(ii.)    time spent after work hours when her supervisor sent Plaintiff hundreds of emails to respond to after hours);

(iii.)    time Plaintiff spent engaging in protected activity (e.g., between April 27-29, 2016, for any time spent preparing for or providing the documents requested by OER;

(iv.)    on June 6, 2016, for time spent engaging in the interactive process and responding to agency requests for documentation of reasonable accommodations and FMLA);

(v.)    for time spent on human resources matters (e.g., timesheets)

516.    If any time for protected activity was paid, payment was delayed (e.g., the agency delayed paying Plaintiff by one pay period for the time spent in mediation on October 4, 2016).

517.    Ms. Jordan restricted the amount of time Plaintiff was paid to respond to and participate in the EEO process. Ms. Jordan, Plaintiff's other harassers, and others who participated on behalf of the agency defense were not restricted in the amount of time they were paid in participating in the agency defense or their participation in the complaint Plaintiff filed. These other individuals could have also been paid premium time for their participation. Therefore, Plaintiff was treated differently because of her protected activity and protected classes

(i.e., an individual who filed a discrimination complaint and part of a group targeted for discrimination based on her protected classes and protected activity).

518. Plaintiff filed a discrimination complaint on March 21, 2016. Plaintiff participated in the EEO process by drafting and documenting in detail her allegations of discrimination, including but not limited to retaliation and a hostile work environment.

519. By opposing discriminatory activity and filing a discrimination complaint, Plaintiff was upholding her duty as a federal employee to uphold the US Constitution.

520. Refusing to pay for all of Plaintiff's time spent on EEO activities (e.g., drafting her allegations) is an attempt to dissuade Plaintiff from continuing to fully participate in the EEO process and threaten her chances of prevailing. At the same time, the government incentivizes discrimination when harassers are allowed to be paid more than victims for their time spent responding to the EEO process. This perverse incentive not only creates a hostile work environment but also differentially treats those who are targeted for discrimination.

521. Others were not required to use leave to respond to such human resources requests, and Plaintiff was previously paid for such requests before June 6, 2016. Ms. Jordan and others in management were paid for their time regarding Plaintiff's requests.

522. Ms. Jordan, as well as others with authority to recommend or order personnel actions, tried to dissuade Plaintiff from requesting medical leave and other accommodations

523. Plaintiff was also subjected to harm through the legal process and abuse of the legal process as demonstrated by FEMA's handling of the EEO process, Plaintiffs' allegations of discrimination, and internal investigations.

## 10. **TENTH CLAIM OF RELIEF**

### Involuntary servitude and/or taking of Plaintiff's benefits and salary

*13th and 15th Amendments of the US Constitution, 22 USC § 7102(8*

524. Since money is fungible, work without pay could be considered a taking of salary owed or requiring Plaintiff to work for free. At times, the amount of work for the pay amounted to less than the minimum wage.

525. Plaintiff was required to work while on medical leave and leave without pay in 2016.

526. Plaintiff was not fully compensated for the time she spent on the EEO process to litigate and file complaints before various administrative bodies to exhaust her administrative remedies related to the current lawsuit. The uncompensated time amounted to several hundred hours of time. The implication of this uncompensated time meant that the federal government took Plaintiff's free time and leave and required to contribute toward trying to ensure others upheld their constitutional oath of office and stopped engaging in corruption, perform the job of others, and vindicate Plaintiff's rights.

527. Between 2014-2016, FEMA (with the knowledge of or by the direct request of Plaintiff's managers) required Plaintiff to contribute her time and buy supplies and equipment to bake for birthdays and other social events for the ADR Division. Plaintiff was required to give the end product to share for the social events. These events happened often, such as on a biweekly basis.

528. Plaintiff was not allowed to choose what she would make for these events.

529. FEMA threatened Plaintiff with serious harm if she did not continue to work without pay while on medical leave. Supervisor Erika Jordan, members of the Office of Equal Rights, and the Office of Chief Human Capital Officer all made demands on Plaintiff's time during the period of continuous medical leave in 2016.

530. Plaintiff was eligible for voluntary leave donations such that the time on unpaid medical leave would be paid, but FEMA reversed its determination of eligibility by stating that Plaintiff would not be eligible for leave donations as long as she engaged in EEO activity and her psychologist did not recant his certification that she could engage in EEO activity.

531. Kirsten Gunsolus of human resources threatened that FEMA would deny Plaintiff accommodations or termination of her employment and thus also health insurance. A denial of accommodations meant that Plaintiff would be required to go back into an abusive environment that would and did cause her psychological damage. This abusive environment also meant that

Plaintiff would likely face future physical damage and restraint as Plaintiff had already been trapped in her cubicle, tripped (battery), and assaulted (physically intimidated).

532. Plaintiff was also subjected to harm through the legal process and abuse of the legal process as demonstrated by FEMA's handling of the EEO process, Plaintiffs' allegations of discrimination, and internal investigations.

533. FEMA/DHS took attempts to make sure (including through sabotage and through the use of the EEO process and DHS's investigatory powers) Plaintiff has not been able to be hired and onboarded into full-time, non-temporary W2 employment since 2019.

534. FEMA also had a culture of harming others (especially women of color) through widespread sexual harassment and retaliation for reporting discrimination as found by the RAND corporation and the DHS Inspector General. Even in the course of the EEOC process, FEMA supervisors also blamed and ridiculed Plaintiff as uncooperative for refusing to allow Mr. Kapoor, a man Plaintiff named as one of her harassers, to touch her, even though her supervisors had acknowledged that Plaintiff was raising sexual harassment claims against Mr. Kapoor.

535. The FEMA ADR Division specifically had a culture of harm whereby Robert Scott had a history of physically intimidating at least one other woman of color, and there were reports whereby supervisors Robert Scott, Erika Jordan, and Cynthia Mazur threatened negative references, threatened that someone would never work for the federal government again, or disparaged another woman of color to interfere with her prospects for employment.

536. Plaintiff was harmed mentally because she was diagnosed with PTSD and adjustment disorder as a result of DHS/FEMA's actions.

### 11. **ELEVENTH CLAIM OF RELIEF**

**Performance goals prohibiting protected activity: retaliation, interference, disparate impact, disparate treatment (unequal application of a policy based on sex/gender, race, national origin, and protected activity)**

*42 USC §§ 1981, 1983, and 1985-1986, SB 331 (CA Silence No More Act), "Speak Out Act" (H.R 8827), Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203), CA Labor Code § 98.6(b)(1), Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Part 1604 and Part 1606)*

537.    Plaintiff realleges and incorporates by reference paragraphs # 118-119.

538.    Robert Scott told the Plaintiff that according to his interpretation of the proposed performance goals, if the Plaintiff engaged in protected activity by making a discrimination, harassment, or workplace violence allegation (such as against the Plaintiff's co-worker Mr. Vikram Kapoor), then that protected behavior would result in a negative performance evaluation for the Plaintiff (a woman) but not for Mr. Kapoor (a man). Mr. Scott answered that Mr. Kapoor (a man) would not be subject to a negative performance evaluation if he made allegations of discrimination, harassment, or workplace violence. In addition, Mr. Scott prohibited Plaintiff from using words that could be used to report discrimination, such as HR, discrimination, workplace violence, harassment, and so forth.

539.    The proposed discriminatory performance goal would apply to the entire 2016 performance year (all day, every day) and would take away Plaintiff's access to remedial mechanisms to report discrimination if Mr. Scott's performance goal proposal were applied as he threatened. The constant nature of the threat of a negative performance appraisal for standing up for what was right, opposing discrimination, and fulfilling Plaintiff's professional responsibility of advocating against discrimination and illegal activity made the discriminatory performance goal and this discriminatory enforcement both severe and pervasive enough to change the terms and conditions of Plaintiff's employment. The proposed application and enforcement of said performance goal also severely impacted a division where conflict and working with offices working on discrimination, harassment, and workplace violence were part of the job description.

540.    This application or interpretation of the proposed performance goal, as well as the enforcement of said application, was discriminatorily applied because of Plaintiff's sex/gender since a woman but a man would not and did not receive a negative performance appraisal for making a discrimination allegation. Even if the proposed performance goal were in fact neutral on its face such that complaints against individuals on the cadre side of the division would result in a negative performance appraisal, it was applied in a discriminatory way. When Plaintiff (not white, Asian, Chinese/Taiwanese descent) also complained about Mr. Scott and Ms. Jordan (both

white individuals on the same cadre side of the division that Plaintiff was on), they did not receive negative performance appraisals.

541. This application of the performance goal, as well as the enforcement of said application, also served a retaliatory purpose to dissuade Plaintiff and other individuals from reporting discrimination. It was per se retaliation (in violation of various statutes) to have a policy that would decrease employees' performance appraisals if they made allegations of discrimination against someone else. It would in effect exclude the ability of employees to make discrimination complaints.

542. Mr. Scott's interpretation and adoption of 2016 performance goals knowingly and discriminatorily applied a supposedly neutral work rule (performance goals) to those who engage in protected activity.

543. Mr. Scott intended discriminatorily apply the performance goal evaluation to Plaintiff's protected activity because he changed his position about whether the goals would apply to protected activity when he had witnesses and specifically asked witnesses to leave to tell Plaintiff she would face consequences on her performance if she continued to engage in protected activity by making allegations of discrimination against Mr. Kapoor.

544. Mr. Scott also told Plaintiff that Mr. Scott ordered her not to say why she declined to sit next to Vikram Kapoor in front of others in an email dated January 11, 2016, in which he said, "I specifically ordered you not to speak with others in the office about this issue."

545. With a disparate impact or disparate standard, statistics would show that Mr. Scott's application of the 2016 performance goals adversely impacted those who made allegations of discrimination.

546. Since Mr. Scott's interpretation of the evaluation of performance goals impacted all individuals under Mr. Scott's chain of command who engaged in protected activity (especially by making allegations of protected activity), this practice would adversely affect individuals who made allegations not only under the Civil Rights Act of 1964 (discrimination based on race, gender, religion, sex) but also the Rehabilitation Act (disability) for both retaliation and interference, amongst other discrimination laws.

547.    Plaintiff made known her supervisor and others through reporting mechanisms that this performance goal application and enforcement was unwelcome, and she faced harm as a result of these procedures and practices as discussed in subsequent claims.

## 12.    TWELFTH CLAIM OF RELIEF

### Negative performance reviews from Robert Scott

*CA Labor Code § 98.6(b)(1), Title VII of the Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Part 1604 and Part 1606), Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203), 42 USC §§ 1983, 1985-1986*

548.    Plaintiff realleges and incorporates by reference all the other paragraphs of this complaint. Specifically referenced in this complaint are procedural history #32-33, and Facts # 127, 133, and 138-139.

549.    Within 90 days after Plaintiff engaged in protected activities as discussed previously and because of Plaintiff's protected activities, Robert Scott (Plaintiff's supervisor) subjected Plaintiff to various adverse actions related to her performance: he reduced her 2015 annual performance appraisal, gave her inadequate or no time to write an opposition to her performance appraisals, and gave her a negative 2016 first quarter performance appraisal.

550.    For the 2014 performance year, Plaintiff received all fours on her core competencies out of a total score of 5 for each category.

551.    The lowered performance appraisal, negative performance comments, and negative performance appraisals were all adverse actions and changed the terms and conditions of Plaintiff's employment.  The quarterly performance appraisal was an adverse action because it was written on Plaintiff's yearly performance appraisal document, which prospective employers (particularly government employers) asked for Plaintiff's last performance appraisal.

552.    The negative performance reviews led to a variety of other side effects.  Contrary to prior performance satisfactory performance evaluations, FEMA/DHS did not award Plaintiff with any bonuses between December 2015 and October 2016.  The negative performance review also made Plaintiff ineligible for internal promotions and led to false, negative references and

disparagement of Plaintiff by members of Plaintiff's management, which included preventing Plaintiff was obtaining employment elsewhere.

553. Plaintiff performed her job satisfactorily throughout her employment within the FEMA ADR Division and received satisfactory performance reviews from 2014-2015 until she received a lowered annual performance appraisal in January 2016 and then a negative quarterly performance appraisal in March/April 2016. FEMA awarded her a bonus for her performance in 2015. Plaintiff still received her annual step increase in pay in July 2016 for adequate performance as written on the SF-50 personnel action form although her supervisors Erika Jordan and Robert Scott falsely claimed on her performance appraisal forms that she was not adequately performing.

554. Plaintiff engaged in several types and instances of protected opposition related to Mr. Scott's adverse actions to lower Plaintiff's subsequent performance reviews and scores:

(i.) Plaintiff complained of discriminatory behavior to her managers Robert Scott in March, July, and September 2015 and Cynthia Mazur in mid-December 2015.

(ii.) In mid-October 2015, Plaintiff refused to write a discriminatory legal memorandum contrary to her position and gave Mr. Scott citations to document and support her position on October 14, 2015.

555. On January 28, 2016, Mr. Scott reduced Plaintiff's 2015 annual performance appraisal scores and wrote negative items on her annual based on her protected activity compared to the prior performance year after she continued to make allegations against Mr. Kapoor of discrimination. Mr. Scott carried out his threat from mid-December that she would face negative consequences and he would lower Plaintiff's performance scores if she alleged discrimination against Mr. Kapoor due to Mr. Scott's adoption and interpretation of the new divisional performance goals for 2016. The proximity of events and fulfillment of the threat gives rise to an inference of discrimination.

556. In the 2015 performance appraisal score, which was delivered in January 2016, Mr. Scott reduced Plaintiff's performance score by one point each in three categories compared to the prior performance year and did not give Plaintiff adequate time and opportunity to contest

the appraisal. On January 28, 2016, those categories were communication, customer service, and teamwork and cooperation. On January 29, 2016, Mr. Scott changed those categories of lower performance and arbitrarily swapped her scores for customer service and technical proficiency.

557. Plaintiff's protected opposition is related to Mr. Scott's subsequent adverse actions taken against Plaintiff's performance because the words he used in the performance discussion on January 28, 2016, describing her performance mirrored the language he used when she engaged in protected opposition when she made allegations of discrimination and when she refused to condone or make false claims contrary to law that would use her services as an attorney to discriminate against others and help others do so. He also made her memorize and recite verbatim his response to her allegations of discrimination to justify his lowered performance score, something he did not require of anyone else.

558. The words Mr. Scott to describe her 2015 performance, such as telling her that she was not "cooperative" enough and ordering her to "not block" the decisions of others, were code words for prescriptive stereotypes of Plaintiff's gender (female) and national origin/race (East Asian, Taiwanese/Chinese) because Mr. Scott expected Plaintiff to act cooperatively and submissively and applied the usage of those terms in a discriminatory way. Mr. Scott did not use the same words to describe non-Asian white individuals or men in such a manner when they demonstrated an opinion and did not act in a cooperative way.

559. Mr. Scott's reaction to Plaintiff taking a legal position contrary to Mr. Scott's position and her refusal to write a discriminatory memorandum was motivated by Plaintiff's color, race, and national origin because Mr. Scott did not require the white individuals (e.g., Lester Schoene and Crevon Tarrance) to write citations and a full memorandum supporting every comment they made when reviewing manuals or other similar agency documents. Like Plaintiff, Ms. Terrance also was a licensed attorney.

560. Mr. Scott's reaction in retaliating against Plaintiff related to the 2015 legal assignment mirrored his own subsequent reaction related to the office move meeting in January 2016 where Plaintiff refused to agree to sit next to her harasser Mr. Kapoor, which in turn alluded to the fact she made discrimination allegations that Mr. Scott opposed. In both

situations, Mr. Scott was angry and retaliated against her because she (as an East Asian woman) did not act submissively and automatically adopt the same position or vote as others (especially white employees or men in the office) and Mr. Scott tried to make Plaintiff recant her position.

561.    Mr. Scott and Ms. Mazur's retaliation against Plaintiff increased (specifically regarding performance appraisals and bonuses) the more Plaintiff engaged in protected activities, such as reporting further up the chain of command on March 18, 2016, and making a formal EEO complaint to the FEMA Office of Equal Rights on March 21, 2016.

562.    A week after she filed a discrimination complaint on March 21, 2016, Mr. Scott gave Plaintiff a negative 2016 first-quarter performance review on March 28, 2016, and officially documented on April 15, 2016, in the performance appraisal form in FEMA's FHR navigator system. He falsely claimed that Plaintiff was not performing to make minimum standards and told her he was putting her on a performance improvement plan (PIP) although a PIP did not exist for her job classification at FEMA.

563.    Mr. Scott gave Plaintiff a negative quarterly performance review in three areas of core competencies after all positive performance ratings up to that date, the same areas related to Plaintiff's protected activities from the 2015 annual performance evaluation, which was submitted in January 2016.

564.    The suspect timing of Mr. Scott's negative performance review of Plaintiff and her protected activity (within 90 days of each other) gives rise to an inference of Plaintiff's protected activity as a cause of Mr. Scott's negative performance review. The words that Mr. Scott used in the performance review also mirrored his comments to Plaintiff immediately after she engaged in protected activity.

565.    On March 10, 18, and 29, 2016, and May 4, 2016, Plaintiff notified Ms. Mazur that Plaintiff did not welcome the retaliatory performance reviews.

566.    None of Plaintiff's management team intervened to stop Mr. Scott from giving Plaintiff negative performance scores and comments. Ms. Mazur allowed Mr. Scott to give Plaintiff a negative performance review because Ms. Mazur said that Plaintiff was refusing to do tasks. Ms. Mazur said she remembered Plaintiff opposing the emotional intelligence assignment

Mr. Scott assigned, which was an assignment Plaintiff opposed because of its retaliatory nature. Plaintiff's complaints to Ms. Mazur related to Plaintiff's protected activity, such as reporting discrimination and retaliation.

567. The adverse actions Mr. Scott and Ms. Mazur took against Plaintiff's performance and related actions (e.g., bonuses, promotions) were also caused by the intersection of gender, race, color, and national origin. When white individuals not of Chinese or Taiwanese descent complained (about issues unrelated to discrimination), they were not likewise faced with any adverse actions, but other women of color faced negative repercussions when they complained (such as blowing the whistle or reporting discrimination). White women and men were not subject to the same type of scrutiny that women of color were in the ADR Division.

568. Although notified of the negative performance review, human resources did not intervene to stop Mr. Scott from giving Plaintiff a negative performance appraisal.

### 13. **THIRTEENTH CLAIM OF RELIEF**

**Supervisor ordered Plaintiff to see a therapist (inappropriate order for a medical examination/interference/retaliation)**

*CA Labor Code § 98.6(b)(1), Title VII of the Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Part 1604 and Part 1606) (race, gender, retaliation), Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203) (regarded as having a disability, improper medical inquiry), 1st Amendment of the US Constitution, 5 USC § 2302, 29 CFR § 1630.13-1630.14 (medical inquiries), 5th and 14th Amendments of the US Constitution (takings clause, equal protection)*

569. Plaintiff realleges and specifically incorporates Fact #159.

570. Plaintiff's supervisor Robert Scott retaliated against Plaintiff by ordering her on January 8, 2016, to undergo medical treatment (see a therapist) to prevent her from continuing to engage in protected activity and retaliate against her for engaging in protected activity.

571. The psychologist charges a fee for each appointment, which FEMA/DHS has not fully compensated Plaintiff for all sessions.

572.   FEMA/DHS had no legitimate business reason to order Plaintiff to see a therapist, nor was the order a business necessity. To Plaintiff's understanding, no other individual within the ADR Division nor OCC was subjected to a psychological examination.

573.   Within a couple of hours after Plaintiff opposed having to agree to a seating arrangement that would require her to sit next to her harasser Mr. Vikram Kapoor in the office move in 2016, Plaintiff's supervisor Mr. Scott ordered Plaintiff to see a therapist. The suspect timing between Plaintiff's protected opposition and subsequent adverse action (order to see a therapist) gives rise to an inference of retaliation.

574.   Mr. Scott repeated his order for Plaintiff to see a therapist one after day Plaintiff reported discrimination to Jill McDonnell of human resources and talked to Douglas Goudy of the FEMA EEO office (which is within 90 days of protected activity), which management knew.

575.   In one of Plaintiff's drafts of the assignment on January 11 or 12, 2016, Plaintiff repeated that her workplace violence concerns and allegations of discrimination against Mr. Kapoor were directly related, and she provided a definition of workplace violence.

576.   Robert Scott's order for Plaintiff to see a therapist was related to Plaintiff's protected activity because he explicitly mentioned Plaintiff's protected activity next to the reasons why he said she needed to go to therapy. On January 12, 2016, at 9:27 AM, Robert Scott emailed Plaintiff, "…A core problem that you need to wrestle with is how, in your mind, you have blown up someone leaving their file drawer open into an act of "workplace violence." It's not one and that is why I am asking you to call EAP to discuss and I also suggest you consult your mentors if you are unable to see that your perspective is misplaced and causing you to behave badly. Publicly defaming a co-worker is completely unacceptable. Do not do this again." EAP is a work-sponsored program that allows employees to see a therapist for free for a limited number of sessions.

577.   Mr. Kapoor tripping Plaintiff with his drawer was one amongst many examples Plaintiff gave Mr. Scott for Plaintiff's sex/gender allegations against Mr. Kapoor and retaliation by Mr. Kapor, including but not limited to Mr. Kapoor's joke about how a woman's place is in the kitchen, his position the term babe was appropriate for a male supervisor to call a female

subordinate, his asking Plaintiff to be his plus one, and his claim it was Plaintiff's job to do the secretarial work. Because Mr. Scott's order for Plaintiff to see a therapist (adverse action) was directly related to Plaintiff's allegations of gender/sex discrimination, that adverse action gives rise to an inference of retaliation.

