1  Jennifer Yeh

2  2309 Noriega St. # 90

3  San Francisco, CA 94122

4  (415) 800-3250

5  j02082024@gmail.com

6  Pro Se *Plaintiff*

7

8  **UNITED STATES DISTRICT COURT**

9  **NORTHERN DISTRICT OF CALIFORNIA**

10  *Oakland*

11

12                                    )

13                                    )  Case Number: 24-CV-00797 KAW

14                                    )

15  JENNIFER YEH                      )  SECOND AMENDED COMPLAINT

16                                    )  (DISCRIMINATION & FMLA CASE)

17          Plaintiff(s),             )

18                                    )

19      vs.                           )  DEMAND FOR JURY TRIAL

20                                    )

21  UNITED STATES OF AMERICA, KRISTI  )

22  NOEM, Secretary of the US Department of )

23  Homeland Security, DEPARTMENT OF  )

24  HOMELAND SECURITY, KAREN          )

25  EVANS, (Acting) Administrator of the )

26  Federal Emergency Management Agency, )

27  FEDERAL EMERGENCY MANAGEMENT )

28  AGENCY, ROBERT F. KENNEDY JR.,    )

1  Secretary of the US Department of Health and )
2  Human Services, and UNKNOWN                )
3  CONTRACTORS.                                )
4                                              )
5          Defendant(s).

---

## I. INTRODUCTION

1.    Plaintiff Jennifer Yeh is an Asian American woman of Chinese/Taiwanese descent recruited by the Federal Emergency Management Agency (FEMA), a component of the US Department of Homeland Security (DHS), in 2014 to serve as an Alternative Dispute Resolution (ADR) Attorney Advisor in the ADR Division of the Office of Chief Counsel (OCC).

2.    Rather than performing the ADR practice and management work for which she was recruited, Plaintiff was marginalized and subjected to a sustained pattern of discrimination, harassment, retaliation, and stereotyping based on sex, race, national origin, and disability. Examining the totality of circumstances, Defendants' discriminatory and retaliatory conduct was pervasive, escalating, and systemic (not isolated or accidental) with a minimum of 100 incidents that have dragged on over a decade. Defendants engaged in blatantly discriminatory and retaliatory conduct, such as jokes about a woman's place being in the kitchen and then making only women (but not men) bake for the office, commenting that Chinese people are barbarians because they eat dogs, and telling her to stop reporting or documenting discrimination.

3.    After Plaintiff's protected activity, Defendants responded with escalating adverse actions and at least 33 categories of tangible employment actions that sometimes happened multiple times a day, such as including physically threatening conduct (that ultimately disabled her), retroactive extensions in employment, restrictions in her bathroom usage, requiring harasser permission to report discrimination, censorship, transfers, work without pay or while on leave, conditioning access to benefits and pay on cessation of protected activity, blacklisting, banning her from all federal buildings, crushing workloads with tight deadlines especially near complaint deadlines, unlawful investigations without due process, intrusive medical examinations of every

bodily system and inquiries under criminal threat, and wrongful termination.

4.  These actions occurred within a broader pattern of institutional failure at FEMA (as documented by the DHS Inspector General (IG) and a FEMA-commissioned RAND study of a widespread culture of discrimination and retaliation) and persisted despite EEOC rulings for Plaintiff. Defendants had a broken complaints system where it was difficult to prevail. Conflicts of interest pervaded, such as where named harassers handled cases against themselves.

5.  Management refused to prevent, stop, or correct the misconduct and enforce anti-harassment policies against the named harassers. They instead protected or rewarded harassers, participated in harassment themselves, and recruited at least 40 others (across divisions, offices, and event departments) to mob Plaintiff.

## II.  JURISDICTION

6.  This court has subject-matter jurisdiction and a private right of action under 28 U.S.C. § 1346 (a defendant is the US government), 28 U.S.C. § 1331 (federal question), 42 U.S.C. § 2000e-16 (Civil Rights Act of 1964), 29 U.S.C. § 791 and 794 (Rehabilitation Act of 1973), 29 U.S.C. § 2617(a) (FMLA).

7.  This Court has personal jurisdiction over Defendants because the United States of America (USA) operates throughout California and the Northern District of California, and Plaintiff resides in this district.

8.  The Court may grant declaratory, equitable, and relief per 28 U.S.C. §§ 2201 and 2202 (declarative relief), 42 U.S.C. § 2000e-5 (Title VII relief), 42 U.S.C. § 1981a (damages), 42 U.S.C. § 12188(b)(2) (civil penalties), 29 U.S.C. § 2617 (FMLA remedies), 28 U.S.C. § 2674 (FTCA damages) and 42 U.S.C. § 2000e-5(k) (attorneys' fees).

## III. VENUE

9.  The venue is appropriate for this court per 28 U.S.C. § 1391(b) and (e) and 28 U.S.C. § 1346(b) because the USA is a Defendant, and Plaintiff resides in this district.

## IV. INTRADISTRICT ASSIGNMENT

10. This lawsuit should be assigned to San Francisco because the Plaintiff is a resident of San Francisco per Civil L.R. 3-2(c) and (d).

1

## V. PARTIES

2        11.    Plaintiff Jennifer Yeh has been a resident of San Francisco, California throughout

3  the applicable period. She was a dual resident of Arlington, Virginia between 2014 and 2019.

4        12.    Defendant United States of America (USA), representing the federal government

5  and its agencies, including HHS and Plaintiff's former employer FEMA/DHS, serves California

6  residents and operates offices and employs personnel nationwide, including in California.

7        13.    Defendant Kristi Noem is being sued in her official capacity as DHS Secretary.

8        14.    Defendant DHS, which is a department of the USA and includes FEMA and FPS,

9  employed Plaintiff through its component FEMA, and has offices in California, employs

10  California residents, and serves California residents.

11        15.    Defendant Karen Evans is being sued in her official capacity as the Acting FEMA

12  Administrator.

13        16.    Defendant FEMA, which is a DHS component where Plaintiff worked, has offices

14  in California and employs and services California residents.

15        17.    Defendant Robert F. Kennedy is being sued in his official capacity as the HHS

16  Secretary. HHS is a department of the USA and includes FOH, which was contracted by

17  Plaintiff's employer to conduct and evaluate the need for medical examinations.

18        18.    Unknown Contractors are individuals, companies, or other contracting entities

19  who were contracted to evaluate, provide, or assist in the provision of fitness for duty for

20  Plaintiff (e.g., Dr. Present, Jayrsee Saha, Stephanie Williams, and their employers or companies).

21  ## VI. BASES OF DISCRIMINATION CLAIMS

22        19.    Defendants discriminated against Plaintiff based on Plaintiff's

23  • Sex/gender: Female

24  • National origin: Chinese/Taiwanese

25  • Race: (East) Asian, not Caucasian

26  • Color: not white, the color of East Asians

27  • Disability: actual Post-Traumatic Stress Disorder (PTSD), adjustment disorder, allergies,

28        and a history of cancer; regarded as (but not actual) mental disabilities (often linked to

gender stereotypes, such as being emotional, paranoid, or crazy).

20.    <u>Protected activities</u>: Defendants engaged in retaliation and retaliatory harassment because Plaintiff participated in a variety of types of protected activities as follows: participation, opposition, and requesting reasonable accommodations.

## VII.    PROTECTED ACTIVITIES

21.    Since September 2014, Plaintiff engaged in over 80 acts of protected activities.

### Opposition to discrimination

22.    Plaintiff repeatedly opposed discrimination based on sex/gender, race, national origin, and disability, as well as retaliation, starting in September 2014.

23.    Plaintiff directly objected to the conduct of those who discriminated against or retaliated against her. For example, she objected to coworker Vikram Kapoor's gender-based work assignments and sexual advances and racist and sexist comments (September 2014-March 2019), confronted colleague Inga Watkins about racist remarks characterizing Chinese people as "barbarians" (2015), and raised safety concerns at a division meeting about not wanting to sit next to her harasser (January 8, 2016).

24.    After reporting a concern about a violation of the Rehabilitation Act, Plaintiff refused to help violate the Rehabilitation Act in October-November 2015 as ordered.

25.    Throughout Plaintiff's employment, starting around September 2014, Plaintiff reported discrimination to coworkers in positions of authority to stop such discrimination, such as team leads, workgroups designed to discuss and eliminate discrimination, and the managers of harassing individuals outside of Plaintiff's chain of command.

### Reports to management

26.    From around March 2015 to March 2019, Plaintiff repeatedly reported retaliation and discrimination through her chain of command: to supervisor Mr. Scott (2015 and 2016), Ms. Mazur (December 2015 through October 2016 after Mr. Scott failed to act), Ms. Jordan (April through October 2016), and Joel Doolin (beginning March 21, 2016).

27.    After transferring in October 2016, she continued reporting violations to her first-line supervisor through Chief Counsel Adrian Sevier.

**Reports to internal oversight offices and personnel**

28.     Starting on January 11, 2016, Plaintiff directly reported ongoing discrimination and unsafe working conditions to various individuals at FEMA's Office of Equal Rights (OER) and Human Resources (OCCHCO) about harassing coworkers and supervisors and their conduct, including their own violations of anti-harassment policies and anti-discrimination laws.

29.     On December 8, 2016, she filed a complaint with FEMA's Administrative Investigations Division (AID), which includes members of OCC, OER, OCCHCO, and OCSO.

30.     When seeing discrimination in the EEO or litigation process starting in March 2016 and continuing, Plaintiff raised it to the appropriate authority or counsel. For example, on July 24, 2021, Plaintiff notified FEMA counsel Melissa Williams and Ashley Darbo of material misrepresentations in FEMA's EEOC filings and offered an opportunity to correct the record; Ms. Williams neither responded nor corrected the statements.

**EEO complaints to OER and the EEOC**

31.     On March 21, 2016, Plaintiff filed her first informal EEO complaint (FEMA Case #HS-FEMA-26505-2016), which became formal on June 22, 2016. After FEMA failed to investigate within the statutory period, she requested an EEOC hearing on April 8, 2017 (EEOC Case #570-2017-00832X). She received her right-to-sue letter on November 13, 2023.

32.     She filed a second EEO complaint on August 18, 2018 (FEMA Case #HS-FEMA-02652-2018), requested a hearing before the EEOC on July 2, 2019 (EEOC Case #570-2019-01375X), and filed an appeal on July 5, 2022, which remains pending before the EEOC.

**Reports to external oversight bodies**

33.     Plaintiff filed a whistleblower retaliation complaint with the DHS Inspector General (IG) on July 25, 2018, with updates on August 8, 2018, December 1, 2021, and March 14, 2022. The IG declined to investigate on August 21, 2018.

34.     On March 26, 2022, Plaintiff filed a complaint with OSC, which closed her case on August 31, 2022, citing her EEO matters despite some claims falling outside the EEOC's purview.

**Reports to security offices**

35.     On March 22, 2016, and July 20, 2018, Plaintiff reported workplace violence and harassment to FEMA building security, the Federal Protective Service (FPS), and the Fraud and Internal Investigation Division (FIID) of FEMA's Office of Chief Security Officer, providing specific details about physical intimidation and assault by her supervisor and coworker.

**Anti-discrimination advocacy**

36.     Plaintiff participated in FEMA's anti-discrimination initiatives, including facilitating a workgroup to discuss bias (e.g., racism) in ADR practice (~2015), serving on a workgroup addressing promotions and performance review issues (2016), participating in Employee Resource Groups (ERGs), OCC women's forum, and similar group activities, and presenting on eliminating gender and racial bias to her division and OCC leadership (April-September 2018). Her presentations documented the gender pay gap within OCC.

37.     As a member of a reasonable accommodations workgroup in 2018, she identified agency failures to comply with disability laws.

**Requests for reasonable accommodation and exercise of FMLA rights**

38.     In 2016-2018, Plaintiff requested several permanent, alternative, and interim accommodations that would remove the abusive work environment while allowing her to enjoy the workplace, such as by transferring her harassers, reassigning her, issuing no-contact orders, or allowing Plaintiff to receive pay during pending accommodations requests.

39.     Plaintiff requested and took FMLA intermittent and full-time (starting April 13, 2016), supported by medical certification documenting serious health conditions. This period overlaps with the period Ms. Jordan claimed she never interacted with Plaintiff.

40.     Plaintiff went on continuous leave from April 18-24, 2016, and for another five months while she waited for FEMA to accommodate her from May 25 through October 17, 2016 (four months of which, July 4-October 18, were unpaid).

**VIII.    EXHAUSTION OF ADMINISTRATIVE REMEDIES**

41.     Plaintiff timely exhausted all administrative remedies.

42.     She filed an EEO complaint on March 21, 2016, received her Notice of Right to Sue from the EEOC for the case on November 13, 2023, and filed this action within 90 days (on

February 9, 2024). *See* Exhibit 1.

43.    She filed a second EEO complaint on August 18, 2018, and per the EEOC's representation, became entitled to sue 180 days after her EEOC appeal was filed in 2022 per 29 C.F.R. § 1614.407 without receiving a Right to Sue. *See* Exhibit 2.

## IX. FACTS

44.    Plaintiff, an Asian American woman of Chinese/Taiwanese descent, worked as an (ADR) Attorney Advisor (IC/GS-13, starting at Step 1, job classification 0905) in FEMA OCC from July 14, 2014, to March 28, 2019. FEMA complied with the EEOC's order to retroactively reverse Plaintiff's wrongful termination and extend her employment to **October 17, 2020**.

45.    FEMA hired Plaintiff as an excepted service CORE employee, which is a non-competitive position paid out of the disaster relief fund.

46.    Plaintiff's work location was 400 Virginia Avenue until the ADR office moved to 500 C Street (the same building as the rest of OCC) on or around **February 19, 2016**. Plaintiff's approved telework locations included Arlington, VA and San Francisco, CA, and she had a work schedule of 8:30-5 PM, Monday through Friday.

47.    Before joining FEMA, Plaintiff was educated at top universities with a Juris Doctor, two Bachelor of Science degrees, and a background in conflict resolution, human rights (including anti-discrimination and the psychology of bias), healthcare, and humanitarian relief.

### Shifting definitions of essential functions

48.    As part of Plaintiff's FMLA requests in 2016, FEMA claimed that Plaintiff's essential job functions were to be able to work in an office setting with the ability to telework at home and conduct work by phone or a computer.

49.    However, for performance evaluation purposes, FEMA asserted that the Plaintiff's essential duties were stereotyped duties defined by management (e.g., secretarial, administrative, or technical tasks), rather than the duties established in her official job description.

### Those with supervisory control over Plaintiff

50.    During Plaintiff's employment, the following individuals had supervisory authority, agency proxies, agency representatives, and agency alter egos:

- **OCC leadership**: Adrian Sevier was the FEMA OCC Chief Counsel throughout Plaintiff's employment, and Mr. Doolin primarily as the Deputy Chief Counsel with Michael Cameron as the Deputy Chief Counsel at the tail ends.

- **ADR Division leadership**: Plaintiff's first-line supervisors in the ADR Division included Robert Scott (Deputy Director) (July 2014-April 2016) and Erika Jordan (Mr. Scott's subordinate) (April-October 2016). Plaintiff's supervisory chain continued through ADR Director Cynthia Mazur and the Deputy Chief Counsel to Chief Counsel Sevier.

- **Response and Recovery Legal Division (RRLD)**: After Plaintiff's transfer to RRLD in October 2016, her supervisors included Jotham Allen, Chad Clifford, Mary Ellen Martinet, along with other acting supervisors, reporting through OCC leadership to Mr. Sevier.

- **Other agency proxies, representatives, and individuals with supervisory authority**: In addition to Plaintiff's direct supervisory chain, the following types of individuals and groups had authority to advise on, recommend, approve, or implement personnel actions affecting Plaintiff: Human Resources personnel (e.g., Corey Coleman, Kirsten Gunsolus, Robyn Jackson, Juan Porter, Catherine Clark, and Kim Farley); OER personnel (e.g., Willisa Donald, Jo Linda Johnson, Sandra Maddox-Britt); Personnel Law Branch attorneys and supervisors overseeing EEO matters (e.g., Melissa Williams, Ashley Darbo, Leigh Hoburg, Daniel Hall, and Joshua Stanton); FOH staff and/or contractors (e.g., Dr. Presant, Jayrsee Saha, and Stephanie Williams); and security personnel (e.g., Mr. Arnone).

51.     From July 2014 to March 2019, none of the above-named in Plaintiff's chain of command (particularly first- or second-line supervisors) were investigators as defined by DHS/FEMA policy.

