United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER YEH,<br>Plaintiff,<br>v.<br>ALEJANDRO MAYORKAS, et al.,<br>Defendants. | Case No. 24-cv-00797-KAW<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS**<br><br>Re: Dkt. No. 105 |

Plaintiff Jennifer Yeh filed this action against Defendants United States of America, Kristi Noem, the Department of Homeland Security ("DHS"), Karen Evans, the Federal Emergency Management Agency ("FEMA"), Robert F. Kennedy, and "Unknown Contractors," alleging discrimination, harassment, and retaliation during her employment based on gender, race, national origin, and disability. (*See* Second Amend. Compl. ("SAC") ¶ 2.) Pending before the Court is Defendants' motion to dismiss. (Defs.' Mot. to Dismiss, Dkt. No. 105.)

Having reviewed the parties' filings, the relevant legal authority, and the arguments made at the November 5, 2026 hearing, the Court GRANTS IN PART and DENIES IN PART Defendants' motion to dismiss.

## I. BACKGROUND

Plaintiff is an Asian American woman of Chinese/Taiwanese descent, who suffers from post-traumatic stress disorder ("PTSD"), adjustment disorder, allergies, and a history of cancer. (SAC ¶ 19.) Plaintiff was employed as an Alternative Dispute Resolution ("ADR") Attorney Advisor by Defendant FEMA from July 14, 2014 to March 28, 2019, when Plaintiff's employment

was terminated.[1] (SAC ¶¶ 44, 158.)

Plaintiff alleges that during her employment, Plaintiff was subjected to discrimination and harassment based on her gender, race, national origin, and disability. (SAC ¶ 2.) Moreover, when Plaintiff complained about such discrimination and harassment -- including reporting discrimination to coworkers starting in September 2014, making complaints to her supervisors in 2015 and 2016, making reports to FEMA's Office of Equal Rights and Human Resources in January 2016, filing EEO-related (equal employment opportunity) complaints on March 21, 2016 and August 18, 2018, and filing a whistleblower retaliation complaint with the DHS Inspector General on July 25, 2018 -- Defendants allegedly retaliated against her, including by physically threatening her, limiting her ability to report harassment, banning Plaintiff from the building, and forcing her to go undergo intrusive medical examinations. (SAC ¶¶ 3, 25-28, 31-33.)

Confusingly, rather than continuing to lay out her facts in chronological order, Plaintiff now groups the alleged discriminatory, harassing, and retaliatory acts into various categories. (*See* SAC ¶¶ 69-159.) These categories include:

**Biased Labels and Discriminatory Acts**: Plaintiff alleges that coworkers, managers, and contractors made discriminatory comments, including joking that women belong in the kitchen, calling Chinese people barbarians for eating dogs, stating that individuals with mental disabilities did not have real needs, asking Plaintiff for her "real" name, treating Plaintiff as untrustworthy after learning she was Chinese, labeling Asian and African food as "smelly," and stating that white people did not associate with people of color. (SAC ¶ 69.) Plaintiff's coworker, Vikram Kapoor, would assert that Plaintiff should be his assistant and that it was her job to do administrative work, as well as remark that male supervisors should be able to call female supervisors "babes." (SAC ¶ 70.) Further, starting in 2015, supervisors and coworkers would call Plaintiff aggressive, dramatic, not a team player, nasty, paranoid, and irrational, with Plaintiff's first-line supervisor Robert Scott referring to her complaints about discrimination as emotional, argumentative, disrespectful, misplaced, and defamatory, and accusing Plaintiff as being sick, behaving badly, not

[1] The Equal Employment Opportunity Commission ("EEOC") later ordered Defendant FEMA to retroactively extend her employment to October 17, 2020. (SAC ¶ 44.)

emotionally intelligent, and not collaborative. (SAC ¶ 71.)

**Retaliation**: Plaintiff asserts that management would accuse Plaintiff of being disrespectful for speaking up, trying to eliminate her position in January 2016 on this basis. (SAC ¶¶ 74-75.) Further, in May 2016, Plaintiff's then first-line supervisor Erika Jordan labeled the time spent by Plaintiff on bathroom breaks, her EEO complaint, and opposition to discrimination as excessive and lacking in time management. (SAC ¶ 76.) ADR Director Cynthia Mazur also testified that she allowed negative reviews of Plaintiff due to her refusal to perform tasks she reported as discriminatory. (SAC ¶ 77.) Plaintiff further asserts that after she filed her first EEO complaint in March 2016, management drastically increased her workload to give her 100 hours of work per week, imposed arbitrarily short deadlines, and withheld vital information. (SAC ¶ 119.) Plaintiff was also required to complete this work with fewer resources and less time, including an April 7, 2016 assignment where Mr. Scott and Ms. Jordan withheld access codes until close to the deadline. (SAC ¶¶ 120-121.) Further, starting April 11, 2016, Ms. Jordan required Plaintiff to complete detailed monthly (then daily) work plans that outlined every minute of her work day, including meal, rest, and restroom breaks. (SAC ¶¶ 122, 125.)

**Sexual Advances**: Starting in October 2014, Mr. Kapoor made unwanted advances towards Plaintiff, including asking her to be his plus one, asking to go to her home, and asking intrusive questions. (SAC ¶ 78.) After Mr. Kapoor was transferred and/or when Plaintiff was on medical leave, Mr. Kapoor continued to stalk Plaintiff, including giving her diamond earrings and sending her invitations to her personal and work e-mails in June 2016. (SAC ¶ 79.) Although HR acknowledged the diamond earrings were an inappropriate romantic gift, management minimized Mr. Kapoor's conduct because of their cost. (SAC ¶¶ 79-80.)

**Pay Disparity and Unpaid Labor**: Plaintiff asserts that she was effectively paid less than others because she was required to perform more work than her colleagues. (SAC ¶ 82.) Further, starting in 2016, Plaintiff's supervisors substantially increased her workload after she made her complaints about discrimination in an attempt to force her out of her job. (SAC ¶ 83.) Management also barred Plaintiff from being paid for her time spent on reasonable accommodations, HR tasks, and EEO time, while allowing other employees to be paid for such

time. (SAC ¶ 84.)