578. Plaintiff notified manager Cynthia Mazur and Jill McDonnell of human resources in January 2016 of Mr. Scott's order for Plaintiff to see a therapist. FEMA/DHS did not stop Mr. Scott from making illegal/discriminatory orders.

579. Mr. Scott continued to urge Plaintiff to see a therapist in subsequent discussions, such as in a 5:26 PM email on March 21, 2016, to "find positive and productive ways of looking at your issues," which were Plaintiff's EEO allegations. March 21, 2016, was the same day Plaintiff officially initiated the EEO process with the FEMA Office of Equal Rights.

580. Robert Scott's order for Plaintiff to see a therapist was related to Plaintiff's sex/gender (female) because he believed that she was a hysterical, emotional woman given his words that she needed to examine her "moods, emotions," had an "active imagination," and needed to deal with her "fears" in therapy. Mr. Scott also falsely characterized that Plaintiff was not "calm" (i.e., emotional) when making her allegations of discrimination. Men were not so treated, characterized, or made to complete such assignments for the same or more extreme behavior. Mr. Scott's belief that Plaintiff had mental disabilities was tied to his discriminatory beliefs about women.

581. Mr. Scott also retaliated by calling Plaintiff "argumentative", "not respectful", and an "attack" Mr. Scott, Ms. Mazur, and coworkers when Plaintiff violated Mr. Scott's prescriptive gender and racial stereotypes by maintaining and not recanting her position regarding the discrimination she faced even when not warranted by the actual words Plaintiff used, such as her 10:34 AM email on January 13, 2016. In response to that email where Plaintiff acknowledged Mr. Scott's entitlement to his opinions and expressed her willingness to hear from others and her commitment to continue to be collaborative and flexible with colleagues, Mr. Scott characterized Plaintiff's email as demonstrating that Plaintiff was "increasingly argumentative and disrespectful."

582.    Mr. Scott sent Plaintiff to see a therapist because he regarded Plaintiff as having a disability she did not have.  Although he provided contradictory statements (under oath) as to when he first knew Plaintiff had a disability, swore one time that he knew she had multiple mental conditions starting on her first day of work and knew she had a disability by January 2016 (the same month when he ordered her to see a therapist).

583.    While Mr. Scott believed Plaintiff had a disability that needed Plaintiff to see a therapist in January 2016, Plaintiff's ultimate diagnoses were not due to an inherent psychological condition or a psychological condition related to Plaintiff's gender that Mr. Scott believed to be some type of hysteria or being too emotional but rather Plaintiff's diagnoses stemmed from the hostile work environment caused by FEMA as Dr. Oaklander certified.  In her draft of the emotional intelligence assignment, Plaintiff specified the harassment she faced caused trauma, which she did not wish to endure again.

## 14.    FOURTEENTH CLAIM OF RELIEF

**Emotional intelligence assignment (improper medical inquiry, retaliation, discrimination based on gender/sex, national origin, race, color, and regarded as having a disability)**

*CA Labor Code § 98.6(b)(1), Title VII of the Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Part 1604 and Part 1606) (race, gender/sex, retaliation), Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203), 1ˢᵗ and 14ᵗʰ Amendments of the US Constitution, 29 CFR § 1630.13-1630.14 (improper medical inquiries). DC Code § 3-12010.01*

584.    Facts specifically included are #121-123.

585.    Within 90 days of Plaintiff engaging in various protected activities (including one instance of protected opposition the same day as being subjected to an adverse action), Robert Scott retaliated against Plaintiff by giving her a retaliatory assignment (an adverse action) to prevent her from continuing to engage in protected activity.  The suspect timing (especially 90 days or less) between the protected activities and the subsequent adverse actions gives rise to an inference and presumption of retaliation.

586.    All of the initially proposed options on January 8, 2016, left the possibility that Plaintiff's harasser Mr. Kapoor would sit next to Plaintiff.  ADR management determined that

Ms. Mazur, Mr. Scott, and Linda Davis (Director of Professional Development for another division) would have fixed, assigned seats but that the rest of the ADR Division would decide the seating arrangement for the remainder of the seats, which could be assigned seats, flexible seating that would change every day (hoteling), or a hybrid option between the two, as well as decide how the seating arrangement would be determined (e.g., by seniority, lottery).

587.   Ms. Mazur and Mr. Scott did not determine and tell the rest of the division that Mr. Kapoor would need to sit away from Plaintiff in any of the proposed seating arrangements.

588.   At the meeting, Plaintiff proposed several options (including delaying the vote until after she could speak to management offline due to the censorship of her speech related to allegations of discrimination, adding conditions that would consider safety to the options, having management decide for everyone, or having a temporary hybrid seating arrangement).  ADR management did not agree with Plaintiff's proposals.  Mr. Scott declined to meet, delay the vote, or allow any conditions.

589.   Being made to sit next to her harasser intermittently or permanently without any control was intimidating and could cause further physical and psychological harm to Plaintiff.

590.   No one in the division (including management) gave Plaintiff a guarantee that there would be no more continued violations against her in the future.

591.   Despite Ms. Mazur saying on January 8, 2016, that Plaintiff showed discretion in the divisional meeting since Plaintiff did not mention any names when expressing her concerns about her safety, Mr. Scott confirmed on January 11 his prohibition on Plaintiff talking to anyone in the office about her discrimination allegations (presumably including manager Ms. Mazur), and on January 12, Mr. Scott falsely accused Plaintiff of publicly defaming Mr. Kapoor.

592.   Mr. Scott was not licensed as a psychologist or psychiatrist, nor was he known to have any training as one.

593.   "Thinking errors" and assessing a person's emotional intelligence are in the domain of therapy.  Mr. Scott did not have a license to administer any type of therapy or assess rational and irrational thoughts.  He did not after a natural aptitude for understanding what emotions were either because when a guest speaker came to the division to present, Mr. Scott

could not even identify one emotion to describe his emotional state after the speaker made several attempts to elicit an answer from Mr. Scott. The presenter repeatedly told Mr. Scott that none of the words he chose were emotions.

594. Mr. Scott tried to disguise an attempt to administer a medical (psychological) examination or inquiry as an "emotional intelligence" assignment. He did so to try to administer a medical examination (therapy) to Plaintiff and have her disclose information that would otherwise be revealed in a privileged conversation with a psychologist. Mr. Scott's intention was clear as he also ordered Plaintiff to see a therapist to do the same.

595. The so-called "emotional intelligence" assessment was not of a nature of learning about what the concept was to advance professional development but one of therapy or a medical assessment and discipline disguised as professional development.

596. In contrast to Mr. Scott's unqualified and biased assessment that Plaintiff's problem was that Plaintiff had an innate psychological condition (i.e., a personality disorder), Dr. Harvey Oaklander (a licensed clinical psychologist for 50 years) determined that FEMA's abusive working conditions were the problem and that Plaintiff did not have some type of innate personality disorder that caused her to think irrationally.

597. Mr. Scott and Ms. Mazur, as well as other OCC managers, did not make anyone else besides Plaintiff in the ADR Division nor any other OCC division complete an "emotional intelligence" assignment like the one Mr. Scott assigned Plaintiff.

598. There was no business necessity nor any job-related reason for Mr. Scott to find out the results of Plaintiff's thinking errors, nor was he in a position to judge or evaluate those thinking errors.

599. Although FEMA never investigated Plaintiff's claims during her tenure at the ADR Division, faced sanctions by the Equal Employment Opportunity Commission because the agency never assigned an investigator for the claims in this case, and had no one in the ADR Division or the rest of OCC investigate Plaintiff's claims who was qualified to do so according to FEMA/DHS policy of the definition of investigator, one of Robert Scott's responses to Plaintiff's

allegations of discrimination on March 21, 2016, by Vikram Kapoor was that her allegations were "false and unsubstantiated" and "not fair or respectful."

600. Mr. Scott claimed that Plaintiff was ordered to do an emotional intelligence assignment because she did not and should have made a proposal that would have violated the agency and department's anti-harassment policies. On January 15, 2020, at the EEOC hearing, one of Robert Scott's alleged reasons for the emotional intelligence assignment was that Plaintiff was invoking her right for DHS/FEMA to abide by its policy and the law on anti-harassment: "And I found out that [Plaintiff's name] was -- was invoking, which is her right, to say she doesn't agree with the plan… She wouldn't -- she wouldn't propose that she sit somewhere else. Because she could have sat at another, probably at another OCC office on the tenth floor or on the seventh floor, or somewhere else." Mr. Scott's proposal that Plaintiff (the victim of harassment) move but not her harasser violated DHS and FEMA's anti-harassment policies.

601. White individuals were allowed to disagree with the seating arrangements and give their opinions on how seating arrangements would be selected, but Plaintiff (an Asian woman) was required to adhere to racial/gender stereotypes of East Asians (especially East Asian, Chinese/Taiwanese women) to be submissive and not have her own opinion (which could mean voting against consensus).

602. Robert Scott's order for Plaintiff to complete an emotional intelligence assignment was related to Plaintiff's sex/gender (female) because he believed that she was a hysterical, emotional woman given his words that she needed to examine her "moods, emotions," had an "active imagination," and needed to deal with her "fears" in therapy. Mr. Scott also falsely characterized that Plaintiff was not "calm" (i.e., emotional) when making her allegations of discrimination. Men were not so treated, characterized, or made to complete such assignments for the same or more extreme behavior. Mr. Scott's belief that Plaintiff had mental disabilities was tied to his discriminatory beliefs about women. The fact that manager Ms. Mazur did not intervene in the retaliatory assignment is also due to gender and Ms. Mazur's adherence to gender norms or stereotypes because Ms. Mazur wanted to give Mr. Scott his autonomy (a male gender norm or stereotype) according to what Ms. Mazur told Plaintiff but

Ms. Mazur did not likewise give Plaintiff the same autonomy and allowed Mr. Scott to retaliate against her when she exercised autonomy and a different vote or opinion from others.

603. Mr. Scott did not like that Plaintiff made allegations against men. He was not as reactive when Plaintiff made an allegation of discrimination against a woman of color (Inga Watkins) for saying that Chinese people are barbarians because they eat dogs. This reactivity demonstrates his level of prejudice against women and that women were the targeted groups.

604. Mr. Scott also retaliated by calling Plaintiff "argumentative", "not respectful", and an "attack" Mr. Scott, Ms. Mazur, and coworkers when Plaintiff violated Mr. Scott's prescriptive gender and racial stereotypes by maintaining and not recanting her position regarding the discrimination she faced even when not warranted by the actual words Plaintiff used, such as her 10:34 AM email on January 13, 2016. In response to that email where Plaintiff acknowledged Mr. Scott's entitlement to his opinions and expressed her willingness to hear from others and her commitment to continue to be collaborative and flexible with colleagues, Mr. Scott characterized Plaintiff's email as demonstrating that Plaintiff was "increasingly argumentative and disrespectful."

605. Mr. Scott made Plaintiff complete the emotional intelligence assignment because he regarded Plaintiff as having a disability she did not have.

606. Although he provided contradictory statements (under oath) as to when he first knew Plaintiff had a disability, swore once that he knew she had multiple mental conditions starting on her first day of work and knew she had a disability by January 2016 (the same month when he ordered her to see a therapist). The assignment was another indirect way for Mr. Scott to have Plaintiff apply cognitive behavior therapy techniques on herself by examining her "thinking errors" and recanting her allegations of discrimination.

607. While Mr. Scott believed Plaintiff had a disability that needed Plaintiff to see a therapist in January 2016, Plaintiff's ultimate diagnoses were not due to an inherent psychological condition or a psychological condition related to Plaintiff's gender that Mr. Scott believed to be some type of hysteria or being too emotional but rather Plaintiff's diagnoses stemmed from the hostile work environment caused by FEMA as Dr. Oaklander certified. In her

draft of the emotional intelligence assignment, Plaintiff specified the harassment she faced caused trauma, which she did not wish to endure again.

608.    Not only was the emotional intelligence assignment itself an adverse action, but also the consequences of Plaintiff having to do the assignment full time meant that Plaintiff was subjected to a variety of other adverse actions.  She was ostracized from meetings (which led to disparagement and rumors in the office that led to her exclusion from referrals and career-promoting opportunities), excluded from decision-making processes for the move to a new office, excluded from training, prohibited from working on projects needed for Plaintiff to obtain a high score on her performance goals and other assignments that contributed to her professional development.

## 15.    **FIFTEENTH CLAIM OF RELIEF**

### Limiting time spent on EEO activities

*Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Parts 1604 and 1606), Rehabilitation Act of 1973 (29 USC 791, 29 CFR 1614.203) 5 USC § 2302(b) (whistleblowing), 5 CFR part 630, subpart I*

609.    Specifically included are facts #208-209 and 218.

610.    Because of Plaintiff's protected activities, including but not limited to the dates and instances Plaintiff filed a discrimination complaint and engaged in other oppositional protected activities described previously, FEMA/DHS tried to limit the time Plaintiff spent participating in the Equal Employment Opportunity (EEO) process.

611.    After Plaintiff initiated the FEMA EEO process, Erika Jordan limited Plaintiff's time to meetings with the EEO counselor only to less than two paid hours per week, which excluded time to draft her allegations on her own.  Even two hours a week was insufficient time given the scope of the allegations.

612.    EEO counselor Andrea Pearson refused to meet with Plaintiff to go one by one to find the dates, times, and explanation of each instance of discrimination as Ms. Pearson requested but instead required Plaintiff to do so on her own time.

613. As a consequence of estimating two hours per week spent on EEO time, Ms. Jordan told Plaintiff she was not managing her time well, gave Plaintiff a negative performance review, made Plaintiff draft daily instead of weekly work plans to predict work assignments and document every minute of the following day, made plans to terminate Plaintiff, tried to prevent Plaintiff future job prospects, and other adverse actions listed previously.

614. These adverse actions were related to Plaintiff's protected activity because Ms. Jordan used the same language she used to refer to Plaintiff's protected activity in the adverse actions (e.g., performance review, background check investigator for a position at another government department).

615. A far as Plaintiff knows, others who participated in the EEO process (e.g., defending the agency) but did not allege discrimination were paid for their time and not limited in the time they spent to defend the agency, process the EEO complaint, or rebut Plaintiff allegations. Plaintiff did not hear that these other individuals faced the same adverse actions for spending the same time Platintiff proposed on EEO activity.

616. Juan Porter's response regarding the denial of VLTP benefits is direct evidence of discrimination (retaliation and interference) because Mr. Porter specified that the denial of benefits was based on Plaintiff's protected activity (participation in the EEO process).

617. Further proof of the nexus between Plaintiff's denial of benefits and her protected activity is the suspect timing because Mr. Porter added this new condition (denying paid leave eligibility) after he claimed that others in management had intervened in Plaintiff's application.

618. VLTP is a government-wide program for federal employees, and descriptions of the program on the Office of Personnel Management (OPM) website and in statute (5 USC 6331-6340) and regulation (5 CFR part 630, subpart I) do not explicitly exclude those who engage in EEO activity from participating in the program. On the contrary, 5 CFR § 630.912 prohibits interference with VLTP rights through actual of attempted coercions, intimidation, or threat.

### 16. **SIXTEENTH CLAIM OF RELIEF**

**Retaliation, interference, changing terms and conditions of the job, and assignment of work based on stereotypes**

*CA Labor Code § 98.6(b)(1), Title VII of the Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Part 1604 and Part 1606), Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203), FMLA of 1993 (29 USC 2601 et seq., as amended; 5 USC §§ 6381-6387, 5 CFR Part 630; 29 CFR Part 825), 42 USC §§ 1981, 1983, and 1985*

619. As stated previously, Plaintiff engaged in a variety of protected activities from 2015 to 2016, such as reporting to her supervisors' allegations of discrimination, opposing policies that would cause discrimination against Plaintiff and others, and on March 21, 2016, filing a discrimination complaint.

620. Within 90 days of protected activities, Plaintiff's management retaliated against her by subjecting Plaintiff to a variety of adverse actions in 2016 that changed the terms and conditions of Plaintiff's employment. The suspect timing of these adverse actions in relation to Plaintiff's protected activities gives rights to a presumption that these actions were retaliation for Plaintiff's protected activities.

621. Plaintiff's management subjected Plaintiff to adverse actions that included but were not limited to removing areas of major responsibility that are career-advancing activities without cause, drastically increasing Plaintiff's assignments that exceeded over 40 hours a week and set her up to fail, adding areas of responsibility outside of the scope of her major duties and legal expertise (in an entirely separate area of law on a subject she has never taken a class in), and drastically increasing stereotyped work based on Plaintiff's protected classes (technical administrative work) that was not career enhancing.

622. Plaintiff was denied access to benefits, opportunities, and promotions offered or available to others (especially April-October 2016): denied the opportunity to detail (May 10, 2016), mentoring program and training funds (April-May 2016), selection to the DMAC (a diversity council position), overtime, leave donations (June-October 2016). Others were allowed to deploy or be detailed and "given a chance" even without the correlating experience but the same standard was not applied to Plaintiff.

623. Plaintiff's management told her it was not her job to engage in ADR practice and refused to allow Plaintiff to participate in a facilitation she had in the past two years, told her not

to facilitate a group that discussed how to eliminate discrimination in ADR practice, and quit her participation as a facilitator in an OCC group on knowledge management that was necessary for a performance goal requirement.

624.    Management also subjected Plaintiff to these adverse actions because of her sex/gender and race because employees who were male, white, and those who had not engaged in protected activity were given a lot of support for assignments and were not assigned more work than could be completed in a 40-hour work week to the same extent Plaintiff was assigned after her reporting up discrimination and other forms of protected activities.

625.    Mr. Scott (a man) had two weeks with no strict deadline to complete two worksheets. However, on April 7, 2016, supervisors Erika Jordan and Robert Scott gave Plaintiff (a woman) a couple of hours to complete over 25 data reports, 37 graphs, and hand counting 2910 data points for a data analysis assignment. Similarly, Mr. Kapoor (a man who had not engaged in protected activity) was given a lot of support for assignments and an assistant for a database assignment.

626.    On April 29, 2016, supervisors Erika Jordan and Robert Scott required in 12 hours a legal memorandum of at least 20 pages in an area of law outside of Plaintiff's legal expertise and set Plaintiff up to fail. Ms. Jordan and Mr. Scott set Plaintiff up to research and draft about an issue that would cause Plaintiff to act outside of the scope of her government duties, outside of government ethics, and risk insubordination of the Chief Counsel.

627.    Plaintiff knew that these actions were retaliation because of the suspect timing and vastly different scope of work Plaintiff had, which increased in severity the more that she engaged in protected activity. In addition, internal emails revealed that Mr. Scott and Ms. Jordan intended to terminate Plaintiff's employment, so these adverse actions provided them cover to try to terminate Plaintiff. This was made clearer as Plaintiff learned that this was a pattern that Ms. Jordan and Mr. Scott had used on at least one other woman of color.

628.    Mr. Scott and Ms. Jordan spread damaging rumors, took adverse performance actions, and interfered with Plaintiff's ability to obtain another position. Plaintiff learned that Ms. Jordan made retaliatory comments about Plaintiff in a background check for a clearance for

the State Department. Although Plaintiff wound up passing the clearance, it was severely delayed and then caused Plaintiff to lose the position after the security clearance period lapsed.

629. Given that other women of color had also faced negative references (but no known white individuals or men) by ADR management, the inference is that ADR management subjected Plaintiff to these adverse actions in part because she is a woman of color.

## 17. **SEVENTEENTH CLAIM OF RELIEF**

**Loss of and interference with medical leave (retaliation/interference)**

*Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203), FMLA (29 USC §§ 2601 et seq., as amended; 5 USC §§ 6381-6387, 5 CFR Part 630; 29 CFR Part 825), 29 USC § 2615a, Title VII of the Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Part 1604 and Part 1606), 42 USC § 12203, 42 USC §§ 1981, 1983, and 1985-1986*

630. Specifically incorporated are procedural history #32-34 and facts section 127, 133 (January 14, 2016), 135, 140-141 (February 2016 Mr. Scott's interference with sick leave), 150 Mr. Scott's interference with telework), 156, 158, 173, 176, 197-202, 206-210, 215, and 236.

631. As a result of Plaintiff's protected activity, her management subjected her to the removal of and interference with her benefits (adverse actions) to access sick leave, paid medical leave, training, and protected leave, particularly near crucial deadlines for the discrimination complaint she filed and as a means to create such a hostile work environment that they would force Plaintiff to quit or set her up to fail such that they would terminate Plaintiff.

632. After Plaintiff reported discrimination allegations and other protected activity, Robert Scott and Erika Jordan restricted Plaintiff's access to sick leave and telework while sick or contagious in 2016. Moreover, other offices, such as employees of the FEMA human resources (e.g., Kirsten Gunsolus of OCCHCO) and EEO offices (OER), also began to interfere with Plaintiff's use of medical leave, including protected medical leave.

633. As stated previously and incorporated here, Plaintiff engaged in participatory and oppositional protected activity in 2015-2016 involving her managers Mr. Scott, Ms. Mazur, Ms. Jordan, Mr. Doolin, and Mr. Sevier, as well as members of OCCHCO and OER.

634. Within one month of when Plaintiff first took FMLA leave (mixed intermittent and continuous) on April 18, 2016, Plaintiff's management team (Robert Scott, Erika Jordan, and Kirsten Gunsolus of human resources) discussed terminating Plaintiff's employment in an internal email chain dated May 17-18, 2016. The suspect timing gives rise to an inference of retaliation based on Plaintiff's exercise of her FMLA rights.