**Management's failure to protect, correct, and prevent and a culture of discrimination, harassment, and retaliation**

52.     Independent investigations corroborate systemic discrimination at FEMA. In 2018, only after a direct report to the FEMA Administrator but not through other reporting mechanisms, an investigation found HR Director Mr. Coleman of OCCHCO to have created an agencywide "toxic" workplace environment marked by "deeply disturbing" sexual harassment

and retaliation claims (as the FEMA Administrator characterized). OCC leadership's response was tepid, delayed, and dismissive of women of color despite orders by the DHS Secretary and FEMA Administrator to create safe reporting channels and to condemn discrimination swiftly.

53.     The DHS IG and RAND Corporation corroborated FEMA's systemic EEO failures (e.g., finding FEMA failing to properly address hundreds of sexual harassment cases between 2012 and 2018) with surveys results showing about 30% of employees report gender bias, racial bias, or retaliation, identifying many of the same entities listed in this case as being biased and facilitating or perpetrating bias at even higher rates of discrimination and retaliation.

54.     Government statistics show a low retention rate of Asian attorneys at FEMA of less than 75% the length of service of white attorneys.

55.     Asian women were virtually absent from senior FEMA and OCC leadership, particularly East Asians and those with Asian surnames or not married to white individuals.

56.     FEMA knowingly hired and retained employees with documented discriminatory conduct. For example, FEMA hired Mr. Kapoor despite his sexist joke during his interview, and Mr. Scott later acknowledged both Mr. Kapoor's flawed background check and his history of difficulty working with women. Ms. Mazur also stated that another woman had previously reported Mr. Scott for discrimination, yet FEMA continued to employ him.

57.     Defendants perpetrated over 100 acts of discrimination, retaliation, or harassment over the past 12 years, of which only some are outlined in this complaint due to space limits.

58.     FEMA management admitted to serious misconduct (e.g., Mr. Kapoor tripped Plaintiff intentionally and gave Plaintiff a gift that HR acknowledged was inappropriate and had dangerous implications; Mr. Allen characterized Mr. Scott's behavior toward Plaintiff as assault; and Mr. Sevier acknowledged promotions were based on sports preferences rather than merit).

59.     Despite regular, repeated notice over the years across several offices and layers of management in those offices (e.g., the Chief Counsel, OER Director, OCCHCO), Defendants refused to stop, prevent, or correct (promptly and effectively) harassment that they knew or should have known about, or often even to look into allegations, leaving Plaintiff unprotected.

60.     Ms. Mazur testified that they imposed no progressive discipline or corrective

1  training on perpetrators and that transferring harassing managers (even temporarily) per anti-
2  harassment policy would be against organizational culture and make the agency look bad.

3        61.    Instead of stopping harassment, managers gave perpetrators awards or promoted
4  them, became perpetrators themselves, imposing tangible employment actions to coerce Plaintiff
5  into submission or silence, and recruiting at least 40 people across departments and offices to
6  mob, isolate, and publicly humiliate her. Simultaneously, management unjustly blamed Plaintiff
7  (dismissed, told her to recant, and apologize for her allegations) and gave her the runaround.

8        62.    For example, internal emails show that, even after FEMA lost Plaintiff's EEOC
9  case, Mr. Doolin urged personnel lawyers on August 18, 2017 to "keep pressing" with their
10  "excellent start," and those lawyers later sought to humiliate and sabotage Plaintiff's work and
11  speech, culminating in HR's Ms. Gunsolus congratulating personnel law's Ms. Williams by
12  email for finally carrying out their long-term plan to get rid of Plaintiff.

13  **A defective complaints system**

14        63.    Defendants maintained structurally defective EEO and anti-harassment systems
15  that perpetuated and worsened the hostile environment, including the following as examples: (1)
16  routing discrimination complaints to offices and individuals with conflicts of interest (including
17  allowing alleged harassers, their subordinates, or those in their chain of command to investigate,
18  process, or advise on complaints against themselves); (2) systematically deflecting responsibility
19  across offices with no neutral decisionmaker addressing the full scope of complaints; (3) refusing
20  to investigate harassers even after repeated reports and findings of widespread discriminatory
21  harassment; (4) failing to enforce Defendants' own anti-harassment policies and EEO standards
22  (e.g., requiring separation or transfer of harassers from complainants or reporting harassment by
23  GS-15s and above) and do so in an impartial manner (instead of treating white individuals and
24  men, especially white men, more favorably than Plaintiff and exempting them from
25  accountability, even when they engaged in conduct antithetical to their professional roles); (5)
26  rejecting the idea that EEO mediators needed to be neutral; (6) using incorrect data in EEO
27  reports; and (vii) refusing to enforce ordered remedies (e.g., for specific training for EEO
28  violations to the people who perpetrated the violations).

64.    FEMA refused to investigate or report the harassment as required, which led to a default judgment by the EEOC in 2017. For example, to date (approximately 10 years after Plaintiff first filed an EEO complaint), FEMA has not investigated or provided a report of investigation for her EEO claims for 2014-2016, including Mr. Scott's assault.

65.    In 2018, FIID's Mr. Arnone claimed that he would not investigate any matter before 2017 against Plaintiff's harassers with a pending EEO complaint.

66.    FEMA destroyed or withheld key evidence (including videos and records) after preservation and FOIA/Privacy Act requests (delaying responses by years) and misfiled and omitted EEO documents, including refusing to submit the complete record as the EEOC ordered.

**Examples of tangible employment actions (which are also adverse actions)**

67.    Those with supervisory authority over Plaintiff inflicted at least 33 categories of tangible employment actions (often perpetrated more than once), which include but are not limited to the following examples:

- Related to her job status and career progression (termination, transfer, demotion, hiring): (1) wrongful termination (March 2019); (2) constructive discharge; (3) 4 retroactive employment extensions (around July to November 2016), creating job and benefits insecurity (e.g., effectively eliminated access to health insurance); (4) eliminating contract renewal in July 2016 from a 2-year contract to much shorter increments without a contract of about a month; (5) recission of job offers (failure to hire); (6) blacklisting (interfering with future work environments), leading to rescission of job offers, a failure to hire, and decreased income potential; (7) refusal to promote to another position; (8) official reassignment to a non-equivalent position with a substantially changed, less desirable job description (October 2016); (9) demotion and forced supervisory changes with a change in job description; (10) failing to onboard her to positions (including a permanent one);

- Pay: (11) continuous leave-without-pay status for approximately 4 months; (12) demands for work without pay (including changing what she could bill for) and other ways to reduce her effective pay rate; (13) denial of premium pay (e.g., overtime); (14) reduced

compensation or unpaid work; (15) delays in pay or other forms of compensation;

- <u>Benefits</u>: (16) removing eligibility or access to benefits (e.g., VLTP, pension); (17) denial of and interference with leave and benefits (e.g., access to legal database, usage of leave); (18) removal of her ability to elect retirement contribution amounts; (19) refusal to convert her CORE position to career-conditional or permanent despite eligibility (affecting federal reemployment rights); (20) making her request leave for non-work hours (e.g., after hours);

- <u>Work responsibilities</u>: (21) changing her job description from that advertised, including to work in line with stereotypes; (22) removal of work assignments and professional development opportunities; (23) changing the types of her assignments and her workload (e.g., assigning 30-day and daily work plans, assigning 100 hours of work to be completed in 40 hours or less, reduction in duties, making her work in topics outside her training and role); (24) removing or failure to select or assign promotion-potential work (e.g., detail, leadership positions, ADR practice, coaching, work for high performance appraisals on performance goals, those needed to complete performance goals); (25) removal of existing work assignments and access to social interactions unless Plaintiff engaged in emotional labor and completed a retaliatory assignment, submitted to psychological questions and treatment (as well as revealed such medical information to management), and apologized for her protected activity (January 2016);

- <u>Work conditions</u>: (26) interfering with her access to the bathroom and breaks; (27) reduced and negative performance evaluations (including without a proper evaluation period), which in turn reduced pay and promotion eligibility (2016); (28) restriction of federal building access; (29) removing access to a functioning EEO process (e.g., impartial investigation, a neutral mediator); (30) assignments to hardship locations; (31) interfering with her access to telework; (32) making her be on-call 24/7 while on unpaid medical leave; (33) making her give up her Constitutional rights (e.g., speech, petition the government, equal protection, due process, talk about the right to self-defense);

- <u>Other quid pro quo</u>: (34) coercion to submit to harassment via carried out threats or

conditioning continued employment on submission to unwelcome acts; (35) making Plaintiff choose between being available to participate in the EEO process or her career.

**Adverse actions common to all disparate treatment and retaliation claims**

68.     Defendants subjected Plaintiff to the following adverse actions: (1) instances of physical intimidation and assault; (2) unequal pay; (3) imposing invasive, unnecessary demands for medical examination and inquiries and inquiries unrelated to job functions (including EKG, reproductive system exams, gardening habits); (4) launching an unjustified security investigation against Plaintiff without reading her rights to her; (5) censorship; (6) selective enforcement of policies; dissuading her from seeking promotion (including by adding barriers to promotion and telling her about standards that did not apply to others); (7) request for unnecessary access to providers; coercing release of her entire medical history under threat of termination and criminal charges; orders to sign overly broad medical releases; (8) orders to reveal medical information to many people (e.g., coworkers, managers, contractors); (9) threats of negative and reduced performance evaluations; discussion of or threats of termination of employment; (10) damage to her professional reputation and career prospects; (11) refusal to transfer her harassers, ensure her security, and other denial of accommodations; (12) blacklisting; (13) disparaging remarks in personnel and background check files; (14) imposing on her discriminatory performance goals; (15) elimination of training; (16) denial of and disparate access to training, career-enhancing work, and professional development; (17) exclusion from the workplace; (18) denial and disparate access to promotion and job opportunities (e.g., refused to fix the equal pay issue, refusing to place her into equivalent positions at the level (e.g., GS-14 and above) they already assigned or expected of her); (19) conditioning performance ratings and assignments on submitting to mandatory psychological treatment, revealing information about her mental state, and completing discriminatory assignments that made her responsible for emotional labor (January 2016 and thereafter); (20) disparate access to leave; (21) punishment (e.g., isolation, building access restriction, censorship of sharing experts' recommendations; prohibition on self-defense training or talking about it; and removal of work assignments that culminated in termination) for following and talking about medical and other advice of experts and reporting

harassment in July 2018 (July 2018-March 2019); (22) imposing corrective emotional labor and therapy-related demands soon after her complaints; and (23) work sabotage.

### Biased labels and discriminatory remarks

69.     Coworkers, managers, and contractors made explicit remarks based on disability, race, gender, national origin, and color, such as jokes that women belong in the kitchen, calling Chinese people barbarians for eating dogs, stating to those with mental disabilities as not having real needs, asking Plaintiff for her real name with a racial explanation when not satisfied that Jennifer could be her real name, referring to only a white man with a JD but not Plaintiff (an Asian woman) with a JD as doctor, treating her as untrustworthy after she revealed her Chinese ethnicity, labeling Asian and African but not Western food as smelly, and mentioning white people (Virginians) did not associate with "those" people (referring to people of color).

70.     Despite sharing the same job title, coworker Mr. Kapoor referred to her work as her baby, yelled at her, expressed his expectation that Plaintiff be his assistant, said it was her job to do admin work, remarked on how male supervisors should be able to call female subordinates babes, and dismissed efforts to include minorities (Asians), saying they should just try harder.

71.     Starting around 2015 and continuing through the litigation process, supervisors and coworkers applied biased labels to Plaintiff based on race, gender, and disability, such as aggressive, dramatic, not a team player, nasty, paranoid, and irrational, particularly as retaliation. For example, Mr. Scott responded to her reporting and opposition to discrimination by referring to her protected activity as emotional, argumentative, disrespectful, misplaced, and defamatory, and showed she was so-called sick, behaving badly, not emotionally intelligent (referring to prescriptive stereotypes regarding emotional labor), and not collaborative (for having her own opinions instead of being submissive). Management treated Plaintiff's protected opposition as violating prescriptive stereotypes of how they believed an East Asian woman should act.

72.     Defendants used these words against Plaintiff despite contrary evidence, regarding her as delusional and paranoid even though a clinical psychologist with over 50 years of experience stated otherwise, and organizations, like the IG, EEOC, and RAND corporation, corroborated widespread harassment and/or a dysfunctional EEO system.

73.    After protected activity, supervisors and HR treated Plaintiff's discrimination reports as mental disability (2015-), claiming she had an "active imagination" and was creating people who do not exist (referring to the existence of harassers), then ordered her to undergo therapy multiple times in 2016, apologize to harassers, recant allegations, admit and identify her thinking errors, reveal psychometric test results, and submit to invasive fitness-for-duty examinations of every bodily system under threat of criminal prosecution (e.g., in 2018-2019), conditions not imposed on similarly situated attorneys.

**Code words for retaliation**

74.    ADR management used the terms disrespectful (for speaking up), lacking in time management (for spending time on EEO activities), giving "blow back" (for refusing to obey or opposing illegal or unethical orders or assignments), and other similar words, as a recurring label for Plaintiff's protected opposition and as a way to punish her for violating proscriptive stereotypes (East Asian women needing to be submissive) and justify negative appraisals.

75.    For example, on **January 20, 2016**, management wanted to eliminate a position in the cadre (i.e., Plaintiff's position) due to a perceived lack of respect, after Mr. Scott had used the same concept of disrespect to describe Plaintiff's allegations of discrimination and her opposition to it. On **May 6, 2016**, Ms. Jordan labeled as disrespectful Plaintiff opposing retaliation, reporting discrimination, and hoping retaliation would not interfere with her work.

76.    Ms. Jordan labeled the use of any time Plaintiff spent on bathroom breaks during the workday, her EEO complaint, career-enhancing tasks, or protected opposition (as opposed to gender-stereotyped administrative tasks) as excessive and lacking time management skills.

77.    Manager Ms. Mazur testified she allowed negative reviews because of Plaintiff's alleged blowback or refusal to perform tasks she reported as discriminatory/unethical. Others outside of her race, national origin, color, or gender did not face such punishment for complaints about non-EEO matters and were even granted leadership titles for complaining.

**Unwanted sexual advances (starting around October 17, 2014)**

78.    Beginning around October 2014, coworker Mr. Kapoor made unwanted advances, such as asking her to be his plus one, repeatedly (despite her declinations) asking her to enter

Plaintiff's home, and saying he was profiling her, accompanied by intrusive, detailed questions.

79.    Even after Plaintiff complained and Mr. Kapoor was deployed elsewhere or while she was on medical leave in 2016 (which his harassment partly prompted), he continued to stalk and contact her. He paternalistically reassigned himself as her coaching partner without consent to sabotage her career and assert his dominance over her, gave her diamond earrings (which HR acknowledged as an inappropriate romantic gift with dangerous implications), and sent her invitations to her personal and work emails (e.g., June 11, 18, and 23, 2016).

80.    After she transferred to a different division in violation of anti-harassment norms, he continued to be able to approach her and go to the same meetings. Management minimized the conduct using a cost-not-nature rationale (how much the gifts cost) rather than addressing the sexualized nature and coercive context.

### Pay disparity: amount, pay rate, and unpaid labor

81.    Plaintiff's base salary, access to premium pay, and effective pay rate (e.g., higher workload at the same or lower salary, unpaid leave, denial of access to high-paying positions) were lower than those outside of her race, gender/sex, national origin, color, disabilities, and their intersectionality within the ADR Division, OCC, and FEMA.

82.    From July 2014 on, Plaintiff was forced to perform substantially more work for equal, less, or no compensation compared to colleagues outside her protected classes at the same work location, especially after she reported and opposed discrimination, and requested FMLA leave and accommodations. This created a discriminatory de facto pay disparity through workload manipulation and unpaid labor. She also had to volunteer her time, resources, and legal expertise (even after work hours, resulting in discriminatory unpaid overtime) to perform work, ensure equal treatment in the office, or provide other benefits to the workplace while others (e.g., white managers) did not have to work for free or received such services for free.

83.    Plaintiff's effective pay rate drastically decreased in 2016 after she reported up and out when her supervisors substantially increased her workload (as a means of harassment and an attempt to force her to quit or be fired) while maintaining the same salary or eliminating it (making her engage in unpaid work even while on leave) to force her out of a job.

84.     In 2016, management barred Plaintiff from being paid for her time related to reasonable accommodations, HR tasks, and EEO time, whereas FEMA/DHS paid those outside of her protected classes for their time. Defendants paid employees who supported their case and did not file or oppose discrimination complaints (generally individuals outside Plaintiff's protected classes) for time spent on matters related to Plaintiff's complaints.