**Double Standards**: Plaintiff alleges that particularly after she complained about discrimination, she was relegated to administrative support and technical work, including being steered away from leadership and ADR practice expertise that white colleagues and men received. (SAC ¶¶ 85, 87.) For example, in February 2016, Mr. Scott blocked Plaintiff from joining a subgroup on performance and promotions, instead pushing her toward work-life balance committees. (SAC ¶ 93.) Additionally, between 2014 and 2016, ADR management required women -- but not men -- to bring elaborate homemade baked goods at their own expense. (SAC ¶ 86.) When Plaintiff declined to participate, Plaintiff was called out for not being a team player. (SAC ¶ 86.) Plaintiff also alleges that she was called argumentative for objecting to orders from Mr. Scott and Ms. Jones to falsify documents. (SAC ¶ 95.)

**Anti-Discrimination Advocacy**: Plaintiff alleges that management took efforts to stop her from advocating for anti-discrimination, including making comments about how eliminating bias was a waste of time. (SAC ¶ 96.) In November 2015, Mr. Scott threatened to discuss her job status after she relayed his opinions about a group on eliminating -isms in ADR practice. (SAC ¶ 97.) In July 2018, Deputy Chief Counsel Joel Doolin canceled Plaintiff's presentation on the elimination of bias against women attorneys. (SAC ¶ 98.) Plaintiff also complains that in 2018, a workgroup's leadership treated white participants and non-complainants more favorably than Plaintiff even when they made the same comments. (SAC ¶ 99.)

**Censorship**: Plaintiff alleges that from October 2015 on, supervisors attempted to obstruct Plaintiff's ability to report, document, or discuss discrimination. (SAC ¶ 100.) For example, Mr. Scott instructed Plaintiff not to forward harassing e-mails in October 2015 and not to document EEO issues in March 2016. (SAC ¶ 101.) Likewise, when Plaintiff contacted EEO and HR in January through March 2016, Mr. Scott reminded Plaintiff not to speak with others about the issue. (SAC ¶ 104.) Between May and September 2016, Ms. Jordan required Plaintiff to obtain pre-approval from a harasser to report harassment. (SAC ¶ 105.)

**Physical Escalation:** Plaintiff alleges that after she reported or opposed discrimination, her coworkers and supervisors responded physically. (SAC ¶ 111.) Mr. Kapoor would

United States District Court
Northern District of California

intentionally trip Plaintiff. (SAC ¶ 112.) Mr. Scott, in turn, trapped Plaintiff in her cubicle and slammed his hand down while ordering her to stop documenting discrimination in January 2016, and made a choking gesture near Plaintiff's throat while ordering her to stop alleging discrimination and threatening her employment in March 2016. (SAC ¶¶ 113-14.)

**"Poison Pill" Choices**: Plaintiff alleges that her supervisors put her in coercive situations. (SAC ¶ 128.) For example, in January 2016, Plaintiff was admonished for not agreeing to sit next to Mr. Kapoor despite his prior harassment. (SAC ¶ 129.) In April 2016, Plaintiff was required to choose between having Mr. Scott (who had physically threatened her) as her first line-supervisor or a second-line supervisor. (SAC ¶ 130.) In April to October 2016, Plaintiff was required to choose between staying in an abusive environment or transfer, which would have negative effects on her career, pay, and EEO case. (SAC ¶ 130.)

**Performance Reviews**: Plaintiff asserts that management threatened her performance scores. (SAC ¶ 131.) For example, in December 2015, Mr. Scott threatened her performance scores if she told Mr. Kapoor to stop harassing her. (SAC ¶ 131.) Plaintiff's annual review was downgraded less than three weeks after she contacted the EEO in January 2016. (SAC ¶ 132.) For Plaintiff's 2015 annual review, Mr. Scott revised Plaintiff's performance scores downward immediately following her EEO-related complaints, referring to her protected activity. (SAC ¶ 133.) Likewise, for Plaintiff's first quarter 2016 evaluation, Mr. Scott referenced Plaintiff's opposition to discrimination as a factor in giving her a negative review. (SAC ¶ 134.) Ms. Jordan gave Plaintiff a negative second quarter 2016 evaluation despite Plaintiff being on protected medical leave for most of the quarter. (SAC ¶ 135.) Finally, in July 2018, Plaintiff's then-supervisor Jotham Allen gave her a satisfactory performance review before threatening her performance after learning that she had revealed information about the agency's handling of reasonable accommodations. (SAC ¶ 136.)

**Accommodation Requests and Interactive Process**: In March 2016, Plaintiff requested accommodations, specifically: (1) transfer of harassers, (2) reassignment of Plaintiff to a different position, (3) restriction of harassers' contact with Plaintiff, and (4) providing Plaintiff security. (SAC ¶ 137.) Plaintiff asserts that Defendant FEMA refused the accommodations except for

reassignment, which was also delayed by several months. (SAC ¶ 139.) Plaintiff further alleges that between 2016 and 2019, Defendant FEMA delayed responding, demanded repeated or unnecessary documentation, provided incorrect contact information, and urged Plaintiff to seek disability retirement. (SAC ¶ 141.) On September 27, 2016, Plaintiff was asked if she would withdraw her EEO complaint if she was accommodated. (SAC ¶ 142.)

**Interference with Leave and Benefits**: In February 2016, Mr. Scott dissuaded Plaintiff from using sick leave or telework, causing her to develop recurrent bronchitis. (SAC ¶ 144.) While Plaintiff was on leave under the Family and Medical Leave Act ("FMLA") between June and September 2016, Defendant FEMA's management would assign work and require e-mail responses, coercing responses by threatening to revoke Plaintiff's previously approved leave, mark her as AWOL, decline accommodations, or termination. (SAC ¶ 146.) Defendant FEMA also interfered and retaliated against Plaintiff's use of FMLA leave, including trying to dissuade her from using leave, delaying or denying FMLA leave, demanding that Plaintiff work while sick or on leave, or giving her negative performance reviews for using leave. (SAC ¶ 148.)