635. Per 5 USC § 6386, individuals on FMLA should continue their health insurance. However, after Plaintiff's FMLA leave was exhausted and the expiration of Plaintiff's contract (which then shifted to a periodic extension similar to month-to-month rent after the end of a rental contract), FEMA retroactively extended her employment periodically such that Plaintiff was unsure if she had health insurance or a job during those periods Plaintiff had not yet exhausted her FMLA leave. Health benefits are a form of compensation and the renewal of an employment contract is a type of appointment.

636. In 2016, Plaintiff's management dissuaded Plaintiff from seeking leave for medical care and simultaneously increased her workload to set her up to fail (e.g., assigning her over 100 hours of work for a 40-hour work week) as retaliation. Due to the workload, Plaintiff had difficulty seeking medical care and recovering from illness after normal business hours (5 PM) such that Plaintiff's cold became deep and recurring bronchitis (and related symptoms) requiring multiple courses of antibiotics, which Plaintiff had not previously experienced.

637. Contrary to division policy, Mr. Scott (in February 2016) and Ms. Jordan (on May 17, 19-20, and 23, 2016) tried to make Plaintiff come into the office while sick in violation of division policy and put up barriers for Plaintiff to use her medical leave. Mr. Scott would not respond to emails regarding leave. Ms. Jordan denied Plaintiff's FMLA leave (despite being qualified and with supporting certification) or added additional barriers before approval of FMLA not previously required.

638. Although Ms. Jordan knew that Plaintiff met the requirements to take FMLA leave, Ms. Jordan refused to designate all the leave requested as FMLA and therefore interfered with Plaintiff's right to use FMLA although the leave was taken for the same underlying condition certified by Dr. Hameed previously. Plaintiff's doctor Dr. Zahid Hameed certified

Plaintiff's need for FMLA leave between April 13-24, 2016. Ms. Jordan knew that Plaintiff had more than one visit to a health care provider required by FMLA to be designated as a serious health condition within the definition of the FMLA because Plaintiff saw Dr. Zahid Hameed on April 13, 17, 19, 22, and 24 of 2016, because Dr. Hameed gave Plaintiff notes to excuse her from work. Ms. Jordan also knew Plaintiff had been prescribed antibiotics, which was an alternative requirement to visiting a provider more than once, to be designated as a serious health condition within the definition of the FMLA.

639. Ms. Jordan, along with FEMA personnel counsel, was not qualified to make medical decisions nor had any known medical training.

640. Others in the ADR Division who had not engaged in making allegations of discrimination were not so dissuaded from or denied access to sick leave or FMLA leave.

641. These instances provide examples of a pattern of retaliatory conduct against Plaintiff, especially given the suspect timing in proximity to Plaintiff's filing of a discrimination complaint against FEMA, manager Mr. Scott's similar actions against Plaintiff, and underlying chatter to terminate Plaintiff. Others were not so treated.

642. On June 2, 2016, and June 6, 2016, in relation to Plaintiff's reasonable accommodation requests, FMLA requests, and related benefits, Ms. Jordan provided incorrect points of contact as a means to interfere with Plaintiff's benefits and retaliate.

643. FEMA management refused to allow Plaintiff to simultaneously access both paid leave (e.g., credit hours, sick leave) and protected leave (e.g., FMLA leave, leave as an accommodation). If Plaintiff chose to use protected leave to exercise her Rehabilitation Act or FMLA rights, FEMA would deny Plaintiff from being paid and accessing the federal government employee benefit of leave donations (i.e., paid leave) through the VLTP program. Supervisor Ms. Jordan made Plaintiff choose between protected leave for a disability and VLTP paid leave, which Plaintiff has a right to have both simultaneously.

644. Because of the forced choice regarding paid versus protected leave (e.g., on June 10, 2016) in violation of Section 825.207 of the FMLA, Ms. Jordan interfered with Plaintiff's FMLA and Rehabilitation Act rights to use protected leave, tried to coerce Plaintiff against and

dissuade her from using protected leave, and retaliated against Plaintiff for requesting leave taken in connection with a disability. In addition, Ms. Jordan's decision led Plaintiff not to pay for EEO time needed for Plaintiff to file a formal discrimination complaint.

645. In June-July 2016, HR's Juan Porter of the leave donation program VLTP (Voluntary Leave Transfer Program) denied Plaintiff's request for the VLTP program. Despite previously qualifying Plaintiff as eligible for the program, Mr. Porter said Plaintiff no longer had a qualifying medical condition after Plaintiff and her doctor did not recant their position that Plaintiff could work on EEO issues. Mr. Porter also claimed high-level individuals in management intervened in Plaintiff's case.

646. On June 14, 2016, and on July 7, 2016, FEMA rejected Plaintiff's VLTP application because of her EEO activity and other criteria than the eligibility requirements of the program.

647. Contrary to Office of Personnel Management (OPM) policy regarding VLTP, Mr. Porter applied different rules to Plaintiff regarding the definition of leave exhaustion so that Plaintiff would not be able to access paid leave.

648. FEMA/DHS interfered with Plaintiff's doctor's orders and continued to try to contact Plaintiff while on medical leave (e.g., July 20-31, 2016), even when Plaintiff's doctor stated that such contact would be detrimental to Plaintiff's health.

649. On September 16, 2016, Kirsten Gunsolus required Plaintiff to respond to a reassignment offer with only 30 minutes' notice to decide while Ms. Gunsolus knew that Plaintiff was at a medical appointment.

650. While Plaintiff was on protected medical leave from May through October 2016, Erika Jordan, OER officials, and Kirsten Gunsolus of human resources (OCCHCO) required Plaintiff to be on call 24/7 or perform unnecessary administrative duties, including when Plaintiff was on leave without pay. FEMA did not pay Plaintiff overtime or for her time on-call. Even though FEMA/DHS had no intention of reassigning Plaintiff anytime soon, they denied Plaintiff's request to take a vacation between August 14-20, 2016, while on paid leave as an accommodation pending Plaintiff's reassignment.

651.    During those months in 2016 that Plaintiff was on protected medical leave, Kirsten Gunsolus of human resources threatened to deny Plaintiff accommodations (which would lead to her termination) and told her that she would be considered AWOL if she did not respond right away even while Plaintiff was in the process of seeking medical treatment (i.e., in a provider's office or in a place with no cell phones allowed). Making Plaintiff respond to FEMA's requests in the middle of a medical appointment interfered with Plaintiff's right to use (protected) medical leave because Plaintiff was effectively responding to FEMA requests rather than using the time allocated for medical leave.

652.    While Plaintiff was on continuous medical leave in 2016, Defendants FEMA/DHS created additional barriers to requesting and having leave requests approved. They made Plaintiff wait until after the start of travel (including out of state) for medical treatment to approve the leave because they refused to accept advanced notification and approval of leave for medical treatment (as is typical agency practice). They stated it would not approve in advance leave for prescribed treatment from July 31, 2016, to August 31, 2016, during which she would not have access to outside communication (to be notified or to check whether her leave had been approved or whether she would be considered AWOL). These additional requirements interfered with her ability to take medical leave.

653.    Assigning Plaintiff work while on medical leave interfered with Plaintiff's protected medical leave and retaliated against Plaintiff for engaging in the EEO process. Assigning this work while Plaintiff was on leave also interfered with Plaintiff's ability to participate in the EEO process because if Plaintiff had to work at all hours, then she would have less time to draft a formal discrimination complaint against FEMA, which named Ms. Jordan.

654.    There is a nexus between Plaintiff's protected activities and FEMA's removal of Plaintiff's access to her leave benefits because the adverse actions occurred close in time (within 90 days) after protected activity. Only after Plaintiff talked to the FEMA EEO office and employee relations did Mr. Scott start to delay and make it difficult for Plaintiff to have her medical leave and telework requests approved.

655. For the denial of Plaintiff's access to the VLTP program, there is direct evidence of the connection because human resources Juan Porter told Plaintiff that could be eligible for the program if her EEO activity stopped. In addition, the suspect timing shows the nexus between her protected activity and the agency's reversal of Plaintiff's previous eligibility determination, especially since Kirsten Gunsolus (one of the individuals named as discriminating against Plaintiff) would review Plaintiff's VLTP claim.

18. **EIGHTEENTH CLAIM OF RELIEF**

**Denial of training (retaliation)**

*CA Labor Code § 98.6(b)(1), Title VII of the Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Part 1604 and Part 1606), Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203). 42 USC §§ 1981, 1983, and 1985, FMLA (29 USC §§ 2601 et seq., as amended; 5 USC §§ 6381-6387, 5 CFR Part 630; 29 CFR Part 825),*

656. Plaintiff specifically incorporates facts #78 (job description included coaching), 135, 169 (Ms. Jordan claimed coaching training was not part of Plaintiff's duties), 196, and 201.

657. As a result of Plaintiff's protected activity, Plaintiff's supervisor Erika Jordan canceled Plaintiff's registration to attend training scheduled for June 4-5, 2016, which is an adverse action that would enhance Plaintiff's professional development.

658. As stated previously and incorporated here, Plaintiff engaged in participatory and oppositional protected activity in 2015-2016 involving her managers Robert Scott, Cynthia Mazur, Erika Jordan, Joel Doolin, and Adrian Sevier. Plaintiff made several attempts to report up and out her allegations of discrimination, including but not limited to on December 4, 11, 2015, and March 21, 2016. Plaintiff opposed her management's attempts to have Plaintiff recant her allegations of discrimination in January 2016, recant or stop her advocacy against discrimination in October 2015, or ignore discrimination that happened to her without correction to repair the hostile work environment.

659. At 8:08 AM on May 24, 2016, Erika Jordan acknowledged that Plaintiff's doctor suggested that Plaintiff needed an accommodation, and by 1:42 PM the same day and another email the next day at 9:39 AM Plaintiff's supervisor Erika Jordan canceled Plaintiff's attendance

for a training. The suspect timing (same or next-day adverse action after protected activity) gives rise to an inference of retaliation and since the adverse action happened within 90 days of the protected activity, there is a presumption of a nexus between the adverse action and protected activity.

660. Ms. Jordan knew that Plaintiff's provider medically approved Plaintiff to attend the training as being within her medical limitations because the training was in a different work environment. Ms. Jordan refused to let Plaintiff attend training as an interim accommodation while Plaintiff was waiting to be reassigned permanently to another office.

661. FEMA/DHS, including Ms. Jordan, did not want to pay for benefits to someone (Plaintiff) that they intended to make leave the agency as demonstrated by chatting on January 20, 2016, and an email chain dated May 17-18, 2016 regarding intent to eliminate Plaintiff's position.

662. Ms. Jordan knew that she would not reschedule Plaintiff's training because of FEMA/DHS and Ms. Jordan's intention to end Plaintiff's employment, and a reassignment would mean that Ms. Jordan would not be in charge of rescheduling training.

663. The individuals (including Ms. Jordan) responsible for Plaintiff's reassignment did not reschedule Plaintiff's training at the new division, nor pay Plaintiff for the cost of the training by the end of the fiscal year (approximately the end of September 2016) when FEMA/DHS knew Plaintiff was not going to be reassigned by the end of the fiscal year.

664. Ms. Jordan's delay in approving the registration of the training soon after Ms. Jordan became Plaintiff's supervisor on April 4, 2016, and internal emails of Ms. Jordan discussing Plaintiff's termination, show that Ms. Jordan never intended to allow Plaintiff to attend training.

665. Between approximately April 11 to May 6, 2016, Ms. Jordan delayed signing and approving Plaintiff's training request and Individual Development Plan (IDP), including by asking to replace Plaintiff's requested training with training Plaintiff already took before.

19.    **NINETEENTH CLAIM OF RELIEF**

**Demotion – retaliation/interference, discrimination (based on race, national origin, gender/sex, color, and disability)**

*CA Labor Code § 98.6(b)(1), Title VII of the Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Part 1604 and Part 1606), Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203), Administrative Procedure Act (5 USC §§ 551–559)*

666.    Plaintiff incorporates facts #163 (demotion), 177, and 247-248 (Ms. Mazur testimony).

667.    Plaintiff complained to her manager Cynthia Mazur on several dates starting in December 2015 and her manager Joel Doolin on March 18, 2016, about retaliation and discrimination on the basis of sex, race, and national origin, including against her supervisor Robert Scott. Plaintiff filed a discrimination complaint with the OER on March 21, 2016.

668.    Mr. Scott treated Plaintiff as mentally disabled for disabilities that she did not have due to Plaintiff's protected activities to allege discrimination and her gender/sex.

669.    Plaintiff requested that FEMA transfer her harassers with violent tendencies— coworker Mr. Kapoor and supervisor Robert Scott (both men)— away from Plaintiff (an Asian woman of color) per FEMA and DHS Anti-Harassment Policies FD-256-5 and DHS Directive 256-01. Plaintiff requested to be sent on a detail as her first option and to be transferred as the last choice away from her harassers. Plaintiff specifically requested not to be transferred to Erika Jordan as her supervisor because Mr. Scott still had control over Ms. Jordan as Mr. Scott was Ms. Jordan's first-line supervisor, and Ms. Jordan was Mr. Scott's right-hand person.

670.    Plaintiff's manager Joel Doolin (Deputy Chief Counsel at the time) notified Chief Counsel Adrian Sevier of Plaintiff's allegations of discrimination, but Mr. Sevier did not intervene to ensure the enforcement of both DHS and FEMA's anti-harassment policies.

671.    At the time, 100% of supervisors within the ADR Division and 100% of senior Office of Chief Counsel managers were white.

672.    Because of Plaintiff's protected activity, Plaintiff was subjected to an adverse employment action of a demotion to Erika Jordan as Plaintiff's first-line supervisor and Robert Scott continuing as Plaintiff's manager and assigning work to Plaintiff through Ms. Jordan. She

was demoted to a position lower on the chain of command compared to all other 0905 classified attorneys at the ADR Division.

673.    The demotion happened directly as a result of Plaintiff requesting that one of her harassers Mr. Scott be transferred because manager Ms. Mazur answered Plaintiff's request for Mr. Scott to be transferred with the response that Plaintiff would be demoted instead.

674.    Plaintiff's demotion was related to her sex/gender, race, and color as a woman of color because another woman of color (Karen Roos) also was demoted from Ms. Scott to Ms. Jordan and subjected to fill out work plans like Plaintiff was a month before Ms. Roos was forced out of the Agency. Ms. Roos had also complained about Mr. Scott's discriminatory behavior. An email chain dated May 17-18, 2016, that Plaintiff received through a Privacy Act disclosure shows that Ms. Jordan, Mr. Scott, and Ms. Gunsolus, had planned to terminate Plaintiff about a month after she had been transferred from Mr. Scott's supervision like what happened to Ms. Roos.

675.    Under a new supervisor, Plaintiff's major duties changed by Ms. Jordan eliminating Plaintiff's ADR practice to no assignments, coercing her to drop any ADR duties she had, increasing her administrative work, assigning Plaintiff work in an entirely different discipline (individual tax work), and segregating Plaintiff from the rest of OCC in having office-wide performance goals changed just for her so that she did not participate in office-wide activities and segregating Plaintiff from office social events due to increased workloads. Plaintiff received less pay for the hours worked, ostracism, increased scrutiny that required Plaintiff to anticipate how she would spend every minute of the day, work without pay, negative referrals/references, after-hours emails, and no time to check emails from time on leave.

676.    For this claim, EEOC AJ Maricia Woodham erred in allowing a sanctioned party to mount a defense and present evidence in its favor and finding in favor of DHS when DHS did not provide any legitimate business reason as a defense. All Plaintiff needed to do was to show proof of the prima facie elements in a default judgment case, which Plaintiff did.

20.    **TWENTIETH CLAIM OF RELIEF**

**Denial of detail**

*Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203), Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Part 1604 and Part 1606), CA Labor Code § 98.6(b)(1)*

677.    Plaintiff specifically realleges and incorporates paragraphs # 34 and 163 (Ms. Mazur's rejection of detail, transfer of harasser Mr. Scott, and demotion of Plaintiff).

678.    In 2016, Plaintiff's FEMA/DHS chain of command (including but not limited to Cynthia Mazur and Joel Doolin) refused to authorize or approve any details such that Plaintiff would temporarily be transferred to another office so she could be out of a stressful work environment surrounded by her harassers.

679.    Other divisions regularly detail or deploy multiple individuals out to other offices, and sometimes, multiple people (including management) are deployed to disasters such that few if any are left in the office.  Deployment is often a requirement unless waived for FEMA employees to obtain their credentials for the FEMA Qualification System.  Details and deployments can not only be opportunities for career advancement (used to groom individuals for promotion or leadership positions) but also opportunities for premium pay with overtime common during deployments.

680.    Others were allowed to deploy or be detailed and "given a chance" even without the experience requirement applied to Plaintiff.  Coworkers Mr. Kapoor and Inga Watkins were detailed in 2015.  There was no known selection process for Mr. Kapoor or Ms. Watkins to be selected for detail but rather, they were ordered by management to do so.

681.    In addition to other prior instances of engaging in protected activities (e.g., reporting discrimination), Plaintiff reported (on March 18, 2016, around 1 PM) the harassment she was facing within the ADR Division to her manager Deputy Chief Counsel Joel Doolin.  Mr. Doolin suggested the possibility of Plaintiff switching to another division (e.g., for a detail).  Mr. Doolin ordered Plaintiff to document her allegations and send them to him by email so that he could forward them to his supervisor Chief Counsel Adrian Sevier.  After Plaintiff's allegations were shown to Mr. Sevier, Plaintiff's management denied the idea of a detail.

682. No one had asked about Plaintiff's qualifications to select who would be sent on a detail, and others were sent on detail without being screened for their qualifications.

683. FEMA refused to offer Plaintiff a detail as an interim accommodation with no valid legal defense. Instead, FEMA made Plaintiff wait 4 months on unpaid leave and around 5 months to transfer Plaintiff permanently to another office. There was no undue hardship (nor any known hardship calculation) that FEMA performed in denying a detail as an interim accommodation. As stated elsewhere, Plaintiff was a qualified individual with a disability who could perform the essential functions of her job. Sending Plaintiff on detail to accommodate her could not only help her perform the essential functions of her job but also give her full enjoyment and access to the workplace.

684. Due to the intentions of FEMA/DHS (including her managers) to retaliate against Plaintiff for her protected activities by forcing her out of the agency, Plaintiff's managers refused to send Plaintiff on detail or to a deployment. Plaintiff's protected activity and the planned adverse actions were related because of the suspect timing between the two and statistics showing that those who had not complained of discrimination were allowed to detail or deploy.

## 21. <u>TWENTY-FIRST CLAIM OF RELIEF</u>

**Scrutinizing bathroom breaks and work (unequal application of policy to women of color who engaged in protected activity, retaliation, interference, retaliatory harassment)**

*Occupational Safety and Health Administration (OSHA) 29 CFR 1910.141(c)(1)(i), CA Labor Code § 98.6(b)(1), Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Part 1604 and Part 1606). Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203), FMLA (29 USC §§ 2601 et seq., as amended; 5 USC §§ 6381-6387, 5 CFR Part 630; 29 CFR Part 825)*

685. Plaintiff incorporates by reference paragraphs #34, 166, and 193.

686. Ms. Jordan was the right-hand person of Mr. Scott (Plaintiff's harasser), worked closely with Mr. Scott, and assigned work to Plaintiff from Mr. Scott. Ms. Jordan based her assignment of work and other actions on the assessment and/or direction of Mr. Scott.

687. Mr. Scott regarded Plaintiff as disabled to have unspecified mental disabilities, including but not limited to those associated with Plaintiff's gender/sex, such as being a hysterical or emotional woman.

688. On April 11, 2016, Supervisor Erika Jordan made Plaintiff create time-intensive detailed monthly work plans and then on May 2, 2016, daily work plans to account for every minute and fractional minute that Plaintiff anticipated speaking on specific work areas and tasks following month and day.

689. Ms. Jordan's work plan assignments required Plaintiff to foresee the future and anticipate what assignments Ms. Jordan, other members of management, clients, and other coworkers would give her even before Plaintiff was notified of said assignments. When Plaintiff tried to discuss assignments with Ms. Jordan to create a shared understanding of the workload and upcoming assignments, Ms. Jordan refused to discuss the issue with Plaintiff even after multiple attempts by Plaintiff.

690. The daily and monthly work plans assigned by Ms. Jordan were more time-intensive than the workforce analysis the division had to conduct for human resources, which could be based on actual prior work done.

691. Ms. Jordan made Plaintiff revise her work plans to include time Plaintiff anticipated taking for breaks, including bathroom breaks, so Ms. Jordan's scrutiny of Plaintiff's bathroom breaks was intentional.

692. Contrary to Ms. Jordan's justification for assigning work plans, scrutiny of Plaintiff's bathroom breaks was unrelated to knowing what the Plaintiff's work assignments were. Rather than having Plaintiff guess what Ms. Jordan and her managers would assign Plaintiff, Ms. Jordan could have asked herself and her managers what they would assign Plaintiff as assignments if they wanted to know what Plaintiff's assignments were going to be.

693. On or around May 6, 2016, Plaintiff's supervisor Ms. Jordan said it was excessive if Plaintiff took any bathroom breaks during the day. When Plaintiff inserted the time for bathroom breaks as Ms. Jordan ordered, Ms. Jordan stated that Plaintiff lacked time management

skills (not performing) for incorporating bathroom breaks into the day (two 15-minute breaks, which equaled third minutes total per day).