**Double standards: stereotyped office labor**

85.     FEMA hired her to practice ADR and assume management responsibilities (which Mr. Scott testified as taking over part of his job as a GS-15), but relegated her to administrative support and technical work while steering her away from promised leadership and ADR practice experience, in deviation from the vacancy announcement, the official job description, and pre-hire representations, particularly after she complained about discrimination (violating stereotypes and norms as an East Asian woman of color of Chinese/Taiwanese descent).

86.     The discriminatory remarks above were often associated with correlated actions. For example, in addition to ADR members making jokes about a woman's place being in the kitchen, from 2014–2016, ADR management voluntold women, especially women of color, but not men, to bring elaborate homemade baked goods by special request (sometimes twice weekly) at their own expense. Women (particularly women of color) who resisted or did not submit to the will of white or male colleagues or managers (even about the social events) were punished socially and professionally, such as when Ms. Bissell called Plaintiff not being a team player for claiming no elaborate baked good was needed for her birthday and difficult providing an alternative of bringing an easier dessert that Ms. Bissell had made for others before be made if a homemade dessert were required. Mr. Doolin was known to use the term open kimono and then ordered Plaintiff to undergo a series of medical exams requiring states of undress.

87.     White colleagues and men received leadership opportunities and career-building details leading to promotions, even when they had a smaller workload, were less effective, slower, and made more mistakes than others outside those protected classes. FEMA routinely groomed white men for higher positions through details but refused Plaintiff (and others of her protected classes) similar opportunities, perpetuating pay and assignment disparities.

SECOND AMENDED COMPLAINT          24-CV-00797 KAW          Page **18** of 68

88.    Management relayed to Plaintiff and selectively applied shadow performance and promotion criteria (different from official standards) not applied to those outside of her protected classes, dissuading her from applying to promotions and challenging explanations for performance scores despite meeting official criteria.

89.    While Plaintiff sat without pay for four months in 2016, FEMA simultaneously hired a white woman to an identical IC-13 RRLD RPD branch position, then misrepresented experience levels, crediting the white hire as so-called more experienced for an extra two months in the RPD branch but downplaying the years at FEMA more than the white hire. Simultaneously, a white man in the same branch was treated as more experienced for having a longer tenure at FEMA but a shorter time than Plaintiff in RPD.

90.    Instead of asking administrative assistants to take notes, FEMA assigned Plaintiff (but not so-called important white men) notetaking duties. For example, after she transferred to RRLD, initiated her EEO complaint, and Chief Counsel Mr. Sevier was made aware of her allegations, manager Mr. Doolin singled her out for criticism about her notetaking, while two white notetakers who performed the criticized task identically were not criticized.

91.    ADR management exempted men from administrative work or placed them in supervisory positions to supervise the administrative work of the women in the office. For example, when men did administrative work (after Plaintiff reported gender discrimination by Mr. Kapoor), Ms. Mazur and Mr. Scott gave them kid gloves with step-by-step instructions, less work, no deadlines or longer timelines, and/or an assistant (i.e., making Plaintiff assist Mr. Kapoor) to complete the tasks but did not treat women as such.

92.    In **April-May 2016**, Ms. Jordan unjustly exempted white employees (e.g., Ms. Asaro, Mr. Scott) from criticism, falsely accused Plaintiff of perpetrating acts white employees took, differentially assigned blame in joint actions, and unequally reduced performance scores.

93.    Coworkers and management systematically steered Plaintiff away from career-enhancing assignments toward stereotyped roles. For example, between **February 22 and 25, 2016**, Mr. Scott blocked her from joining a TRSG subgroup on performance and promotions (related to her discrimination claims) and pushed her toward work-life balance (childcare)

committees. He repeatedly told her she was taking on too many activities when she pursued discrimination-related subgroups, but raised no objections to cleaning and childcare committees, even when she offered to substitute her participation in other projects.

94.    Dr. Presant deferred to the medical or psychological assessments of unlicensed FEMA personnel based on whether they agreed with Plaintiff's discrimination allegations rather than making an independent clinical judgment.

95.    Plaintiff and others in the same protected categories were subjected to harsher punishment than those of a different race, color, sex/gender, and national origin, particularly after speaking up against discriminatory or unethical actions. For example, on **April 23, 2015**, Mr. Scott called Plaintiff argumentative after she objected to orders from Mr. Scott and Ms. Jordan instructing staff to falsify documents and refused to assist or even appear to assist in the misconduct. Mr. Scott and Ms. Jordan retaliated against another woman of color who had voiced similar objections. Later in 2016, especially after Plaintiff reached out to OER and OCCHCO to complain, management started to set her up to fail and falsely claim she had performance issues. When she made a report to a high-level OCC woman (of a different race) in leadership in **2018**, this woman admonished her for making waves and told her to ask her own people.

### Anti-discrimination advocacy

96.    Various men in OCC (including members of Plaintiff's chain of command and at least one personnel lawyer) made comments about how eliminating bias was not valuable or was a waste of time. They tried to stop the meeting of the OCC women's forum, stop her from leading a group on eliminating isms in ADR practice (e.g., November 2015), stop her in 2018 from giving presentations on the elimination of bias against women (including racialized gender bias), interfere with her attendance record and thus performance for a workgroup if she attended in 2018, stop her from joining TRSG subgroups to eliminate bias, and other such actions.

97.    On **November 18, 2015**, Mr. Scott threatened to discuss Plaintiff's role (i.e., her job status) after she relayed Mr. Scott's opinions about the ADR isms group.

98.    Between **July 10-12, 2018**, Mr. Doolin cancelled Plaintiff's presentation on the elimination of bias against women attorneys, where he claimed the presentation (topic) was not

valuable. Mr. Doolin was reported to have similarly tried to stop other women within OCC from

organizing to share their experiences (potentially of discrimination).

99.    In 2018, OCC (particularly the workgroup's leadership) sabotaged Plaintiff's

efforts to expose failures in the accommodation process and shielded FEMA from accountability

by manipulating minutes and findings of a subgroup of a workgroup to conceal dissent and

findings of potential gaps. Group leaders treated white participants and non-complainants more

favorably than Plaintiff, even for the same comments, and despite the ability to attend both

groups, tried to restrict members from attending a meeting on eliminating bias against women.

**Censorship**

100.    Supervisors waged a sustained campaign to obstruct Plaintiff's ability to report,

document, or discuss discrimination from **at least October 2015 and continuing** through the

EEO process, turning EEO activity into punishable offenses, refusing to pay for EEO time

(allowed to others), and imposing heightened work demands on Plaintiff, especially near EEO

deadlines (including while she was on leave) to silence her.

101.    ADR supervisors repeatedly admonished Plaintiff for leaving any record of

harassment. For example, Mr. Scott explicitly instructed her not to forward harassing emails

because he did not want a record (**October 30, 2015**) and directed her not to document EEO

issues (**March 21, 2016**). On **February 16, 2016**, Mr. Scott prohibited her from documenting

her achievements that would rebut his negative performance evaluations.

102.    Within an hour of when Plaintiff documented continued harassment and

retaliation, Ms. Jordan instructed Plaintiff on **April 28** not to use email on related issues and

attempted to stop her from documenting discrimination (on **April 29, May 6, and May 11**).

103.    ADR management (particularly Mr. Scott and Ms. Jordan) reprimanded Plaintiff

repeatedly for reporting discrimination. For example, Mr. Scott told her that she was talking to

too many people, referring to her reports of discrimination (e.g., to HR, managers, OER).

104.    After Plaintiff contacted EEO/HR (**January-March 2016**), Mr. Scott emailed, "I

specifically directed you not to speak with others in the office about this issue," and the next day

physically trapped her in her cubicle while ordering her to stop documenting discrimination.

105.    From **May 6 to September 2016**, Ms. Jordan admonished Plaintiff and required her to obtain pre-approval from a harasser to report the harasser.

106.    Starting around **December 2015**, management imposed censorship policies that barred the use of discrimination-related terms, made it a performance violation for Plaintiff to oppose discrimination after she questioned the incorporation of discriminatory standards into performance goals, refused to make Plaintiff available to respond to the EEOC while deployed, and restricted her EEO time to only OER meetings that did not involve drafting claims while refusing to provide time or resources for Plaintiff or someone else to draft claims.

107.    After Plaintiff asked in March 2016 for ADR management to clarify censorship rules in writing, they imposed broad bans on "potentially critical, conflictual, judgmental, or emotional" discussions (March 16), emails about EEO matters (March 17), creation of records containing EEO/HR terms (March 18), and negative speech about others (March 21), but enforced these rules primarily to suppress Plaintiff's protected reporting while white managers faced no repercussions when violating the policy for non-EEO issues.

108.    FEMA further attempted to silence Plaintiff through NDAs tied both to her EEO litigation and to a spurious FIID security investigation against her, using confidentiality in effect as a tool of retaliation rather than legitimate settlement practice, and not threatening to impose consequences on others who did not oppose or report EEO activity against her employer.

109.    For instance, in 2018, FIID's Mr. Arnone asserted that an NDA demanded that she sign would bar her EEO-related speech about events predating the FIID investigation and interview, a position his FIID counterpart Mr. Stupar conceded was impermissible.

110.    On **January 14, 2020**, FEMA conditioned EEO settlement on an unprecedented gag order prohibiting Plaintiff (but not others who had not filed complaints) from discussing discrimination even when required by future employers, state bar authorities, investigators, or legal processes where disclosure was mandatory, coercing misconduct and perjury, and to date, FEMA counsel has refused to entertain any settlement negotiations without such a gag order.

### Physical escalation (2014-2016)

111.    After Plaintiff reported, documented, or opposed discrimination, the harassment

escalated to physical violence by supervisors and coworkers alike, such as tripping Plaintiff, trapping her in her cubicle, assaulting her with the intent to choke her, and requiring invasive mental and physical exams of every bodily system by individuals with dubious qualifications.

112.     Mr. Kapoor intentionally tripped Plaintiff (which Mr. Doolin agreed was intentional) under circumstances suggesting premeditation. He fully extended his file cabinet drawer (which sat between their desks) multiple feet for hours yet never used it. He also had an odd reaction after she tripped.

113.     On **January 12, 2016** (~5-6 PM), as he trapped Plaintiff in her cubicle, Mr. Scott slammed his hand down angrily while ordering her to stop documenting discrimination.

114.     On **March 22, 2016** (the day after Plaintiff filed an EEO complaint), Mr. Scott cornered her twice while enraged and made a choking gesture near her throat while ordering her to stop alleging discrimination and threatening her employment. At the EEOC hearing, Mr. Scott later offered fabricated accounts of the day, which (if true) would have required x-ray vision or time travel. Subsequent supervisor Mr. Allen referred to Mr. Scott's actions as an assault.

**Retaliation and backlash for violating biased stereotypes.**

115.     In **January 14, 2016**, after Plaintiff spoke to OER's Mr. Goudy about process to file an discrimination complaint, manager Ms. Mazur asked Plaintiff whether rumors that she was planning to file a discrimination complaint were true, which was a threat and an indication that the OER office leaked the details of a confidential conversation with an OER official and the potential that questions about whether said office in processing EEO complaints impartially.

116.     **In April 2016**, Ms. Jordan changed the scope of Plaintiff's position to eliminate ADR work (e.g., April 26) and restricted Plaintiff's access to related training (on April 11). Ms. Jordan adopted Mr. Scott's assessment of Plaintiff's performance and job in her own evaluation.

117.     When Plaintiff spoke out against the discriminatory behaviors, management in the ADR Division victim-blamed Plaintiff for and tried to make her conform to stereotypes, such as by further changing her job description into non-career-enhancing secretarial and other stereotyped duties, making Plaintiff assist Mr. Kapoor after she complained about his harassment, assigning her to dead-end committees (e.g., related to housework and childcare),

denying her training, and steered away from career-enhancing assignments to increase her performance scores (involving increased pay) and more in line with her original job description.

118.    Supervisors subjected Plaintiff to extreme surveillance and micromanagement not imposed on white or male employees, including monitoring her location, demanding access to locked personal belongings, requiring pre-approval before reporting discrimination, and criticizing her bathroom usage as excessive time management failures.

119.    Particularly, after Plaintiff filed her first EEO complaint in March 2016, ADR management drastically increased her workload (such as giving her over 100 hours of work per week with only 40 hours of pay), imposed arbitrarily short deadlines, and tried to sabotage her assignments, such as withholding vital information or requiring her to mind-read.

120.    ADR management ordered her to complete work with fewer resources in a fraction of the time compared to others, such as requiring Plaintiff to independently recreate in hours legal research, analysis, and a memorandum on a topic that took a team of lawyers (whose full-time job was that area of law) months to complete.

121.    For example, on April 7, 2016, Ms. Jordan and Mr. Scott sabotaged an assignment by withholding key information (e.g., access codes) until close to the deadline, forcing Plaintiff to complete a report requiring 2,910 data points (hand counted), 25 worksheets, and 37 graphs within 2-3 hours, which Mr. Scott completed in weeks with a smaller scope of work. Ms. Jordan stated that if Plaintiff needed more time, she would be required to work for free.

122.    Starting April 11, 2016, Ms. Jordan assigned only Plaintiff to complete detailed monthly (then daily) work plans that anticipated and outlined every minute of her work day, which were more time-intensive than the workforce analysis the division had to conduct for human resources, which could be based on actual prior work done.  Ms. Jordan gave conflicting directives that both required her to plan for breaks yet called such breaks (including to use the bathroom) excessive when Plaintiff put in a standard 30-minute lunch and two 15-minute breaks.

123.    Ms. Mazur claimed later that no breaks were required at work, even with a 100-hour estimated work week.

124.    No one else in ADR (those outside of her race or national origin) was required to

1    perform such work plans, had their bathroom breaks monitored, or punished for taking breaks.

2        125.    Consistent with a broader pattern targeting women of color for retaliation, OCC

3    management subjected Plaintiff (particularly after she engaged in protected activity) to

4    discriminatory profiling, micromanagement, heightened scrutiny, and pretextual criticism, such

5    as by surveilling her movements and work, attempting to access her personal belongings, and

6    forcing her to create detailed minute-by-minute work plans (including anticipating bathroom

7    usage, break times, and future assignments), treatment not imposed on men or white employees.

8        126.    Examples of pretextual criticism include Ms. Jordan's claim around **April-May**

9    **2016** that headings not written in complete sentences were unprofessional, and Mr. Doolin's

10    singling her out for notetaking criticism in **2018**. This campaign also included Mr. Scott's

11    contradictory criticism between **January 24–25, 2016**, when he faulted Plaintiff for responding

12    to an urgent Sunday disaster-related request from coworker Nathelia Davenport by acting

13    without his prior approval while simultaneously insisting she should make independent task

14    decisions despite his failure to respond when notified.

15        127.    Defendants (especially ADR management) blacklisted and disparaged Plaintiff,

16    resulting in rescinded job offers, withdrawn references, and negative perceptions of her even on

17    or before her first day at new positions.

18            **Poison pill choices, lose-lose situations, and forced submission**

19        128.    Supervisors repeatedly placed Plaintiff in facially voluntary but actually coercive

20    Sophie's choice situations where every option perpetuated abuse, then blamed her for refusing

21    the agency's so-called offer. Examples include the following:

22        129.    On **January 8, 2016**, at an office move meeting, management subjected seating to

23    popular vote with no restrictions on where harasser Mr. Kapoor could sit, rejected proposals by

24    Plaintiff for private resolution or management-assigned seating, admonished her for not agreeing

25    to sit next to her harasser, characterizing her refusal as a lack of emotional intelligence and

26    holding her entirely responsible for others' emotions. Mr. Scott claimed that she had to choose

27    one of the seating options (which "did not depend on anything past, present, or future"), even if it

28    meant she would need to sit next to a harasser who resorted to violence toward her. Others

1   outside of Plaintiff's protected classes and those who had not engaged in protected opposition

2   were not subjected to subsequent retaliatory assignments or made to apologize to Plaintiff.

3   130.   In **April 2016**, management forced Plaintiff to so-called choose between having

4   Mr. Scott (who assaulted her) as a first-line supervisor or a second-line supervisor or between

5   April-October 2016, choose between staying in the abusive environment (including under the

6   supervision of harassers) or transferring with costs to her career, pay, EEO case, and hardship

7   locations with barriers to answering tribunal requests.