**Invasive Exams and Security Investigation**: After Plaintiff reported harassment to security on July 20, 2018, Mr. Allen, Mr. Doolin, and HR placed Plaintiff on indefinite mandatory telework, effectively prohibiting her from federal buildings without Mr. Allen's advance permission. (SAC ¶ 151.) Further, Plaintiff was ordered to complete invasive full-body physical and mental examinations on August 3 and September 20, 2018. (SAC ¶ 151.) The exams included genital/rectal exams, a full psychological assessment, and a complete medical history. (SAC ¶ 153.) Defendant FEMA's Fraud and Internal Investigation Division also launched an investigation against Plaintiff based on a false report, which was later recanted. (SAC ¶ 152.)

**Termination Attempts and Actual Termination:** Plaintiff alleges that managers made several threats to her job, including after she participated in ADR -isms groups in November 2015, after she raised concerns about discriminatory performance goals in December 2015, after she expressed concerns about sitting next to Mr. Kapoor in January 2016, after she talked to OER about initiating the EEO process in January 2016, and after she and Mr. Scott discussed her EEO allegations in January 2016. (SAC ¶ 154.) While Plaintiff was on protected leave in May 2016,

internal e-mails were circulated discussing her planned termination. (SAC ¶ 156.) Plaintiff was ultimately terminated effective March 28, 2019 for refusing a second fitness-for-duty examination, even though the medical appointment had been effectively canceled because the department was closed due to the government shutdown. (SAC ¶¶ 158-159.)

On February 9, 2024, Plaintiff filed this case. (Dkt. No. 1.) On May 14, 2024, Plaintiff filed an amended complaint, alleging 37 causes of action. (Dkt. No. 28.) On September 19, 2024, Defendants filed a motion to dismiss the amended complaint. (Dkt. No. 57.) On June 6, 2025, the Court granted Defendants' motion to dismiss, finding that the complaint failed to satisfy Rule 8. (Dismissal Order at 8-9, Dkt. No. 84.) The Court explained that the complaint "should clearly delineate each legal claim, and state facts indicating the nature and grounds for each claim. Specifically, each cause of action should clearly state the alleged violation, the statutory authority, the date on which the incident occurred, who was involved, the facts, and how the claim satisfies the elements rendering it a viable cause of action." (*Id.* at 9.) The Court also found that several of the claims were "repetitive and could be incorporated into single claims." (*Id.*)

On February 9, 2027, Plaintiff filed the operative complaint, alleging claims for: (1) disparate treatment based on race, national origin, and gender in violation of Title VII, (2) disparate treatment based on disability in violation of the Rehabilitation Act, (3) disparate impact in violation of Title VII, (4) disparate impact in violation of the Rehabilitation Act, (5) retaliation in violation of Title VII, (6) retaliation in violation of the Rehabilitation Act, (7) interference with the exercise of Rehabilitation Act rights, (8) inappropriate medical inquiries and examinations in violation of the Rehabilitation Act, (9) failure to accommodate in violation of the Rehabilitation Act, (10) failure to engage in the interactive process in violation of the Rehabilitation Act, (11) constructive discharge in violation of Title VII, (12) constructive discharge in violation of the Rehabilitation Act, (13) supervisor (quid pro quo) harassment in violation of Title VII, (14) supervisor (quid pro quo) harassment in violation of the Rehabilitation Act, (15) harassment in violation of Title VII, (16) harassment in violation of the Rehabilitation Act, (17) retaliatory harassment in violation of the Civil Rights Act, (18) retaliatory harassment in violation of the Rehabilitation Act, (19) FMLA interference, and (20) FMLA retaliation.

On May 15, 2026, Defendants filed a motion to dismiss. On July 24, 2026, Plaintiff filed an opposition. (Pl.'s Opp'n, Dkt. No. 108.) On August 7, 2026, Defendants filed a reply. (Defs.' Reply, Dkt. No. 111.)

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss based on the failure to state a claim upon which relief may be granted. A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

In considering such a motion, a court must "accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted), and may dismiss the case or a claim "only where there is no cognizable legal theory" or there is an absence of "sufficient factual matter to state a facially plausible claim to relief." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Navarro*, 250 F.3d at 732). A claim is plausible on its face when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). In other words, the facts alleged must demonstrate "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"Threadbare recitals of the elements of a cause of action" and "conclusory statements" are inadequate. *Iqbal*, 556 U.S. at 678; *see also Epstein v. Wash. Energy Co*., 83 F.3d 1136, 1140 (9th Cir. 1996) ("[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim."). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully . . . When a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (internal citations omitted).

Generally, if the court grants a motion to dismiss, it should grant leave to amend even if no

request to amend is made "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

## III. DISCUSSION

### A. Rule 8 Federal Pleading Standards

Defendants again move to dismiss the complaint on the ground that the amended complaint fails to satisfy Rule 8. (Defs.' Mot. to Dismiss at 7.) Rule 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

While hardly the model of clarity, the Court finds that this is not a case where Rule 8 mandates dismissal. In each claim, Plaintiff identifies the statutory basis for each claim and identifies particular conduct that she asserts underlies her claims. For example, with respect to the Title VII disparate treatment claim, Plaintiff identifies discriminatory conduct such as: (1) assigning her gendered, racial, and stereotyped tasks inconsistent with her role, (2) imposing unequal standards, scrutiny, and discipline, (3) subjecting her to sexual harassment and gendered conduct, (4) denying equal pay, overtime, benefits, and professional opportunities, and (5) subjecting her to sexist and racist language. (SAC ¶ 164.) Plaintiff further explains that she was treated more harshly and subject to censorship and increased workloads, termination, and unwarranted medical exams. (SAC ¶ 166.) While Plaintiff does not identify the specific date or individual who committed each of these wrongs, such information is generally contained in the fact section itself.