694. The bathroom usage and breaks of others within the ADR Division, including other subordinates of Ms. Jordan, were not tracked, judged, dictated, or eliminated. Others within the ADR Division were not negatively reviewed for taking bathroom breaks. When Plaintiff told Ms. Mazur of Ms. Jordan's attempt to restrict Plaintiff's bathroom usage, Ms. Mazur told Plaintiff that she was not entitled to breaks during the day as an exempt employee.

695. Because Ms. Jordan restricted Plaintiff's access to bathroom breaks and retaliated against her on performance appraisals if Plaintiff went to the bathroom or allocated time to go to the bathroom, FEMA (through Ms. Jordan, Ms. Mazur, Ashley Darbo and/or Melissa Williams) did not provide unobstructed free access for Plaintiff to use the bathroom.

696. The policy of making employees create a work plan or tracking their breaks was unevenly applied with OCC and the ADR Division toward women of color, especially those who had engaged in protected activity. Karen Roos (another woman of color) used to work for the ADR Division within OCC had also been required to make a work plan one month before she was forced out of the agency. Ms. Roos also had been switched from having Mr. Scott as her first-line supervisor to Erika Jordan as her first-line supervisor. Ashley Darbo was the supervisory personnel lawyer advising the ADR Division on matters related to Plaintiff and was the counsel of record for the present case at the EEOC. Ashley Darbo also told Toshia Cooper, another former OCC employee who was a woman of color and who worked in the personnel law branch that she was not entitled to breaks after she engaged in protected activity.

697. Ms. Jordan making Plaintiff draft daily work plans (an increase in burden from monthly work plans) was retaliation for Plaintiff's protected activity because Ms. Jordan assigned the daily work plans one day after Plaintiff submitted her ideas to stop retaliation to OCC TRSG subgroup. Manager Robert Scott also was a member of the same subgroup.

698. Ms. Jordan's adverse actions were also within 90 days of other protected activity Plaintiff engaged in, including filing a discrimination complaint, reporting discrimination to her

managers (which Ms. Jordan explicitly admonished Plaintiff for doing), taking protected FMLA leave, and requesting a reasonable accommodation.

## 22. TWENTY-SECOND CLAIM OF RELIEF

**Erika Jordan retaliation (performance review), FMLA interference, and discrimination (based on race, national origin, color, sex/gender)**

*CA Labor Code § 98.6(b)(1), FMLA (29 USC §§ 2601 et seq., as amended; 5 USC §§ 6381-6387, 5 CFR Part 630; 29 CFR Part 825), Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Part 1604 and Part 1606), Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203)*

699.    Plaintiff performed her job satisfactorily throughout her employment within the FEMA ADR Division and received satisfactory performance reviews from 2014-2015 until she received a negative performance review in January 2016.  When Plaintiff was given satisfactory performance reviews, FEMA awarded her a bonus in 2015.

700.    Plaintiff was performing satisfactorily to receive her annual step increase in 2016 on a personnel action form dated July 9, 2016, with an effective date of July 10, 2016.

701.    Within 90 days of engaging in protected activity (participation and opposition), Erika Jordan (Plaintiff's then first-line supervisor) gave Plaintiff a negative performance review (an adverse action and a change in the terms and conditions of Plaintiff's employment) on July 12, 2016.  This negative performance appraisal, along with the consequences of a negative performance appraisal, were not only adverse actions that changed the terms and conditions of Plaintiff position but also contributed to an abusive and hostile working environment.

702.    As demonstrated by Plaintiff's demands in her filed EEO complaint and other protected activity, Ms. Jordan's actions were unwelcome, and a reasonable person in these circumstances would consider the working environment abusive and hostile.

703.    Erika Jordan did not provide such negative feedback before Plaintiff's protected activity even when Plaintiff worked closely with Ms. Jordan before Ms. Jordan became Plaintiff's supervisor.

704.    The protected activity that Plaintiff engaged in within 90 days of the adverse performance review as listed previously included but was not limited to Plaintiff filing a formal

AMENDED COMPLAINT       24-CV-00797 KAW                    Page **140** of **190**

EEO complaint on June 22, 2016, requesting reasonable accommodations, opposing discrimination, using protected FMLA leave, and participating in activities to stop and prevent retaliation at FEMA. The proximate timing (within 90 days) of Plaintiff's protected activity and various FEMA/DHS employees with supervisory control approved and/or refused to stop the finalization of Ms. Jordan's negative performance appraisal for Plaintiff give rise to an inference of retaliation.

705. Contrary to agency policy, Ms. Jordan completed a performance appraisal without adequate time for appraisal and did not discuss nor notify Plaintiff about the appraisal. Ms. Jordan considered Plaintiff's time on protected leave as a reason for non-performance.

706. Plaintiff was on extended protected medical leave for the majority of the three-month evaluation period. Ms. Jordan gave Plaintiff an official negative appraisal although Plaintiff had only had a few working days that Ms. Jordan could evaluate Plaintiff's performance, including the first four days of Ms. Jordan's supervision in which Ms. Jordan did not contact Plaintiff nor assign her work.

707. After Ms. Jordan became Plaintiff's supervisor Plaintiff used intermittent sick leave starting on April 4, 2016, some full and some partial days. On April 18, 2016, Plaintiff started using FMLA leave with mixed intermittent and continuous FMLA leave until she started continuous FMLA leave from May 25, 2016, until she exhausted her FMLA leave. After exhausting her paid sick or FMLA leave, FEMA put Plaintiff on continuous leave without pay for about 4 months from July 4, 2016, until she started her reassignment on October 18, 2016.

708. During Ms. Jordan's tenure as Plaintiff's supervisor, she did not give Plaintiff time to catch up for the days she missed on sick leave and interfered with Plaintiff's medical leave by assigning her work during such leave, which interfered with Plaintiff's recovery. On top of office meetings, which could take 30 hours a week alone, Ms. Jordan assigned Plaintiff to complete over 100 hours of work in a 40-hour week comprising of at least 33 assignments in one and a half months, which included completing (in 12 hours) a legal memorandum of at least 20 pages in an area of law outside of Plaintiff's expertise and preparing over 25 data reports, 37 graphs, and hand counting 2910 data points within a couple of hours. These assignments did not

include the additional requirement that Plaintiff create detailed monthly and daily work plans that would predict and account for every minute and part of every minute of Plaintiff's work day, nor the time Plaintiff needed to work on her EEO complaint or the time Plaintiff needed to spend after hours on baking orders for the office and reading emails (270 pages sent after hours alone). When Ms. Jordan became Plaintiff's supervisor, Plaintiff's work assignment rate increased by at least 56% with an average of 16.5 assignments per month compared to 10.6 assignments per month. 10.6 assignments per month was also considered an increase from Mr. Scott's own increase of Plaintiff's workload in retaliation for her protected activity in 2016.

709.    Plaintiff's performance was not actually negative but rather Ms. Jordan falsely represented of Plaintiff's performance. In an SF-50 Notification of Personnel Action (effective date of July 10, 2016), FEMA still awarded Plaintiff with an annual step increase in her wages because "WORK PERFORMANCE IS AT AN ACCEPTABLE LEVEL OF COMPETENCE."

710.    The negative performance review led to a variety of other side effects that also harmed Plaintiff. Contrary to prior performance satisfactory performance evaluations, FEMA/DHS did not award Plaintiff with any bonuses between December 2015 and October 2016. The negative performance review also made Plaintiff ineligible for internal promotions and led to false, negative references and disparagement of Plaintiff by members of Plaintiff's management, which included preventing Plaintiff was obtaining employment elsewhere and preventing Plaintiff from being promoted internally.

711.    The impact of this negative quarterly performance review led to the generation of a negative, final performance appraisal and rating prior to the end of the last 90 days of the evaluation period for the entire 2016 calendar year. A negative annual performance appraisal, in turn, led to a false, negative reference against Plaintiff.

712.    Plaintiff's manager and harasser Mr. Scott and Kirsten Gunsolus of human resources also did not stop the retaliatory performance review from Ms. Jordan as they had worked together to terminate Plaintiff in May 2016.

713.    Ms. Mazur allowed Ms. Jordan to give Plaintiff a negative performance review because Ms. Mazur said that there was "blow back" against (i.e., refusal to do) assignments. Ms.

Mazur admitted that at least one assignment Plaintiff pushed back on was an assignment Plaintiff told Ms. Mazur she opposed the assignment because it was retaliatory. Plaintiff's complaints to Ms. Mazur started in December 2015 when Plaintiff first directly reported to Ms. Mazur Plaintiff's allegations of discrimination and Mr. Scott's refusal to stop discrimination against Plaintiff. Subsequent complaints Plaintiff raised with Ms. Mazur were further acts of discrimination and retaliation Plaintiff faced.

714. Ms. Jordan, Mr. Scott, and Ms. Mazur's actions were also caused by race and national origin because when white individuals not of Chinese or Taiwanese descent complained, they did not likewise face any adverse actions.

715. When Elisabeth Bissell (white) complained about having to participate or be videotaped for a whole-division recording, ADR management promoted her to lead the entire project. When white individuals in the ADR Division complained about housekeeping issues, ADR management listened and allowed them to continue to air their grievances, and those individuals who complained did not receive negative performance reviews.

716. When another woman of color Natasha Wilkins also blew the whistle to object to Mr. Scott asking her to falsify documentation, Mr. Scott and Erika Jordan retaliated by making this employee cancel her vacation (a pre-purchased cruise). When another woman of color (Karen Roos, Latina) also engaged in protected activity reporting discrimination and other inappropriate behavior by Mr. Scott, Mr. Scott and Ms. Jordan also subjected Ms. Roos to a negative performance review, threats of negative job references, and forced her to quit.

## 23. **TWENTY-THIRD CLAIM OF RELIEF**

### Inappropriate medical inquiries

*Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203)*

717. Plaintiff was an employee at FEMA when supervisor Erika Jordan (with potentially the advice of counsel and human resources) made inappropriate medical inquiries of Plaintiff that exceeded the scope appropriate allowed by the Rehabilitation Act of 1973.

718. Although Plaintiff submitted adequate information to support her reasonable accommodations claim and her provider answered all of the questions in the FEMA reasonable

accommodations documentation, which Plaintiff's provider was not required to provide, FEMA attempted to directly contact Plaintiff's provider to obtain additional unnecessary information about Plaintiff.

719. When FEMA counsel submitted her Agency Response to Complainant's Statement of Requested Relief to the EEOC, FEMA admitted that violated the Rehabilitation Act of 1973 by making a medical inquiry as to the "nature, severity and duration of impairment."

720. FEMA inappropriately asked Plaintiff's provider to disclose any medication use although FEMA had already been provided information about Plaintiff's limitations.

721. Asking employees about their use of prescription medications is not job-related and consistent with business necessity.

722. It is inappropriate for an employer to ask for information from a provider (psychologist) it knows is unable to prescribe medication as an attempt to obtain an inappropriate scope of medication and a medical diagnosis, which an employer is not entitled to receive even when an employee requests a reasonable accommodation.

723. In the Agency Response to Complainant's Statement of Requested Relief submitted to the EEOC's AJ Woodham, DHS/FEMA admitted that it violated the Rehabilitation Act of 1973 by making a medical inquiry as to the "nature, severity and duration of impairment."

### 24.   TWENTY-FOURTH CLAIM OF RELIEF

**Failure to accommodate (disability discrimination, retaliation)**

*Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203)*

724. Plaintiff realleges and incorporates facts # 86-88, 92, 161 (March 28, 2016, denial to transfer Mr. Scott), 198, 201, 203, 205, 208, 213-214, 217, 220, 224, 227, 236-237, and 240.

725. FEMA did not timely and effectively accommodate Plaintiff in 2016 to all of her reasonable accommodation requests. FEMA denied twice Plaintiff's request for the abusive parts of the work environment to be corrected through transfer (i.e., transferring her management chain). FEMA refused to accept or offer Plaintiff any interim accommodations that would work with Plaintiff's limitations. FEMA declined to allow Plaintiff to have leave as an accommodation run concurrently with paid leave. FEMA transferred Plaintiff but did so in a very untimely

manner (taking about 5 months instead of a couple of days) and rescinded three offers of employment during those 5 months without just cause, such as rescinding an offer after Plaintiff wanted to confirm she would have access to accommodations at the new position. FEMA ultimately transferred Plaintiff to a position that did not effectively accommodate her condition and brought along some of the same discriminatory aspects of the original position.

726.    Defendants DHS, FEMA, and their employees (e.g., Erika Jordan, Robert Scott, Cynthia Mazur, Joel Doolin, Adrian Sevier, Willisa Donald, Kirsten Gunsolus) failed to accommodate Plaintiff's disability although she requested multiple accommodations.

727.    Defendant knew or had reason to know that Plaintiff had a disability that was the basis for her accommodation request.

728.    At the order of supervisor Mr. Scott, Plaintiff began seeing clinical psychologist Dr. Harvey Oaklander approximately January 12, 2016, on a weekly basis.

729.    Plaintiff's supervisors refused to order Mr. Kapoor or Mr. Scott to stop harassing Plaintiff, to stay away from her, and not to contact her. Plaintiff's supervisors also did not ask anyone else harassing Plaintiff to stop harassing her. On March 30, 2016, Ms. Mazur declined to transfer Mr. Scott out of Plaintiff's chain of command.

730.    On June 10, 2016, Plaintiff requested leave as an accommodation to run concurrently with her FMLA and then continuously after her paid leave was exhausted at the end of June 2016 but did not Ms. Jordan denied Plaintiff's request without providing the required undue hardship analysis to justify her denial of Plaintiff's accommodation request.

731.    In an email on around July 6, 2016, Erika Jordan said the reassignment search should only take one day to complete, which demonstrates that FEMA/DHS should not have taken 5 months to reassign Plaintiff. FEMA did not reassign Plaintiff until several months later after Ms. Jordan asked Plaintiff about needing an accommodation. FEMA exceeded its 60-day requirement for a reassignment search as outlined in FEMA Reasonable Accommodation Policy 123-6-1 by several times over, taking about 5 months to reassign Plaintiff.

732.    After Plaintiff's acceptance of reassignment positions over three months, FEMA/DHS through notification by Kirsten Gunsolus of human resources rescinded its offers

three times for four positions. Plaintiff accepted the offered reassignment positions at least seven times from July 18, 2016, to October 14, 2016.

733. FEMA rescinded the Deployable Field Counsel (DFC) position it had offered Plaintiff on July 13, 2016, and OER Director Willisa Donald conducted a second search and presented Plaintiff with three non-legal positions unrelated to ADR. Until September, Ms. Donald did not answer Plaintiff about what happened to the DFC position she had already accepted three times where Ms. Donald mentioned that Plaintiff's protected opposition to FEMA's failure to transfer her harassers caused FEMA to rescind the initial DFC offer.

734. On September 27, 2016, the day Plaintiff was supposed to return to work, Kirsten Gunsolus told Plaintiff that the position was going to be rescinded because of "management being out of the office on travel" but in a later sworn statement, Ms. Gunsolus claimed that the position was already given to another person.

735. FEMA's travel excuse was unlikely given FEMA could have had Plaintiff start after management returned from travel or Plaintiff could have started even if management had not returned from travel, especially since Plaintiff was not new to FEMA. Plaintiff started working for Erika Jordan for days before Ms. Jordan reached out to Plaintiff for a first meeting.

736. FEMA's position given to someone else excuse was unlikely given Plaintiff was only notified earlier that afternoon that she was to report to the new office the next day before the position was rescinded. Most people would have more than half a day's notice to report to a new office or know if an offer had been issued.

737. FEMA did not uphold its promise to Plaintiff to give her at least 24 hours' notice.

738. FEMA reassigned Plaintiff back to the same building in OCC to the Response and Recovery Legal Division's Recovery Policy and Doctrine Branch (RRLD/RPD) on October 18, 2016. Manager Cynthia Mazur told the rest of the ADR Division that Plaintiff was leaving even before Plaintiff herself knew.

739. None of the positions that FEMA offered Plaintiff for reassignment completely removed the hostile and abusive work environment as Plaintiff's harassers were allowed to contact and approach Plaintiff whenever they wished with no change in their work schedules or

AMENDED COMPLAINT    24-CV-00797 KAW    Page **146** of **190**

locations. Plaintiff's new desk was located in an open office accessible to all FEMA staff two floors above the ADR Division office. In addition, Plaintiff's harassers continued to attend the same officewide meetings and events with Plaintiff. The ultimate transfer position within RPD/RRLD was not effective, did not resolve the equal pay issues, and did not resolve the change in terms of conditions of her employment as discussed previously.

740.    The ultimate transfer location (RRLD) was not effective in that FEMA/DHS continued to allow the same environment to come to Plaintiff at her new seat in another office. Plaintiff's management required Plaintiff to be in the same room as her harassers during OCC-wide meetings and activities, and Plaintiff's harassers were allowed to approach and contact Plaintiff whenever they wanted without restriction. Plaintiff's harassers continued to speak disparagingly about Plaintiff not only to other coworkers but also to potential job prospects, such as the State Department. Joel Doolin (Plaintiff's manager) even recruited additional individuals from other legal divisions in the effort against Plaintiff. Managers Joel Doolin and Adrian Sevier declined to give Plaintiff any career-enhancing positions afterward and decided to take over micromanagement, such as assigning Plaintiff to take notes and then reviewing her notetaking ability while not giving the same "advice" to white coworkers who did not engage in protected activity and who did the same.

741.    Even after Plaintiff's reassignment in October 2016, individuals who contributed to the hostile work environment for that spurred Plaintiff's reassignment continued to contact Plaintiff. Although Cynthia Mazur was specifically notified that Plaintiff did not wish to see Elizabeth Bissell after Plaintiff was reassigned to RRLD, Ms. Bissell still came up to Plaintiff to speak to her in training asking intrusive questions while Plaintiff's back was to a desk, making it hard for Plaintiff to leave. In addition, Ms. Mazur has also come up to Plaintiff to speak to Plaintiff multiple times although she has been named numerous times in this complaint as engaging in or facilitating discrimination.

742.    FEMA refused to determine whether the reassignment position would meet the needs of Plaintiff's disability outside of the specific act of reassignment and considered that

Plaintiff would be fully accommodated if the agency reassigned Plaintiff to a new position that would not allow Plaintiff to go to medical appointments necessary for her disability.

743. The positions FEMA offered for reassignment were significantly worse than the position she applied for when she first started at FEMA. One reassignment offer would require Plaintiff to buy a car without relocation expenses and was in a less desirable location in rural Virginia rather than close to medical care in the city, and another required hardship postings with long hours without easy access to medical care or even potentially electricity. None of the positions involved management and ADR practice experience as Mr. Scott and Ms. Jordan promised Plaintiff when she was hired.

744. FEMA/DHS and Plaintiff's first-line supervisor Erika Jordan and second-line supervisor Robert Scott knew Plaintiff had a disability because she requested an accommodation and the agency received medical certification from Plaintiff's psychologist Dr. Harvard Oaklander supporting the need for an accommodation related to reassignment on May 21, 2016.

745. Plaintiff's management had reason to know Plaintiff had a disability related to her treatment with Dr. Oaklander before May 21, 2016. Plaintiff first started seeing Dr. Oaklander in January 2016 because her then first-line supervisor Robert Scott ordered Plaintiff to see a psychologist. Plaintiff's management knew Plaintiff had regular weekly appointments with Dr. Oaklander. Moreover, Plaintiff requested FMLA leave for the same underlying reason as her request for accommodation.

746. While Mr. Scott believed Plaintiff had a disability that needed Plaintiff to see a therapist in January 2016, Plaintiff's ultimate diagnoses were not due to an inherent psychological condition or a psychological condition related to Plaintiff's gender that Mr. Scott believed to be some type of hysteria or being too emotional but rather Plaintiff's diagnoses stemmed from the hostile work environment caused by FEMA as Dr. Oaklander certified. Dr. Oaklander specifically gave FEMA a report of his comprehensive analysis of Plaintiff's mental health, which certified that besides the diagnoses he actually made (adjustment disorder, PTSD), Plaintiff did not have any other mental health diagnoses that FEMA falsely claimed that she had.

747.   Ms. Jordan and Mr. Scott made contradictory statements (all under penalty of perjury), even compared to their own prior statements, as to the first date they knew Plaintiff had a disability to various individuals and forums at separate times.  Their representations ranged from never knowing Plaintiff had a disability while she worked in the ADR Division between July 2014 to October 2016 to knowing that Plaintiff had a disability from the first day of working at FEMA in July 2014, knowing Plaintiff had a mental disability in January 2016, and not knowing Plaintiff had a disability/medical condition until May 2016.  FEMA Counsel Melissa Williams and Ashley Darbo also submitted to representations of the agency and oversaw testimony to the EEOC by Ms. Jordan and Mr. Scott that contradicted each other regarding the date Ms. Jordan and Mr. Scott knew of Plaintiff had a disability.

748.   FEMA/DHS also could have told Plaintiff's harassers to stay away from and not contact Plaintiff in line with FEMA and DHS's anti-harassment policies, but FEMA/DHS refused to do so as well.

749.   FEMA/DHS (facilitated by members of the FEMA EEO office OER, human resources OCCHCO, and Plaintiff's management team) could have but refused to offer Plaintiff the same or equivalent position for reassignment.

750.   FEMA/DHS offered Plaintiff no interim accommodations that met the limitations of her disability.  Plaintiff's management could have made an interim accommodation that met the limitations of her disability by detailing Plaintiff, but her management refused to detail Plaintiff to transfer to another office temporarily while a new permanent position would be found for Plaintiff and/or her harassers.