8   **Downgraded performance reviews and threats to performance**

9   131.   FEMA management threatened Plaintiff's performance several times for and after

10   her protected activity and carried out that threat in the form of reduced and negative performance

11   appraisals in 2016. For example, Mr. Scott threatened her performance score in December 2015

12   if she told Mr. Kapoor to stop harassing her and on January 12, 2016, called her not solution

13   oriented (a performance category) for suggesting Mr. Kapoor undergo harassment training.

14   132.   Plaintiff's performance trajectory shifted after protected activity, including a

15   downgraded annual review around January 28-29, 2016 (~18 days after EEO contact) and a

16   negative first-quarter review (days after she initiated the informal complaints process with OER),

17   despite prior satisfactory performance and a 2015 bonus.

18   133.   For the 2015 annual performance review, Mr. Scott revised Plaintiff's

19   performance scores downward, immediately following her EEO-related complaints and using

20   words he referred to her protected activity (e.g., lack of customer service for telling a harasser,

21   whom Mr. Scott considered her customer, to stop harassing her). He effectively denied her any

22   opportunity for rebuttal by providing her with only minutes to sign the evaluation and making

23   arbitrary score changes after the performance discussion.

24   134.   For the first-quarter 2016 evaluation, Mr. Scott refused to allow Plaintiff a chance

25   to submit accomplishments, cited tasks such as web design duties not included in her job

26   description, and referenced her opposition to discrimination as a factor in the negative review.

27   135.   Ms. Jordan violated agency policy requiring an adequate appraisal period when

28   she gave Plaintiff a negative second-quarter 2016 performance appraisal without a performance

discussion with Plaintiff, given that Plaintiff was on protected medical leave for most of the quarter, and for using time on protected leave as a basis for not performing.

136.   On **July 25, 2018**, after learning that Plaintiff reported harassment to security, Mr. Allen threatened her performance related to a workgroup when she revealed critical information about the agency's handling of reasonable accommodations, despite having satisfactory performance on the morning of July 20, 2018, before he found out about the report to FPS.

**Accommodation requests and interactive process failure**

137.   Plaintiff requested reasonable accommodations starting around March 2016, such as (1) transfer of harassers per FEMA/DHS policy to eliminate the abusive environment (requested March 18, 28, July 19, and August 1, 2016); (2) reassign Plaintiff to a different position as alternative accommodation because FEMA refused to transfer harassers (Dr. Oaklander recommended May 21, 2016; Plaintiff submitted documentation May 31, 2016); (3) restrict of harassers' contact with Plaintiff at RRLD starting June 1, 2018; and (4) provide Plaintiff with security for her protection (an alternative accommodation).

138.   Plaintiff requested positions that could accommodate all her disabilities, not just one aspect, and to be informed beforehand whether new positions could provide such accommodations, rather than arrive at a position that would not accommodate her needs upon arrival, but FEMA refused.

139.   FEMA refused all accommodations except to reassign her. Even then, it was delayed several months (in violation of policy) and was ineffective, as the agency did not fully remove her from the abusive environment and denied the need for continuous accommodations.

140.   FEMA also refused to provide interim accommodations with modified duty that could accommodate her needs, access to paid leave as an accommodation, concurrent use of leave (paid leave, leave as an accommodation, and FMLA leave) to maintain income and job protection during recovery; and not exposing Plaintiff to abuse (allowing her to take uninterrupted leave for recovery) after her accommodations requests.

141.   Between 2016-2019, rather than promptly and meaningfully engaging in the interactive process, FEMA delayed responses, imposed shifting or inconsistent essential

functions definitions, demanded repeated or unnecessary documentation or information (e.g., medication usage or direct contact with Plaintiff's provider despite already having adequate medical certification), allowed the process to stall for months while Plaintiff remained without effective accommodations and was driven onto extended leave without pay, provided incorrect contact information for Plaintiff's reasonable accommodation and FMLA requests, and urged her to seek disability retirement (June 2, 2016) in lieu of accommodations or a medical termination (to deny Plaintiff of unemployment benefits). OER's Ms. Maddox-Britt also walked out mid-meeting rather than discuss accommodations.

142.    On **September 27, 2016, at 3:30 PM,** OER's Mr. Goudy asked Plaintiff whether she was going to withdraw her EEO complaint if she was accommodated (reassigned).

**Interference with leave and benefits**

143.    Starting **February 2016**, Mr. Scott dissuaded Plaintiff from using sick leave or telework (e.g., admonishing her for following up on an unanswered sick leave request, and only responding 15 minutes before her shift after trying to call 1.5 hours before her shift), causing her illness to worsen from deep bronchitis (nearly pneumonia) to recurrent bronchitis.

144.    While Plaintiff sought medical/FMLA leave supported by certification tying her serious health condition to workplace harassment, supervisors assigned work during leave and threatened AWOL-type consequences, and the Department of Labor later confirmed that a supervisor's **May 20, 2016**, certification demand was unlawful.

145.    FEMA management interrupted Plaintiff's medical leave at least six times between **June and September 2016**, assigning work, requiring email responses, requiring her to be on-call 24/7 and available in the area (could not travel), and contacting her unnecessarily, especially after hours under short deadlines, near EEO deadlines, and during medical treatment.

146.    Management used threats to coerce responses while she was on protected medical leave, including threatening to revoke previously approved leave, mark her AWOL, or decline accommodations, resulting in termination. They prohibited the advance approval of leave for treatment and required responses during medical appointments (threatening to mark Plaintiff as AWOL or deny accommodations).

147.    In the days immediately before the formal EEO complaints deadline in 2016, management assigned work that could be completed after her return or by others, with deadlines at the close of business the day before and by 8 AM on the complaint deadline morning.

148.    In 2016, FEMA repeatedly interfered with and retaliated against Plaintiff's use of FMLA leave, such as by dissuading her from using it, pressuring her to use other leave types, refusing to allow concurrent use of PTO or accommodations with FMLA leave (which prevented access to leave donations), delaying and denying eligible FMLA requests (including threatening to do so retroactively as on June 21, 2016), demanding premature certification for urgent leave, disclosing sensitive medical information on unsecured email in violation of policy, requiring responses during medical appointments or lose leave protection, directing Plaintiff to work while sick or on leave, and rating her performance negatively for using leave.

**Reporting harassment to security leads to a retaliatory security investigation, invasive exams and requests, fabricated allegations, and other harm**

149.    After Plaintiff reported harassment to security on July 20, 2018, and asked about building rules regarding pepper spray (without bringing any to work), Plaintiff's management and FIID (but not FPS and building security) treated Plaintiff as a so-called threat without basis.

150.    Contrary to management's claim, FPS and building security confirmed Plaintiff posed no threat when reporting as a victim or asking questions. FPS warned that pressing the panic button might not prompt a response for hours and advised her to file a restraining order. FIID's Mr. Arnone confirmed that the ban from federal buildings and medical exams were management decisions, not one based on security necessity.

151.    On **July 20, 2018**, Mr. Allen, Mr. Doolin, and members of OCCHCO and personnel law placed Plaintiff (not the alleged harassers) on indefinite mandatory telework, effectively banished her from federal buildings without advance permission from Mr. Allen for her movements during and outside of work hours (isolating her from the workplace), and twice ordered Plaintiff to complete invasive full-body physical and mental examinations (on August 3 and September 20, 2018), which included demanding a broad medical release, related to report to FPS on July 20 and her reasonable accommodations.

152.    FEMA FIID launched an investigation against Plaintiff without reading her rights, required her to sign an overly broad NDA, and made a false report to the IG. Mr. Arnone later recanted, effectively admitting under oath that the claims against Plaintiff had been fabricated. He acknowledged that Plaintiff was not a threat and that she had merely asked a question about the building rules. He explained that he called her "confused" because he himself was confused, alleging that he could not follow her non-chronological presentation of her allegations yet also understood enough to determine who should or should not investigate each claim.

153.    Despite having received a medical certification from a licensed psychologist who has been licensed since 1974 of Plaintiff's fitness for duty and no threat perceived by security, FEMA ordered (on **September 20, 2018**), a second even more intrusive fitness for duty based on their denial of her EEO claims, comprising of a series of physical and mental examinations and inquiries including but not limited to genital/rectal exams and information and a sweeping complete medical history under threat of criminal punishment. For the first fitness-for-duty exam, FEMA required her to undergo and reveal the results of a full psychological assessment, revealing her cancer history. FEMA has maintained that if she is to return to work at FEMA, the second order has remained in effect (albeit the EEOC ruled for a narrower yet undefined scope).

**Wrongful termination and termination attempts**

154.    Management made several threats to Plaintiff's job, such as after her protected opposition in relation to her participation and protected opposition related to the ADR -isms groups (e.g., in November 2015), after she raised concerns about discriminatory performance goals (in December 2015), after she expressed concerns about sitting next to her harasser Mr. Kapoor (in January 8, 2016), after she talked to OER about initiating the EEO process (on January 11, 2016), and in a meeting where she and Mr. Scott discussed issues related to her EEO allegations (January 12, 2016).

155.    Management tried to carry out its threats through constructive discharge and termination attempts between 2016 and 2018.

156.    While Plaintiff was on protected leave, internal emails titled "RE: Termination notice" (May 17–18, 2016) discussed planning her termination, and other emails amongst senior

management, personnel lawyers, and OCCHCO congratulating themselves on her termination or their concerted efforts against her, supporting an inference of pretext and retaliatory motive.

157.    Working conditions became so intolerable that a reasonable person would feel compelled to resign, amounting to constructive discharge, such as the following three instances. (1) Within a week of filing her OER complaint in March 2016, management demoted Plaintiff and offered only a forced choice between her assaulting supervisor as her first or second-line supervisor. (2) FEMA refused to transfer or discipline harassers and after months without pay while keeping her under the same discriminatory management chain, forced her to accept a transfer in hardship locations out of the ADR Division to non-equivalent positions. (3) In 2018-2019, FEMA created intolerable conditions such that she took a detail in another office through refusal to accommodate and ensure her safety, mobbing, compelled medical examinations, building access restrictions, retaliatory investigations without required warnings, and effectively isolating her by removing job duties until her wrongful termination in March 2019.

158.    Despite claiming it was voluntary, FEMA terminated Plaintiff effective March 28, 2019 (just before the vesting of her pension), based on refusal of a second fitness-for-duty exam that Plaintiff contends was procedurally improper, after she sought the required explanation of consequences and reported there was no valid appointment during the shutdown. The EEOC found the exam was not truly voluntary and ordered the reversal of the wrongful termination.

159.    On January 3, 2019, Plaintiff notified management that the offer was improper and requested the consequences of declining, a regulatory prerequisite for mandatory examinations. FEMA never responded. On January 6, 2019, Plaintiff notified them she would not attend the January 7 appointment because FEMA failed to respond, and consultant Saha confirmed HUD/FOH was closed during the government shutdown with no appointment scheduled. FEMA terminated her anyway.

## X.  CLAIMS

160.    <u>For all claims</u>, the following are incorporated by reference into all claims:

- The preceding Sections I through X above are incorporated by reference into claims as if fully set forth herein.

- At all relevant times, as a direct and proximate result of Defendants' conduct, Plaintiff suffered termination, lost wages and benefits, damage to her professional reputation, severe emotional distress, and other compensable harm.

- All US government Defendants are covered entities under the Rehabilitation Act of 1973 and the Civil Rights Act of 1964. Any claim listing FEMA and its employees includes DHS and USA (as well as the FEMA Administrator and DHS Secretary), as FEMA is part of DHS and USA.

- Each separate act is a separate count for claims for the following issues: disparate treatment, retaliation, interference, disparate impact, failure to accommodate, improper medical inquiries, constructive discharge, and quid pro quo harassment.

### (1)    FIRST CLAIM OF RELIEF

**Disparate treatment based on race, national origin, gender/sex, and/or color** (Against the USA, DHS Secretary, FEMA Administrator, HHS Secretary, and Unknown Contractors) *Civil Rights Act of 1964 (*42 U.S.C. §§ 2000e et seq., its amendments, and related regulations*)*

161.    Plaintiff is an Asian American woman of color of Chinese/Taiwanese descent and a member of protected classes under the Civil Rights Act based on sex/gender, race, color, national origin, and intersectionality thereof.

162.    At all relevant times, she was qualified for her position and performed her duties satisfactorily.

163.    Beginning in or about July 2014 and continuing throughout her employment, Defendants knew about Plaintiff's protected characteristics under the Civil Rights Act and intentionally discriminated against Plaintiff because of those characteristics by subjecting her to materially adverse terms and conditions of employment and treating her less favorably than similarly situated employees outside her protected classes.

164.    Defendants' discriminatory conduct (adverse actions) included, among other things: (1) ignoring Plaintiff's job description and assigning her gendered, racial, and stereotyped tasks inconsistent with her role; (2) imposing unequal standards, scrutiny, and discipline (including selective enforcement of policies); (3) subjecting her to unwanted sexual advances

and gendered conduct (e.g., Mr. Kapoor's paternalistic, unilateral decision to change Plaintiff's coaching partner to himself during a coaching demo) that resulted in retaliatory assignments and tangible employment actions; (4) denying equal pay, overtime, benefits, and professional opportunities; and (5) subjecting her to various sexist, racist, and stereotyped language.

165.    When Plaintiff refused to conform to discriminatory stereotypes or acted outside of expected norms based on gender, race, and other protected characteristics, Defendants escalated the discrimination by subjecting her to harsher treatment than similarly situated employees outside her protected classes, including intimidation, verbal abuse, censorship, increased workloads, and further adverse employment actions. For example, Plaintiff's complaints themselves were treated as violating prescriptive stereotypes of submissiveness as an East Asian woman of color of Chinese/Taiwanese descent.

166.    As a result of Defendants' discriminatory treatment, Plaintiff suffered multiple additional adverse employment actions, including but not limited to the actions listed in ¶¶ 67-68 above (such as termination and unwarranted medical exams) and the following: (1) reduced compensation or unpaid work; and (2) false reports against another woman of color and Plaintiff.

167.    After Plaintiff was forced out of her position, she was replaced by those who were not of her race, color, and national origin, some of whom were given supervisory titles.

### (2)    SECOND CLAIM OF RELIEF

**Disparate treatment based on actual, record of, and regarded as having disabilities** (Against the USA, DHS Secretary, FEMA Administrator, HHS Secretary, and Unknown Contractors) *Rehabilitation Act of 1973 (29 U.S.C. §§ 791 & 794,* its amendments, and *29 C.F.R. § 1614.203)*

168.    Starting in 2016, Defendants (especially FEMA management) intentionally discriminated against Plaintiff based on disability status (actual, historical, and regarded as) by treating her differently based on her disability status from those not so disabled. Defendants also subjected Plaintiff to adverse actions not imposed on non-disabled employees or helped others do so because of her status as a person with a disability.

169.    Plaintiff is a qualified individual with disabilities that substantially limit major life activities and/or bodily functions (including PTSD, adjustment disorder, allergies, and a history

of cancer), such as sleeping, concentrating, normal cellular growth, and breathing, who could perform the essential functions of her attorney position with or without reasonable accommodation. Plaintiff's disability status is supported by medical certification.

170.    Defendants also regarded Plaintiff as having mental disabilities she did not actually have, including through their characterizations (using disability and gender stereotypes, such as emotional or dangerous) of her discrimination complaints as evidence of mental impairment, reinforcing that disability status was in play in personnel decisions. Dr. Oaklander, who has been a licensed clinical psychologist since 1974 (about 52 years), ruled out other psychological diagnoses that Defendants regarded Plaintiff as having but did not have.

171.    Plaintiff performed successfully before the challenged adverse actions. Plaintiff received satisfactory reviews and a bonus in 2015. However, negative evaluations followed after her protected activity and her not meeting Defendants' proscriptive disability-related stereotypes about her. Plaintiff remained capable of performing the job's essential functions with reasonable accommodation and without being subjected to discriminatory standards.

172.    The relevant management officials also knew of Plaintiff's disability (actual, history of, regarded as) and limitations disability before and during the challenged adverse actions (as early as 2014) by their own admission and because they received (or were informed of) Plaintiff's medical certifications and medical-related requests; Mr. Scott ordered her to go to therapy; and the disability-related narrative management circulated about her.

173.    Defendants' contradictory sworn accounts about when they learned of her disability support an inference of pretext rather than lack of knowledge.

174.    These adverse employment actions affected her pay, benefits (including leave), job offers, and promotion potential in ways that others without disabilities did not endure.