Defendants argue that Plaintiff fails to identify which Defendant caused Plaintiff's harm. (Defs.' Mot. to Dismiss at 8.) As Plaintiff points out, however, Defendants are interrelated government agencies and their administrators, with Defendant FEMA being a subcomponent of Defendants DHS and United States. (Pl.'s Opp'n at 5.) Given that Plaintiff is not suing the individual managers who actually carried out the complained of actions, Defendants' demand that Plaintiff identify the actions of each agency administrator does not appear applicable in this case.

Defendants also note that each of Plaintiff's twenty claims incorporate the same list of fifty-eight actions contained in Paragraphs 67-68. (Defs.' Mot. at 9.) While this alone would be problematic, as discussed above, Plaintiff does identify more specifically which actions she asserts

underlies each claim. Thus, this is not a problematic shotgun pleading where the complaint merely "incorporat[es] all facts or defenses from all previous counts into each successive count." *Gibson v. City of Portland*, 165 F.4th 1265, 1288 (9th Cir. 2026).

Accordingly, the Court finds that the complaint satisfies Rule 8.

**B. Claims 1 and 2: Disparate Treatment**

Plaintiff brings claims for disparate treatment under Title VII and the Rehabilitation Act. To establish a prima facie case of discrimination under Title VII, a plaintiff must demonstrate: "(1) that [s]he belongs to a protected class; (2) [s]he was qualified for the position; (3) [s]he was subject to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably." *Leong v. Potter*, 347 F.3d 1117, 1124 (9th Cir. 2003). Similarly, to establish a prima facie case of discrimination under the Rehabilitation Act, a plaintiff must demonstrate: "(1) she is a person with a disability, (2) who is otherwise qualified for employment, and (3) suffered discrimination because of her disability." *Walton v. United States Marshals Serv.*, 492 F.3d 998, 1005 (9th Cir. 2007).

Defendants assert that Plaintiff's claims for disparate treatment under Title VII and the Rehabilitation Act both fail for two reasons. First, Defendants argue that because Plaintiff incorporates all of her factual allegations and list of adverse actions into both claims, it is not possible to determine which adverse action Plaintiff asserts is the result of discrimination. (Defs.' Mot. to Dismiss at 11.) This argument, however, ignores that Plaintiff did identify more specific actions. For example, for the Title VII claim, Plaintiff points to Defendants allegedly assigning her gendered and stereotyped tasks inconsistent with her role (*i.e.*, secretarial, administrative, or technical tasks), imposing unequal standards and discipline, subjecting her to sexual harassment by Mr. Kapoor, denying equal pay and other benefits, and subjecting her to sexist and racist language. (SAC ¶ 164; *see also* SAC ¶ 49.) Plaintiff also points to her termination. (SAC ¶ 167.) Likewise, for the Rehabilitation Act claim, Plaintiff specifically identifies Defendants' consideration of her time on disability-related leave as lack of experience or performance, denial of accommodations, work assignments that framed her complaints as thinking errors and psychology deficits, being forced to undergo intrusive physical and mental examinations, and

termination for declining to undergo the medical examinations. (SAC ¶¶ 175-76.) Defendants fail to explain why these are insufficiently specific averments.

Second, Defendants argue that Plaintiff fails to identify similarly situated individuals outside of her protected class who were treated more favorably. (Defs.' Mot. to Dismiss at 11.) As Plaintiff correctly points out, however, the Ninth Circuit has found that "a relevant comparator is not an *element* of a disparate treatment claim," but is "circumstantial evidence of unlawful discriminatory intent." *Ballou v. McElvain*, 29 F.4th 413, 424 (9th Cir. 2022) (internal quotation omitted). Rather, courts can "determine whether a government action was motivated by discriminatory purpose by engaging in the sensitive inquiry into such circumstantial and **direct** evidence of intent as may be available." *Id.* at 425 (emphasis added). Thus, Plaintiff is not required to identify comparators. This is particularly the case where Plaintiff has identified direct evidence of discriminatory intent, including but not limited to directly racist, sexist, and ableist comments (SAC ¶ 69), Mr. Scott responding to Plaintiff's complaints by using gendered and disability-related terms (SAC ¶ 71), and management and HR treating Plaintiff's reports of discrimination as a symptom of a mental disability (SAC ¶ 73).

Accordingly, the Court DENIES Defendants' motion to dismiss the disparate treatment claims.

### C. Claims 3 and 4: Disparate Impact

Plaintiff brings claims for disparate impact under Title VII and the Rehabilitation Act. "A claim of disparate impact challenges employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Stout v. Potter*, 276 F.3d 1118, 1121 (9th Cir. 2002). "To plead a prima facie case of disparate impact, a plaintiff must (1) show a significant disparate impact on a protected class or group; (2) identify the specific employment practices or selection criteria at issue; and (3) show a causal relationship between the challenged practices or criteria and the disparate impact." *Bolden-Hardge v. Off. of the Cal. State Controller*, 63 F.4th 1215, 1227 (9th Cir. 2023) (internal quotation omitted). To satisfy the first prong, "plaintiffs often support their claims of disparate impact with statistics," although "statistics are not strictly necessary." *Id.*

Rather, if the disparate impact is "obvious," then statistics are not necessary to plead a prima facie case. *Id.* at 1228 (finding that an oath requirement that was forbidden by the plaintiff's religion would have an "obvious impact" on all other individuals of that plaintiff's religion).

Here, Defendants argue that Plaintiff has failed to identify policies or practices that more harshly impact one group over another. In alleging disparate impact under both Title VII and the Rehabilitation Act, Plaintiff points to the same seven policies. (SAC ¶¶ 178, 184; Pl.'s Opp'n at 12-13.) The Court finds that Plaintiff has adequately alleged facts to support a disparate impact as to the first policy only.