751.   There was no undue hardship or fundamental alteration for FEMA/DHS to transfer her harassers instead of Plaintiff because that was FEMA/DHS policy to transfer harassers (not the victim of harassment).  There was no undue hardship or fundamental alteration to approve leave as an accommodation concurrently with Plaintiff's request to use her paid time off or another form of leave as it was a non-cost request with little to no administrative burden given that both FMLA and leave without pay were existing available types of leave offered.

25.   **TWENTY-FIFTH CLAIM OF RELIEF**

**Failure to engage in the interactive process in good faith; constructive discharge; retaliation**

*Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203)*

752. Included are facts #161, 195, 203, 217, 223, 229, 235, 242, and 244-245.

753. As stated in the previous paragraphs, Plaintiff complained to her chain of command, to the Office of Equal Rights, to human resources, and/or security about discrimination on various bases of discrimination listed previously.

754. Plaintiff participated in the EEO process and opposed discriminatory activity as discussed previously.

755. On March 28, 2016, by submitting a request to her manager Ms. Mazur, Plaintiff requested that FEMA/DHS transfer her harassers per FEMA and DHS anti-harassment policies.

756. Employer FEMA/DHS repeatedly refused to follow its own Anti-Harassment policies to transfer her harassers and create a work environment free from harassment. As a last result, Plaintiff on or around May 31, 2016, Plaintiff requested a reasonable accommodation for her adjustment disorder/PTSD, which was caused by the abusive work environment at FEMA. In addition, responsible management officials (e.g., Plaintiff's managers, OER Director Willisa Donald, human resources) refused to offer or accept an alternative accommodation within the scope of Plaintiff's limitations.

757. Because Plaintiff's employer FEMA/DHS intended to make Plaintiff leave the agency, FEMA/DHS did not engage in the interactive process in good faith while it tried to use various means to force Plaintiff out of work.

758. Because of Plaintiff's involvement in protected activities (including within 90 days of these adverse actions), Plaintiff was subject to several adverse employment actions, which included but were not limited to Defendants FEMA/DHS (through OCC/ADR management, human resources, and the Office of Equal Rights) engaging in efforts to force Plaintiff out of the employment by retroactively extending her employment multiple times, refusing to extend her contract in a timely manner despite her adequate performance, offering Plaintiff poor reassignment positions and then retracting them for months because FEMA did not

have the intention to actually reassign Plaintiff, refusing to offer Plaintiff open positions within FEMA or DHS headquarters, and making Plaintiff wait out months on unpaid leave because FEMA refused to accommodate Plaintiff in a timely manner (within the deadlines set by Agency policy) nor allowed her access to paid leave during the time in question.

759.   FEMA intentionally wanted Plaintiff to leave her employment at FEMA either through force (involuntary resignation) as shown by internal emails or through a variety of means to force Plaintiff to quit through constructive discharge.  FEMA tried to force Plaintiff to quit by asking Plaintiff to resign, refusing to extend Plaintiff's contract according to schedule and instead retroactively extending her employment in small lengths of time for months, rescinding several accepted offers of employment without adequate justification, making Plaintiff stay on leave without pay for approximately 4 months, rejecting alternative accommodations that met Plaintiff's medical limitations to allow her to continue to work with pay, and interfering with Plaintiff's ability to access paid leave while on leave awaiting reassignment.

760.   FEMA refused to respond or did not answer how it conducted the 60-day search process, say which OCC jobs it found but declined to offer Plaintiff, provide a timeline for the reassignment, provide an answer whether Plaintiff would be able to attend EEO proceedings in the reassignment position and provide enough information to the positions offered to make an informed decision, especially when the provided position descriptions were outdated.  FEMA also did not respond effectively to Plaintiff's questions or provide updated job descriptions of the offered positions.

761.   FEMA/DHS Kirsten Gunsolus tried to use the "For Official Use Only" (FOUO) label in an improper manner on discriminatorily damaging documents to hide evidence.

762.   FEMA/DHS refused to talk about reasonable interim accommodations (e.g., sending Plaintiff on detail).

763.   In a letter dated June 2, 2016, Ms. Jordan suggested that Plaintiff voluntarily resign and seek disability retirement.  While FEMA/DHS could have chosen to terminate Plaintiff's employment on medical grounds for being unable to accommodate Plaintiff in a

timely manner, FEMA/DHS refused to choose an option that would enable Plaintiff to receive unemployment benefits. Along with Ms. Jordan's negative quarterly performance appraisal based on an inadequate evaluation period during the same period, this choice shows FEMA/DHS's choice (including her management team) to harm Plaintiff.

764. In an email on around July 6, 2016, Erika Jordan said the reassignment search should only take one day to complete, which demonstrates that FEMA/DHS should not have taken 5 months to reassign Plaintiff.

765. On September 8, 2016, OER Director Ms. Donald refused to answer what happened to the Deployable Field Counsel position that Plaintiff already accepted and why FEMA was conducting a new search.

766. Defendants FEMA/DHS took back three job offers (each of which was an adverse action) for weak or retaliatory reasons, such as someone in the office was on leave and could not meet Plaintiff on her start date or the job offer was withdrawn after Plaintiff asked whether she would have access to accommodations at the new work location.

767. Plaintiff went on continuous leave between April 18-22, 2016, and 5 months from May 25, 2016, until October 17, 2016, while she waited for FEMA to accommodate her. This period overlaps with the period Ms. Jordan claimed she never interacted with Plaintiff. During this period, Plaintiff started on continuous leave without pay for about 4 months from July 4, 2016, until she was reassigned on October 18, 2016.

768. The ultimate RRLD section (RPD) had hired another person earlier (Jennifer Beerman, a white woman) and onboarded her in the position about two months before reassigning Plaintiff. FEMA could have put Plaintiff in that position 2 months earlier rather than making Plaintiff wait 2 months without pay to be reassigned and then telling Plaintiff she did not have as much experience as Ms. Beerman because Plaintiff had 2 months less of experience in that Division as Ms. Beerman. However, when another individual transferred into RPD (Quinn Lucie), Plaintiff was told he (a white man) had more experience based on his experience in another division when Plaintiff's own experience in another division was not so calculated.

769.    The DHS Inspector General began its investigation of systemic harassment at FEMA in part due to allegations against HR Director Corey Coleman for fostering a widespread culture of sexual harassment (especially against women of color) that started in the HR office.

770.    FEMA retroactively extended Plaintiff's employment, refused to allow Plaintiff access to the voluntary leave donation program to access paid leave, refused to reassign Plaintiff within the accommodations timeline and while Plaintiff still had paid leave, and continued to take back offers of reassignment to Plaintiff to try to force Plaintiff to quit.

771.    Plaintiff's then first-line supervisor Erika Jordan swore under oath that she never interacted with Plaintiff after April 2016. Ms. Jordan became Plaintiff's supervisor on April 4, 2016. However, at the January 2020 hearing, Ms. Jordan said otherwise. FEMA claimed that Ms. Jordan engaged in the interactive process with Plaintiff during the same period said Ms. Jordan claimed she never interacted with Plaintiff.

772.    A week after she filed a discrimination complaint on March 21, 2016, Mr. Scott gave Plaintiff a negative 2016 first-quarter performance review on March 28, 2016, and officially documented on April 15, 2016, in the performance appraisal form in FEMA's FHR navigator system. He falsely claimed that Plaintiff was not performing to make minimum standards and told her he was putting her on a performance improvement plan (PIP) although a PIP did not exist for her job classification at FEMA.

773.    When Plaintiff was finally wrongfully terminated[1] in 2018, internal records show Kirsten Gunsolus and Melissa Williams congratulated themselves for finally being able to get rid of Plaintiff. Kirsten Gunsolus was the HR specialist in charge of Plaintiff's reasonable accommodations discussions and reviewing Plaintiff's FMLA complaint regarding the current

---

[1] On April 28, 2022, Supervisory Administrative Judge Danielle Hoyt of the EEOC ordered Plaintiff's wrongful termination to be overturned and Plaintiff reinstated in EEOC Case No. # EEO2-570-2019-01375X. FEMA has yet to reinstate Plaintiff and fully abide by the determination.

complaint. Melissa Williams was the OCC counsel in charge of this EEO case Plaintiff first filed in 2016, and the OCC counsel who advised ADR Division on matters relating to Plaintiff.

## 26. TWENTY-SIXTH CLAIM OF RELIEF

**Retroactive extensions of employment and refusal to renew contract (constructive discharge)**

*Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203), 29 USC § 2615, FMLA (29 USC §§ 2601 et seq., as amended; 5 USC §§ 6381-6387, 5 CFR Part 630; 29 CFR Part 825), 42 USC § 1981, 1983, and 1985-6*

774. Plaintiff realleges and incorporates paragraphs 31-34, 36-37, 135, 199, 202-203, 229, 235, and 241-245.

775. Internal discussions to eliminate Plaintiff's position after Plaintiff spoke to OER about filing a complaint, filed a complaint, and engaged in other protected activity and then FEMA acting on its expressed intent to terminate Plaintiff's position gives rise to an inference of retaliation and that FEMA tried to carry out its intent by retroactively extending Plaintiff's employment such that she would be forced to leave or believe she no longer had employment.

776. FEMA did not renew Plaintiff's contract, which was set to expire July 13 or July 14, 2016. At the time, FEMA did not inform Plaintiff that her employment would extend periodically (month to month) until her contract was renewed. Plaintiff did not find this out until she was reassigned on October 18, 2016.

777. Between July 13, 2016, and November 16, 2016, Plaintiff did not know definitively whether she was still employed or had benefits such as health insurance until after she received the notice of personnel action retroactively. Her employment was extended twice retroactively in one-month increments, once in a one-week increment, reassigned retroactively, and extended her 2-year contract 4 months late.

778. Retroactively extending Plaintiff's employment harmed her ability to access her federal health insurance and other benefits (especially during medical leave) given the unclear or unknown availability of said benefits.

## 27. TWENTY-SEVENTH CLAIM OF RELIEF

**Retaliation/interference for requesting accommodations and exercising FMLA rights**

*Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203), 29 USC § 2615, FMLA (29 USC §§ 2601 et seq., as amended; 5 USC §§ 6381-6387, 5 CFR Part 630; 29 CFR Part 825), 42 USC § 1981, 1983, and 1985-6*

779.    Please specifically refer to facts #32, 34, 36, 86-87, 196, 198, 203, 208, 224, 236-237, 239, and 241.

780.    Plaintiff's supervisor Erika Jordan refused to entertain Plaintiff's reasonable accommodation request unless Plaintiff filled out and returned a separate form for a reasonable accommodation request although Ms. Jordan already had the necessary information to know that Plaintiff requested a reasonable accommodation. No special forms or magic words are required for a reasonable accommodation request. Ms. Jordan interfered with Plaintiff's ability to access, request, and obtain a reasonable accommodation by adding red tape when Ms. Jordan could have transferred the information that she received on the FMLA form to a reasonable accommodation form or simply accepted the FMLA form as a reasonable accommodation request.

781.    FEMA limited Plaintiff's access to request a reasonable accommodation by having a blanket policy of not transferring any managers. Because FEMA refused to transfer Plaintiff's harassers (including those who were managers), even when Plaintiff's request was within her employer's own anti-harassment policies, Plaintiff was segregated and excluded from career-promoting opportunities by being able to stay in her current position but without abuse that would trigger her PTSD and exacerbate her adjustment disorder. Had Plaintiff's harassers been transferred, FEMA could have instantaneously accommodated Plaintiff instead of having her ability to access accommodations for 5 months.

782.    On May 24, 2016, Plaintiff's supervisor Erika Jordan notified Plaintiff asking whether Plaintiff's doctor's FMLA certification meant that Plaintiff was asking for a reasonable accommodation for a disability.

783.    According to FEMA policy, OER would have the ability to make personnel decisions regarding reasonable accommodations decisions (which are personnel decisions). Various employees of OER, including OER Director Willisa Donald, were involved in

processing Plaintiff's reasonable accommodation request to be reassigned. Mr. Goudy was a subordinate of OER Director Willisa Donald.

784. Ms. Jordan's June 10, 2016, denial of Plaintiff being able to access other forms of leave concurrently as leave as an accommodation request interfered with Plaintiff's ability to use leave as an accommodation that Plaintiff had to choose only one at a time.

785. On July 19, 2016, Plaintiff's supervisor Erika Jordan denied leave as an accommodation until she exhausted FMLA leave was based on the fact that Plaintiff exercised her right to use FMLA leave rather than on medical facts. Basing a denial of an accommodation on an exercise of FMLA rights is per se FMLA retaliation and an interference with Plaintiff to obtain a reasonable accommodation.

786. Ms. Jordan would not entertain such an accommodation request until Plaintiff exhausted her FMLA leave, yet Ms. Jordan said that she had 10-11 days to respond to accommodation requests. Given Ms. Jordan's policy, Plaintiff would have had unprotected leave between the exhaustion of FMLA leave and a response to another request for accommodation.

787. A policy of only allowing Plaintiff to request one leave at a time interfered with Plaintiff's rights to access concurrently both FMLA and leave as an accommodation.

788. Mr. Goudy's September 27, 2016, comment provides direct evidence that OER was considering Plaintiff's participation in the EEO process as to whether to carry out her reasonable accommodation request. Mr. Goudy's comments show FEMA's intent to interfere with Plaintiff's access to reasonable accommodation and coerce her or dissuade her from continuing to participate in the EEO process.

789. FEMA made Plaintiff reassignment offers of employment that would interfere with her ability to continue in the EEO process. On July 13, 2016, FEMA made its first offer of reassignment for a Deployable Field Counsel (DFC). DFCs often work long hours (12-hour shifts) in disaster locations and while deployed to a disaster, OCC would not make Plaintiff available to respond to EEO orders or requests. Plaintiff would not have enough time to work on her discrimination complaint after a 12-hour shift if she would have to spend most of the time needed off hours working on her discrimination complaint. In addition, due to disaster

conditions, Plaintiff might not have regular access to the internet, phone, or other equipment or services needed to participate in the EEO process (e.g., notary, scanner, printer, post office).

790. On September 27, 2016, FEMA rescinded the September 22, 2016, offer to be reassigned as an Intergovernmental Affairs Specialist.

791. Because of the suspect timing between Plaintiff's protected activity in requesting an accommodation and the rescission of FEMA's offer (especially given FEMA's changing reasons for the rescission), there is an inference that FEMA retaliated against Plaintiff.

792. On September 16, 2016, Ms. Gunsolus (cc'ing Willisa Donald) said that if Plaintiff continued to engage in protected speech, the agency would not reassign her, and the protected speech would be considered to be a declination of a transfer. This position was direct evidence of retaliation based on Plaintiff's protected opposition to discrimination.

793. On September 27, 2016, Ms. Gunsolus of HR told Plaintiff that FEMA rescinded the Intergovernmental Affairs Specialist position because "As a result of your new management being out of the office on travel, there will be no one in the office to get you situated tomorrow." However, in Ms. Gunsolus's later sworn affidavit, she claimed that the FEMA rescinded the Intergovernmental Affairs position because FEMA offered the position to someone else.

794. On September 27, 2016, at 10:40 AM by email with Ms. Donald cc'd Ms. Gunsolus and admitted that the agency had refused to accept Plaintiff's reassignment for the DFC position because of Plaintiff's engagement in protected speech/activity (i.e., claiming that Plaintiff had been forced to leave the ADR Division due to discrimination). This is direct evidence of retaliation.

## 28. **TWENTY-EIGHTH CLAIM OF RELIEF**

**Constructive discharge and transfer to RRLD (retaliation, discrimination based on sex/gender, color, race, and national origin)**

*CA Labor Code § 98.6(b)(1), Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203), Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Part 1604 and Part 1606). FMLA (29 USC §§ 2601 et seq., as amended; 5 USC §§ 6381-6387, 5 CFR Part 630; 29 CFR Part 825)*

795. Plaintiff realleges and incorporates paragraphs 161, 163, 198, and 214.

796.    Plaintiff was forced to leave her ADR Attorney Advisor position for other positions due to harassment and FEMA's refusal to correct the hostile work environment. FEMA/DHS discriminatorily transferred Plaintiff twice because FEMA refused to enforce its own anti-harassment policies (a demotion and transfer to a different division within the same office). FEMA did not return Plaintiff to an equivalent work environment after her FMLA leave and leave as an accommodation.

797.    FEMA subjected Plaintiff to these discriminatory transfers and constructive discharge from the position she was hired into because of retaliation. Plaintiff's management made Plaintiff (the victim of harassment) transfer but not those she accused of harassment (the perpetrators) in violation of the DHS and FEMA anti-harassment policies. Within a week or so of Plaintiff opposing sitting next to someone she accused of harassment in January 2016 and after she first reached out to the OER about how to file a discrimination complaint, office chatter (including by one who would become Plaintiff's supervisor) claimed someone under Robert Scott's supervision (i.e., Plaintiff) would be losing their job and ADR Division Director told Plaintiff she heard plaintiff was filing a discrimination complaint. Mr. Scott would later testify in January 2020 that Plaintiff should have offered to transfer or sit to another office.

798.    About a week or so after Plaintiff officially filed a discrimination complaint with OER, management demoted Plaintiff, and Mr. Scott told her she was going to be put on a Performance Improvement Plan (PIP) although Plaintiff's job classification did not have PIPs. In addition, later FOIA/Privacy Act releases would show Mr. Scott, Ms. Jordan, Kirsten Gunsolus, and Melissa Williams were working together to terminate Plaintiff. The suspect timing of these adverse actions after Plaintiff's protected activities and FEMA management's revealed intent to terminate Plaintiff gives rise to an inference of retaliation.

799.    Although Mr. Scott claimed that Plaintiff making allegations against others of discrimination was an example of Plaintiff so-called behaving badly, Mr. Scott did not engage in progressive discipline per the FEMA CORE manual by formally accusing Plaintiff of any type of misconduct before attempting to terminate Plaintiff.

800. FEMA's transfers and constructive discharge of Plaintiff were also related to Plaintiff's sex/gender. Mr. Scott said Plaintiff (a woman) should have offered to transfer but refused to transfer a man (Mr. Kapoor or Mr. Scott). Moreover, manager Ms. Mazur testified that she would not transfer any managers. Two-thirds of the men at the ADR Division headquarters were managers, and later when management promoted Mr. Kapoor, 100% of the men at the ADR Division headquarters would be supervisors. This discriminatory application of agency and departmental policy of not transferring managers meant that men who harassed others or refused to protect victims of harassment would be exempt from the FEMA anti-harassment policy, but women would not be.

801. If FEMA refused to apply the FEMA and DHS anti-harassment policy to its managers in ADR, then that would disproportionately violate affect cases involving men and white individuals named as harassers.

802. FEMA's transfers and constructive discharge of Plaintiff were also related to Plaintiff's national origin, race, and color for a similar reason for not transferring managers was discriminatory against women. 100% of managers/supervisors of the five managers/supervisors within the ADR Division were white. Only two white ADR Division employees who worked at headquarters of the ADR Division were not managers (i.e., had supervisor titles with subordinate employees) whereas 100% of people of color, including Plaintiff who was Taiwanese/Chinese, were not managers. Therefore, there was a substantial likelihood that white individuals would be exempt from the FEMA anti-harassment policy, but non-white individuals would not be. In addition, Plaintiff faced retaliation because she did not conform to racial stereotypes of East Asian (Chinese/Taiwanese) individuals because she was assertive in advocating against discrimination and had an opinion about the seating arrangements in the new office.

803. Plaintiff complained to her supervisors at various times in 2015 about Mr. Kapoor's discriminatory behavior, and in January 2016, requested that Plaintiff's harasser Mr. Kapoor not sit next to Plaintiff in the move to a new office. In response, Plaintiff's supervisor Mr. Scott retaliated against Plaintiff for suggesting Mr. Kapoor move or sit away from Plaintiff

and said Plaintiff (the victim of harassment)—not the harasser Mr. Kapoor—should have suggested to move to sit in a different office.

804. On March 28, 2016, Plaintiff requested from her manager Ms. Mazur that she transfer Mr. Scott out of Plaintiff's chain of command. Ms. Mazur declined to become Plaintiff's first-line supervisor. Ms. Mazur also declined to allow Plaintiff to have a supervisor who was not in the chain of command of one of her harassers Robert Scott.

805. On March 30, 2016, Plaintiff told Ms. Mazur that Plaintiff did not want Ms. Jordan as her supervisor because Mr. Scott still had effective control over Ms. Jordan as Ms. Jordan's supervisor. About 30 minutes later, Ms. Cynthia Mazur told Plaintiff that Erika Jordan would be Plaintiff's supervisor starting Monday, April 4, 2016. Plaintiff again tried to request that FEMA transfer her harassing managers when Ms. Jordan became Plaintiff's supervisor, but Ms. Jordan denied the request without explanation.

806. In June 2016, Dr. Oaklander again reasserted that the abusive work environment Plaintiff was facing exacerbated her psychological condition after providing another medical certification in May 2016.

807. Plaintiff first took FMLA leave in April 2016, which entitled her to return to an "equivalent position," which is one of "equal pay, benefits, and other terms and conditions (including shift and location)" per the terms of FMLA. The positions FEMA offered Plaintiff as a reassignment were not of an equivalent position. The positions included hardship postings of a 50% increase in base working hours (with typical 12-hour shifts) without readily access to the internet, medical care, and other amenities. One also required Plaintiff to buy a car and move without relocation expenses. Many were not located in cities, and one would require frequent travel and relocation to disaster zones.