175.    Examples of these adverse actions include, but are not limited to, those listed in ¶¶ 67-68 above and included examples such as the following: (1) consideration of the time she spent on disability-related leave for lack of experience or performance; and (2) disparate denial of accommodations based on the type of disability.

176.    Defendant treated Plaintiff differently from similarly situated employees without

disabilities (or not regarded as disabled), particularly Plaintiff's disabilities (actual, record of, or regarded as). Others were not subjected to forced and intrusive physical and mental evaluations, treatment, and inquiries (including full medical histories under threat of criminal prosecution), work assignments framing discrimination complaints as thinking errors that required correction by making Plaintiff reveal mental health information to correct alleged psychological deficits, or termination for declining to undergo so-called voluntary medical examinations that violated government procedures. Adverse actions (e.g., medical exams in 2018-2019) were also based on stereotypes that people with mental disabilities, such as that they are inherently dangerous.

177.    After Plaintiff was forced out of her position, FEMA replaced her with those (some of whom were given supervisory titles) who were not disabled or regarded as having any of the disabilities attributed to Plaintiff.

### (3)    THIRD CLAIM OF RELIEF

**Discriminatory policies and discriminatory application of policy (disparate impact)**

(Against the USA, DHS Secretary, and FEMA Administrator)

*Civil Rights Act of 1964 (42 U.S.C. §§ 2000e et seq.,* its amendments, and related regulations*)*

178.    FEMA and the federal government enforced facially neutral policies that disproportionately harmed employees based on race, sex, national origin, and color, including Asian women and those who opposed discrimination.

179.    These policies included the following examples: (1) ADR Division censorship rules banning discussion or documentation of negative, controversial, or emotional issues and words like workplace violence, discrimination, harassment, EEO, and hate crime, which management selectively enforced only against protected activity; (2) exempting managers named as harassers from FEMA/DHS anti-harassment policies, given the office's demographic makeup, disproportionately shielding supervisors who were white and/or male; (3) mandatory NDAs imposed when employees who reported discrimination or were overly broad to cover EEO-related topics (even prohibiting EEO-speech to the EEOC); (4) coerced medical exams triggered by security or harassment reports, disproportionately imposed on women and people of color who engaged in protected activity; (5) prohibiting attorney's fees for pro se plaintiffs while

providing free legal representation to accused (including substantiated) harassers; (6) prohibiting EEO time while in an unpaid status, which disproportionately impacted those forced to take unpaid protected leave (e.g., FMLA, due to disability or other medical condition, those who faced retaliation) or were wrongfully terminated; and (7) having a facially neutral policy for pay based on steps and merit but that in reality disproportionately impacts plaintiffs (particularly pro se) in discrimination cases and those who are women, people of color, minorities, and those of Chinese/East Asian descent with in the same job classification and years of service.

180.    These policies were not job-related or consistent with business necessity and had no legitimate justification, yet they caused significant adverse employment consequences, such as suppressing complaints, perpetuating harassment, denying promotions and pay, and forcing employees of Plaintiff's protected classes out of the agency.

181.    The attorney's fees and prohibiting EEO time while in an unpaid status policies cause significant adverse effects by discouraging complainants (especially those in protected classes who historically file such complaints) from pursuing lengthy federal discrimination cases, effectively limiting and violating plaintiffs' constitutional rights to petition the government, engage in free speech, due process, and equal protection.

182.    Less discriminatory alternatives existed, including policies that exempt protected speech and EEO activity, prohibit retaliation-based NDAs, enforce anti-harassment rules equally against all employees regardless of title, eliminate restrictions on EEO activity or protected speech; prohibit the unequal restrictions on speech; limit medical examinations to objective job-related criteria, prohibit exams related to agency's perceptions of a plaintiff's discrimination allegations, and reimburse pro se plaintiffs (especially licensed attorneys) or assign paid attorneys to plaintiffs to encourage efficient adjudication while discouraging discrimination consistent with the federal government's stated policy to be a model employer.

**FOURTH CLAIM OF RELIEF**

**Discriminatory policies and discriminatory application of policy (disparate impact)**

(Against the USA, DHS Secretary, and FEMA Administrator)

*Rehabilitation Act of 1973 (29 U.S.C. §§ 791 & 794, its amendments, and 29 C.F.R. 1614.203)*

183.    FEMA and the federal government enforced facially neutral policies that disproportionately harmed employees with disabilities, employees regarded as disabled, and those who opposed disability discrimination or requested reasonable accommodations.

184.    These policies included the following examples: (1) ADR Division censorship rules banning documentation or discussion of negative, controversial, or emotional issues and words like discrimination, harassment, EEO, workplace violence, and hate crime, which management selectively enforced only against protected activity; (2) exempting managers named as harassers from FEMA/DHS anti-harassment policies, given the office's demographic makeup, disproportionately shielding supervisors who did not have a disability; (3) mandatory NDAs imposed when employees who reported discrimination or were overly broad to cover EEO-related topics (such as prohibiting the discussion of EEO allegations before the EEOC); (4) coerced medical examinations triggered by security or harassment reports and medically recommended actions, disproportionately imposed on people with disabilities who engaged in protected activity or followed doctor's advice; (5) prohibiting attorney's fees for pro se plaintiffs (including licensed attorneys proceeding pro se) while providing free legal representation to accused (including substantiated) harassers; and (6) prohibiting EEO time while in an unpaid status, which disproportionately impacted those forced to take unpaid protected leave (e.g., FMLA, due to disability or other medical condition, those who faced retaliation) or were wrongfully terminated; and (7) having a facially neutral policy for pay based on steps and merit but that in reality disproportionately impacts plaintiffs (particularly pro se) in discrimination cases and those who have disabilities with in the same job classification and years of service.

185.    Employees with disabilities (compared to those without) are statistically more likely to file discrimination complaints, request accommodations, and report harassment related to their disability status, making them disproportionately vulnerable to these policies' adverse effects, including suppression of complaints, invasive medical scrutiny, retaliation disguised as medical inquiry, denial of career advancement, and forced resignation or termination.

186.    The attorney's fees and prohibiting EEO time while in an unpaid status policies cause significant adverse effects by discouraging complainants (especially those in protected

classes who historically file such complaints) from pursuing lengthy federal discrimination cases, effectively limiting and violating plaintiffs' constitutional rights to petition the government, engage in free speech, due process, and equal protection.

187.    These policies were not job-related, consistent with business necessity, or supported by legitimate justification, particularly where medical examinations were triggered by protected activity rather than objective safety concerns, and where NDAs and fee prohibitions served no purpose other than to discourage disability discrimination complaints.

188.    Less discriminatory alternatives existed and were readily available, including policies that protect disability-related speech and accommodation requests, enforce anti-harassment rules equally regardless of employee rank, prohibit retaliation-based NDAs, limit medical examinations to narrowly tailored, job-related assessments supported by objective evidence, and provide equal access to legal representation by reimbursing pro se plaintiffs or assigning paid counsel to employees pursuing discrimination claims.

### (5)    FIFTH CLAIM OF RELIEF

**Retaliation** (Against the USA, DHS Secretary, FEMA Administrator, HHS Secretary, and Unknown Contractors)

*Civil Rights Act of 1964 (42 U.S.C. §§ 2000e et seq.,* its amendments, and related regulations)

189.    Beginning in 2014, Plaintiff engaged in protected activities (as described in Section VII above) under the Civil Rights Act of 1964, such as the following: (1) opposing and reporting discrimination based on sex/gender, race, color, and national origin, internally and externally (e.g., coworkers, her chain of command through the Chief Counsel, and various oversight offices), (2) contacting FEMA's EEO office (on January 11, 2016), (3) participating in the EEO process (including initiating the informal complaints process March 21, 2016 and August 18, 2018); and (4) participating in anti-discrimination workgroups and presentations.

190.    Defendants engaged in acts of per se retaliation against Plaintiff, subjected her to retaliation with direct evidence of retaliation, or aided others in doing so, such as the following: (1) starting in 2015, censoring Plaintiff's use of EEO-related speech; (2) prohibiting and limiting protected activity (documenting, reporting, opposing discrimination) (2015-2016); (3) creating

performance goals that punished Plaintiff if she spoke out against discrimination (December 2015-October 2016); (4) limiting EEO time in 2016, (5) conditioning reassignment to a non-hostile work environment and benefits on stopping EEO activity in 2016, (6) blanket exclusion of access to benefits (e.g., leave) due to protected activity; (7) refusing to investigate a security complaint because of her EEO activity (2018-); (8) making or advising about personnel decisions against her and also processing her EEO complaints, even against themselves (2016-); and (9) giving harassers veto power over which discrimination allegations are reported and when.

191.    After Plaintiff engaged in this protected activity and because of these activities, Defendants took materially adverse actions that would deter a reasonable employee from making or supporting a discrimination complaint or assisted others in doing so, including but are not limited to those listed in ¶¶ 67-68 above and included examples such as the following: (1) delaying or refusing to respond to her Privacy Act/FOIA requests regarding EEO-case-related evidence; (2) limiting her time and ability to pursue EEO activity (e.g., transferring her to hardship job locations and assignments that would prohibit her from responding to EEO requests, unreasonable assignments near EEO deadlines while on leave, OER ordering responses during known Christmas leave; and making her but not harassers pay for participation in the EEO process); (2) forcing job and status instability through retroactive extensions in employment, coerced transfers, demotions, change in job descriptions, and constructive discharge; (3) making Plaintiff volunteer extensive time (spanning years) to pursue her EEO complaints (especially when there was staff who could do the work and harassers were compensated and provided legal counsel); (4) false reports against another woman of color and Plaintiff after a report to security about harassment by others; (5) Defendants' evidence destruction, suppression, or manipulation and attempts to do so; (6) delaying pay related to Plaintiff's EEO activity; and (7) making various threats to Plaintiff, such as regarding her employment status and performance.

<b>Nexus between protected activity and adverse actions</b>

192.    Management directly linked adverse actions to Plaintiff's protected activities, such as the following. For example, on January 11, 2016, Mr. Scott emailed Plaintiff, "I specifically directed you not to speak with others in the office about this issue" regarding using

EEO-related words and making harassment allegations; and Ms. Mazur testified in 2020 that she allowed adverse appraisals against Plaintiff to stand because of her "blow back" or "outright refusal" to perform tasks that she had identified as discriminatory or retaliatory.

193.    The causal connection between her protected activity and the adverse actions is further established by close temporal proximity (e.g., escalation of restrictions and discipline following her reports, such as assault the day after filing an OER complaint and restricting her from federal offices the same day she reported harassment to FPS), a pattern of management negatively characterizing her EEO-related actions (e.g., as bad behavior, aggressive, hate mail, disrespectful, defamation, delusional, a time management issue), less favorable comparative treatment compared to those who did not engage in protected activity, and the barriers imposed (especially before EEO deadlines) to prevent her from supporting her complaints. Causal connection could also be established using code words or euphemisms selectively applied to protected activity, as discussed in ¶ 74-77. For example, ADR management selectively applied their censorship policy when they facially prohibited all negative or controversial topics in emails but did not enforce this policy against their own negative emails while applying the policy admonishing Plaintiff for using email to document, report, or oppose discrimination.

**(6)    SIXTH CLAIM OF RELIEF**

**Retaliation** (Against USA, DHS Secretary, FEMA Administrator, HHS Secretary, and Unknown Contractors)

*Rehabilitation Act of 1973 (29 U.S.C. §§ 791 & 794,* its amendments, and related regulations*)*

194.    Beginning in or around March 2015 (though some reports suggest the behavior to extend back to July 2014), Defendants (including coworkers, supervisors, contractors, and agency representatives) subjected Plaintiff to the adverse employment actions (retaliation) or assisted in subjecting her to those actions because of her protected activities to dissuade her from engaging in those protected activities.

195.    Plaintiff is a qualified individual with disabilities that substantially limit major life activities and/or bodily functions (including PTSD, adjustment disorder, allergies, and a history of cancer), such as sleeping, concentrating, normal cellular growth, and breathing, who could

perform the essential functions of her FEMA ADR attorney position and attorney position with or without reasonable accommodation.

196.    Defendants also wrongly branded Plaintiff as disabled based on biased assumptions about her, projecting disabilities she did not have onto her because of discriminatory stereotypes tied to her gender, race, national origin, and color.

197.    Beginning in or about 2015 and continuing through her termination in March 2019, Plaintiff engaged in protected activity under the Rehabilitation Act as described in Section VII above, such as the following: opposing or raising concerns for herself and others related to disability discrimination and other violations of the Rehabilitation Act, participating in the EEO process, requesting reasonable accommodations, and participating in the interactive process.

198.    Per se discrimination: Defendants engaged in acts of per se retaliation against Plaintiff, subjected her to retaliation with direct evidence of retaliation, or aided others in doing so, such as the following: (1) censoring Plaintiff's use of EEO-related speech and documentation (starting in 2015), (2) limiting and prohibiting protected activity (documenting, reporting, opposing discrimination) (2015-2016), (3) creating performance goals that punished Plaintiff if she spoke out against discrimination (December 2015-October 2016), (4) limiting EEO time in 2016, conditioning benefits (e.g., VLTP) on stopping EEO activity in 2016, (5) conditioning accommodations on stopping EEO protected activities in 2016 (denial of accommodation as retaliation for continued protected opposition), (6) making or advising about personnel decisions against Plaintiff while processing her EEO complaints (2016-2019), (7) giving harassers veto power over which discrimination allegations are reported and when, (8) refusing to investigate a security complaint because of EEO activity (2018-), (9) processing discrimination complaints against themselves or their superiors (2016-), and (10) blanket exclusion of access to benefits (e.g., leave) due to protected activity (e.g., requesting accommodations).

199.    Retaliatory adverse actions: After and because Plaintiff engaged in this disability-related protected activity, Defendant, through supervisors and responsible management officials, subjected her to materially adverse actions that would dissuade a reasonable employee in her circumstance from engaging in protected activity or to prevent her from supporting an EEO

claim, including but are not limited to those listed in ¶¶ 67-68 above and included examples such as the following: (1) tying performance expectations to disability-related emotional intelligence and therapy demands); (2) making Plaintiff volunteer extensive time (spanning years) to pursue her EEO complaints (especially when there was staff who could do the work and harassers were compensated and provided legal counsel); (3) creating barriers to medical leave and threatening AWOL status while she was on protected medical leave in 2016; (4) Defendants' evidence destruction, suppression, or manipulation and attempts to do so; (5) delaying pay related to Plaintiff's EEO activity; and (6) making various threats to Plaintiff, such as about her employment status and performance.

### Nexus between protected activity and adverse actions

200.    Management directly linked adverse actions to Plaintiff's protected activities, such as the following. For example, on January 11, 2016, Mr. Scott emailed Plaintiff, "I specifically directed you not to speak with others in the office about this issue" regarding using EEO-related words and making harassment allegations; and Ms. Mazur testified in 2020 that she allowed adverse appraisals against Plaintiff to stand because of her "blow back" or "outright refusal" to perform tasks that she had identified as discriminatory or retaliatory.

201.    The nexus between the adverse actions against Plaintiff and her protected activity was especially evident after she requested accommodations or took disability-related medical, through suspect timing, comparative evidence, context, and changing stories, such as when management (1) denied medical leave or created extra barriers to medical leave requests, (2) rescinded a position soon after she requested to be accommodated at the position but later gave conflicting and weak explanations as to why it was rescinded; and (3) repeatedly created hurdles to medical treatment and leave approval while she was on protected medical leave in 2016.

### (7)    SEVENTH CLAIM OF RELIEF

**Interference with the exercise of Rehabilitation Act rights** (Against the USA, DHS Secretary, FEMA Administrator, HHS Secretary, and Unknown Contractors)

*Rehabilitation Act of 1973 (29 U.S.C. §§ 791 & 794,* its amendments, and related regulations*)*

202.    Plaintiff exercised or enjoyed rights protected by the Rehabilitation Act (as

described in Section VII above) or had aided or encouraged others to exercise such rights, such as rights to participate in the EEO process (including filing a complaint); oppose discrimination; access, obtain, and enjoy reasonable accommodations; and exercise other rights under the Rehabilitation Act, such as the right to use medical leave or seek medical treatment.

203.    Defendants coerced, intimidated, threatened, and interfered with Plaintiff's ability to enjoy, exercise, and assist others in the exercise of Rehabilitation Act rights, such as a problematic work environment (including a dysfunctional EEO system) throughout the applicable period and starting around July 2015 for specific acts against Plaintiff, such as to be free from improper medical examinations and inquiries.