Specifically, Plaintiff alleges that there were censorship rules banning discussion or documentation of negative, controversial, or emotional issues, as well as words like workplace violence, discrimination, harassment, EEO, and hate crime. (SAC ¶¶ 179(1), 184(1).) Plaintiff further asserts that these policies were put in place starting in December 2015, with bans on specific types of speech and complaints in March 2016. (SAC ¶ 107.) The Court finds that this is specific enough to state a claim. Plaintiff has alleged facts identifying a policy that is more likely to impact one group over another, as minorities, women, and individuals with disabilities are more likely to make complaints about discrimination about their protected characteristics than individuals with no protected characteristics. Thus, this is a policy that would appear to have an "obvious impact" on individuals with protected characteristics. Accordingly, Plaintiff has stated a claim for disparate impact, such that denial is warranted.

As to the remaining "policies," the Court finds that Plaintiff fails to identify facts that such policies actually existed. "Courts have routinely required, in a variety of anti-discrimination contexts, more than a simple assertion that a policy of discrimination exists[.]" *Mora v. US Bank*, No. CV 15-02436 DDP (AJWx), 2015 U.S. Dist. LEXIS 97731, at *17 n.2 (C.D. Cal. July 27, 2015) (citing cases). For example, with respect to the alleged mandatory NDAs, coerced medical examinations, and prohibition on EEO time, there are no facts to suggest that these were agency-wide policies, as opposed to specific decisions that applied to only Plaintiff. (*See* SAC ¶¶ 100 (stating that supervisors refused to pay for Plaintiff's EEO time while allowing it to others), 108 (stating that Defendant FEMA attempted to silence Plaintiff through NDAs), 151 (stating that

Plaintiff was ordered to complete invasive physical and mental examinations).) Plaintiff alleges no facts suggesting the existence of a policy exempting named harassers from anti-harassment policies or prohibiting attorney's fees for pro se litigants. Finally, as to the facially neutral pay steps and merit policy, Plaintiff fails to explain how this reduced the pay of individuals with protected characteristics; rather, Plaintiff states in her complaint that *her* pay rate was effectively decreased because she was assigned more work after reporting discrimination. (SAC ¶¶ 81-83.) At the hearing, Plaintiff was unable to identify any facts in her complaint, instead acknowledging that some of the policies (such as mandatory NDAs) applied only to her but that she got the "impression" that it did apply to others. This is not sufficient to suggest policies existed.

Accordingly, the Court DENIES Defendants' motion to dismiss the disparate impact claims, but limits the claim to only the alleged policy of rules banning discussion or documentation of negative, controversial, or emotional issues and words like workplace violence, discrimination, harassment, EEO, and hate crime. Because it is not apparent from the hearing that Plaintiff could identify any other facts to establish the other alleged policies, Plaintiff is not permitted to amend this claim further.

**D. Claims 5 and 6: Retaliation**

Plaintiff brings claims for retaliation under Title VII and the Rehabilitation Act. To assert a prima facie case of retaliation, an employee must plead that "(1) [s]he engaged in a protected activity; (2) h[er] employer subjected h[er] to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action." *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000); *see also Coons v. Sec'y of the U.S. Dep't of the Treasury*, 383 F.3d 879, 887 (9th Cir. 2004).

As an initial matter, Defendants again complain that it is unclear which adverse actions are connected to each claim. (Defs.' Mot. to Dismiss at 15.) The complaint, however, identifies specific acts of alleged retaliation, which are different for the Title VII and Rehabilitation Act claims. (*Compare* SAC ¶ 190 (identifying nine actions) *with* ¶ 199 (identifying six actions).)

Defendants also move for dismissal on the ground that Plaintiff fails to allege that she suffered an adverse action because she engaged in a protected activity, as well as the failure to

United States District Court
Northern District of California

allege who was responsible for the adverse action and the timing. (Defs.' Mot. to Dismiss at 15-16.) The Court disagrees. For example, Plaintiff filed her first informal EEO complaint on March 21, 2016 (formalized on June 22, 2016), in which she made claims of discrimination based on race, gender, and disability. (SAC ¶ 31, Exh. A at 2.) The following day, Mr. Scott allegedly cornered Plaintiff twice and made choking gestures near her throat while ordering her to stop alleging discrimination and threatening her employment. (SAC ¶¶ 114, 191(7), 199(6).) The following month, Plaintiff's workload was drastically increased and information withheld, including Ms. Jordan and Mr. Scott withholding access codes on April 7, 2016, Ms. Jordan requiring Plaintiff to complete detailed work plans that anticipated every minute of her workday on April 11, 2016 (SAC ¶¶ 119, 121-22, 190(3).) Ms. Jordan also changed the scope of Plaintiff's position to eliminate ADR work and restrict Plaintiff's access to related training. (SAC ¶ 116.) Based on the timing and Mr. Scott's obvious knowledge of Plaintiff's complaints, there are sufficient facts to demonstrate causation.

Accordingly, the Court DENIES Defendants' motion to dismiss the retaliation claims.

**E. Claims 7 and 8: Rehabilitation Act Claims**

Plaintiff's seventh claim asserts interference with the exercise of Rehabilitation Act rights, whereas Plaintiff's eighth claim challenges inappropriate medical inquires and examinations under the Rehabilitation Act.

Defendants seek dismissal of these claims because they appear to be related to the EEOC administrative investigation and claim process. (Defs.' Mot. to Dismiss at 10-11.) Plaintiff responds that they do not. (Pl.'s Opp'n at 6-7.) Indeed, while Plaintiff makes some general complaints about the EEO system being dysfunctional, the actions underlying these claims appear to be separate from the EEOC administrative investigation and claim process. (*See* SAC ¶¶ 204, 208.) Thus, Defendants have not stated a cognizable reason for dismissal of these claims.[2]

[2] That said, it is not apparent to the Court that there can be independent or standalone claims for the exercise of Rehabilitation Act rights or for requiring medical inquiries and examinations. The Court has found no case law concerning an interference with Rehabilitation Act rights claim, and the complaint about requiring medical inquiries and examinations appears to be an action supporting the other Rehabilitation Act claims. As Defendant failed to make such arguments, however, the Court declines to dismiss these claims on grounds sua sponte raised by the Court.