808. Plaintiff was transferred to OCC Recovery Policy and Doctrine within the Response and Recovery Legal Division (RRLD) on October 18, 2018, to an open office with open doors within the same building at 500 C Street, SW, Washington, DC as the ADR Division. The ADR Division at least was a bit more private with a door to the office. Plaintiff was subject

to the same Chief and Deputy Chief Counsel in the Plaintiff's chain of command were in the Plaintiff's chain of command.

809. The ultimate transfer position (RRLD) did not provide career-enhancing work, such as ADR practice experience as a primary duty, as Plaintiff was promised when hired. Instead, management still assigned Plaintiff administrative work and notetaking. Mr. Doolin then took it upon himself to unjustly criticize Plaintiff's notetaking, making criticisms of Plaintiff's notetaking but not criticizing the ability of other notetakers who had not engaged in protected activity, especially when they took notes in the same way Mr. Doolin criticized Plaintiff for doing. Although Plaintiff started earlier or at the same time as others for coaching, other ADR Division employees who stayed and regularly received mediation cases and received higher-level coach credentials (PCCs or MCCs) because of 500 to 2500 or more coaching hours made available to them. With higher-level coaching credentials, coaches can charge higher rates and increase their desirability in the open market.

810. The ultimate transfer position to RPD also was not put in a position as a GS rate (GS 14 or 15) applicable taking into account the equal pay issues Plaintiff was subject to within ADR Division, and FEMA specifically refused to put Plaintiff in the GS-14 Office of Chief Counsel Cadre Coordinator position when Plaintiff raised the issue.

### 29. <u>TWENTY-NINTH CLAIM OF RELIEF</u>

**Failure to promote**

*Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203), Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Part 1604 and Part 1606), FMLA (29 USC §§ 2601 et seq., as amended; 5 USC §§ 6381-6387, 5 CFR Part 630; 29 CFR Part 825)*

811. Prior to Plaintiff filing a discrimination complaint, the ADR cadre discussed promoting Plaintiff to a reservist manager (a supervisory position) in the cadre, but after Plaintiff reported to manager Ms. Mazur about the discrimination, chat in the cadre talked about eliminating a position (i.e., Plaintiff's position). Later, FEMA ADR hired a reservist manager and someone to replace Plaintiff, both of whom (based on last name) were likely of a different race, national origin, and color than Plaintiff and based on prior ADR hiring practices, white.

812.    Mr. Scott said that Plaintiff was not eligible for promotion as divisional promotions would be given to those who had worked for FEMA longer than Plaintiff had, such as Martha Gallagher and Linda Baron. However, on April 3, 2017, ADR management promoted Mr. Kapoor (who had been at the ADR Division for the same amount of time as Plaintiff) to an IC-14 position. In addition, the agency unequivocally said that it would not remove Robert Scott from Plaintiff's environment even through an accommodation, and Robert Scott would have been the supervisor for the said position. Therefore, FEMA effectively excluded Plaintiff from applying for promotional ADR positions unless she worked for or with her harassers.

813.    Although Plaintiff was already working at a GS-14 and GS-15 level as discussed in the equal pay claim, FEMA refused to reassign Plaintiff to the open OCC cadre coordinator position for an almost equivalent to Plaintiff's ADR job as a GS-13/IC-13.

814.    Because FEMA refused to implement its own agency and departmental anti-harassment policies and effectively blocked from returning to the ADR Division, Plaintiff was effectively restricted from promotions within the ADR Division.

815.    Because of the retaliatory performance reviews, Plaintiff was also restricted from being promoted from other internal OCC positions and potentially being hired to other positions in the federal government or elsewhere that requested copies of Plaintiff's performance reviews.

### 30.    THIRTIETH CLAIM OF RELIEF

**Unequal application of the FEMA/DHS anti-harassment policies (hostile work environment, policy unequally applied to white individuals and men, disparate impact)**

*Civil Rights Act of 1964 (*42 USC §§ 2000e et seq., *29 CFR Part 1604 and Part 1606),*

*Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203), 42 USC § 1981, 1983, 1985-6*

816.    Plaintiff was subjected to harassment and a hostile work environment by a discriminatory application of FEMA and DHS's anti-harassment policies that did not apply to managers and effectively did not apply to white individuals or men.

817.    This conduct was unwelcome and was sufficiently serious or happened often enough to change the conditions of her employment and create a hostile work environment.

818.    Plaintiff's managers and others with supervisory control enforced this discriminatory application of policy.

819.    A reasonable person under these circumstances would consider the working environment to be abusive or hostile.

820.    FEMA/DHS did not demonstrate that it followed its own anti-harassment policies. FEMA's Anti-Harassment Policy FD 256-6 required that managers and supervisors make sure "employees who report harassment are protected against retaliation;" notify OER, and either OCCHCO or OCSO; and "[k]eep the complainant apprised of the status of any investigation into their claim of harassment, and notify the complainant when the investigation has been concluded subject to privacy considerations of the alleged harasser."

821.    Per FEMA's Anti-Harassment Policy, OER employees must physically remove the harasser from the complainant (i.e., Plaintiff) and the workplace, and OER must be the one to promptly investigate allegations of harassment that do not involve physical touching or GS-15 or higher. Furthermore, DHS's Anti-Harassment Instruction #256-01-001 (June 6, 2019) states, "Managers and supervisors who knowingly tolerate or ignore harassment or retaliation, including managers or supervisors who fail to immediately report such misconduct, are in violation of the DHS Anti-Harassment Policy Statement and subject to discipline."

822.    Plaintiff was forced to sit next to her harassers (especially those with violent tendencies) and allow such harassers the potential to return to assault Plaintiff. In 2016, Mr. Kapoor, Mr. Scott, Ms. Jordan, and Ms. Mazur were not required to transfer.

823.    None of Plaintiff's harassers, including those Plaintiff accused of workplace violence (male), were subjected to any medical examinations assessing their threat status and mental state.

824.    At the 2020 hearing, Ms. Mazur testified that no managers would be transferred.

825.    Between 2014-2016, 100% of managers were white in the ADR Division, and two-thirds of men in the ADR Division were men.

826.    FEMA and DHS's anti-harassment policies did not exempt managers. Exempting managers from following DHS and FEMA's anti-harassment policies disproportionately impacts

those who would file discrimination complaints against men and white individuals, such as those who might bring a sexual harassment or racial discrimination complaint, and disproportionately exempts men and white individuals from responsibility.

827. Having a policy that did not apply to most men and white individuals effectively created a hostile work environment for women and racial minorities as DHS's Inspector General and RAND Corporation found a culture of widespread harassment and discrimination.

## 31. **THIRTY-FIRST CLAIM OF RELIEF**

**Retaliation by attorneys involved in Plaintiff's prior EEO activity and advised on or directed subsequent adverse actions**

*CA Labor Code § 98.6(b)(1), Title VII of the Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Part 1604 and Part 1606). FMLA (29 USC §§ 2601 et seq., as amended; 5 USC §§ 6381-6387, 5 CFR Part 630; 29 CFR Part 825), Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203), 42 USC § 1981, 1983, and 1985-6*

828. It is per se reprisal when an individual (e.g., agency attorney) involved in a plaintiff's prior discrimination complaint advised on or directed a subsequent adverse action.

829. The EEOC Office of Federal Operations (OFO) determined that it would be a conflict of interest for a personnel attorney to advise a division on a personnel matter and then subsequently represent the agency in the same matter.

830. Personnel lawyer Melissa Williams, supervisory personnel lawyer Ashley Darbo, Deputy Chief Counsel Joel Doolin, and Chief Counsel Adrian Sevier (as well as potentially other attorneys within Ms. Williams' and Ms. Darbo's chain of command) had both input into personnel decisions related to Plaintiff and oversaw litigation or made an appearance before the EEOC to represent FEMA in this EEOC case. Ms. Darbo advised ADR management regarding their restricting and tracking Plaintiff's bathroom usage and breaks, as well as the approval of Plaintiff's FMLA leave, amongst potentially other topics. Ms. Williams, Ms. Darbo, and Linda Aragon acted as agency counsel for Plaintiff's discrimination case during the FEMA EEO process, as well as before the EEOC.

831.    FEMA personnel lawyers or other agency representatives were supervisors within the meaning of discrimination law because they had the authority to advise on or take personnel actions against Plaintiff.  Unlike the typical lawyer, personnel lawyers blurred the lines from providing legal advice to directly participating in and making decisions related to adverse actions and harassment.

832.    Joel Doolin and Adrian Sevier were Plaintiff's managers and high-level officials at the FEMA with dual reporting structures to the FEMA Administrator (the head of the agency) and the DHS Office of General Counsel.  EEOC management directive (MD) Chapter 1, Section IV(B)(1) states that conflicts of interest may be present when the alleged responsible official is a member of the immediate staff of the head of the agency.

833.    Mr. Sevier and Mr. Doolin were also managers of FEMA personnel lawyers Ms. Williams, Ms. Darbo, and Linda Aragon who worked in the FEMA Personnel Law Branch (PLB).  PLB members were Plaintiff's co-workers in OCC with whom she would attend trainings, participate in work groups, and collaborate on projects.

834.    Mr. Sevier and Mr. Doolin supervised the attorneys in charge of reviewing or drafting the charge in Plaintiff's discrimination case during the FEMA and EEOC EEO process.

835.    Mr. Sevier and Mr. Doolin were involved in the discriminatory actions that formed the basis of Plaintiff's allegations of discrimination claims against FEMA/DHS.

836.    Mr. Doolin indiscriminately sent emails to PLB and their supervisors about Plaintiff's open discrimination case, which included personal medical information, and told the branch to keep working against Plaintiff.  Some of those PLB attorneys went on to retaliate against Plaintiff, including by sharing her EEO disclosures openly with other DHS attorneys.

837.    Kirsten Gunsolus of FEMA HR sent an email to Melissa Williams (FEMA counsel for the administrative portion of this complaint) expressing how happy she [Ms. Gunsolus] was that she and Melissa Williams finally could terminate Plaintiff (an adverse action) after a long time trying.

838.    Ms. Williams' managers and supervisors who oversaw litigation of the present case themselves made statements or took actions showing discrimination.  Various personnel

lawyers (including Ms. Darbo and her supervisor Joshua Stanton) showed their discriminatory intent toward people with disabilities and those with disabilities (especially mental disabilities) who requested accommodations.

### 32. <u>**THIRTY-SECOND CLAIM OF RELIEF**</u>

**Retaliation by FEMA EEO officials (OER)**

*CA Labor Code § 98.6(b)(1), Title VII of the Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Part 1604 and Part 1606), Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203), 42 USC § 1981, 1983, and 1985-6*

839. It is per se reprisal when an agency EEO official involved in Plaintiff's prior EEO complaint advised on or directed a subsequent adverse action.

840. OER officials were directly involved in personnel decisions and the EEO process, including conditioning participation in the EEO process on Plaintiff's protected activity. OER officials were also directly involved in facilitating discrimination. Unlike the typical employer, FEMA OER blurred the lines from processing EEO complaints to directly participating in and making decisions related to adverse actions and harassment.

841. FEMA EEO officials were supervisors within the meaning of discrimination law because they had the authority to advise on or take personnel actions against Plaintiff.

842. Between approximately May to October 2016, Willisa Donald—Director of the Office of Equal Rights (OER), which was FEMA's EEO office—concurrently both oversaw the EEO process initiated by Plaintiff and participated in the process that resulted in various adverse personnel decisions, such as Plaintiff's reassignment, the rescission of employment offers, the untimely extension of Plaintiff's employment contract, and unstable continuing coverage of Plaintiff's health benefits (especially during medical leave).

843. During the search for reassignment, Plaintiff was on FMLA leave and followed by leave without pay (LWOP), which was leave as an accommodation.

844. Ms. Donald managed the FEMA EEO intake official (Douglas Goudy), the EEO Counselor (Andrea Pearson), and EEO case manager Erik Skinner for Plaintiff's EEO case against FEMA that underlie the current complaint.

845. OER officials worked with FEMA's defense (human resources and personnel lawyers), as well as Plaintiff's harassing managers, to make personnel decisions, such as regarding Plaintiff's reassignment.

846. After Plaintiff's protected activity (e.g., reporting discrimination, requesting an accommodation), OER did not accept any claims that named OER officials in Plaintiff's discrimination complaint.

847. OER did not transfer the processing of the Plaintiff's complaint to another component or department that did not possess conflicts of interest as was the case in the Plaintiff's case.

848. After Plaintiff reached out to Mr. Goudy to discuss how to file an EEO complaint at FEMA on January 11, 2016, Plaintiff's manager Cynthia Mazur said that she heard Plaintiff was going to file an EEO complaint.

849. Mr. Goudy's comment on September 27, 2016, indicated that OER was conditioning whether Plaintiff's exercise of her rights to engage in one type of protected activity would mean restriction of her other rights to engage in another type of protected activity. OER, therefore, interfering with Plaintiff's right to be accommodated and retaliating against her for engaging in the EEO process by filing a discrimination complaint.

850. In the 2016 reassignment process, Mr. Goudy also tried to find out Plaintiff's location as a means to ensure FEMA would not accommodate Plaintiff if she returned to California instead of staying in DC.

851. Per FEMA's Anti-Harassment Policy, OER employees must physically remove the harasser from a complainant and the workplace, and OER must be the one to promptly investigate allegations of harassment that do not involve physical touching or GS-15 or higher. OER never did so in Plaintiff's case.

852. A FOIA release of the internal administrative investigations process (AID) that Plaintiff filed on December 8, 2016, also showed that OER did not investigate Plaintiff's claims in her AID complaint according to its internal investigations procedure, which in turn showed that FEMA did not meet its obligations under its Anti-Harassment Policy.

853. Plaintiff's chain of command did not stop any of the EEO officials because they handed off authority to these individuals and worked with them to stop Plaintiff from engaging in protected activities.

## 33. **THIRTY-THIRD CLAIM OF RELIEF**

### Retaliation by human resources employees (OCCHCO)

*CA Labor Code § 98.6(b)(1), Title VII of the Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Part 1604 and Part 1606). FMLA (29 USC §§ 2601 et seq., as amended; 5 USC §§ 6381-6387, 5 CFR Part 630; 29 CFR Part 825), Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203), 42 USC § 1981, 1983, and 1985-6*

854. Plaintiff realleges and incorporates paragraphs #32-34, 49-50 (RAND and DHS IG report), 87, 209, 218, 221, and 223.

855. FEMA human resources (OCCHCO) employees were supervisors within the meaning of discrimination law because they had the authority to advise on or take personnel actions against Plaintiff. Unlike at the typical employer, FEMA OCCHCO blurred the lines from filling out paperwork related to personnel actions to directly participating in and making decisions related to adverse actions and harassment.

856. After Plaintiff filed a discrimination complaint on March 21, 2016, FEMA switched the main HR contact to Kirsten Gunsolus who participated in harassing Plaintiff instead of trying to correct harassment as did the previous HR contact Jill McDonnell.

857. OCCHCO conditioned Plaintiff's receipt of benefits (e.g., accommodations, leave donations) on the cessation of protected activity by Plaintiff and her therapist. OCCHCO also participated in trying to terminate Plaintiff and refusing to extend or delaying the extension of Plaintiff's employment. The denial of benefits and employment, as well as the security about access to health insurance and other benefits that come with employment, are adverse actions.

858. Juan Porter (who managed VLTP leave for FEMA OCCHCO) told Plaintiff that he denied her leave donation request after employee relations spoke to him although it had been approved before; employee relations (e.g., Kirsten Gunsolus) were working with management on defending the Agency against Plaintiff's EEO allegations. Mr. Porter also claimed that many

senior leaders knew about Plaintiff's case, which indicated that these leaders prohibited Plaintiff from receiving leave donations based on Plaintiff's protected activity.

859. In 2016, Ms. Gunsolus threatened to deny Plaintiff accommodations (which would lead to her termination) and told her that she would be considered AWOL if she did not respond right away even while Plaintiff was in the process of seeking medical treatment (i.e., in a provider's office or in a place with no cell phones allowed).

860. OCCHCO extended Plaintiff's employment retroactively several times in 2016, extending inappropriate leave reassignment positions, and rescinding the offers of employment for reassignment without just cause.

861. Several members of OCCHCO were involved in the extension of Plaintiff's employment, including the head of OCCHCO Corey Coleman, who was one of the main instigating reasons the DHS IG started the investigation against FEMA for widespread harassment due to harassment allegations against him.

862. Kirsten Gunsolus of OCCHCO sent an email to Melissa Williams (FEMA counsel for the administrative portion of this complaint) expressing how happy she [Ms. Gunsolus] was that she and Melissa Williams finally could terminate Plaintiff after a long time trying.

863. FEMA/DHS Kirsten Gunsolus tried to use the "For Official Use Only" (FOUO) label in an improper manner on discriminatorily damaging documents to hide evidence.

864. Ms. Gunsolus claimed that she was the proper person to send complaints about the agency's decision regarding Plaintiff's FMLA leave, such that Ms. Gunsolus would review complaints about her own decisions.

865. Employee Relations' Kirsten Gunsolus (on August 2, 2016, August 4, 2016, and August 9, 2016) and Robyne Jackson (August 4, 2016, and August 9, 2016) refused to stop or even address Ms. Jordan's prohibition on Plaintiff to report up EEO issues.

866. Plaintiff's chain of command did not stop any of the HR officials because they handed off authority to these individuals and worked with them to harass Plaintiff and stop her from engaging in protected activities.

34.   **THIRTY-FOURTH CLAIM OF RELIEF**

**Harassment (hostile work environment, quid pro quo) by supervisors (based on protected activity, race, national origin, gender/sex, disability, and color)**

*CA Labor Code § 98.6(b)(1), Title VII of the Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Part 1604 and Part 1606), FMLA (29 USC §§ 2601 et seq., as amended; 5 USC §§ 6381-6387, 5 CFR Part 630; 29 CFR Part 825), Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203), 42 USC § 1981, 1983, 1985-6, FTCA (28 USC §§ 1346 and 2671-2680), 5 USC § 2302(b)(1)*

867. Plaintiff realleges and incorporates paragraphs #53-54 (RAND and DHS IG finding of widespread harassment at FEMA) and 87.

868. Plaintiff was subjected to harassment and a hostile work environment by those with supervisory control over her, including but not limited to those in her chain of command but also FEMA personnel lawyers and their supervisors, human resources employees, EEO officials, and members of FEMA's AID team, who had the authority to advise on or take personnel actions against Plaintiff.

869. What started primarily with coworker harassment in 2014 spread to harassment by those with supervisory control with Plaintiff in mid-2015 on from those in her chain of command, to the involvement by several members of human resources, personnel law, the Office of Equal Rights, and others, after Plaintiff started opposing and reporting up and out discrimination, which has continued to the present through the litigation process. This harassment included several senior executives (heads of offices) of FEMA, if not higher.

870. FEMA human resources (OCCHCO) employees, OER employees, and personnel and EEO lawyers (and their supervisors and managers) were supervisors within the meaning of discrimination law because they had the authority to advise on or take personnel actions against Plaintiff.

871. Those with supervisory control over Plaintiff harassed her due to her sex/gender, color, race, national origin, and protected activities.

872. This conduct was unwelcome and was sufficiently serious or happened often enough to change the conditions of her employment and create a hostile work environment.

873. Not only did these supervisors and others with supervisory control over Plaintiff directly harass Plaintiff but they also refused to stop, correct, and prevent harassment from occurring to create a hostile work environment.