204.    As described in Sections I and IX(4) (especially ¶¶ 143-148) and incorporated here, examples of Defendants' actions that constitute interference include but are not limited to (1) threatening Plaintiff to stop her from reporting or documenting discrimination and other protected activities; (2) censoring her, limiting her ability to document or report abuses (including by making it a performance violation); (3) restricting leave usage; (4) limiting her time/ability to pursue EEO activity (e.g., putting her in situations where she would not be able to respond to EEO appearances or requests, limiting EEO time, her bathroom usage); (5) increasing her workload while decreasing or eliminating pay and benefits; (6) adding barriers to her ability to participate in the EEO process, protected opposition, and accommodations requests; (7) creating an unfair, biased EEO process; (8) unreasonably delaying action on her accommodation requests; (9) thwarting attempts to seek provider-recommended treatment or enjoy medical leave; (10) creating conditions that would make the exercise of her rights moot (e.g., instead of accommodating her), causing Plaintiff to leave the job); (11) ordering her to undergo invasive medical exams and information under threat of criminal prosecution or helping others carry out such orders; (12) restricting her from the workplace and other federal buildings; (13) humiliating and ostracizing her; (14) tying her receipt of accommodations with dropping her EEO activity; (15) systemically refusing to answer Plaintiff's questions and punishing her for doing so; (16) refusing to engage in the interactive process (as described in Claim 10); (17) dissuading her from seeking a promotion or other career-enhancing activities; (18) launching a biased investigation

without due process against her during ongoing EEO complaints and accommodations request; (19) making Plaintiff volunteer extensive time (spanning years) to pursue her EEO complaints; (20) delaying/refusing requests (e.g., Privacy Act/FOIA, OER investigation) for EEO evidence; (21) telling her that speaking about medical treatment and expert advice (e.g., relaying what a self-defense instructor or psychologist said, asking about security options) and that following medical treatment (e.g., taking a self-defense class) would amount to her being a threat that would result in intrusive medical exams and launching an investigation against her; and (22) delaying payment by one pay period for the time Plaintiff spent in mediation on October 4, 2016.

### (8)    EIGHTH CLAIM OF RELIEF

**Inappropriate medical inquiries and examinations** (Against the USA, DHS Secretary, FEMA Administrator, HHS Secretary, and Unknown Contractors)

*Rehabilitation Act of 1973 (29 U.S.C. §§ 791 & 794,* its amendments, and related regulations*)*

205.    Between **January 2016** and **March 2919 and continuing to date**, Defendants (including Plaintiff's chain of command, HR, counsel, HHS/FOH, and FOH contractors) repeatedly subjected Plaintiff to improperly intrusive, broad medical inquiries and exams, which were not job-related or consistent with business necessity in violation of the Rehabilitation Act, without any individualized, objective evidence that she could not perform her essential duties or posed a direct threat and with evidence that would rebut such claims.

206.    The EEOC found that Defendants ordered overly broad medical requests.

207.    Defendants continued to demand additional medical information and exams, even after receiving all documentation required by law to support Plaintiff's accommodation and medical leave requests, as well as a full mental workup for a first fitness-for-duty certification.

208.    Examples of medical exams and inquiries Defendants subjected Plaintiff include are but not limited to the following: (1) complete medical histories (e.g., on November 26, 2018), extensive medical releases, (2) direct virtually unrestricted access to Plaintiff's providers, (3) full body physical and mental examinations (e.g., August 3 and September 20, 2018 for two fitness-for-duty examinations, including revealing her cancer history), (4) requests about medication usage, (5) orders to go to therapy and complete assignments that functioned as psychological

assessments or treatment (in 2016), and (6) demanded disclosures of privileged medical information revealed through these medical examinations and inquiries.

209.    To date, Defendants continue to claim Plaintiff must submit to additional medical exams and provide medical information of undefined scope to return to work, which is not required of any other employees in her job classification (e.g., attorneys or ADR professionals).

210.    Others in management or agency proxies knew about these orders, refused to intervene or sanction the actions, and even assisted the attempts.

211.    Defendants' request caused concrete harm in emotional distress to Plaintiff and violated her privacy and constitutional rights, which included widespread dissemination of such medical information contained in the complaint and other documents, including when counsel of record spread this information to coworkers who referred to it at a departmental training.

### (9)    NINETH CLAIM OF RELIEF

### Failure to accommodate (disability discrimination)

(Against All FEMA, DHS, the USA, DHS Secretary, and FEMA Administrator)

*Rehabilitation Act of 1973 (29 U.S.C. § 791,* its amendments, and related regulations*)*

212.    Between 2016 and 2019, Defendants failed to accommodate Plaintiff in a timely, effective, or continuous manner, despite several requests for permanent and interim accommodations and suggestions of alternative accommodations to enable her to perform the essential functions of her job and enjoy equal access to promotions, activities, assignments, and other aspects of the work environment, including the following:

- refusing to enforce existing anti-harassment polices (at no cost) by moving alleged harassers away from their victim (Plaintiff);

- rescinding three offers of medically recommended reassignment and delaying it for months (May–October 2016), despite management's claim that it could be completed in a day;

- transferring Plaintiff to a new position without ensuring or allowing that accommodations were in place upon arrival or that her harassers would be kept away, explicitly rejected no-contact orders and security for Plaintiff to protect her from her harassers; and

- denying interim accommodations that could accommodate her disabilities and not further

exacerbate her disabilities, such as on July 19, 2016, for paid leave and the concurrent use of FMLA and leave as an accommodation.

213.    Defendants (Plaintiff's employer) knew or should have known of Plaintiff's disability-related limitations through, among other things, due to medical certifications, orders by supervisor Mr. Scott to seek therapy, and medical leave and accommodations requests.

214.    Defendants so unreasonably delayed, ignored, or defectively handled Plaintiff's accommodation requests that their conduct amounted to repeated denials—rejecting separation from harassers because it would make the agency look bad, insisting she could not seek as an accommodation anything already required by policy (even if not enforced), claiming it was unreasonable to ask that existing policies be enforced, and either failing to respond at all or responding only after such severe delay or in such ineffective ways that her accommodations were effectively nullified.

215.    Plaintiff has been diagnosed with the disabilities of PTSD and adjustment disorder arising from workplace abuse at FEMA, and she also has allergies and a history of cancer relevant to this case. These impairments substantially limit one or more major life activities and/or major bodily functions, including (among others) sleeping, eating, concentrating, brain function, breathing, immune function, seeing, and normal cellular growth.

216.    Plaintiff was a qualified individual with disabilities who could perform the essential functions of her FEMA position with or without reasonable accommodation. Plaintiff performed satisfactorily and received satisfactory performance reviews in 2014–2015 and a bonus in mid-2015. With reasonable accommodations consistent with medical restrictions, Plaintiff could continue to perform the essential functions of her job.

217.    Defendants did not conduct the required financial and hardship calculations before denying her requests.

218.    Defendant did not identify any undue hardship or fundamental alteration that would have prevented granting Plaintiff's requested accommodations, many of which cost little to nothing and involved enforcing existing policies, practices, programs, or job requirements.

219.    Nothing limited Defendants from ensuring that the work environment was

accessible to Plaintiff before they reassigned Plaintiff and provided inconsistent and changing explanations for their failure to accommodate. Defendants' excuses for rescinding offers (e.g., an accidental offer, supervisor travel) were ingenuous, especially since Plaintiff qualified for the said positions (e.g., permanent positions under Schedule A), email allowed for contact on travel, and FEMA previously insisted on transferring Plaintiff to Ms. Jordan's supervision although Ms. Jordan did not contact Plaintiff for several days after her transfer.

220.    As a result of Defendant's failure to accommodate, Plaintiff experienced exacerbation of her disabilities, prolonged exposure to an abusive environment, loss of pay and benefits, and loss of her position.

(10)    TENTH CLAIM OF RELIEF

**Failure to engage in the interactive process in good faith**

(Against the USA, the DHS Secretary, and the FEMA Administrator)

*Rehabilitation Act of 1973 (29 U.S.C. § 791,* its amendments, and related regulations*)*

221.    Defendants failed to engage in a good-faith, timely interactive process with Plaintiff throughout her employment after she requested reasonable accommodations for her disabilities between 2014 and 2019. In effect, Defendants' failure to engage in good faith in the interactive process amounted to and led to a failure to accommodate.

222.    Any provision of such accommodations and responses to accommodations was so unreasonably delayed or defective that they amounted to denials.

223.    Defendants knew or should have known of Plaintiff's disability-related limitations through, among other things, because of medical certifications, orders by supervisor Mr. Scott to seek therapy, and medical leave and accommodations requests.

224.    Plaintiff was a qualified individual with disabilities who could perform the essential functions of her FEMA position with or without reasonable accommodation. Plaintiff performed satisfactorily and received satisfactory performance reviews in 2014–2015 and a bonus in mid-2015. With reasonable accommodations consistent with medical restrictions, Plaintiff could continue to perform the essential functions of her job.

225.    Plaintiff has been diagnosed with disabilities relevant to this case (PTSD and

adjustment disorder arising from abuse from the FEMA workplace, allergies, and cancer). These impairments substantially limit one or more major life activities and/or major bodily functions, including (among others) sleeping, eating, concentrating, brain function, breathing, immune function, seeing, and normal cellular growth.

226.     Rather than working collaboratively to identify and implement effective accommodations, Defendants' failure to engage in the interactive process in the following ways, as examples:

- unnecessarily delayed decisions for months on reassignment and other accommodations (including rescinding multiple reassignment offers);
- stonewalling, which included refusing to provide specifics or answer questions (e.g., the jobs found and offered, the rescinded offers), explain denials, or provide status updates on the search for positions;
- refusing to discuss offers, accept, or discuss alternative or interim accommodations within the scope of Plaintiff's limitations while Plaintiff awaited resolution, even though these measures would have mitigated harm and posed no undue hardship; and
- refusing to meaningfully participate in accommodation discussions, including OER staff walking out mid-meeting when Plaintiff tried to initiate the interactive process, OCCHCO hiding discriminatory documents under restrictive "For Official Use Only" (FOUO) labels.

227.     Because Defendants intended to force Plaintiff out of work, as corroborated by internal management correspondence, they did not engage in the interactive process in good faith between 2016 and 2019 while they tried to use various means to do so.

228.     Defendant's pattern of delay, stonewalling, rescinded offers, refusal to discuss feasible alternatives, and alternative motives (e.g., intent to terminate Plaintiff) demonstrated a systemic failure to engage in the interactive process in good faith, contributing to Plaintiff's continued exposure to a harmful environment and eventual separation from employment.

### (11)     ELEVENTH CLAIM OF RELIEF

**Constructive discharge** (Against the USA, DHS Secretary, FEMA Administrator, HHS Secretary, and Unknown Contractors)

1    *Civil Rights Act of 1964 (42 U.S.C. §§ 2000e et seq.,* its amendments, and related regulations*)*

2    229.    Plaintiff is an Asian American woman of color of Chinese/Taiwanese descent and

3    a member of protected classes under the Civil Rights Act based on race, color, national origin,

4    and sex/gender.

5    230.    Defendants, through their management officials, contractors, representatives, and

6    proxies or alter egos, created and maintained working conditions (based on a totality of

7    circumstances) that were so intolerable that a reasonable person in Plaintiff's position would

8    have felt compelled to resign from a position (including to accept demotion, transfer, or

9    separation from employment), including the following:

10   • Plaintiff's demotion and the transfer of her first-line supervisor from Mr. Scott to Ms.

11   Jordan in April 2016 following complaints of harassment;

12   • her reassignment from the ADR Division to RRLD in October 2016, which left her under

13   managers who had enabled prior harassment and allowed harassers continued access; and

14   • in 2018-2019 (during which she was detailed to another office) during which she faced

15   attempts to eliminate Plaintiff's employment.

16   231.    These conditions were driven by over 100 ongoing violations of the Civil Rights

17   Act of 1964 as described in Sections I and IX above, including repeated harassment based on

18   race, gender/sex, color, and national origin, by management officials, coworkers, and

19   contractors, threats to Plaintiff's safety, extended periods of work without pay, mobbing,

20   performance downgrades, workloads heightened to crushing levels under short deadlines,

21   elimination of bathroom breaks, discriminatory assignment decisions, and the failure to correct a

22   known hostile work environment despite multiple reports.

23   232.    The cumulative effect of Defendants' actions (including instances of physical

24   intimidation, assault, stalking, job insecurity, loss of benefits, repeated retroactive contract

25   extensions, demotion, harassment, and discriminatory transfers) created working conditions so

26   intolerable that a reasonable person in Plaintiff's position of her protected gender/sex, race,

27   national origins, and color would have felt compelled to resign, accept demotion, or accept

28   transfer as the only alternatives.

1

**(12)    TWELFTH CLAIM OF RELIEF**

2

**Constructive discharge** (Against the USA, DHS Secretary, FEMA Administrator, HHS

3

Secretary, and Unknown Contractors)

4

*Rehabilitation Act of 1973 (29 U.S.C. §§ 791 & 794,* its amendments, and related regulations*)*

5

     233.    Plaintiff is a qualified individual with disabilities (including PTSD, adjustment

6

disorder, allergies, and a history of cancer) and was also regarded by Defendant as having

7

additional mental impairments.

8

     234.    Defendants, through their management officials, contractors, representatives, and

9

proxies or alter egos, created and maintained working conditions (based on a totality of

10

circumstances) that were so intolerable that a reasonable person in Plaintiff's position would

11

have felt compelled to resign from a position (including to accept demotion, transfer, or

12

separation from employment), including the following:

13

- Following complaints of harassment, the period that culminated in Plaintiff's demotion and

14

    the transfer of her first-line supervisor from Mr. Scott to Ms. Jordan in April 2016;

15

- the period that culminated in her reassignment from the ADR Division to RRLD in October

16

    2016, which left her under managers who had enabled prior harassment and allowed

17

    harassers continued access; and

18

- the period in 2018-2019 (during which she was detailed to another office) during which she

19

    faced attempts to eliminate Plaintiff's employment.

20

     235.    These intolerable conditions (as described in Sections I and IX) included the

21

following as examples: worsening of her disabilities and health condition to the verge of

22

pneumonia, mobbing, prolonged exposure to an abusive environment, forced extended unpaid

23

status and work without pay (while being on call 24/7), extended periods of job instability with

24

retroactive extensions of employment that kept Plaintiff's job and benefits status in limbo, loss of

25

meaningful work, the use of extensive and intrusive medical examinations and inquiries,

26

widespread release of highly confidential medical information, and requirements for Plaintiff to

27

request leave for hours outside of her work schedule (e.g., nights and weekends).

28

     236.    These conditions arose from and were compounded by Defendants' violations of

the Rehabilitation Act, including repeated disability-based harassment, retaliation for requesting accommodations and using medical leave, failure to accommodate, failure to engage in the interactive process in good faith, and improper medical inquiries and examinations.

237.    Considering the cumulative impact of these actions, a reasonable person with Plaintiff's disabilities would have felt compelled to leave her position or accept demotion and reassignment as the only options short of sacrificing her health.

### (13)    THIRTEENTH CLAIM OF RELIEF

**Supervisor harassment (quid pro quo) based on Plaintiff's gender/sex, race, gender, national origin, color, and intersectionality thereof** (Against the USA, DHS Secretary, FEMA Administrator, HHS Secretary, and Unknown Contractors)

*Civil Rights Act of 1964 (42 U.S.C. §§ 2000e et seq.,* its amendments, and related regulations*)*

238.    Supervisors, other management officials, agency proxies, agency alter egos (e.g., Mr. Scott, Ms. Jordan, Ms. Mazur, OER and OCCHCO officials) who had the authority to alter the terms and conditions of her employment subjected Plaintiff (an Asian American woman of color of Chinese/Taiwanese descent) to unwelcome quid pro quo harassment based on her gender/sex, race, national origin, color, and protected activity related to the Civil Rights Act.

239.    Using job benefits (e.g., assignments, pay, continued employment, performance reviews, promotion opportunities, leave, and meetings) and threats and attempts to impose adverse actions, those with supervisory control over Plaintiff abused their authority to coerce her to accept discrimination or harassment by (1) threatening and attempting to discharge Plaintiff's job, position, or other material job-related consequences; and (2) conditioning tangible job benefits on Plaintiff's submission to continued harassment (especially without complaint) based on her gender/sex, race, national origin, color, protected activity, and intersectionality thereof.