Accordingly, the Court DENIES Defendants' motion to dismiss these Rehabilitation Act claims.

### F. Claims 9 and 10: Failure to Accommodate and Failure to Engage in Interactive Process

Plaintiff brings claims under the Rehabilitation Act for failure to accommodate and failure to engage in the interactive process. To establish a prima facie case for failure to accommodate, a plaintiff must plead: "(1) [s]he is disabled . . . (2) [s]he is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) [s]he suffered an adverse employment action because of h[er] disability." *Allen v. Pac. Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003); *see also Zehnder v. Arizona*, No. 25-4633, 2026 U.S. App. LEXIS 28615, at *2 n.1 (9th Cir. Sep. 18, 2026) (observing that failure to accommodate claims under the ADA and Rehabilitation Act "all use the ADA standard"). The interactive process, in turn, is the employer's mandatory obligation to work "with the employee to identify and implement appropriate reasonable accommodations." *Humphrey v. Mem'l Hosps. Ass'n*, 393 F.3d 1128, 1137 (9th Cir. 2001). "The interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees, and neither side can delay or obstruct the process." *Id.*

For both claims, Defendants seek dismissal on the ground that Plaintiff has failed to identify the reasonable accommodation and how it connects to her disability. (Defs.' Mot. to Dismiss at 21-22.) Plaintiff, in turn, points to the accommodations she requested, including: (1) transferring her harassers, (2) reassigning Plaintiff to a different position, (3) restricting contact between Plaintiffs and her harassers, and (4) providing Plaintiff with security. (Pl.'s Opp'n at 22; SAC ¶ 137.) Plaintiff also asserts that she requested concurrent use of FMLA and paid leave to maintain income during her recovery. (Pl.'s Opp'n at 22; SAC ¶ 140.) As Defendants point out, however, Plaintiff fails to explain how these accommodations related to her disabilities. *See Wozab v. Flextronics Am., LLC*, No. 2:11-cv-1612-LDG-GWF, 2012 U.S. Dist. LEXIS 140118, at

*10 (D. Nev. Sep. 28, 2012) (dismissing failure to accommodate claim where the plaintiff failed to adequately allege how the requested accommodations were reasonable and why they were necessary to perform the plaintiff's job); *Witt v. Farms*, No. 21-cv-00411-BAS-AGS, 2022 U.S. Dist. LEXIS 116392, at *10 (S.D. Cal. June 30, 2022) (dismissing claim where the plaintiff failed to explain why her request not to wear a mask was a reasonable accommodation for her claimed disabilities).

Additionally, with respect to the interactive process claim, Defendants contend that there are no non-conclusory allegations regarding the failure to engage in the interactive process. (Defs.' Mot. to Dismiss at 22.) Plaintiff responds that on September 27, 2016, Mr. Goudy asked Plaintiff whether she was going to withdraw her EEO complaint if she was accommodated through reassignment. (Pl.'s Opp'n at 22; SAC ¶ 142.) It is unclear how this question alone constitutes a failure to engage in the interactive process, given that it appears Plaintiff was transferred the following month.[3] (*See* SAC ¶ 27.)

Accordingly, the Court GRANTS Defendants' motion to dismiss these claims. Because the Court cannot conclude that amendment is futile, dismissal is with leave to amend.

### G. Claims 11 and 12: Constructive Discharge

Plaintiff brings claims for constructive discharge under Title VII and the Rehabilitation Act. Both claims are based on the same alleged actions, namely a transfer in April 2016, a reassignment in October 2016, and a period in 2018-2019 when there were alleged attempts to eliminate her employment. (SAC ¶¶ 230, 234.) A claim for constructive discharge "has two basic elements." *Green v. Brennan*, 578 U.S. 547, 555. First, the plaintiff must show that "[s]he was discriminated against by h[er] employer to the point where a reasonable person in [her] position would have felt compelled to resign." *Id.* Second, the plaintiff "must also show that [s]he **actually resigned**." *Id.* (emphasis added).

Here, Defendants seek dismissal because Plaintiff did not resign; rather, her employment was terminated. (Defs.' Mot. to Dismiss at 17.) Plaintiff responds that she was constructively

---

[3] Per the prior complaint, Plaintiff was transferred on October 13, 2016. (*See* Dismissal Order at 4.)

United States District Court
Northern District of California

discharged because she transferred positions due to her working conditions. (Pl.'s Opp'n at 18.) In support, Plaintiff points to *Muldrow v. City of St. Louis*, where the Supreme Court found that a transfer could leave a worker worse off. 601 U.S. 346, 355 (2024). *Muldrow*, however, did not concern constructive discharge, let alone find that a transfer was the equivalent of a resignation. Rather, *Muldrow* found that a transfer can constitute a harm to a term or condition of employment. *Id.* at 354-55.

In short, Plaintiff fails to establish one of the basic elements of constructive discharge: resignation. Accordingly, the Court GRANTS Defendants' motion to dismiss the constructive discharge claims. Further, because amendment is futile as there is no dispute that Plaintiff was actually terminated from her employment, these claims are dismissed with prejudice.

### H. Claims 13 and 14: Quid Pro Quo Harassment

Plaintiff brings claims for quid pro quo harassment under Title VII and the Rehabilitation Act. Defendants argue that these claims fail because they are not based on sexual harassment. (Defs.' Mot. to Dismiss at 17.)