874. A reasonable person under these circumstances would consider the working environment to be abusive or hostile.

875. The hostile work environment caused by those with supervisory control over Plaintiff includes the sum of the other claims caused by those individuals, including but not limited to the following 25 categories:

(i.) Plaintiff's supervisors and managers changed Plaintiff's job description on the vacancy announcement and official job description to work based on stereotypes related to Plaintiff's gender, race, color, and national origin, assigning work based on those stereotypes, changing performance goals in line with those stereotypes, and increasing administrative assignments based on those stereotypes after Plaintiff's protected activities;

(ii.) Mr. Scott physically intimidated Plaintiff twice (assaulting Plaintiff and trapping her in her cubicle) because she was an Asian woman of color while telling her to stop documenting discrimination, including once when Mr. Scott regarded Plaintiff as disabled by treating her like a hysterical woman (a gender-based stereotype);

(iii.) FEMA lacked a functioning EEO system rife with conflicts of interest such that Plaintiff had no recourse for a hostile work environment;

(iv.) Management refused to stop harassment by coworkers, including using inappropriate language implying Plaintiff had various mental disabilities that she did not have (e.g., "You've actually created, in your mind, people who don't exist"), calling her aggressive (code language for a woman for violates gender stereotypes), minimizing her allegations, calling her a liar and defamer for her allegations, and so forth);

(v.) At least 27 instances in which those with supervisory authority (including human resources, agency counsel, Robert Scott, Cynthia Mazur, and Erika Jordan) tried to keep Plaintiff from engaging in protected activities and using words related to discrimination;

(vi.)    FEMA management hired into lower-paying positions for the same work and paid Plaintiff less based on her race and gender/sex, as well as paying her less or not at all for gender-stereotyped assignments (e.g., baking);

(vii.)    Mr. Scott (with Ms. Mazur's approval) docked Plaintiff on her annual and then provided a negative quarterly performance review after and because of Plaintiff's participatory and oppositional protected activities, as well as Mr. Scott's differential standards applied to white employees compared to Plaintiff who was Asian;

(viii.)    Mr. Scott set annual performance goals that would decrease if Plaintiff engaged in reporting or opposing discrimination by a coworker;

(ix.)    Mr. Scott ordered Plaintiff to see a therapist multiple times (January 8 and 12 and March 21, 2016) because he regarded her as having a mental disability that she did not have (particularly that associated with her sex/gender, i.e., being a hysterical or emotional woman) and because he tried to stop her from reporting allegations of discrimination;

(x.)    Mr. Scott (in response to Plaintiff's opposition to sitting next to her harasser and having an opinion) on January 8, 2016, ordered Plaintiff to complete an emotional intelligence assignment that was an attempt by Mr. Scott (who was qualified to administer therapy and not a licensed psychologist) to administer a psychological examination, assess Plaintiff's mental and emotional state, and have Plaintiff reveal privileged medical information because Mr. Scott reacted to Plaintiff violating stereotypes/norms regarding her race and national origin and her attempt to engage in protected activity;

(xi.)    Mr. Scott, Ms. Jordan, and other members of Plaintiff's management team subjected Plaintiff to at least 12 types of adverse actions in relation to her sex/gender, race, disability, color, national origin, and protected activities;

(xii.)    Between April and May 2016, Ms. Jordan denied Plaintiff's use of training funds for training within her position description (on ADR practice for coaching) based on Plaintiff's sex/gender, delaying approval of such training, and then denying such training in its entirety in response to Plaintiff's protected activities, including but not limited her use of protected leave and reporting discrimination;

(xiii.)   At least 17 instances in 2016 in which Mr. Scott, Ms. Jordan, Ms. Gunsolus, and other members of OER interfered with Plaintiff's use of medical leave (including but not limited to sick leave, FMLA leave, and leave as an accommodation) through denial or delay of approval, increasing barriers to approving leave, limiting or restricting access to paid leave, and making Plaintiff work or be on call 24/7 during leave;

(xiv.)   FEMA management demoted Plaintiff on March 30, 2016, with a start date of April 4, 2016;

(xv.)   FEMA management denied sending Plaintiff on a detail as an accommodation, a way to remove Plaintiff from her harassers, and a career-promoting activity;

(xvi.)   Ms. Jordan scrutinizing and limiting Plaintiff's work and bathroom breaks;

(xvii.)   Ms. Jordan and the individuals who helped draft FEMA's accommodations response made improper medical inquiries asking for too much information than allowed;

(xviii.)   In 2016, FEMA (with participation by several members of OCC, OCCHCO, and OER) failed to accommodate Plaintiff several times by denying a transfer of Plaintiff's harassers, rescinding 3 offers of accommodation without a proper legal basis, untimely accommodating Plaintiff by approximately 5 months (including several without pay), delaying Plaintiff's access to accommodations through red tape, offering Plaintiff reassignments that did not accommodate her disability, and refusing to offer any interim accommodations that would accommodate her disability;

(xix.)   Several months in 2016, Ms. Jordan (with knowledge from those higher up the chain of command, including but not limited to Cynthia Mazur and Robert Scott), Ashley Darbo (supervisory personnel lawyer), various members of HR (Kirsten Gunsolus, Robyne Jackson, Angela A McGuirl, Corey Coleman), and OER (Willisa Donald) refused to engage in the interactive process in good faith because FEMA wanted Plaintiff to leave the agency (e.g., refusing to answer Plaintiff regarding the status of her accommodation request, retroactively extending Plaintiffs employment multiple times, refusing to extend her contract in a timely manner despite her adequate performance, offering Plaintiff poor reassignment positions and

then retracting them for months, refusing to offer Plaintiff open positions within FEMA or DHS headquarters, refusing to allow Plaintiff to access paid leave and making Plaintiff wait out 4 months on unpaid leave when FEMA did not timely accommodate Plaintiff, and Kirsten Gunsolus misusing For Official Use Only labels to hide the agency's discriminatory activity);

(xx.)    There are at least 11 instances between May and September 2016 in which FEMA (Erika Jordan, Willisa Donald, Kirsten Gunsolus and other members of human resources, and Douglas Goudy) interfered with or retaliated against Plaintiff because she exercised her FMLA rights or requested a reasonable accommodation;

(xxi.)    Plaintiff was subjected to constructive discharge, discriminatory transfers, retroactive extensions of employment, and the rescission of job offers by various members of FEMA management (including but not limited to Erika Jordan, Robert Scott, Cynthia Mazur, Joel Doolin, and potentially those higher up the chain of command) and those with supervisory control (various members of OCCHCO and OER) because FEMA refused to correct the hostile work environment in accordance with agency and department policies;

(xxii.)    Plaintiff faced retaliation by attorneys with conflicts of interests by being involved in advising on or ordering personnel actions against Plaintiff, subsequently representing FEMA on those same actions, advising the EEO office on the processing of subsequent EEO processes related to those actions, or advising or order further subsequent personnel actions against Plaintiff;

(xxiii.)    Several members of human resources have the authority to order or implement personnel actions against Plaintiff engaged in retaliatory harassment against Plaintiff;

*(xxiv.)*    FEMA refused to compensate those working on the same EEO cases equally;

*(xxv.)*    FEMA management unequally applied the FEMA and DHS anti-harassment policies to protect harassers, especially men and white individuals;

876.    FEMA management failed to protect Plaintiff from harassment, as well as correct past harassment and prevent future harassment. At all times during Plaintiff's employment at the FEMA ADR Division, FEMA management allowed Plaintiff's named harassers to contact and

AMENDED COMPLAINT        24-CV-00797 KAW        Page **174** of **190**

approach Plaintiff whenever they wanted. Plaintiff offered to mediate multiple times and suggested a neutral third party, but ADR management refused mediation multiple times (e.g., March 17, 2016, April 26, 2016), and the FEMA EEO office refused to assign a neutral mediator after the initiation of the EEO complaint.

877. FEMA management has claimed a number of times that none of the individuals Plaintiff alleged as harassers were disciplined and since these individuals were given awards, they likely were not because giving awards to those who have been disciplined violates agency policy. Plaintiff's management victim-blamed Plaintiff, expecting her—not management or her harassers—to correct the hostile work environment. Plaintiff's management, as well others with control over advising personnel actions against Plaintiff, created a permissive office culture that rewarded discriminatory acts and behaviors and a failure to protect Plaintiff from harassment and correct a hostile work environment.

878. Plaintiff's supervisor Mr. Scott became increasingly hostile in the language and behavior he directed at Plaintiff in response to her allegations, calling her "argumentative and disrespectful with him and everyone in the office, " "creating, in your mind, people who don't exist", and having an "active imagination", treating her as disabled in front of coworkers (e.g., in March 2016), and telling her that relationship failure in the office was 100% her fault, including with those harassing her. Mr. Scott denied all protected activity and minimized or ignored the Plaintiff's specific claims against Vikram Kapoor. Meanwhile, manager Cynthia Mazur told Plaintiff that Plaintiff could stop with a victim mentality and that Plaintiff was not a victim. In response to Plaintiff's allegations, Ms. Mazur assigned Plaintiff to the ADR Division etiquette committee to talk about office housework (a gender-stereotyped assignment) and listen to others try to create rules that would discriminate against others based on their national origin (i.e., not bring so-called smelly Asian or African food) in response to Plaintiff's allegations of discrimination. Joel Doolin only asked Plaintiff to "reset" relations but did not ask any of Plaintiff's harassers to do the same in response to discrimination allegations.

879. Mr. Doolin was also known to use the phrase "open kimono," which referred to East Asian women being forcibly undressed (typically by white males).

880. In January 2016, Mr. Scott (with Ms. Mazur's consent) refused to allow Plaintiff to vote (as an Asian woman) for a seating arrangement at the new office location in a different way from the rest of the office and later excluded her from participating in move discussions altogether.

881. Plaintiff's chain of command disparaged Plaintiff on a background check, to others within DHS, and on job reference checks. For example, Ms. Jordan purposely gave misleading and negative information on a clearance check for Plaintiff. Plaintiff's former supervisors have continued to disparage Plaintiff after her employment at the ADR Division. Even at the January 2020 hearing, Mr. Scott who was no longer employed at FEMA at the time of the hearing disparaged Plaintiff in his testimony by falsely claiming that Plaintiff brought a prohibited item to FEMA in 2018. His disparaging and false remarks about Plaintiff likely came from another FEMA employee spreading false rumors about Plaintiff. Neither FEMA counsel Melissa Williams nor Ashley Darbo corrected what they knew to be false testimony at the time of the hearing or afterwards when Plaintiff gave them an opportunity to correct the record.

882. Between February and June 2016 (particularly in April and May 2016 after Plaintiff filed a discrimination complaint), Plaintiff's supervisors Erika Jordan, Robert Scott, and Cynthia Mazur were unresponsive to Plaintiff regarding key information necessary to do her job at least 80 times. They also withheld the location of files and records. For example, Robert Scott and Erika Jordan refused to confirm the location of files, as well as how to open them or how they organized them.

883. *Blame without justification*: Plaintiff's supervisor Erika Jordan counted the time that Plaintiff was on protected FMLA leave or other types of sick or annual leave as to a reason she believed Plaintiff was not performing. On May 11, 2016, Plaintiff's supervisor Ms. Jordan (without asking) automatically assumed and admonished Plaintiff for assigning a co-worker with work when Robert Scott had done so. Ms. Jordan did not ask and blamed without reason.

884. To disparage Plaintiff's character and to imply that Plaintiff had some type of mental disorder she did not have, Erika Jordan lied in a sworn declaration that she had not

interacted with Plaintiff at all since April 2016, when Ms. Jordan contacted Plaintiff multiple times after April 2016, such as to assign work and decline reasonable accommodations.

885. *Excessive micromanaging*: Erika Jordan managed Plaintiff's usage of the bathroom and other breaks and made Plaintiff complete daily and 30-day plans. Ms. Jordan required Plaintiff to ask Ms. Jordan for permission for everything, including making allegations of discrimination against a manager (against Ms. Jordan). Mr. Scott also made Ms. Jordan call Plaintiff to check on Plaintiff (racial profiling Plaintiff because she was a woman of color) but did not do so for others who were white. Mr. Scott and Ms. Mazur had also racially profiled and scrutinized other women of color more closely than others.

886. Ms. Jordan, Mr. Scott, and Ms. Mazur allowed Plaintiff's workload to increase exponentially in 2016 after Plaintiff reported and opposed discrimination. Assigning Plaintiff over 100 hours per work a week but expecting her to complete it within 40 hours (especially while Plaintiff was chronically sick) was harassing. This was compounded when her supervisors blocked Plaintiff from accessing sick leave so that she could heal instead of becoming sicker to be diagnosed with severe bronchitis. Plaintiff's manager's excessive workload, as well as direct orders to segregate Plaintiff from the rest of her coworkers, naturally led to social isolation in addition to intentional ostracism. Plaintiff was excluded from meetings, individuals, officewide workgroup events (needed for performance goals), and social events to lead to networking and career advancement.

887. Plaintiff's management disparaged Plaintiff and ensured that she was ostracized within OCC, the fields of dispute resolution and coaching, and the Washington, DC metro area where networking is important for obtaining a new position. This ostracism prevented Plaintiff from making networking gains and professional references needed to obtain a new position. Within government positions, ostracism and social isolation can also mean not being able to obtain a position with a security clearance or at least a delay in such a background check.

888. Plaintiff's managers gave her contradictory directives to set her up to fail. After Plaintiff reported discrimination, Robert Scott brought up for the first time that Plaintiff should have talked to him daily during their quarterly performance review. Plaintiff tried calling Mr.

Scott daily after the review but was unable to reach him, or he would decline to meet. Later, Erika Jordan said that Plaintiff did not meet her enough, especially to discuss their joint vision. Contrary to Ms. Jordan's representations, Ms. Jordan refused to meet Plaintiff and discuss the issues when Plaintiff brought them up at meetings and refused to allow Plaintiff to speak about coming to a consensus about any joint vision.

889.    In 2016 (especially after Plaintiff started reporting up and out her allegations of discrimination), Plaintiff's supervisors set up unrealistic expectations for Plaintiff and set her up to fail in the assignments they ordered. Erika Jordan assigned Plaintiff an excessive workload, completing over 100 hours of work within 40 hours excluding time to allow Plaintiff to catch up from her sick (protected) leave. Ms. Jordan (with Ms. Mazur and Mr. Scott's approval) assigned Plaintiff to write a 20-page legal memorandum within 12 hours for an extremely complex and novel area of law that Plaintiff had never taken any courses in law school and that was unrelated to the major duties of the ADR Attorney Advisor as in the job vacancy announcement and the official position description.

890.    Erika Jordan said that Plaintiff was not performing an IC-13 level when Plaintiff did not present the type of deliverables she was asking for within a couple of hours. However, when Plaintiff raised those issues at a section staff meeting (the DFA meeting), people said that it was impossible to determine such deliverables at present because it was premature without further discussion. Moreover, similar requests by other projects took months of development.

891.    Mr. Scott and Ms. Jordan (with Ms. Mazur's knowledge) tried to coerce or threaten Plaintiff to violate her professional legal and coaching ethics and retaliated against Plaintiff when she refused to do so. Making attorneys violate their professional responsibilities to use their services to discriminate against others and make Plaintiff tolerate discrimination by others against Plaintiff as a condition of work and retaliating against these attorneys for refusing to violate professional ethics is in itself severe enough for a finding of harassment. Contrary to the EEOC's finding, this type of work environment is not simply about making a workplace perfect or a request of a snowflake unable to endure anything.

892. Erika Jordan did nothing when a coworker questioned Plaintiff's job status based on her last name from her email address that revealed her national origin and race.

893. Plaintiff exchanged emails with Ms. Mazur regarding her concerns over discrimination and retaliation she faced at the office, including but not limited to on January 12, March 10, March 16-17, March 21, March 27-30, April 27, and May 5-6, 2016. Ms. Mazur refused to stop the harassment she faced.

894. Section VI(A) of FEMA's Anti-Harassment Policy FD 256-6 required that managers and supervisors make sure "employees who report harassment are protected against retaliation;" notify OER, and either OCCHCO or OCSO; and "[k]eep the complainant apprised of the status of any investigation into their claim of harassment, and notify the complainant when the investigation has been concluded subject to privacy considerations of the alleged harasser."

895. DHS's Anti-Harassment Instruction #256-01-001 (June 6, 2019) states, "Managers and supervisors who knowingly tolerate or ignore harassment or retaliation, including managers or supervisors who fail to immediately report such misconduct, are in violation of the DHS Anti-Harassment Policy Statement and subject to discipline."

896. FEMA provided no evidence that Plaintiff's supervisors or managers reported the harassment or retaliation to the IG or faced discipline for reporting the misconduct, nor that OER or the IG investigated Plaintiff's allegations. The Agency specifically defined the terms investigation and investigator to mean more than any supervisor simply asking questions; an investigator per FEMA's own policies must have specific training, employ forensic techniques, and be part of specific offices, none of which FEMA did.

897. Censorship was only applied to Plaintiff (as an Asian woman of Taiwanese/Chinese descent who had engaged in protected activity) and characterized as "emotional" (a stereotype of women) but not to men who had not made allegations of discrimination, including if the men had lashed out in anger.

## 35. **THIRTY-FIFTH CLAIM OF RELIEF**

### **Attorney's fees and litigation costs**

*5th, 13th, 14th, and 15th Amendments of the US Constitution (due process, takings, equal protection, involuntary servitude), 22 USC § 7102(8), Administrative Procedure Act, Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Part 1604 and Part 1606), Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203), 29 CFR § 1614.501, 22 USC § 7102(8), FMLA (29 USC §§ 2601 et seq., as amended; 5 USC §§ 6381-6387, 5 CFR Part 630; 29 CFR Part 825)*

898.    Plaintiff realleges and incorporates by reference all other paragraphs of this complaint, specifically paragraph 60.

899.    On September 30, 2022, AJ Maricia Woodham refused to allow Plaintiff to recover attorneys' fees or costs because she was a pro se attorney. This ruling is discriminatory because it treats those targeted for discrimination differently from those who are not so targeted.

900.    Plaintiff is a barred attorney as required by 29 CFR § 1614.501.

901.    29 CFR § 1614.501 allows a complainant to recover attorneys' fees in Title VII and Rehabilitation Act cases, which is the case here. The federal regulations allow attorneys to be reimbursed for 100% of their time spent on discrimination cases. Federal guidelines award attorney's fees for the prevailing complainant, as in the case in Plaintiff's case.

902.    In the course of the administrative proceedings before the EEOC, Plaintiff submitted the same filings and performed the same work as any other attorney had Plaintiff been able to hire an attorney. However, AJ Woodham refused to allow Plaintiff to question herself to establish prima facie elements and show evidence of pretext during the 2020 hearing.

903.    Plaintiff was not an employee of the federal government at the time of the November 30, 2022, judgment by AJ Maricia Woodham for the EEOC case (No. 570-2017-00832X) related to the current case.

904.    FEMA has been using the legal process to ensure financial and career harm to Plaintiff, as well as to make her work for free for what otherwise would be mandatory paid work for involvement in the EEO process. If Plaintiff did not represent herself and engage in EEO activity, she would suffer even greater serious harm and potential physical restraint.

905. Although Plaintiff was awarded a default judgment in her favor in 2017, Plaintiff was not reimbursed for the costs to fly to Washington, DC from California to attend a multi-day hearing in January 2020, as well as any other costs for the EEO process.

906. The Civil Rights Act of 1964 SEC. 2000e-4 gives witnesses and agents of those witnesses (i.e., attorneys) summoned before the EEOC fees and mileage. Since witnesses Ms. Jordan and Ms. Mazur, as well as FEMA counsel Ms. Williams, were all employees, they should have been paid for their time, and it is possible FEMA also paid its witness Mr. Scott for his time to testify in January 2020. However, only Plaintiff was not reimbursed for her time because FEMA targeted her for discrimination because of her sex, national origin, race, and color. Therefore, the EEOC and FEMA unequally applied the payment for her participation at the EEOC hearing, as well as for other costs and fees incurred in the EEO process, because of her protected activities and her protected bases.

907. Excluding pro se attorneys from seeking attorney's fees is discriminatory and violates the 5th Amendment of the US Constitution (Due Process and Equal Protection through the Due Process clause for the federal government) and the Administrative Procedure Act. A ruling or policy that excludes pro se attorneys from receiving reimbursement for attorneys' fees and costs would discriminatorily apply that policy to exclude attorneys targeted for discrimination because of their protected class or activity. This ruling and policy adversely and indirectly affect members of marginalized protected classes and those who face retaliation who might bring a case of discrimination because those are the people who tend to be targeted for discrimination. In other words, those who are a member of a protected class (e.g., a person of color, Asian, of Taiwanese/Chinese descent, a woman, a person with a disability), the target of discrimination, and who engaged in a protected activity (e.g., filing a complaint) would be excluded from reimbursement.

908. Strict scrutiny applies to this ruling or policy not to reimburse those targeted for discrimination because race, color, and national origin are part of the allegations in this case.

909.    One of the exclusions for being reimbursed for attorney's fees per 29 CFR § 1614.501 is that barred federal employees may not seek attorney's fees. This exclusion is discriminatory and violates the Equal Protection clause of the Constitution.

910.    If Plaintiff is not granted attorneys' fees, FEMA would be able to engage in disparate treatment against Plaintiff without recourse. The effect would be that it would be harder, if not impossible, for Plaintiff to obtain benefits and pay compared to employees who did not file discrimination complaints. Employees who were not targeted for discrimination could receive their pay and benefits without any additional work. However, Plaintiff would be and was subjected to at least 550 hours of additional unpaid work to recover only a portion of the damages she received.

911.    The effect of not granting Plaintiff attorney's fees for her pro se work would be that Plaintiff's effective pay rate would be far lower (perhaps even under minimum wage) than those of her peers who were not targeted for discrimination and did not engage in protected activity by filing a discrimination case due to the all of the unpaid work Plaintiff would be required to incur.

912.    If Plaintiff settled, FEMA would make her give up her rights to engage in protected activity through their nondisclosure and nondisparagement clauses.

913.    Hiring an attorney would not be affordable or practical either. The market rate of an attorney was about 10 times or more than Plaintiff's government rate for her salary, which would make payment more than her annual salary. Plaintiff's job classification did not allow her to qualify to be in a union that might hire a representative for union members, and attorneys are reluctant to file cases against other attorneys.

914.    To ensure equal protection under the Constitution and freedom from interference while engaging in protected activity, federal employers (if not all employers) should offer plaintiffs a free attorney or pay attorneys' fees for their time engaged in the EEO process. Otherwise, effectively, employees would need to accept as a term and condition of employment that discrimination and a hostile work environment would be a normal and accepted part of the job and not file a discrimination complaint. Otherwise, if they engaged in protected activity,

they would need to volunteer significant amounts of their time to receive equal rights or waive part of their rights if they settle. For those injured by the hostile work environment like Plaintiff was, engaging in protected activity pro se would also mean additional injury to them by being retraumatized and triggered in the course of seeing and recalling the harassment repeatedly.

915.    Because AJ Woodham applied a ruling that violated the US Constitution, her ruling not to reimburse Plaintiff for pro se attorneys' fees and other costs incurred during the EEO process violated the Administrative Procedure Act. Since an EEOC regulation is at issue, there is no alternative adequate remedy for challenging the unconstitutionality of the regulation.

916.    A policy of not allowing attorney's fees for attorney pro se complainants would also allow an employer's disparate treatment and unequal pay. If it takes a complainant 500 hours in attorney time to recover back pay, but employees who do not file complaints receive their full pay, then the complainant spent 500 more hours than other employees to receive the same absolute pay and benefits as those employees who did not engage in protected activity.