240.    **Specific instances of quid pro quo coercion include the following examples**: (1) in December 2015, Mr. Scott threatened negative performance consequences if Plaintiff did not adhere to discriminatory performance goals that prohibited opposing discrimination, such as telling Mr. Kapoor to stop harassing her; (2) in January 2016, Mr. Scott and Ms. Mazur required Plaintiff to "choose" a seating arrangement to let a harasser sit next to her, apologize (including

to her harassers), go to therapy, and engage in emotional labor for her protected activity, threatening isolation and restricting access to work if she did not; (3) 2016–, management required Plaintiff to submit to invasive medical exams and allow sexually harassing conduct as conditions of retaining her position and/or benefits; (4) between April and June 2016, OCCHCO conditioned approval VLTP benefits on Plaintiff and her doctor ceasing EEO activity, and Ms. Jordan conditioning approval of accommodations and paid leave on cessation of FMLA leave and vice versa; (5) in 2016, OCCHCO's Ms. Gunsolus and OER's Ms. Donald conditioned receipt of accommodations on Plaintiff ceasing to engage in protected activity by opposing FEMA's refusal to follow its own anti-harassment policy, and OER's Mr. Goudy conditioning receipt of accommodations on dropping her discrimination complaint (September 2016); and (6) workgroup leaders (one of which was a personnel lawyer) conditioned participation credit (or disparagement) on cessation of participation in activities related to the inclusion of women or elimination of bias against women.

241.    **Tangible employment action** (see ¶ 67 above for a more comprehensive list): If Plaintiff did not accept said conditions, her supervisors told her she would face negative or reduced performance reviews and thus reduced pay, access to promotions, and continued employment; they carried out their threats. They also terminated her position officially and unofficially (through demotion, reassignment, detail, termination) after she continued to oppose harassment and refuse to accept the conditions.

### (14)    FOURTEENTH CLAIM OF RELIEF

**Supervisor harassment (quid pro quo) based on disability and the Rehabilitation Act**

(Against the USA, DHS Secretary, FEMA Administrator, HHS Secretary, and Unknown Contractors)

*Rehabilitation Act of 1973 (29 U.S.C. §§ 791 & 794,* its amendments, and related regulations*)*

242.    Plaintiff is a qualified individual with actual, recorded, and perceived disabilities, that substantially limit major life activities and/or bodily functions (including PTSD, adjustment disorder, allergies, and a history of cancer), such as sleeping, concentrating, normal cellular growth, and breathing, and was regarded by management as mentally disabled based on gender

1    stereotypes (e.g., emotional and paranoid).

2         243.    Responsible management officials (e.g., Mr. Scott, Ms. Jordan, agency proxies, or

3    agency alter egos) conditioned tangible job benefits (e.g., continued employment, assignments,

4    performance reviews, promotion opportunities, leave, pay, and meetings) on Plaintiff's

5    submission to continued harassment or discrimination (especially without complaint) based on

6    her gender/sex, race, national origin, color, and intersectionality thereof.

7         244.    A reasonable person with Plaintiff's disabilities under these circumstances would

8    consider the working environment to be abusive or hostile.

9         245.    <u>Quid pro quo conduct</u>: Quid pro conduct based on violations of the Rehabilitation

10   Act included the following examples: (1) in December 2015, Mr. Scott threatening negative

11   performance consequences if Plaintiff did not adhere to discriminatory performance goals that

12   prohibited opposing discrimination, (2) in January 2016, Mr. Scott threatening unwelcome

13   assignments or orders, and exclusion from workplace meetings, social interactions, and normal

14   work or if she did not apologize to harassers, recant her allegations, and submit to psychological

15   inquiries and examinations while sharing such medical information to FEMA employees; (3)

16   starting in 2018-, Defendants requiring Plaintiff to undergo broad, not job-related medical

17   examinations and disclose extensive medical information as a practical condition of keeping her

18   position; (4) in 2016, OCCHCO's Ms. Gunsolus and OER's Ms. Donald threatening AWOL

19   designations, loss of accommodations, or other adverse consequences if she did not comply with

20   disability-related demands even while on approved medical leave (even during provider

21   appointments); (5) between April and June 2016, OCCHCO conditioning approval VLTP

22   medical leave benefits on Plaintiff and her physician ceasing EEO activity, and Ms. Jordan

23   conditioning approval of accommodations and paid leave on cessation of FMLA leave and vice

24   versa; (6) in 2016, OCCHCO's Ms. Gunsolus and OER's Ms. Donald conditioning receipt of

25   accommodations on Plaintiff ceasing to engage in protected opposition, and OER's Mr. Goudy

26   conditioning receipt of accommodations on dropping her discrimination complaint; (7)

27   workgroup leaders (one of which was a personnel lawyer) conditioned participation credit (or

28   disparagement) on cessation of participation in activities related to the inclusion of women or

elimination of bias against women; and (8) Mr. Scott conditioned payment for work on if she stopped raising her concerns about potential violation of the Rehabilitation Act in October 2015.

246.    When Plaintiff resisted these conditions and continued to assert her rights, these responsible management officials followed through by sabotaged her work, destabilizing her job status (such as through leave-without-pay and reassignment); providing only severely delayed and ineffective accommodations; reducing her performance appraisals when she continued to oppose discrimination; and terminating her after she refused to comply with unnecessary and coercive medical requirements, thereby using or threatening tangible employment actions (see ¶ 67 above for a more comprehensive list) to enforce the quid pro quo. Not only did those with supervisory control over Plaintiff directly harass Plaintiff, but they also refused to stop, correct, and prevent harassment from occurring to create a hostile work environment.

### (15)    FIFTEENTH CLAIM OF RELIEF

**Harassment (hostile work environment) based on race, national origin, gender/sex, color, and/or intersectionality thereof** (Against the USA, DHS Secretary, FEMA Administrator, HHS Secretary, and Unknown Contractors)

*Civil Rights Act of 1964 (42 U.S.C. §§ 2000e et seq.,* its amendments, and related regulations*)*

247.    Plaintiff is an Asian American woman of color of Chinese/Taiwanese descent.

248.    Starting in 2014, coworkers, contractors, and those with supervisory control over Plaintiff (including individuals within her chain of command, agency representatives, alter egos, and proxies, such as HR, personnel lawyers and their supervisors, OER staff, and security) subjected Plaintiff to severe and pervasive harassment (creating a hostile work environment) because of her sex/gender, color, race, national origin, and the intersectionality thereof.

249.    At all relevant times, those with supervisory authority over Plaintiff (including but not limited to Plaintiff's chain of command through at least Mr. Sevier and OCCHCO, OER, and PLB staff as described in ¶ 50) acted as agents, alter egos, or proxies of FEMA/DHS/USA in managing Plaintiff's work, performance, leave, discipline, security status, and EEO process.

250.    Defendant had actual notice of the hostile conditions. As described in Section VII (especially ¶¶ 25-35), Plaintiff repeatedly reported the harassment and discrimination through

1    multiple channels, including to her chain of command (up to Chief Counsel Mr. Sevier) and

2    several internal and external oversight offices or personnel.

3        251.    However, Plaintiff has yet to be fully made whole after 12 years of reports.

4    Responsible management officials refused to correct, prevent, and stop harassment, even joining

5    in and recruiting others to participate in the harassment. Often, her complaints were dismissed or

6    not addressed at all, and she was given the run-around.

7                    **Severe and pervasive harassing conduct**

8        252.    Under a totality of circumstances as described in Sections I and IX, Defendants'

9    conduct was sufficiently severe (including multiple instances of physical aggression and

10   intimidation, including assault that disabled Plaintiff) or pervasive (e.g., many instances

11   occurring multiple times a day in 2016, a systemic failure of the EEO process, mobbing

12   involving at least 40 people, affecting ~30% of FEMA employees) enough to change the

13   conditions of her employment and create a hostile work environment.

14               **Objective and subjective hostile work environment**

15       253.    This conduct was unwelcome, and a reasonable person of the same protected

16   classes as Plaintiff under these circumstances (based on the totality of circumstances) would find

17   the combination of racial slurs, physical intimidation, gender stereotyping, and systemic sabotage

18   severe enough to alter employment conditions and create an objectively hostile environment.

19       254.    Various entities corroborated that a hostile work environment existed, such as

20   •   The DHS Inspector General and the RAND Corporation found a widespread, race- and

21       gender-based harassment culture at FEMA (affecting about 30% of employees) involving

22       the same offices at issue here (including OCCHCO, OCC, OER, and OSCO/FIID).

23   •   The then-FEMA Administrator publicly admitted FEMA's work environment was "toxic."

24   •   The EEOC entered a 2017 default judgment in Plaintiff's administrative case against

25       DHS/FEMA, finding a complete failure of FEMA's EEO investigation process and

26       responsiveness.

27   •   A licensed clinical psychologist diagnosed Plaintiff with PTSD/adjustment disorder

28       causally linked to the abusive environment, medically corroborating the severity of the

SECOND AMENDED COMPLAINT          24-CV-00797 KAW          Page **55** of 68

intimidation and other misconduct.

**Tangible employment actions**

255.    These supervisors and others with supervisory authority exercised their authority to inflict at least 33 tangible employment actions that escalated and enforced the hostile environment, including the following as examples and a more comprehensive list at Section IX ¶ 67: continuous leave-without-pay status and four retroactive employment extensions creating job, pay, and benefits insecurity (June–November 2016); supervisory changes; multiple reduced and negative performance evaluations that reduced pay and promotion eligibility (2016); and changes in job description, assignments, workload, and other conditions.

256.    These tangible employment actions were explicitly tied to stereotypes of her protected classes and her refusal to submit to discriminatory conditions, to recant allegations of discrimination, or to stop documenting and opposing bias, thereby using job benefits, pay, and continued employment as leverage to enforce her silence and compliance. For example, because of stereotypes of Asian women needed to be submissive and stereotyped beliefs of women as crazy or emotional and that East Asian women needed to be undressed to uncover the truth (i.e., dishonest), management Plaintiff in the form of supporting assignments instead of leadership ones and management made her undergo intrusive physical and mental medical exams, including involving states of undress, and required her to change her thinking to be more submissive (i.e., not have her own opinions) to the opinions of those of outside of her protected classes.

**Examples of harassing conduct**

257.    In addition to the adverse actions described in ¶¶ 67-68, 164-166, and 240, the hostile conduct based on Plaintiff's protected classes covered under the Civil Rights Act of 1964 included the following as some examples: (1) racist and sexist comments (e.g.,  calling Chinese people "barbarians" for eating dogs, jokes that women belong in the kitchen, asking Plaintiff for her "real name" with a racial explanation) and stereotyped labels, especially when Plaintiff violated stereotyped norms (e.g., emotional, aggressive, not a team player, nasty), (2) sexual advances (e.g., repeated unwanted gifts, intrusive questions, and solicitations), (3) regular systematic enforcement of race- and gender-based stereotypes by steering her into stereotyped

roles (e.g., related to administrative work, baking, and emotional labor instead of leadership and career-promoting work) while dissuading her from pursuing work that violated such stereotypes, (4) persistent ridicule, bullying, or humiliation, (5) menacing physical behavior; (6) ostracism and isolation; (7) interference with work; and (8) double standards in the application of policies.

258.    By creating, tolerating, and escalating a pattern of harassment, including through mobbing many employees and contractors, Defendants violated the Civil Rights Act by subjecting Plaintiff to a hostile work environment and are liable under agency principles and direct and vicarious liability doctrines.

### (16)    SIXTEENTH CLAIM OF RELIEF

**Harassment (hostile work environment) based on disability** (Against the USA, DHS

Secretary, FEMA Administrator, HHS Secretary, and Unknown Contractors)

*Rehabilitation Act of 1973 (29 U.S.C. §§ 791 & 794,* its amendments, and related regulations*)*

259.    Plaintiff is a qualified individual with disabilities that substantially limit major life activities and/or bodily functions (including PTSD, adjustment disorder, allergies, and a history of cancer), such as sleeping, concentrating, normal cellular growth, and breathing, who could perform the essential functions of her position with or without reasonable accommodation.

260.    Defendants regarded Plaintiff as having mental disabilities she did not have by characterizing her discrimination complaints as "thinking errors" and other such biased terms, relying on gender- and disability-based stereotypes (e.g., being emotional, believing all mental disabled individuals are dangerous, confused, or paranoid) and treating her as if she had unspecified psychiatric or emotional disorders that then influenced personnel decisions.

261.    Plaintiff performed satisfactorily and received satisfactory performance reviews in 2014–2015 and a bonus in mid-2015.

262.     Defendants knew of Plaintiff's disability (actual, history of) and limitations through therapy orders, accommodation and leave requests, and medical certifications submitted in 2016-2018. Defendants also (by their own admission) knew of Plaintiff's disabilities, including regarding her as disabled as early as 2014.

263.    Starting in 2014, those with supervisory control over her and proxies for

Defendants (see Section IX, ¶ 50) subjected Plaintiff to a hostile work environment based on her disability status (actual, history of, and regarded as).

264.    Responsible management officials refused to correct, prevent, and stop harassment, even joining in and recruiting others to participate in the harassment.

**Severe and pervasive harassing conduct**

265.    Under a totality of circumstances as described in Sections I and IX, Defendants' conduct was sufficiently severe (including multiple instances of physical aggression and intimidation, including assault) or pervasive (e.g., many instances occurring multiple times a day in 2016, a systemic failure of the EEO process, mobbing involving at least 40 people, affecting ~30% of FEMA employees) enough to change the conditions of her employment and create a hostile work environment. It also included a dysfunctional EEO system.

266.    The disability-based harassment was not isolated but was a continuing pattern combining coerced psychological treatment, characterization of protected activity as evidence of mental impairment, invasive medical examinations based on dangerous-disability stereotypes, FMLA interference, isolation, and tangible adverse actions, occurring repeatedly (including multiple times daily during 2016) over the years.

267.    Responsible management officials refused to correct, prevent, and stop harassment, even joining in and recruiting others to participate in the harassment.

**Objective and subjective standards met**

268.    This conduct was unwelcome.

269.    Based on a totality of circumstances of a combination of racial slurs, physical intimidation, stereotyping, systemic sabotage, and other harm, a reasonable person with Plaintiff's disabilities or who was regarded as disabled under these circumstances would consider the working environment to be abusive or hostile.

270.    Various entities independently corroborated Plaintiff's allegations of a hostile work environment, such as the following:

- The DHS Inspector General and the RAND Corporation found a widespread culture of retaliation and biased investigations at FEMA involving the same offices at issue here

(including OCCHCO, OCC, OER, and OSCO/FIID).

- The then-FEMA Administrator publicly admitted FEMA's work environment was "toxic."

- The EEOC entered a 2017 default judgment against FEMA/DHS in Plaintiff's administrative case, finding a complete failure of FEMA's EEO investigation process and responsiveness.

- A licensed clinical psychologist diagnosed Plaintiff with PTSD/adjustment disorder causally linked to the abusive environment, medically corroborating the severity of the intimidation and other misconduct.

**Tangible employment actions**

271.    Those with supervisory authority over Plaintiff exercised their authority to inflict at least 33 tangible employment action categories that escalated and enforced the disability-related hostile environment, including the following as examples with a more comprehensive list at Section IX ¶ 67: wrongful termination; continuous leave-without-pay status; four retroactive employment extensions with the rescission of multiple accepted job offers that created job, pay, and benefits insecurity; and denial of leave and benefits (including VLTP eligibility), all of which materialized the threats and intimidation alleged above and demonstrated that supervisors' discriminatory conduct pervaded the terms and conditions of Plaintiff's employment.

**Examples of harassing conduct**

272.    In addition to the adverse actions described in ¶¶ 67-68, 174-175, and 245, Defendants' disability-based hostile-environment conduct went beyond "mere" disparate treatment and included distinct categories of harassment: (1) stigmatizing and defamatory psychiatric labeling (e.g., supervisors treating Plaintiff's discrimination reports as proof she was delusional, had "thinking errors," was "creating people who do not exist," or was emotionally unstable or dangerous), and spreading those characterizations to others; (2) ostracism and segregation; (3) coerced psychological "correction," such as orders to attend therapy, complete an "emotional intelligence" assignment to fix supposed "thinking errors," and disclose psychometric-test results ("Weakness Finder"), all premised on perceived mental impairment rather than job performance; (4) intrusive, coercive medical control, demanding broad releases of

medical history and subjecting her to unnecessary, non–job-related medical inquiries and fitness-for-duty examinations (including references to reproductive health, EKG, and other invasive topics); (5) disability-related ridicule, humiliation, and hostility (e.g., mocking or minimizing mental-health needs and treating such limitations as "fake" or less legitimate than visible disabilities, instead of accommodating her); (6) humiliation (e.g., making her beg or rely on the good graces of those who abused her, perp walking her); and (7) social/professional isolation, keeping her off active status, restricting her access to training and doctor-approved work while on leave awaiting reassignment, and maintaining contact channels that left her exposed to the same individuals she reported, despite medical warnings that exposure would cause harm.