Typically, quid pro quo harassment is a category of sexual harassment, and "occurs when a supervisor demands sexual favors in return for a job benefit." *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000); *see Ellison v. Brady*, 924 F.2d 872, 875 (9th Cir. 1991) ("In 'quid pro quo' cases, employers condition employment benefits on sexual favors."). Here, Plaintiff argues that any case where a person with authority over employment decisions conditions a job benefit on a demand tied to a protected characteristics or protected activity constitutes quid pro quo harassment. (Pl.'s Opp'n at 19.) Plaintiff, however, cites no authority in which a court has recognized quid pro quo harassment outside of the context of sexual harassment; indeed, even Plaintiff's sole case concerns quid pro quo sexual harassment.[4] *See Burlington Indus. v. Ellerth*, 524 U.S. 742, 753 (1998). Plaintiff's reliance on 24 C.F.R. § 100.600 is also unavailing as this

---

[4] The Court notes that the Ninth Circuit has recognized the possibility of a quid pro quo harassment claim in the context of religious discrimination, "which essentially occurs when a supervisor demands that an employee alter or renounce some religious belief in exchange for job benefits." *Cross v. Cent. Contra Costa Transit Auth.*, No. 24-6068, 2026 U.S. App. LEXIS 788, at *8 n.1 (9th Cir. Jan. 3, 2026).

concerns discriminatory conduct under the Fair Housing Act. Finally, Plaintiff points to the Ninth Circuit Model Civil Jury Instruction 10.4 comment, but this concerns hostile work environment and harassment, not quid pro quo harassment specifically. Indeed, this comment does not mention quid pro quo harassment at all.

Without authority in support, the Court declines to expand the definition of quid pro quo harassment to any situation where an employee agrees to any particular condition in exchange for a job benefit. Further, because quid pro quo harassment is a type of sexual harassment, there would be no basis for such a claim under the Rehabilitation Act (which protects individuals with disabilities), such that the Rehabilitation Act claim is dismissed with prejudice.

Contrary to Defendants' assertion that Plaintiff has not made any allegations of sexual harassment, however, the Court finds that Plaintiff has at least one allegation of sexual harassment in support of her quid pro quo claim, namely that management required Plaintiff to submit to invasive medical exams and allow sexually harassing conduct as a condition of retaining her position. (SAC ¶ 240(3).) These medical exams included genital and rectal exams, and the sexually harassing conduct includes Mr. Kapoor's unwanted advances, including trying to get into her home and giving her diamond earrings that HR acknowledged was an inappropriate romantic gift. (SAC ¶¶ 78-79, 153.)

Accordingly, the Court DENIES Defendants' motion to dismiss as to the Title VII quid pro quo claim, but GRANTS Defendants' motion to dismiss as to the Rehabilitation Act quid pro quo claim. Because amendment is futile, the Rehabilitation quid pro quo claim is dismissed with prejudice.

**I. Claims 15-18: Harassment**

Plaintiff's fifteenth and sixteenth claims concerns harassment in the form of a hostile work environment under Title VII and the Rehabilitation Act respectively. Plaintiff's seventeenth and eighteenth claims concerns retaliatory harassment under Title VII and the Rehabilitation Act respectively. A hostile environment exists where the employee pleads: "(1) that [s]he was subjected to verbal or physical conduct or a harassing nature, (2) that this conduct was unwelcome, and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of

the victim's employment and create an abusive working environment." *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1110 (9th Cir. 2000). Similarly, the Ninth Circuit has recognized that "a hostile work environment may be the basis for a retaliation claim[.]" *Ray*, 217 F.3d at 1244; *see also id.* at 1245 ("Harassment is obviously actionable when based on race and gender. Harassment as retaliation for engaging in protected activity should be no different[.]").

Defendants argue that the claims should be dismissed because Plaintiff fails to allege non-discrete acts of harassment. (Defs.' Mot. to Dismiss at 18.) Courts have "distinguished between claims for hostile work environment and claims based on 'discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire.'" *Ahn v. Wormuth*, No. 23-cv-00114-SI, 2023 U.S. Dist. LEXIS 119194, at *9 (N.D. Cal. July 11, 2023) (quoting *AMTRAK v. Morgan*, 536 U.S. 101, 114 (2002)). Thus, where a "hostile work environment claim alleges only discrete acts, namely denial of promotions and removal of supervisory duties," a hostile work environment claim necessarily fails. *Id.* at *9-10.

Here, however, Plaintiff has identified numerous non-discrete actions in support of her harassment claims. While Defendants correctly point out that Plaintiff appears to premise both her discrimination and hostile work environment claims on the same actions, that does not mean that every action allegedly suffered by Plaintiff is legally a discrete act. There can be no real dispute that actions such as the racist, sexist, and ableist comments (SAC ¶¶ 257(1), 272(1), 272(4), (5), 281(2)), requiring women to bake goods (SAC ¶ 257(3)), persistent bullying (SAC ¶ 257(4)), physical threats such as choking gestures (SAC ¶¶ 257(5)), ostracism (SAC ¶¶ 257(6), 272(2), 274(5)), applying double standards (SAC ¶ 257(8)), and scrutinizing Plaintiff's behavior (SAC ¶ 274(2)) are not discrete acts on par with termination or the failure to promote.

Alternatively, Defendants argue that Plaintiff does not identify severe or pervasive conduct. (Defs.' Mot. to Dismiss at 20.) Plaintiff, however, alleges numerous actions throughout her employment, including racist, sexist, and ableist remarks (SAC ¶ 69), being called nasty, paranoid, irrational, aggressive, emotional, disrespectful, and sick starting in 2015 (SAC ¶ 71), ordering her to undergo therapy multiple times in 2016 (SAC ¶ 73), being told not to report harassment in October 2015, February through May 2016 (SAC ¶¶ 101-104, 107), being required

United States District Court
Northern District of California

to obtain pre-approval from a harasser to report harassment from May to September 2016 (SAC ¶ 105), being physically threatened in January and March 2016 by Mr. Scott (SAC ¶¶ 113-114), being banned from the building in July 2018 (SAC ¶ 151), being subjected to a security investigation in 2018 based on a false report (SAC ¶ 152), and being required to undergo intrusive fitness for duty examinations in august and September 2018 (SAC ¶ 151). It is simply not apparent to the Court how this is not sufficient to constitute severe or pervasive conduct. To the extent Defendants argue that many of the complained of actions are normal workplace operations, Defendants fail to cite any authority that racist and sexist remarks, being told not to report harassment, being physically threatened with choking gestures, and being required to undergo genital and rectal examinations for an attorney position would constitute normal workplace operations. (*See* Defs.' Mot. to Dismiss at 20-21; Defs.' Reply at 9.)