917.    Not paying pro se attorneys but paying attorneys who did not engage in protected activity against their employer would be retaliatory or exclusionary based on protected activity. It would be an intersectionality issue just as only discriminating against Asian women but not Asian men or other women who were not Asian would still be considered discrimination. In addition, complainants are also more likely to be of a marginalized protected base than the average attorney.

## 36.    THIRTY-SIXTH CLAIM OF RELIEF

### Appeal of EEOC decision

*Administrative Procedure Act (5 USC §§ 551–559), 5th Amendment of the US Constitution (equal protection, due process), 29 CFR § 1614.202, 29 CFR § 1614.109, and 29 CFR § 1614.108(c)(3), 29 CFR § 1620.27*

918.    Refer specifically to procedural history paragraphs # 34 (initiation of EEOC complaint), 41-42 (April 8, 2017, EEOC hearing request and FEMA's failure to respond to EEOC order to produce), 44-45 (EEOC allowed FEMA's untimely submission of evidence of the

merits and charge after a default judgment), and 50 (FEMA untimely submitted evidence in January 2020 hearing).

919.   Before issuing a default judgment, an administrative judge in Washington, DC should examine the allegations (i.e., Plaintiff's allegations submitted with her hearing request as FEMA did not submit a charge) to determine whether Plaintiff has alleged the prima facie elements sufficient for a finding of default judgment. *See Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 100 (D.D.C.2000) (in evaluating a plaintiff's claim for a right of relief in a default judgment case, the court may "accept as true the plaintiff[s'] uncontroverted evidence.")

920.   In violation of due process and equal protection protected by the US Constitution (and therefore a violation of the Administrative Procedure Act), EEOC AJ Woodham allowed a sanctioned party that loses with a default judgment to present information that formed the basis of the sanction, while disadvantaging the non-sanctioned party (Plaintiff).  The EEOC erred in ordering a hearing on the merits (after a default judgment against DHS/FEMA) that required Plaintiff (the non-sanctioned party) to prove pretext without an investigation, discovery mandated by regulation before a hearing, motions for summary judgment, an opportunity for Plaintiff to fully present her case (each prima facie element of each claim and a rebuttal), and other procedural requirements.

921.   Because the EEOC ordered a hearing on the merits, Plaintiff's ability to seek justice was delayed by about 7 years.  Furthermore, the 7-year gap meant FEMA subjected Plaintiff to further discrimination and harassment in the interim that led to a second discrimination case against FEMA, as well as FEMA using the litigation process to harass Plaintiff.  Seven years is an excessive delay in justice, particularly since Plaintiff first started facing harassment related to FEMA 10 years ago.

922.   In AJ Woodham's Decision Entering Judgment (September 30, 2022), she found that Plaintiff met the prima facie elements for a hostile work environment (finding an ineffective complaints mechanism and investigation procedure that prompted the default judgment), FEMA's discriminatory denial of FMLA, and a failure to accommodate.  In a default judgment case, that proof should have been sufficient, and Plaintiff would not need to prove pretext when

then Defendant FEMA should not have been allowed to present an untimely defense, some of the defenses it did present did not meet their burden, and Plaintiff was not provided an opportunity to present a rebuttal to FEMA's defense. Moreover, AJ Woodham erred in finding that an adverse action is required for a failure-to-accommodate claim. Furthermore, a burden-shifting analysis, proof of nexus, or proof that Plaintiff is part of a protected class is also not always required. such as where there is direct evidence of discrimination. medical inquiries, and examinations rules apply to all employees). *See Davis v. Ashcroft*, 355 F. Supp. 2d 330, 338 (D.D.C. 2005); 42 USC § 12112(d)(4).

923. All claims that AJ Woodham ruled against Plaintiff for not proving pretext should be automatically reversed in Plaintiff's favor since the burden does not shift to Plaintiff to prove pretext until after Plaintiff has already made a sufficient prima facie case. Furthermore,

924. On appeal, the EEOC allowed Defendant FEMA/DHS to engage in procedural misconduct again without sanctions as Plaintiff requested on January 10, 2023. The EEOC ordered FEMA/DHS to upload the full record for examination on appeal, which FEMA/DHS did not do. The EEOC did not intervene to sanction FEMA/DHS again and made decisions on May 4, 2023, on appeal and reconsideration on November 13, 2023, without the full record.

925. AJ Woodham wrote that it would be unreasonable to ask for a non-hostile work environment as a reasonable accommodation, which she equated to be a "stress-free" work environment. Plaintiff did not ask for a "stress-free" work environment. An accommodation request cannot be unreasonable nor an undue hardship when a person is requesting an employer to do what is already required by law (a work environment that is free from harassment, a non-hostile work environment). Undue hardship is determined by a financial calculation and fundamental alteration analysis, not a subjective determination of whether a request is reasonable A subjective determination can incorporate the biases against people with disabilities.

926. It is also a violation of equal protection to summarily require all individuals with disabilities or other targets of discrimination to accept harassment and a hostile work environment as a term and condition of employment.

927. If harassment in a workplace has become so severe or pervasive as to cause injury, as is in this case that Plaintiff was caused mental injury with also physical effects due to the abusive nature in the workplace, then an employer is required to fix that hostile workplace regardless of which remedial mechanism applies (a reasonable accommodation, a determination of a hostile work environment, a determination of a violation of policy, etc.).

928. If an employer requires an employee to break the law or violate professional ethics due to that employee's protected class or protected activity, that should automatically meet the bar as severe enough to create a hostile work environment and constructive discharge. Otherwise, the legal standard would be that employees will need to accept breaking the law or violating professional ethics as a term and condition of their employment. That standard would say that breaking the law and violating professional ethics are acceptable. Requiring employers to follow the law and not require their employees to break the law or violate professional ethics is not the same as making a workplace "stress-free."

929. Contrary to the EEOC's position, direct statements based on someone's protected classes or stereotypes of those protected classes, such as a statement about how Chinese people are barbarians because they eat dogs and jokes about how a woman's place is in the kitchen, are textbook examples of discriminatory remarks. Those types of statements raise equal protection issues. AJ Woodham arbitrarily and capriciously claimed that there was no evidence of discrimination and claimed that none of the claims Plaintiff raised were related to discrimination, arbitrarily ignoring direct evidence of discrimination as listed above.

930. AJ Woodham acknowledged that FEMA management testified that they hired Plaintiff to work on administrative matters whereas coworker Mr. Kapoor was hired to work on ADR practice. The fact that AJ Woodham accepted that the FEMA intended to assign work differently based on gender norms should be enough to make a finding of discrimination. On paper, Plaintiff and Mr. Kapoor answered the same job vacancy and had the same official position description for ADR practice. When Mr. Scott and Ms. Jordan interviewed Plaintiff, they not only told her that she would be doing ADR practice but also that she would gain management experience, which would mean she would have greater responsibility than Mr.

Kapoor. The fact that FEMA admitted to assigning work differently only proves Plaintiff's claim of gender discrimination. Even under the Equal Pay Act (and not the Civil Rights Act, which the EEOC declined to apply in this case), pay is based on the same location, not the specific supervisor someone has. Mr. Kapoor and Plaintiff worked in the same location. It is a problematic equal protection issue if AJs can rule that there is nothing discriminatory about employers creating positions or assigning work based on gender and other discriminatory stereotypes.

931.    The EEOC arbitrarily and capriciously picked and chose which equal pay laws to apply when multiple applied and decided not to apply the Civil Rights Act of 1964 in determining an equal pay violation (even upon appeal) and only apply one statute where federal regulation 29 CFR § 1620.27 specifically states that both a Civil Rights Act of 1964 and Equal Pay Act violation may occur simultaneously or where a Civil Rights Act of 1964 violation may not always also be a violation of the Equal Pay Act.

### 37. __THIRTY-SEVENTH CLAIM OF RELIEF__

**Refusal of enforcement bodies to adjudicate all of Plaintiff's claims if Plaintiff filed a discrimination claim**

*Administrative Procedure Act (5 USC §§ 551–559), 5th Amendment of the US Constitution (equal protection, due process), 29 CFR § 1614.202, 29 CFR § 1614.109, and 29 CFR § 1614.108(c)(3), 29 CFR § 1620.27, Civil Rights Act of 1964 (42 USC §§ 2000e et seq., 29 CFR Part 1604 and Part 1606), Rehabilitation Act of 1973 (29 USC § 791, 29 CFR § 1614.203), 29 CFR § 1614.501, 22 USC § 7102(8), FMLA (29 USC §§ 2601 et seq., as amended; 5 USC §§ 6381-6387, 5 CFR Part 630; 29 CFR Part 825)*

932.    The effect of a lack of coordination between federal agencies has had a disparate impact and retaliatory effect on Plaintiff.

933.    The Office of Special Counsel (OSC) refused to address Plaintiff's issues as long as they related to her discrimination claim even when the statutes would be different from that of the EEOC's because OSC claimed that the EEOC would handle all of Plaintiff's claims, even

ones that were not based on discrimination laws, such as the Family and Medical Leave Act and the Whistleblower Protection Act.

934.    During the EEOC process, the EEOC did not address Plaintiff's claims and only addressed the issues from the charge drafted by Defendant related to discrimination statutes.

935.    OSC and the EEOC did not abide by the terms of their "Memorandum of Understanding Between U.S. Office of Special Counsel And Equal Employment Opportunity Commission" to ensure that all of Plaintiff's claims would be adjudicated.

## X.    DEMAND FOR JURY TRIAL

936.    Plaintiff requests a jury for all claims for which a jury is permitted.

## XI.    REQUEST FOR RELIEF

937.    Plaintiff prays that the Court grant such relief as may be appropriate at the time of the decision of relief, which may change.  The current list includes but is not limited to

(i.)    injunctive and protective orders (including but not limited to stay away and no contact orders issued to Robert Scott, Vikram Kapoor, Cynthia Mazur, Erika Jordan, Kirsten Gunsolus, Joel Doolin, Adrian Sevier, Michael Cameron, and those in the FEMA personnel law branch or supervising PLB will never supervise any projects, HR matters, or employment of Plaintiff; appropriate sanctions for FEMA's and specific attorney misconduct; restitution for unjust enrichment for career benefits from the misconduct of harassing parties)

(ii.)    damages (including but not limited to back pay, front pay, compensatory damages for paid expenses and for the cost of repair, owed government benefits, pension, back and front health insurance premiums and out-of-pocket expenses, owed training and bar dues, owed access to benefits/travel costs or equivalent cash, student loan repayment, costs to mitigate and retrain, back and front medical fees, liquidated damages for FMLA, and other damages);

(iii.)    benefits would include but are not limited to student loan discharge (or the equivalent in cash), tax liability from discharge, overcharge payments, additional interest added due to delayed discharge, interest or return on investment due to continued student loan payments, and the cash-equivalent for training and software subscriptions (e.g., to LexisNexis).

(iv.)   equitable relief (including reinstatement to a permanent position at the correct pay level at Plaintiff's choice of agency or employer, lost experience hours, coaching hours, mediation hours, management hours, specific training for named individuals in this complaint and all current government employees who were OCCHCO, OCC, OCSO, OER, or SES employees at FEMA regardless of current employment status with FEMA with oversight and specific penalties for failure to comply, protective order, restorative justice initiative, change in official written policy and practice at FEMA and DHS, penalties for prior refusal to comply, restorative justice, policy change, discipline of appropriate individuals, etc.);

(v.)    monetary, equitable relief, injunction, and/or sanctions for the unjust enrichment coworkers and supervisors received from discriminating, harassing, or retaliating against Plaintiff and/or refusing to stop or prevent discrimination, retaliation, or harassment against Plaintiff;

(vi.)   litigation costs;

(vii.)  reinstatement relocation costs;

(viii.) attorney fees;

(ix.)   adjustments for opportunity costs in the form of interest and/or return on investment on awarded relief;

(x.)    adjustments for inflation;

(xi.)   adjustments for cost-of-living or location;

(xii.)  the difference in any taxes not only for damages but also for potential tax liability due to not being able to contribute the full amount to tax-free growth retirement accounts retroactively;

(xiii.) the ability to choose the amount allocated retroactively into retirement accounts;

(xiv.)  interest for delays by Defendants in paying out and implementing damages

Date: __May 13, 2024__        Sign Name: _____

                              Print Name: __Jennifer Yeh_____

AMENDED COMPLAINT        24-CV-00797 KAW              Page **189** of **190**

CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2024, I filed the foregoing with the Clerk of the Court. Through the service of the summons, this motion will be sent to the Defendants.

Jennifer Yeh

2309 Noriega St. #90

San Francisco, CA 94122

EXHIBIT 1



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Office of Federal Operations
P.O. Box 77960
Washington, DC 20013

Jennifer Yeh a/k/a
Adena D.,[1]
Complainant,

v.

Alejandro N. Mayorkas,
Secretary,
Department of Homeland Security
(Federal Emergency Management Agency),
Agency.

Request No. 2023003573

Appeal No. 2023001109

Hearing No. 570-2017-00832X

Agency No. HS-FEMA-26505-2016

## DECISION ON REQUEST FOR RECONSIDERATION

Complainant requested that the Equal Employment Opportunity Commission (EEOC or Commission) reconsider its decision in Adena D. v. Department of Homeland Security, EEOC Appeal No. 2023001109 (May 4, 2023). EEOC Regulations provide that the Commission may, in its discretion, grant a request to reconsider any previous Commission decision issued pursuant to 29 C.F.R. § 1614.405(a), where the requesting party demonstrates that: (1) the appellate decision involved a clearly erroneous interpretation of material fact or law; or (2) the appellate decision will have a substantial impact on the policies, practices, or operations of the agency. See 29 C.F.R. § 1614.405(c).

At the time of events giving rise to this complaint, Complainant worked as an Alternative Dispute Resolution (ADR) Specialist/Attorney Advisor in the Agency's ADR Division in Washington, D.C.

---

[1] This case has been randomly assigned a pseudonym which will replace Complainant's name when the decision is published to non-parties and the Commission's website.

On June 22, 2016, Complainant filed an EEO complaint alleging that the Agency discriminated against her on the bases of race (Asian), national origin (Chinese/Taiwanese), sex (female), color (non-white), "equal pay," and disability (regarded as mentally disabled), and in reprisal for prior protected EEO activity when:

1. For an unspecified period, the Deputy Director, who was Complainant's immediate supervisor at the time, failed to act in response to allegations that Complainant was harassed by a male Coworker and informed Complainant that the Coworker was "merely teasing or bullying" her.
2. Since December 2015, Complainant was subjected to ongoing harassment. In support of this claim, Complainant alleged the following incidents:

   a. On December 14, 2015, the Deputy Director admonished Complainant for making a hypothetical statement in front of her coworkers about a hate crime, discrimination, and workplace violence.
   b. On December 20, 2015, in a meeting as a member of the drafting committee for the 2016 division performance goals, Complainant raised concerns to the Deputy Director about the Coworker yelling at her.
   c. On January 8, 2016, the Deputy Director gave Complainant an Emotional Intelligence assignment for stating that she was concerned about her safety in the new open workspace.
   d. On January 13, 2016, in an email entitled, "Improving your communication skills," the Deputy Director wrote that Complainant was becoming increasingly argumentative and disrespectful to him and everyone in the office.
   e. On January 28, 2016, the Deputy Director told Complainant that she did not perform in a legally sufficient manner because she refused to write a legal opinion that would violate anti-discrimination laws.
   f. On January 29, 2016, the Deputy Director gave Complainant a two-minute deadline to sign her annual performance review.
   g. On multiple occasions in February and March 2016, the Director did not act to stop discrimination and retaliation until the Deputy Chief Counsel told the Deputy Director and Director that they could not censor Complainant's speech.
   h. On March 18, 2016, Complainant reported to the Deputy Chief Counsel that the retaliation was continuing.
   i. On March 22, 2016, the Deputy Director said in an "agitated manner" that Complainant sent him hate mail and implied that she needed to visit the nurse's office. The Deputy Director stood close to Complainant and appeared to be visibly physically upset.
   j. On March 28, 2016, Complainant received a negative quarterly performance review from the Deputy Director of not meeting achieved expectations.
   k. On March 29, 2016, the Director stated that Complainant's requests to stop retaliation would be denied by her supervisors, and that either the Deputy Director or a new supervisor would be her first-line supervisor.

    l. On April 4, 2016, Complainant was informed that she would have a new supervisor, which she considered a demotion because the Supervisor was below her old supervisor (the Deputy Director) in the office's chain of command.

    m. On April 11, 2016, the Supervisor assigned Complainant to make a 30-day plan that no one else had to do.

    n. On April 17, 2016, the Supervisor assigned Complainant, through the Deputy Director, to write a legal memorandum by Wednesday or Thursday morning. The Supervisor also assigned Complainant other tasks with a 24-hour turnaround.

    o. On May 2, 2016, in alleged reprisal for sending out the ideas to the "TRSG Project," the Supervisor told Complainant to give her a daily plan of her work, rather than write a 30-day plan.

    p. On May 6, 2016, the Supervisor told Complainant to stop writing emails that were disrespectful.

3. On May 10, 2016, Complainant learned that she was not selected for a detail.

4. On May 20, 2016, the Supervisor denied Complainant's Family and Medical Leave Act (FMLA) request and said that Complainant would need to provide the FMLA certification form before it could be approved.

5. The Agency refused to reassign and accommodate Complainant for a position three times, and it exceeded the 60-day requirement for a reassignment search, and it refused to engage in the interactive process in good faith.

After 180 days had elapsed, the Agency informed Complainant that it had not completed the investigation and notified her that she had a right to request to a hearing before an EEOC Administrative Judge (AJ). Complainant requested a hearing. The initial AJ (AJ1) ordered the Agency to produce the complaint file and report of investigation within 15 days. AJ1 informed the Agency that failure to produce the documentation or provide written justification to show good cause would result in appropriate sanctions.

After the Agency failed to produce the complaint file, the second AJ (AJ2), issued an order entering default judgment. A hearing was later held to determine liability and entitlement to relief. The AJ determined that Complainant failed to establish a prima facie case of discrimination regarding her allegations of disparate treatment and unequal pay in violation of the Equal Pay Act; that the Agency provided legitimate nondiscriminatory reasons for its actions; that the Agency engaged in a good faith interactive process in response to Complainant's reasonable accommodation request; and that the incidents alleged did not amount to more than general workplace disputes and tribulations. Nevertheless, AJ2 determined that Complainant was entitled to nominal damages because of the Agency's failure to timely investigate her complaint and awarded her $10,000.00. AJ2 also ordered training regarding the Agency's obligations to timely investigate and comply with orders; and to post a notice regarding the decision. The Agency subsequently issued a final order implementing AJ2's decision.

Complainant appealed and submitted a brief that was more than 260 pages and uploaded approximately 1,500 pages of documents in support of her appeal. Complainant requested additional sanctions against the Agency. Complainant also argued that AJ2 erred in not ordering a supplemental investigation; opening discovery; or allowing motions for summary judgment, and in refusing to accommodate Complainant's post-traumatic stress disorder (PTSD) during the hearing. Complainant further asserted that AJ2 erred in analyzing the merits of her claims. Complainant requested additional remedies and an increase in the award for non-pecuniary compensatory damages. The Agency opposed Complainant's appeal and emphasized that it had fully complied with the AJ's remedial relief order.

In EEOC Appeal No. 2023001109 (May 4, 2023), we issued a detailed decision fully addressing Complainant's appellate arguments, including her request to add new claims. Our prior decision also addressed Complainant's arguments regarding AJ2's credibility determinations, her request for sanctions, and her concerns about the hearing and entitlement to relief. We ultimately concurred with the AJ2's award of $10,000.00 in nonpecuniary compensatory damages and affirmed the Agency's final order adopting AJ2's decision.

In requesting reconsideration, Complainant submits a 66-page brief for our consideration, including attachments totaling hundreds of pages. She largely reiterates the same arguments that were previously considered and addressed in detail in our prior decision. We emphasize that a request for reconsideration is not a second appeal to the Commission. Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110) (Aug. 5, 2015), at 9-18; see, e.g., Lopez v. Dep't of Agric., EEOC Request No. 0520070736 (Aug. 20, 2007). Rather, a reconsideration request is an opportunity to demonstrate that the appellate decision involved a clearly erroneous interpretation of material fact or law, or will have a substantial impact on the policies, practices, or operations of the Agency. Complainant has not done so here.

After reviewing the previous decision and the entire record, we find that the request fails to meet the criteria of 29 C.F.R. § 1614.405(c), and it is our decision to deny the request. The decision in EEOC Appeal No. 2023001109 remains our decision. There is no further right of administrative appeal.

## COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (P0610)

This decision of the Commission is final, and there is no further right of administrative appeal from the Commission's decision. You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision. If you file a civil action, you must name as the defendant in the complaint the person who is the official Agency head or department head, identifying that person by his or her full name and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or "department" means the national organization, and not the local office, facility or department in which you work.

5                                                    2023003573

## RIGHT TO REQUEST COUNSEL (Z0815)

If you want to file a civil action but cannot pay the fees, costs, or security to do so, you may request permission from the court to proceed with the civil action without paying these fees or costs. Similarly, if you cannot afford an attorney to represent you in the civil action, you may request the court to appoint an attorney for you. **You must submit the requests for waiver of court costs or appointment of an attorney directly to the court, not the Commission.** The court has the sole discretion to grant or deny these types of requests. Such requests do not alter the time limits for filing a civil action (please read the paragraph titled Complainant's Right to File a Civil Action for the specific time limits).

FOR THE COMMISSION:

Carlton M. Hadden, Director
Office of Federal Operations

November 13, 2023
Date