### (17)     SEVENTEENTH CLAIM OF RELIEF

**Retaliatory harassment** (Against the USA, DHS Secretary, FEMA Administrator, HHS Secretary, and Unknown Contractors)

*Civil Rights Act of 1964 (42 U.S.C. §§ 2000e et seq.,* its amendments, and related regulations*)*

273.    Beginning in 2014, Plaintiff repeatedly opposed and reported discrimination, participated in the EEO process related to violations of the Civil Rights Act of 1964, as described in Section VII.

274.    After and because of this protected activity, Defendants (including their managers, attorneys, HR and EEO personnel, security officials, and other agents, contractors, or alter egos of FEMA/DHS/USA) engaged in a sustained pattern of retaliatory harassment that went beyond discrete actions (described in ¶¶ 67-68 and 190-191) and created a hostile work environment to dissuade a reasonable employee from complaining and other protected activity, including the following as examples: (1) repeatedly threatening her job, performance appraisals, security status, and access to leave or accommodations when she continued to complain; (2) micromanaging and scrutinizing her work, body, bathroom usage, and movement more harshly than others; (3) repeatedly trying to notifying Plaintiff and trying to pressure her into destroying evidence; (4) victim blaming, stereotyping, smearing her reputation (often in line with gender, ethnic, and racial stereotypes) as difficult, not a team player, crazy, incompetent, untrustworthy, or a security risk, and other forms of verbal harassment; (5) ostracizing Plaintiff; (6) withholding

information and support; (7) imposing contradictory and unrealistic expectations; (8) set Plaintiff up to fail (e.g., after she raised concerns about discriminatory performance goals in December 2015, Mr. Scott demanded her Plaintiff immediately recite his lengthy verbal statements word-for-word from memory, requiring perfect photographic recall applied to no one else); and (9) exponentially increasing work after reports of discrimination or before EEO deadlines.

275.    In 2016, this retaliatory harassment escalated particularly after Plaintiff reported discrimination to the ADR Director, OCC Deputy Director, OCCHCO, OER, and building security, such as by increasing her workload several fold, such as make her complete over 100 hours of work within 40 hours and require her to independently re-create by herself the research and deliberation of a team of niche lawyers within days instead of the months they had.  In 2018, this retaliation drastically increased after Plaintiff again made a report to security, but this time resulted in threats of criminal punishment and wrongful termination.

276.    Defendants further enabled the hostile environment by permitting and enforcing complaint-chilling practices that deterred protected reporting, including but not limited to the following: (1) supervisory censorship policies prohibiting use of discrimination-related words and documentation of EEO issues (enforced December 2015–October 2016); (2) limiting Plaintiff's EEO time to unreasonable amounts (e.g., Ms. Jordan's limitation to 2 hours to draft 50-60 pages of required allegations in or around April 2016); (3) requiring Plaintiff to obtain permission from her harasser Ms. Jordan before reporting her for discrimination (May–September 2016); (4) rescinding pay for time spent on EEO, accommodation, and FMLA-related work (June–October 2016); (5) providing legal counsel and EEO time to named harassers but not to Plaintiff or in equal measure; (6) treating protected EEO activity itself as grounds for adverse employment actions, performance violations, and investigations; (7) destroying evidence; and (8) having an ineffective EEO complaints process riddled with conflicts of interest, lasting over a decade, and harder and more expensive to win than the lottery.

277.    Plaintiff's supervisors and officials with authority to stop, prevent, or correct this conduct knew of the retaliatory harassment because they received Plaintiff's complaints, personally participated in the conduct (including hostile meetings, demeaning comments, and

punitive assignments), and were repeatedly notified through internal reports and EEO filings, yet

they failed to take effective corrective action and instead reinforced or escalated the hostile

treatment. They believed corrective action would conflict with their culture or image and wanted

the harassment to continue until it deterred Plaintiff from engaging in protected activity.

278.    The retaliatory harassment was unwelcome, targeted Plaintiff because of her

protected activity, and was sufficiently severe or pervasive (considered cumulatively over

multiple years of ostracism, verbal abuse, intimidation, suppression of protected activity, and

threats to her employment and security status) to create a work environment that would dissuade

a reasonable employee in a similar position from making or supporting a charge of

discrimination or engage in other forms of protected activities.

### (18)    EIGHTEENTH CLAIM OF RELIEF

**Retaliatory harassment** (Against the USA, DHS Secretary, FEMA Administrator, HHS

Secretary, and Unknown Contractors)

*Rehabilitation Act of 1973 (29 U.S.C. §§ 791 & 794,* its amendments, and related regulations*)*

279.    Plaintiff, from 2015 onward, repeatedly engaged in protected activity related to

the Rehabilitation Act (as described in Section VII above), such as participating in EEO

processes; pointing out potential violations of or gaps related to the implementation of the

Rehabilitation Act; requesting medical leave and accommodations; and reporting, opposing, or

documenting disability discrimination and other violations of the Rehabilitation Act (e.g., the

misuse of her medical information, improper medical examinations and inquiries).

280.    After and because of this protected activity under the Rehabilitation Act,

Defendants (such as through their managers, HR, personnel lawyers, EEO personnel, security

officials, and other FEMA/DHS/USA agents, alter egos, proxies, or contractors) subjected

Plaintiff to the same pattern of retaliatory harassment and hostile work environment.

281.    Beyond the discrete tangible employment actions described in ¶¶ 67-68 and 198-

199, Defendants engaged in a pattern of retaliatory harassment that created a hostile work

environment designed to dissuade a reasonable employee from engaging in protected activity,

including but not limited to the following: (1) questioning or undermining her need for leave and

accommodations; treating her disability-related requests as misconduct; (2) characterizing her as mentally unstable or dangerous; (3) threatening her with being AWOL if she did not respond right away while on medical leave, her job status, and thus termination; (4) coercive demands for medical exams and inquiries that were linked to her prior protected leave requests and complaints and went beyond legitimate business necessity; (5) using her medical history and treatment as a basis for suspicion and punitive treatment; (6) providing incorrect points of contact for accommodations and FMLA requests; (7) interference with the accommodation process; (8) repeated administrative barriers and conflicting instructions; (9) pressure to accept unsuitable or harmful reassignment terms while on medical leave; and (10) presenting altered reports as subgroup conclusions and minutes (by erasing Plaintiff's efforts in workgroup reports and rewriting reports and minutes to remove discrimination concerns or protected opposition).

282.    Defendants further enabled the hostile environment by permitting and enforcing complaint-chilling practices that deterred protected reporting, including but not limited to the following: (1) supervisory censorship policies prohibiting use of discrimination-related words and documentation of EEO issues (enforced December 2015–October 2016); (2) unreasonable limits on Plaintiff's EEO time (e.g., Ms. Jordan's limitation to 2 hours to draft 50-60 pages of required allegations in or around April 2016); (3) requiring Plaintiff to obtain permission from her harasser Ms. Jordan before reporting her for discrimination (May-September 2016); (4) rescinding pay for time spent on EEO, accommodation, and FMLA-related work (June–October 2016); (5) providing legal counsel and EEO time to named harassers but not to Plaintiff or in equal measure; (6) treating protected EEO activity itself as grounds for adverse employment actions, performance violations, and investigations; (7) destroying or coercing the destruction of evidence; and (8) maintaining a dysfunctional EEO complaints process that was ineffective, expensive, lengthy (spanning over a decade), riddled with conflicts of interest, and produced success rates far below the prevalence of harassment.

283.    Officials with supervisory authority over Plaintiff's work and accommodations knew of this retaliatory harassment because they perpetuated such harassment and because they received and processed her accommodation and leave requests and her complaints about

1  disability-based treatment, yet they failed to take effective corrective action and instead
2  reinforced the hostile treatment, allowing it to continue and escalate over time.

3       284.    The retaliatory harassment was unwelcome, targeted Plaintiff for engaging in
4  protected activity under the Rehabilitation Act, and was (cumulatively) sufficiently pervasive or
5  severe (multiple years of undermining, stigmatizing comments, interference, and coercive
6  medical demands) to create a work environment that would dissuade a reasonable employee
7  from seeking accommodations, filing a complaint, or opposing disability discrimination.

8                        **(19)    NINETEENTH CLAIM OF RELIEF**
9                   **FMLA interference** (Against All Defendants)
10      *Title I of the Family and Medical Leave Act* (FMLA) *(29 U.S.C. §§ 2611-2620)*

11      285.    Plaintiff's employer denied, restrained, or interfered with her FMLA rights under
12  Title I during her intermittent employment between July 14 and November 22, 2016.

13      286.    Plaintiff exercised rights protected by the FMLA by requesting and taking
14  medical leave for serious health conditions in or about April–June 2016 and by providing
15  supporting medical documentation to FEMA through her supervisors and the offices responsible
16  for leave administration (including OCCHCO). She was entitled to leave and FMLA protections.

17      287.    While she was an employee between July 14 and November 22, 2016, Plaintiff
18  was covered by Title I of the FMLA and thus may bring a private civil action for interference.

19      288.    As described in ¶¶ 19, 38-40 above and incorporated by reference, Plaintiff was
20  eligible for protected medical leave because she suffered from serious health conditions (certified
21  by medical providers), which involved ongoing medical treatment and periods of incapacity.

22      289.    During this period, Plaintiff was excluded under Title II of the FMLA because she
23  was a CORE employee who was not a Title 5 civil service employee, not bound by a 2-year term
24  contract, unpaid during the period but before reassignment, and classified by FEMA as a short-
25  term employee with SF-50 stating (not to exceed) NTE terms of employment of less than a year.

26      290.    Meeting the service and hour requirements for FMLA coverage, she completed at
27  least 1250 hours of service during the previous 12-month period.

28      291.    Defendants FEMA, DHS, and USA qualify as "employers" because they are the

1    US government with more than 50 employees.

2       292.    As a result of Defendants' repeated interference, Plaintiff suffered disruption of

3    medical leave and recovery, economic losses, benefits, career harm, and emotional distress. This

4    led to unsafe and retaliatory working conditions, culminating in the loss of her job and career.

5                    **Examples of interference with FMLA rights**

6       293.    Examples of interference included when Plaintiff's employer (through

7    management officials, such as the listed individual defendants) (1) refused concurrent use of paid

8    and FMLA leave, thereby blocking Plaintiff's access to VLTP leave donations; (2) threatened to

9    discipline Plaintiff for taking FMLA leave; (3) contacted and assigned her work during active

10   medical leave and appointments (June–September 2016); (4) attempted to terminate her

11   employment so she could not exercise FMLA rights; (5) rescinding training; (6) changed her

12   work conditions, such as changing her job description, placing her in hardship locations,

13   revoking pay after she used leave, and reassigning her to a non-equivalent position; (8) had

14   conflicts of interest in the processing of FMLA leave and the enforcement of rights violations;

15   (8) failing return Plaintiff to the same or an equivalent position for which she was hired with; (8)

16   making her job and benefits status unstable; (9) giving her negative evaluations for time spent on

17   protected leave, and (10) delaying her return to work after the end of her FMLA leave.

18              **(20)    TWENTIETH CLAIM OF RELIEF**

19              **FMLA retaliation** (Against All Defendants)

20       *Title I of the Family and Medical Leave Act (29 U.S.C. §§ 2611-2620)*

21       294.    Plaintiff's employer retaliated against Plaintiff for exercising her FMLA rights.

22       295.    As described in Section VII above (e.g.,¶¶ 39-40), Plaintiff engaged in FMLA-

23   related protected activity, such as requesting and taking FMLA leave for serious health

24   conditions beginning around April 2016; submitting medical documentation to support her leave

25   requests; and opposing interference with or violation of her FMLA rights.

26       296.    While she was an employee between July 14 and November 22, 2016, Plaintiff

27   was covered by Title I of the FMLA and thus may bring a private civil action for interference.

28       297.    During this period, Plaintiff was excluded under Title II of the FMLA because she

was a CORE employee who was not a Title 5 civil service employee, not bound by a 2-year term contract, unpaid during the period but before reassignment, and classified by FEMA as a short-term employee with SF-50 stating (not to exceed) NTE terms of employment of less than a year.

298.    Meeting the service and hour requirements for FMLA coverage, she completed at least 1250 hours of service during the previous 12-month period.

299.    Defendants FEMA, DHS, and USA qualify as "employers" because they are the US government with more than 50 employees.

300.    As described in ¶¶ 19, 38-40 above and incorporated by reference, Plaintiff suffered from serious health conditions (certified by medical providers) that made her eligible for protected medical leave, which involved ongoing medical treatment and periods of incapacity.

301.    During April–June 2016, Plaintiff timely notified FEMA of her need for FMLA leave, requested leave, and submitted sufficient medical certification or documentation.

302.    After and because Plaintiff invoked FMLA rights, she suffered adverse actions causally connected to her exercise of FMLA rights, by management officials (such as the listed individual defendants), such as the following: (1) discouragement of the usage of leave; (2) negative evaluations with shortened evaluation periods; (3) forced transfer and rescission of offers to different, non-equivalent positions (between July and October 2016); (4) interruption of medical leave; (5) denial of benefits (e.g., rescinding previously approved eligibility of VLTP in June–July 2016 and denying vacation time to travel during August 14-20, 2016); (6) retaliatory assignments; (7) attempted termination; (8) segregation and exclusion; and (9) conflicts of interest in the processing of FMLA leave and the enforcement of rights violations.

303.    The causal connection between Plaintiff's FMLA activity the adverse actions can be shown by managements' admissions (e.g., April 26, May 17-28, June 6, and September 16 and 27, 2016) tying performance and billing restrictions to FMLA leave, differential treatment from those who did not request FMLA leave, suspect timing between leave activity and adverse actions, and shifting or pretextual explanations for actions affecting leave and reassignment.

## XI. DEMAND FOR JURY TRIAL

304.    Plaintiff requests a jury for all claims for which a jury is permitted.

1

**XII.    REQUEST FOR RELIEF**

2      305.    Plaintiff prays that the Court order a judgment in Plaintiff's favor and grant such

3  relief as may be appropriate at the time of the decision of relief, such as the following: a

4  declaration that Defendants violated Plaintiff's constitutional rights and rights to be free from

5  discrimination and that they maliciously, intentionally, and unlawfully violated the law;

6  injunctive and protective orders, including but not limited to permanently enjoin Defendants

7  from attempting to or succeeding in harming Plaintiff, stay away and no contact orders issued to

8  Mr. Scott, Mr. Kapoor, Ms. Mazur, Ms. Jordan, and Ms. Gunsolus; those in the FEMA personnel

9  law branch, supervising PLB, or others in her FEMA chain of command 2014-2019 (e.g., Mr.

10 Doolin, Mr. Sevier, Mr. Cameron, and other FEMA OCC supervisors) will never supervise any

11 projects, HR matters, or employment of Plaintiff; damages; equitable relief; monetary, equitable

12 relief, injunction, restitution, and/or sanctions for the misconduct of Defendants' employees

13 (including attorneys) and/or contractors and for the unjust enrichment, benefits (e.g., to their

14 careers, finances), or other gains they received from harming Plaintiff by violating the law,

15 aiding or abetting the violation of law, and/or refusing to stop, prevent, or correct illegal actions

16 against her; adjustments for opportunity costs in the form of interest and/or return on investment

17 on awarded relief, for inflation, and for cost-of-living or location; litigation costs and attorneys'

18 fees; the difference in any current or potential tax liability (e.g., for damages, loss of tax-free

19 growth in retirement accounts) due to this case; oversight, interest, and other penalties for delays

20 or failure of Defendants to pay out damages, enforce relief, and other prior refusal to comply

21 with tribunal orders; and other such legal and equitable relief as warranted.

22

23 Respectfully submitted,

24

25 Date:    February 9, 2026          Sign Name: _____

26                                   Print Name:    Jennifer Yeh

27

28

CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2026, I filed the foregoing via e-file to the attorney (Molly Friend) for the following Defendants: Kristi Noem (Secretary of the U.S. Department of Homeland Security), Department of Homeland Security, Karen Evans (Acting Administrator of the Federal Emergency Management Agency), and the Federal Emergency Management Agency

Jennifer Yeh

Jennifer Yeh

2309 Noriega St. #90

San Francisco, CA 94122