Accordingly, the Court DENIES Defendants' motion to dismiss the harassment claims.

**J. Claim 19: Interference with FMLA**

Plaintiff brings a claim for interference with her FMLA rights. "To make out a prima facie case of FMLA interference, an employee must establish that [(1)] he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled." *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1243 (9th Cir. 2014) (internal quotation omitted).

Defendants assert that Plaintiff was able to take her FMLA leave, and that there is nothing to suggest that her negative evaluations, changed work conditions, or delay to her return to work was the result of Plaintiff taking leave. (Defs.' Mot. to Dismiss at 23.) Defendants, however, ignore Plaintiff's allegations that Defendants discouraged her from taking FMLA leave. The Ninth Circuit has found that interference with FMLA leave includes "'not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.'" *Liu v. Amway Corp.*, 347 F.3d 1125, 1133 (quoting 29 C.F.R. § 825.220(b)). Here, Plaintiff has alleged specific facts that she was discouraged from using her FMLA leave, including assigning her work while she was on FMLA leave and threatening to mark her as AWOL or decline accommodations if she

did not work. (SAC ¶¶ 144-46.) Courts have found such actions to constitute unlawful interference. *See McCoy v. Clark Cty.*, No. 2:20-cv-1331-KJD-NJK, 2021 U.S. Dist. LEXIS 242044, at *7 (D. Nev. Dec. 17, 2021) (finding that assigning work to the plaintiff while on leave and then demanding it to be completed immediately upon return could constitute interference, punishment, or encouragement not to take leave).

Accordingly, the Court DENIES Defendants' motion to dismiss the FMLA interference claim.

### K. Claim 20: FMLA Retaliation

Finally, Plaintiff brings a claim for retaliation under the FMLA. Defendants generally argue that Plaintiff's FMLA retaliation claim must be dismissed for the same reason as the interference claim, namely that there is no causal connection between the invocation of Plaintiff's FMLA rights and the adverse actions. (Defs.' Mot. to Dismiss at 23.) As discussed above, however, Plaintiff does allege such facts.[5]

Accordingly, the Court DENIES Defendants' motion to dismiss the FMLA retaliation claim.

### L. Unknown Contractors

As discussed at the hearing, the Court discussed the "Unknown Contractors" and the failure to identify them, despite the case having been pending for two years. There, Plaintiff generally complained of particular actions that certain individuals took, but did not show that they were decisionmakers who took discriminatory or retaliatory actions against Plaintiff. Plaintiff finally explained that she was adding them in the event that Defendants attempted to shift liability to these contractors.

---

[5] The Court notes that the Ninth Circuit has explained that where a claim is based on the exercise of FMLA rights, the claim should be addressed as an interference claim, not a retaliation claim. *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001); *see also Rivera v. FedEx Corp.*, No. C 12-1098 PJH, 2013 U.S. Dist. LEXIS 178506, at *18 (N.D. Cal. Dec. 18, 2013) ("when a plaintiff alleges retaliation for exercise of FMLA rights, this claim is properly analyzed as an interference claim"). Retaliation claims, in contrast, are limited to opposing a practice made unlawful by the FMLA. *Bachelder*, 259 F.3d at 1124. Here, Plaintiff explicitly states that she suffered the complained of adverse actions "because Plaintiff invoked FMLA rights." (SAC ¶ 302.) Thus, this claim does not appear proper. Again, however, the Court declines to dismiss the claim on a basis not raised by Defendants.

At this point in the case, there is nothing to suggest that the Unknown Contractors are liable for any of the claims in this case. Thus, the Court will dismiss the Unknown Contractors as a party in this case. Should Defendants actually attempt to shift liability to any third-party contractors into the case, the Court will likely permit Plaintiff to file a motion to amend the complaint. Until that point, however, the Unknown Contractors are not a proper party.

## IV. CONCLUSION

For the reasons stated above, the Court GRANTS IN PART and DENIES IN PART Defendants' motion to dismiss. The Court GRANTS Defendants' motion to dismiss the following claims: (9) failure to accommodate, (10) failure to engage in the interactive process, (11) constructive discharge, (12) constructive discharge, and (14) quid pro quo sexual harassment under the Rehabilitation Act. Dismissal as to claims 9 and 10 is without prejudice; the other claims are dismissed with prejudice. Further, the Court DISMISSES the Unknown Contractors as a party to this case.

Plaintiff may file an amended complaint within 30 days. The amendments must be limited to claims 9 and 10, and should only explain the factual connection between the requested accommodations and Plaintiff's disabilities, as well as the any other facts demonstrating a failure to engage in the interactive process.[6] **No additional claims or parties may be added**. Plaintiff shall provide a redline version of the amended complaint that indicates the changes.

Should Defendants file a motion to dismiss, the motion to dismiss may only raise arguments based on claims 9 and 10; Defendants may not raise new arguments to dismiss any of the remaining claims that could have been brought in a prior motion to dismiss. *See* Fed. R. Civ. P. 12(g)(2); *Garcia v. City of L.A.*, No. CV 19-6182 DSF (PLAx), 2020 U.S. Dist. LEXIS 212975, at *25 (C.D. Cal. June 2, 2020) ("Rule 12(g)(2) prohibits successive motions to dismiss that raise

///

///

///

[6] These amendments should be very minor, *i.e.*, the addition of a few paragraphs. Plaintiff should not be making any major changes to the complaint, such as reordering or rewriting the complaint.



United States District Court
Northern District of California

United States District Court
Northern District of California

arguments that could have been made in a prior motion[.]")

IT IS SO ORDERED.

Dated: November 18, 2026

KANDIS A. WESTMORE
United States Magistrate Judge